# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| EMMA KOE, individually and on behalf of her minor daughter, AMY KOE; HAILEY MOE, individually and on behalf of her minor daughter, TORI MOE; PAUL VOE; ANNA ZOE, individually and on behalf of her minor daughter, LISA ZOE; TRANSPARENT, on behalf of its members,<br><br>     Plaintiffs,<br><br>  v.<br><br>CAYLEE NOGGLE, in her official capacity as Commissioner of the Georgia Department of Community Health; GEORGIA DEPARTMENT OF COMMUNITY HEALTH'S BOARD OF COMMUNITY HEALTH; NORMAN BOYD, ROBERT S. COWLES III, DAVID CREWS, RUSSELL CRUTCHFIELD, ROGER FOLSOM, NELVA LEE, MARK SHANE MOBLEY, CYNTHIA RUCKER, ANTHONY WILLIAMSON, in their official capacities as members of the Georgia Department of Community Health's Board of Community Health; THE GEORGIA COMPOSITE MEDICAL BOARD; JOHN S. ANTALIS, | CIVIL ACTION NO. |

SUBRAHMANYA BHAT,
WILLIAM BOSTOCK, KATHRYN
CHEEK, RUTHIE CRIDER, DEBI
DALTON, CHARMAINE
FAUCHER, AUSTIN FLINT,
SREENIVASULU GANGASANI,
JUDY GARDNER, ALEXANDER S.
GROSS, CHARLES E. HARRIS,
JR., J. JEFFREY MARSHALL,
MATTHEW W. NORMAN, BARBY
J. SIMMONS, in their official
capacities as members of the Georgia
Composite Medical Board; DANIEL
DORSEY, in his official capacity as
the Executive Director of the Georgia
Composite Medical Board,

                         Defendants.

## COMPLAINT

## I.   PRELIMINARY STATEMENT

1.     This Action is a federal constitutional challenge to Georgia Senate

Bill 140 (hereafter "S.B. 140," the "Health Care Ban," or the "Ban"), a law passed

during the 2023 Georgia legislative session that prohibits medical providers from

treating gender dysphoria in minors with hormone therapy, thereby denying

transgender youth access to established and medically necessary care. *See* S.B. 140,

157th Gen. Assemb., Reg. Sess. (Ga. 2023). The Health Care Ban was passed

despite opposition from transgender youth, parents, advocacy groups, medical

providers, and medical organizations in Georgia. Governor Brian Kemp nevertheless signed S.B. 140 into law on March 23, 2023, and it takes effect on July 1, 2023.

2.     The Health Care Ban violates the fundamental rights of parents to make medical decisions to ensure the health and well-being of their children. By prohibiting medical providers from treating minors with gender dysphoria—a rare condition often requiring medical and therapeutic treatment and care—in accordance with the standards of care and clinical practice guidelines, the Ban prohibits Georgia parents from seeking and obtaining appropriate medical treatment for their children.

3.     The Health Care Ban also violates the guarantees of equal protection by denying transgender youth essential, and often lifesaving, medical treatment based on their sex and on their transgender status.

4.     Defendants cannot demonstrate any rational basis, much less an important or compelling one, for the Health Care Ban, which prevents transgender youth from obtaining safe, established, and necessary medical care.

5.     Plaintiffs seek declaratory and injunctive relief to enjoin enforcement of the Health Care Ban. Without this relief, Plaintiffs will suffer real, immediate, and irreparable injury.

## II.   JURISDICTION AND VENUE

6.    This civil and constitutional action arises under the United States Constitution and 42 U.S.C. § 1983.

7.    This Court has subject matter jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343, and 1367.

8.    This Court is authorized to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

9.    This Court has personal jurisdiction over Defendants because Defendants are domiciled in Georgia and the denial of Plaintiffs' rights guaranteed by federal law occurred within Georgia.

10.    Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b)(1)– (2) because one or more Defendants reside in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district and division.

## III.   THE PARTIES

### A.    Plaintiffs

11.    Plaintiff Emma Koe is the mother of Plaintiff Amy Koe, a 12-year-old girl who is transgender, for whom she also appears in this case as her next friend.

Emma and Amy Koe are both residents of Atlanta, Georgia. Because of concerns about their privacy and safety, both Plaintiffs are proceeding pseudonymously. *See* Koe Motion to Proceed Under Pseudonyms, filed concurrently herewith.

12. Plaintiff Hailey Moe is the mother of Plaintiff Tori Moe, a 12-year-old girl who is transgender, for whom she also appears in this case as her next friend. Hailey and Tori Moe are both residents of the Atlanta, Georgia, metropolitan area. Because of concerns about their privacy and safety, both Plaintiffs are proceeding pseudonymously. *See* Moe Motion to Proceed Under Pseudonyms, filed concurrently herewith.

13. Plaintiff Paul Voe is the father of Mia Voe, an 11-year-old girl who is transgender. Paul and Mia Voe are residents of the Athens, Georgia, metropolitan area. Because of concerns about their privacy and safety, Plaintiff Paul Voe and his daughter Mia are proceeding pseudonymously. *See* Voe Motion to Proceed Under Pseudonyms, filed concurrently herewith.

14. Plaintiffs Anna and Scott Zoe are the parents of Plaintiff Lisa Zoe, a 10-year-old girl who is transgender, for whom they also appear in this case as her next friends. Anna, Scott, and Lisa Zoe are residents of the Atlanta, Georgia, metropolitan area. Additionally, Anna and Scott are members of TransParent. Because of concerns about their privacy and safety, all members of the Zoe family

are proceeding pseudonymously. *See* Zoe Motion to Proceed Under Pseudonyms, filed concurrently herewith.

15.     Plaintiff TransParent ("TransParent") is a community-based support and resource organization that serves parents and caregivers of transgender children. TransParent has 19 chapters in 11 states, including a chapter in Decatur, Georgia, which serves the greater Atlanta metropolitan area. As the only current Georgia chapter, its membership is open to all eligible Georgia residents. TransParent's mission is to bring compassionate support to parents and caregivers navigating complex issues faced by transgender individuals. To carry out its mission, TransParent facilitates confidential, peer-led group meetings that provide support, connection, and resources to parents and caregivers. One key function of TransParent is connecting families of transgender children to local practitioners who provide gender-affirming medical care. TransParent asserts its claims in this lawsuit on behalf of its members. Rita Soe is a member of TransParent and is the mother of Brent Soe, a 16-year-old boy who is transgender. Brent and his parents are residents of the Atlanta, Georgia, metropolitan area. Because of concerns about their privacy and safety, all members of the Soe Family are proceeding pseudonymously. *See* Soe Motion to Proceed Under Pseudonyms, filed concurrently herewith.

**B.   Defendants**

16.    Defendant Caylee Noggle is the Commissioner of the Georgia Department of Community Health. The Commissioner of the Georgia Department of Community Health is subject to appointment and removal by the Governor. O.C.G.A. § 31-2-6 (2022). By statute, the Commissioner is the chief administrative officer of the Department of Community Health and supervises, directs, accounts for, organizes, plans, administers, and executes the functions vested in the Department. *Id.* § 31-2-6. Thus, in her official capacity as Commissioner, Defendant Noggle directs and supervises the process of establishing sanctions, by rule and regulation, for violating the Health Care Ban. *Id.* §§ 31-7-2.1(a), 31-7-3.2(h). Further, in her official capacity as Commissioner, Defendant Noggle administers and executes sanctions for violations of rules and regulations, including revocation of an institution's permit to operate, pursuant to the Department of Community Health's authority. *See, e.g.*, *id.* §§ 31-7-3, 31-7-3.2(g), 31-7-4. Defendant Noggle's official place of business is Atlanta, Fulton County, Georgia. Defendant Noggle is sued in her official capacity.

17.    The Georgia Department of Community Health's Board of Community Health (the "Board") comprises nine members appointed by the Governor and confirmed by the State Senate. O.C.G.A. § 31-2-2, 31-2-3(a) (2022).

The Board establishes the general policy to be followed by the Department of Community Health. *Id.* The Board has the authority to adopt and promulgate rules and regulations for violations of the Health Care Ban. *Id.* §§ 31-2-3, 31-7-2.1(a), 31-7-3.2(h). The Board also has the authority to execute and enforce violations of rules and regulations, including revocation of an institution's permit to operate. *See, e.g.*, *id*. §§ 31-7-3, 31-7-3.2(g), 31-7-4. The Board is based and headquartered in, and the official place of business for the members of the Georgia Department of Community Health is, Atlanta, Fulton County, Georgia.

18.     Defendant Norman Boyd is a board member and the Chairman of the Georgia Department of Community Health. Defendant Boyd is sued in his official capacity.

19.     Defendant Robert S. Cowles III, M.D., F.A.C.S., is a board member of the Georgia Department of Community Health. Defendant Cowles is sued in his official capacity.

20.     Defendant David Crews is a board member of the Georgia Department of Community Health. Defendant Crews is sued in his official capacity.

21.     Defendant Russell Crutchfield, Ed.D., is a board member and the Secretary of the Georgia Department of Community Health. Defendant Crutchfield is sued in his official capacity.

22.     Defendant Roger Folsom is a board member and the Vice Chairman of the Georgia Department of Community Health. Defendant Folsom is sued in his official capacity.

23.     Defendant Nelva Lee, Ph.D., is a board member of the Georgia Department of Community Health. Defendant Lee is sued in her official capacity.

24.     Defendant Mark Shane Mobley is a board member of the Georgia Department of Community Health. Defendant Mobley is sued in his official capacity.

25.     Defendant Cynthia Rucker, D.N.P., RN-BC, NE-BC, is a board member of the Georgia Department of Community Health. Defendant Rucker is sued in her official capacity.

26.     Defendant Anthony Williamson is a board member of the Georgia Department of Community Health. Defendant Williamson is sued in his official capacity.

27.     The Georgia Composite Medical Board comprises 16 members (i.e., 15 voting members and one ex-officio member) appointed by the Governor and

confirmed by the State Senate. O.C.G.A. § 43-34-2(a) (2022). By statute, the

Georgia Composite Medical Board has the power to adopt rules and regulations

necessary for the proper administration and enforcement of physicians' practice.

*Id.* § 43-34-5(c). Further, the Georgia Composite Medical Board has the authority

to execute and enforce violations of rules and regulations—of any state, the

Georgia Composite Medical Board, the United States, or any other lawful

authority—by taking disciplinary action, including probation and suspension,

administration of a reprimand, revocation of a license, and imposition of a fine. *Id*.

§ 43-34-8(a), (b). The Georgia Composite Medical Board is based and

headquartered in, and the official place of business for the members of the Georgia

Composite Medical Board is, Atlanta, Fulton County, Georgia.

28. Defendant John S. Antalis, M.D., is a member of the Georgia

Composite Medical Board. Defendant Antalis is sued in his official capacity.

29. Defendant Subrahmanya Bhat, M.D., is a member of the Georgia

Composite Medical Board. Defendant Bhat is sued in his official capacity.

30. Defendant William Bostock, D.O., is a member of the Georgia

Composite Medical Board. Defendant Bostock is sued in his official capacity.

31. Defendant Kathryn Cheek, M.D., is a board member of the Georgia

Composite Medical Board. Defendant Cheek is sued in her official capacity.

32.    Defendant Ruthie Crider, M.D., is a member of the Georgia Composite Medical Board. Defendant Crider is sued in her official capacity.

33.    Defendant Debi Dalton, M.D., is a member of the Georgia Composite Medical Board. Defendant Dalton is sued in her official capacity.

34.    Defendant Charmaine Faucher, PA-C, is an ex-officio member of the Georgia Composite Medical Board. Defendant Faucher is sued in her official capacity.

35.    Defendant Austin Flint, M.D., is a member of the Georgia Composite Medical Board. Defendant Flint is sued in his official capacity.

36.    Defendant Sreenivasulu Gangasani, M.D., is a member of the Georgia Composite Medical Board. Defendant Gangasani is sued in his official capacity.

37.    Defendant Judy Gardner, Pharm.D., is a consumer member of the Georgia Composite Medical Board. Defendant Gardner is sued in her official capacity.

38.    Defendant Alexander S. Gross, M.D., is a member of the Georgia Composite Medical Board. Defendant Gross is sued in his official capacity.

39.    Defendant Charles E. Harris, Jr., is a consumer member of the Georgia Composite Medical Board. Defendant Harris is sued in his official capacity.

40.     Defendant J. Jeffrey Marshall, M.D., is a member of the Georgia Composite Medical Board. Defendant Marshall is sued in his official capacity.

41.     Defendant Matthew W. Norman, M.D., is a member and the Chair of the Georgia Composite Medical Board. Defendant Norman is sued in his official capacity.

42.     Defendant Andrew Reisman, M.D., is a member of the Georgia Composite Medical Board. Defendant Reisman is sued in his official capacity.

43.     Defendant Barby J. Simmons, D.O., is a member of the Georgia Composite Medical Board. Defendant Simmons is sued in her official capacity.

44.     Defendant Daniel Dorsey is the Executive Director of the Georgia Composite Medical Board. The Executive Director is appointed by the Georgia Composite Medical Board. O.C.G.A. § 43-34-6 (2022). By statute, the Executive Director has the power to carry out investigations for the purpose of discovering violations of the Board's rules and regulations. *Id.* §§ 43-34-5, 43-34-6, 43-34-8(d). Defendant Dorsey's official place of business is Atlanta, Fulton County, Georgia. Defendant Dorsey is sued in his official capacity.

**IV.   FACTUAL BACKGROUND**

    **A.   Background on Gender Dysphoria**

45.     "Gender identity" refers to a person's internal, innate, and immutable sense of their particular gender. Gender identity is a core, defining trait, which cannot be changed voluntarily or through medical intervention, and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

46.     A person's gender identity is a fundamental aspect of human development.

47.     Everyone has a gender identity. A person's gender identity is durable and cannot be altered through medical intervention.

48.     A person's gender identity usually, but not always, matches the sex they were designated at birth based on their external genitalia.

49.     The term "natal sex" is more precise than the term "biological sex" because there are many biological sex characteristics and they do not always align with each other in a single direction. For example, some people with intersex characteristics may have a chromosomal configuration typically associated with a male sex designation but genital characteristics typically associated with a female sex designation. For these reasons, the Endocrine Society, an international medical

organization of over 18,000 endocrinology researchers and clinicians, advises practitioners that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.

50. For most people, their gender identity aligns with their natal sex. But for people who are transgender, their gender identity differs from their natal sex. A boy who is transgender is someone whose natal sex is female while persistently, consistently, and insistently identifying as male. A girl who is transgender is someone whose natal sex is male while persistently, consistently, and insistently identifying as female.

51. Gender identity emerges early in life for transgender and non-transgender people alike. Most people develop a strong sense of their gender identity by the onset of puberty, though it can also occur much earlier. Some transgender people become aware early in childhood that their gender identity differs from their natal sex. For others, this awareness occurs closer to the onset of puberty, when physical changes in their bodies result in the recognition that their gender identity is not aligned with their natal sex.

**B.    Standards of Care for Treating Minors with Gender Dysphoria**

52. Health care providers in Georgia use established guidelines to diagnose and treat youth with gender dysphoria.

53.     According to the Text Revision of the Fifth Edition of the American

Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders

("DSM-5-TR"), which is the most current edition of the DSM, "gender dysphoria"

is the diagnostic term for the clinically significant distress that can result from the

lack of congruence between a person's gender identity and natal sex.[1]

54.     Being transgender is not itself a medical condition. But gender

dysphoria resulting from being transgender is a serious medical condition that, if

left untreated, frequently results in debilitating anxiety, severe depression, self-

harm, and suicide.[2]

55.     In the past, mental health professionals sought to treat gender

dysphoria by trying to change the person's gender identity to correspond to their

natal sex; these efforts were unsuccessful and gravely detrimental. Today, the

medical profession recognizes that such efforts put transgender individuals at risk

---

[1] The DSM is the handbook used by health care professionals in the United States as the authoritative guide for the diagnosis of mental disorders, including descriptions, symptoms, and other criteria for establishing consistent and reliable diagnoses.

[2] *See, e.g.*, Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, 37 J. Interpersonal Violence 2696 (2022) ("Data from the U.S. Transgender Survey indicate that 82% of transgender individuals have considered killing themselves and 40% have attempted suicide. . . . Within the transgender population, suicidality is highest among young people.").

of profound harm, including dramatically increased rates of suicidal ideation and suicide.

56.     The World Professional Association for Transgender Health ("WPATH") has published widely accepted standards of care for the treatment of gender dysphoria, most recently in S*tandards of Care for the Health of Transgender and Gender Diverse People, Version 8*, which was published in the International Journal of Transgender Health.[3] The WPATH standards of care offer medical providers evidence-based guidance on how to effectively treat gender dysphoria, which most often entails treatment that enables a transgender person to live more fully in alignment with their gender identity. This treatment is sometimes referred to as "transition-related medical care" or "gender-affirming care."

57.     The Endocrine Society has also promulgated a standard of care and clinical guidelines in line with the WPATH standards of care that are specific to the provision of hormone therapy for treating gender dysphoria in minors and adults. *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (2017).

---

[3] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health (2022).

58.     Both of these standards of care have been adopted by major medical and mental health associations in the United States, such as the American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society.

59.     The precise treatment for gender dysphoria depends on each patient's particular needs, and the general medical standards of care differ based on the person's age and development.

60.     The standards of care for a minor with gender dysphoria who has not yet reached puberty do not include any medical interventions and, instead, are limited to supporting "social transition," which means allowing a transgender child to live and be socially recognized in accordance with their gender identity. Social transition can include adopting a name, pronouns, hairstyle, and clothing consistent with the person's gender identity.

61.     Under the standards of care and clinical guidelines, medical interventions may become necessary and appropriate as transgender youth reach puberty. The standards of care direct pediatric endocrinologists and other providers treating transgender patients to work in close consultation with qualified mental

health professionals experienced in diagnosing and treating gender dysphoria, as well as with patients and their parents, to determine whether medical treatment is appropriate.

62.     Medication that delays puberty is one common medical intervention for transgender minors with gender dysphoria who would experience extreme distress if they were to go through puberty in accordance with their natal sex.

63.     Puberty-delaying treatment is only appropriate if several rigorous medical and psychosocial factors are met as determined by a minor's health care providers. When puberty-delaying treatment is determined to be appropriate, it is typically started prior to the development of secondary sex characteristics during puberty.

64.     Health care providers often prescribe minors puberty-delaying treatment to prevent the distress of developing permanent, unwanted physical characteristics that do not align with the minor's gender identity. Puberty-delaying treatment works by pausing endogenous puberty at whatever stage it is at when the treatment begins, which limits the influence of a person's endogenous hormones on their body and thereby prevents them from going through puberty in accordance with their natal sex.

65.    If determined to be medically necessary and appropriate for a

transgender minor with gender dysphoria to undergo puberty in alignment with

their gender identity, hormone therapy is initiated to enable them to do so.

66.    Under the Endocrine Society's Clinical Guidelines, hormone therapy

is appropriate for transgender minors if:

- A qualified mental health professional has confirmed:

    - persistence of gender dysphoria;
    - any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's environment and functioning are stable enough to start sex hormone treatment;
    - the adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment.

- And the adolescent:

    - has been informed of the partly irreversible effects and side effects of treatment (including potential loss of fertility and options to preserve fertility);
    - has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

- And a pediatric endocrinologist or other clinician experienced in pubertal induction:

- agrees with the indication for sex hormone treatment;
- has confirmed that there are no medical contraindications to hormone treatment.

67.     If a minor receives puberty-blocking treatment, they do not develop the secondary sex characteristics of their natal sex. If a minor's gender dysphoria persists and certain other guidelines are met, they can then receive hormone treatment in accordance with their gender identity so they go through puberty around the same age as their peers. Hormone treatment results in developing the secondary sex characteristics that match their gender identity. However, for youth who have already gone through natal puberty, puberty-blocking treatment is not a prerequisite for hormone treatment. Hormone therapy may be medically necessary and appropriate treatment for people with gender dysphoria who have undergone natal puberty.

68.     Minors with gender dysphoria diagnoses, who need medical care to alleviate or avoid pain and suffering, are prescribed hormone therapy when medically necessary as determined by a pediatric endocrinologist or another qualified medical care provider and in alignment with the standards of care and clinical practice guidelines. Although hormone therapy is generally prescribed during the time of puberty and, with minors, typically follows puberty-blocking medications, the need for hormone treatment is highly individualized and can

present itself at any time. It is imperative that when the need for hormone treatment arises, these lifesaving medications are available.

69.     Minors with gender dysphoria who are prescribed puberty-blocking medications but are not able to begin hormone therapy at the appropriate time may suffer negative consequences of being on puberty blockers for a prolonged period. Although puberty-blocking medications are a safe and effective treatment for delaying puberty in transgender youth, remaining on puberty-blocking medication until the age of majority is not a viable or recommended option. Medical providers generally aim to limit the number of years of treatment with puberty blockers due to the risk of lower bone mineral density and vitamin D deficiency. The Health Care Ban prevents minors on puberty-blocking medication from beginning hormone therapy, forcing them to either face the negative consequences of prolonged puberty-blocking therapy or stop the puberty-blocking medication and go through natal puberty—options that present grave risks. For those not already on puberty-blocking medication, the Health Care Ban discourages providers from prescribing them in the first place because allowing individuals to take puberty-blocking medications until the age of majority without access to hormone therapy is not a viable option under the appropriate standards of care.

70.     The medical treatment for transgender minors with gender dysphoria is effective. It can substantially reduce lifelong gender dysphoria. Longitudinal studies have shown that transgender minors with gender dysphoria who receive essential medical care, including puberty blockers and hormones, show levels of mental health and stability consistent with non-transgender minors. Lily Durwood et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. Child & Adolescent Psychiatry 116 (2017); Kristina Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics 1 (2016). In contrast, transgender youth suffering from gender dysphoria who do not receive appropriate medical care are at risk of serious harm, including increased rates of major depression, suicidal ideation, and suicide.

### C.     Georgia's Health Care Ban for Transgender Minors, S.B. 140

71.     On March 21, 2023, the Georgia General Assembly passed the Health Care Ban, which prohibits health care providers in the state of Georgia from treating transgender minors with hormone therapy.

72.     The Health Care Ban further directs the Georgia Composite Medical Board to "adopt rules and regulations regarding the prohibitions" and specifies that "[a] licensed physician who violates this Code section shall be held administratively accountable to the board for such violation." S.B. 140 §§ 3(b), (c).

22

73.     In passing the Ban, the General Assembly ignored guidance from more than 500 Georgia medical providers—including pediatricians, psychiatrists, endocrinologists, and other health care providers—opposed to S.B. 140.[4] Those providers underscored the benefits of gender-affirming care for their transgender minor patients and the grave harm to their patients' health and well-being if they are denied access to this care.

74.     Only one doctor—who does not have expertise in treating transgender youth—testified in support of the Health Care Ban. In her testimony, she summarily and inaccurately compared changing one's body in alignment with their gender identity with the decision to change one's middle name. Georgia House of Representatives, *Public Health 03.14.23*, YouTube, at 1:43:45, 1:46:35 (Mar. 14, 2023), https://www.youtube.com/watch?v=REs3xP8H-Wg&t=6226s.

75.     The limited testimony provided during the hearing process for S.B. 140 erroneously described gender dysphoria as "experimental" and not life-threatening for minors. Georgia State Senate, *2/22/23 – Committee on Health & Human Services*, YouTube, at 44:40 (Mar. 14, 2023), https://www.youtube.com/watch?v=WsGBigfkYro. This testimony ignores

---

[4] *OPINION: An Open Letter to Gold Dome on Transgender Bill*, Atlanta Journal Constitution (Mar. 16, 2023), https://www.ajc.com/opinion/opinion-an-open-letter-to-gold-dome-on-transgender-bill/S47QAWV6DZBSTNK4W5DJICFZH4/.

reputable data which demonstrate that youth who need but do not receive gender-affirming care are at serious risk of harm, including the risk of major depression, suicidal ideation, developing a suicide plan, and dying by suicide. Austin, *supra* note 2 ("Data from the U.S. Transgender Survey indicate that 82% of transgender individuals have considered killing themselves and 40% have attempted suicide. . . . Within the transgender population, suicidality is highest among young people.").

76.     The General Assembly passed the bill despite the testimony of transgender people who shared their painful, personal experiences with gender dysphoria and explained the critical need for access to medical care.

77.     The General Assembly passed the bill despite the testimony of parents who pleaded for the legislature not to interfere with the health and well-being of their children by depriving them of the medical care they need to thrive and, sometimes, survive.

78.     On March 23, 2023, Governor Brian Kemp signed the Health Care Ban into law.

79.     The Ban goes into effect on July 1, 2023.

**D.      The Health Care Ban Created by S.B. 140**

80.      S.B. 140 amends two separate Titles of the Official Code of Georgia Annotated. *See* S.B. 140, 157th Gen. Assemb., Reg. Sess. (Ga. 2023).

81.      The Health Care Ban prevents health care professionals from providing established medically necessary care to minors. Specifically, the Health Care Ban regulates hospitals and related institutions (under Title 31) by prohibiting certain procedures and therapies for treating gender dysphoria in minors from being performed or administered in those hospitals and institutions. *See* S.B. 140 § 2. Similarly, the Health Care Ban regulates physicians licensed by the Georgia Composite Medical Board (under Title 43) by prohibiting physicians from performing or administering the same procedures and therapies for treating gender dysphoria in minors. *See* S.B. 140 § 3. Both amendments also provide for penalties and limited exceptions. S.B. 140 § 2; S.B. 140 § 3.

**1.      The Health Care Ban Prohibits Surgical Procedures and Hormone Therapies for Treating Gender Dysphoria**

82.      The Health Care Ban is substantively similar under Titles 31 and 43. In each case, the Ban prohibits "irreversible procedures or therapies . . . performed on a minor for the treatment of gender dysphoria." *Compare* S.B. 140 § 2(a), *with* S.B. 140 § 3(a). Specifically, the Ban prohibits "(1) Sex reassignment surgeries, or any other surgical procedures, that are performed for the purpose of altering

primary or secondary sexual characteristics; or (2) Hormone replacement therapies." S.B. 140 § 2(a); S.B. 140 § 3(a).[5]

83.    The primary difference between the two amendments is their applicability to health care providers. The amendment to Title 31 applies to hospitals and related institutions, whereas the amendment to Title 43 applies to physicians licensed by the Georgia Composite Medical Board. S.B. 140 § 2(a); S.B. 140 § 3(a).

### 2.    The Health Care Ban Has Exceptions

84.    The amendment to Title 43 provides limited exceptions for:

> (1) Treatments for medical conditions other than gender dysphoria or for the purpose of sex reassignment where such treatments are deemed medically necessary; (2) Treatments for individuals born with a medically verifiable disorder of sex development, including individuals born with ambiguous genitalia or chromosomal abnormalities resulting in ambiguity regarding the individual's biological sex; (3) Treatments for individuals with partial androgen insensitivity syndrome; and (4) Continued treatment of minors who are, prior to July 1, 2023, being treated with irreversible hormone replacement therapies.

S.B. 140 § 3(b).

---

[5] Because Plaintiffs are not seeking surgical procedures, this challenge is limited to S.B. 140's prohibition on "[h]ormone replacement techniques," S.B. 140 § 2(a)(2).

85.     The amendment to Title 31 incorporates the same exceptions by reference to the amendment to Title 43. S.B. 140 § 2(b) (citing Code Section 43-34-15).

### 3.     The Health Care Ban Imposes Harsh Penalties for Violations

86.     The amendment to Title 31 provides that the Department of Community Health "shall establish sanctions, by rule and regulation, for violations of this Code section up to and including the revocation of an institution's permit issued pursuant to Code Section 31-7-3." S.B. 140 § 2(c). As of filing this Complaint, the Georgia Department of Community Health has not yet established relevant sanctions for these violations.

87.     After S.B. 140's effective date, health care institutions will be forced to choose between withholding medically necessary treatment for their minor transgender patients, on one hand, and facing still unknown sanctions on the other. In addition, O.C.G.A. § 31-5-8 (2022) states that any person violating the provisions of Title 31 shall be guilty of a misdemeanor. Thus, even though the Health Care Ban's amendment to Title 31 focuses on hospitals and other institutions, individual health care providers may face criminal prosecution if they provide medically necessary care to minor transgender patients.

27

88.     The amendment to Title 43 provides that "[a] licensed physician who violates this Code section shall be held administratively accountable to the [Georgia Composite Medical Board] for such violation." S.B. 140 § 3(c). Thus, licensed physicians will be faced with the impossible choice of withholding medically necessary treatment from their transgender patients or facing administrative sanctions by the Georgia Composite Medical Board, including revocation of their license. O.C.G.A. § 43-34-8(a), (b).

### E.     The Health Care Ban Will Irreparably Harm Plaintiffs

89.     S.B. 140 causes irreparable harm to each of the Plaintiffs.

#### 1.     The Health Care Ban Will Irreparably Harm Parent and Minor Plaintiffs

##### a.     *Emma and Amy Koe*

90.     Amy Koe is a 12-year-old girl who resides with her mother Emma Koe, her father, and her sister, in Atlanta, Georgia. Amy is a happy and creative kid who loves cooking, writing plays, games, and computers. From an early age, Amy played the female role in pretend play, gravitated toward having female friends, showed a preference for girls' clothing, and told her parents on several occasions that she wished God had made her a girl. Five years ago, at age seven, Amy began to persistently express that she was female, and her parents came to understand that she was transgender. She began to socially transition, including by

adopting a girl's hairstyle, clothing, pronouns, and name. Amy's mental health has improved dramatically since coming out; she has become more confident, come into her own, and resolved sleeping issues.

91.     Amy has been diagnosed with gender dysphoria and has received care from several medical providers, including a psychologist, psychiatrist, pediatrician, and pediatric endocrinologist. Amy has begun puberty-blocking medication at the recommendation of her providers. Amy has expressed that she is ready to go through female puberty and wants to look like her mother when she gets older, as opposed to looking more like her father.

92.     Amy's medical providers have, together with Amy and her parents, concluded that it is medically necessary for her to begin hormone therapy. The Health Care Ban, however, will prevent Amy from accessing that care, which will have devastating physical and psychological consequences. In addition, the Health Care Ban will deprive Amy's mother, Emma Koe, of the ability to make medical decisions in the best interest of her child, and within the appropriate and necessary timeframe for Amy.

> b.    *Hailey and Tori Moe*

93.     Tori Moe is an exceptionally bright and engaged 12-year-old girl who resides with her mother Hailey Moe, her father, and her brothers, in the Atlanta,

Georgia, metropolitan area. Tori has blossomed socially and intellectually in the past few years after coming out as transgender around age nine. Tori showed signs of identifying as a girl as early as age four, such as by joyfully dressing in girls' clothing whenever possible.

94.     Because Tori has been experiencing anxiety about going through male puberty, she has been seeing a therapist regularly. Tori's therapist has diagnosed her with gender dysphoria. At the recommendation of her provider team, including her pediatrician and pediatric endocrinologist, Tori currently takes puberty-blocking medication.

95.     Tori's medical providers continue to monitor her treatment and have, together with Tori and her parents, concluded that hormone therapy is the next step in Tori's recommended treatment plan and is expected to begin hormone therapy in the near future. The Health Care Ban will prevent Tori from obtaining any form of hormone therapy after July 1, denying her the appropriate medical care she needs and depriving Hailey of the ability to make medical decisions in the best interest of her child, and within the appropriate and necessary timeframe for Tori. If the Ban is allowed to go into effect, Tori's medical care will be disrupted, which would cause Tori extreme anxiety and distress.

96.     If allowed to go into effect, the Health Care Ban will also force Hailey and her spouse to consider uprooting their family and moving out of Georgia to receive medically necessary care for Tori. Doing so would move them away from family nearby and necessitate pulling both Tori and her brothers out of their current schools and friendship groups. And because the Moe family only settled in the Atlanta area in January 2021, having to move the family again for the second time in less than three years would be a major hardship.

> c.     *Paul and Mia Voe*

97.     Mia Voe is a whip smart, strong-willed, well-adjusted, opinionated, and precocious 11-year-old girl. She loves playing piano, reading, and learning about Greek mythology. She is also transgender. Mia, her parents, and older brother live in the Athens, Georgia, metropolitan area. While Mia socially transitioned around age five, she began showing signs of gender dysphoria as a toddler. Once she was able to socially transition, she displayed a dramatic improvement in her mental health and behavior.

98.     Mia is now, and has been for the past six years, under the care of a psychologist who has diagnosed her with gender dysphoria. She is also under the care of a pediatric endocrinologist who is closely monitoring her hormones for indications of puberty. Mia's medical providers have concluded that it will be

31

medically necessary for her to begin puberty-blocking medication in the near future.

99.     Similarly, Mia's medical providers, together with Mia and her parents, have decided that she will need to undergo hormone therapy as part of her medical treatment. If allowed to go into effect, the Health Care Ban will prevent the Voe family and their doctors from developing an individualized, forward-looking care plan that is necessary for treating gender dysphoria. Preventing Mia from accessing the recommended treatment for her gender dysphoria will have devastating physical and psychological consequences. In addition, the Health Care Ban will deprive Mia's father Paul of the ability to make medical decisions in the best interest of his child in the appropriate and necessary timeframe for Mia.

### d.     Anna, Scott, and Lisa Zoe

100.   Lisa Zoe is a funny, creative, and sensitive 10-year-old girl. She lives with her parents and younger sibling in the Atlanta, Georgia, metropolitan area. Lisa loves technology, history, and creative endeavors such as stop motion animation and colorizing black-and-white photographs. She began identifying as a girl as a toddler, including preferring to wear girls' clothing whenever possible. Lisa recognized her female gender identity around age six, at which point she socially transitioned.

101.   Lisa's primary care pediatrician first recognized that Lisa was a transgender girl at age six. Lisa has since seen a therapist. Lisa's pediatric endocrinologist and pediatrician have both diagnosed Lisa with gender dysphoria. She continues to receive care from her pediatrician and pediatric endocrinologist.

102.   Because Lisa has not started puberty yet, she has not begun puberty-blocking medication. Her pediatric endocrinologist is monitoring her hormone levels to determine when puberty-blocking medication will be appropriate, after which she will undergo hormone therapy based on the recommendation of her providers in consultation with Lisa and her parents. If the Ban takes effect, this medically necessary treatment will not be an option for Lisa, which will have devastating physical and psychological consequences. In addition, the Health Care Ban will deprive parents Anna and Scott of the ability to develop an individualized and forward-looking medical treatment plan that is necessary to treat Lisa's gender dysphoria.

103.   If allowed to go into effect, the Health Care Ban will also force Anna and Scott to consider uprooting their family and moving out of Georgia to receive medically necessary care for Lisa. Doing so would move them away from supportive friends and neighbors, would require pulling both Lisa and her sister out of their current schools and friendship groups, and force Anna and Scott Zoe to

find new jobs. If not for the Health Care Ban, the Zoe family would not consider moving away from Georgia.

### 2. The Health Care Ban Will Irreparably Harm TransParent's Members

104.   Founded in 2011, TransParent is a national organization with a chapter structure that serves as a network of support organizations for parents and caregivers with transgender children.

105.   Plaintiff TransParent is a 501(c)(3) nonprofit membership organization whose mission is to bring compassionate support to parents and caregivers navigating complex issues faced by transgender individuals. The three pillars that guide TransParent's efforts are: connection (building parent communities to strengthen and aid families in their role as confident caregivers and advocates); resources (being a pathway to informational and supportive resources assisting families and their transgender child); and visibility (expanding awareness, acceptance, and cultural integration of the full gender spectrum). By fulfilling this mission, TransParent strives to help parents empower their children to live authentically.

106.   TransParent and its local chapters carry out their mission by facilitating confidential, peer-led, group meetings that provide support, connection, and resources to parents and caregivers. When a parent learns that their child is

34

transgender, there is a range of very complex emotions that have the potential to fracture the relationship between the parent and the child and, subsequently, damage the child's self-esteem and confidence. Parents and children often feel shame and experience isolation resulting in negative outcomes. TransParent believes that sharing the journey with peers helps build strong and confident parents and children who are empowered to live an authentic life.

107.   TransParent has a chapter in Decatur, Georgia. It is the sole TransParent chapter in Georgia, and it focuses on issues facing families across the state. Most members of this local chapter live in the greater metropolitan area of Atlanta, but there are no geographical limitations for membership. These members include parents who are directly impacted by S.B. 140.

108.   If the Health Care Ban goes into effect, S.B. 140 will cause immediate and irreparable harm to TransParent members in Georgia. Parents of transgender children will be deprived of their rights to pursue medically necessary care for their children. The children of TransParent members in Georgia who do not initiate hormone therapy before July 1, 2023, will not be able to access this care and their parents will experience the unfathomable pain of watching their children suffer because they are unable to provide medically necessary treatment for their children's gender dysphoria. The Ban strikes at the very core of TransParent's

mission—building strong and confident parents and children who are empowered to live an authentic life.

109.   TransParent members in Georgia have experienced stigma, anxiety, and fear since the passage of S.B. 140. Georgia members of TransParent have discussed the enormous amount of stress experienced as a result of the passage of the Health Care Ban. The Ban affects their children's health and well-being, and forces the parent members to make difficult choices regarding the care of their children, their place of residence, and even their careers. These stressful considerations have caused members to lose sleep, experience significant mental turmoil, and fear for the well-being of their children and families. Parent members are distraught because the Ban usurps their right to make medical decisions in the best interest of their children, and grave consequences will likely result.

110.   If the Ban is allowed to go into effect, there are members of TransParent who will be denied the ability to pursue safe and necessary medical care for their children.

111.   Rita Soe is a member of TransParent and the mother of Brent Soe, a shy, thoughtful, and empathetic 16-year-old boy who resides with his parents and brother in Georgia. Brent is passionate, inquisitive, and a deep thinker with many interests, including reading, music, visual arts, writing, and animals. Two years

ago, Brent came out to his mother as transgender and began to socially transition, including by adopting a boy's hairstyle and clothing. Since embracing his male gender identity and fully socially transitioning earlier this year at school, Brent's mental health has improved dramatically.

112.   Brent is under the care of a psychologist who has diagnosed him with gender dysphoria. Brent's psychologist and his mother Rita regularly discuss his gender dysphoria and, together with Brent, have concluded that it will be medically necessary for him to begin hormone theory in the near future. The Health Care Ban, however, will deprive the Soe family of the ability to pursue that medically necessary care for their child. Although Brent has expressed that he is ready to start hormone therapy, his parents have decided to wait a few more months and allow Brent to continue with psychotherapy and live in conformity with his gender identity before initiating a hormone regimen. Rita Soe and her husband are concerned with the Ban's effect on Brent's ability to begin hormone therapy after July 1, 2023, but they do not believe it is in Brent's best interests to begin hormone treatment based on the arbitrary deadline set by the Georgia legislature. However, hormone therapy will soon become medically necessary for Brent, and his parents need to be able to access that care as soon as his health care providers recommend it.

113.   Anna and Scott Zoe are also members of TransParent and have been since the Metro Atlanta Chapter's founding in 2019. Like Rita Soe, Anna and Scott Zoe joined TransParent seeking the support and counsel of fellow parents of transgender children.

## V.   THE HEALTH CARE BAN WILL CAUSE SEVERE HARM TO TRANSGENDER YOUTH

114.   Preventing transgender minors with gender dysphoria from accessing medically necessary hormone therapy risks extreme harm to their present and future health and well-being.

115.   When gender dysphoria is not treated appropriately, the results are significant and often include increased distress, major depression, anxiety, self-harm, suicidal ideation, and suicide.

116.   As a result of laws like the Ban, 93% of transgender youth now worry about their ability to access gender-affirming care. Elana Redfield et al., *Prohibiting Gender-Affirming Medical Care for Youth*, The Williams Institute (Mar. 2023), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Youth-Health-Bans-Mar-2023.pdf. Studies demonstrate that laws like the Ban have

resulted in reported worsened mental health and increased risk of suicidality in transgender youth.[6]

117.    Studies show that when minors are able to access hormone therapy, which allows them to go through puberty consistent with their gender identity, their distress is more likely to recede and their mental health improves.[7] Both clinical experience and medical studies support that for many young people, this treatment is transformative, and they go from painful suffering to thriving.

---

[6] *See, e.g.*, Austin, *supra* note 2 ("Data from the U.S. Transgender Survey indicate that 82% of transgender individuals have considered killing themselves and 40% have attempted suicide. . . . Within the transgender population, suicidality is highest among young people.").

[7] *See, e.g.*, Amy E. Green et al., *Association of Gender- Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643 (2022) (explaining the correlation between gender-affirming hormone therapy and reduced rates of depression and suicidality among transgender youth); Jack L. Turban et al., *Access to Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, PLoS ONE (2022) (explaining that access to gender-affirming hormone therapy in adolescence is associated with favorable mental health outcomes in adulthood, when compared to individuals who desired but could not access hormonal interventions); Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014).

## VI.   CLAIMS FOR RELIEF

**COUNT I: DEPRIVATION OF SUBSTANTIVE DUE PROCESS –
INTERFERENCE WITH FUNDAMENTAL RIGHT OF PARENTS TO
DIRECT THE CARE OF THEIR CHILDREN**
**U.S. Const. Amend. XIV**
**Parent Plaintiffs and Plaintiff TransParent Against All Defendants in Their
Official Capacities**

118.   Plaintiffs incorporate paragraphs 1–2, 4–10, 45–117 of the Complaint as if set forth fully herein.

119.   The Koe, Moe, Voe, and Zoe families ("Parent Plaintiffs") and Plaintiff TransParent, on behalf of itself and its members, bring this Count against all Defendants.

120.   The Fourteenth Amendment to the United States Constitution protects the rights of parents to make decisions "concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). As the Supreme Court has repeatedly emphasized, this right is "perhaps the oldest of the fundamental liberty interests recognized by this Court," and presumes— appropriately—that "fit parents act in the best interests of their children." *Id.* at 65, 66, 68–69; *see also Parham v. J.R.*, 442 U.S. 584, 602 (1979) (collecting cases). Accordingly, a law that substantially interferes with parental autonomy is subject

to strict scrutiny. *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004).

121.   The ability to make medical decisions—especially those that are recognized to be safe, effective, and medically necessary—in a child's best interest is a critical aspect of this parental right. The law recognizes that in almost all cases, the government is no substitute for a fit parent's judgment "concerning the growth, development, and upbringing of their children." *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990) (quoting *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 313 (11th Cir. 1989)). Thus, a state cannot "willfully disregard the right of parents to generally make decisions concerning the [medical] treatment to be given to their children." *Id.*

122.   The Health Care Ban violates this fundamental right by preventing the Parent Plaintiffs from obtaining medically necessary care for their minor children.

123.   The Health Care Ban similarly violates this fundamental right held by the individual members of Plaintiff TransParent, which comprises parents and caregivers of transgender children.

124.   By intruding upon the Parent Plaintiffs' and Plaintiff TransParent members' fundamental right to direct the care and upbringing of their minor children, the Health Care Ban is subject to strict scrutiny.

41

125.    Defendants lack even a legitimate interest in preventing parents from ensuring their children can receive necessary medical care, much less a compelling one.

### COUNT II: DEPRIVATION OF EQUAL PROTECTION – DISCRIMINATION ON THE BASIS OF SEX AND TRANSGENDER STATUS
### U.S. Const. Amend. XIV
### Plaintiff Families Against All Defendants in Their Official Capacities

126.    Plaintiffs incorporate Paragraphs 1, 3–10, 45–96, 100–03, 114–17 of the Complaint as if set forth fully herein.

127.    The Koe, Moe, and Zoe families ("Plaintiff Families") bring this Count against all Defendants.

128.    The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

129.    The Health Care Ban singles out transgender minors and prohibits them from obtaining medically necessary treatment based on their sex and transgender status. Importantly, the Ban's discriminatory purpose is carried out by prohibiting the use of medically necessary treatment only when that treatment is

provided to transgender youth who did not begin treatment with hormone therapy before July 1, 2023, not when provided to non-transgender youth.

130.   Transgender-based government classifications are subject, at a minimum, to heightened scrutiny because they are sex-based classifications. Under the Equal Protection Clause, government classifications based on sex are subject to heightened scrutiny and are presumptively unconstitutional.

131.   Moreover, because transgender people have obvious, immutable, and distinguishing characteristics, including having a gender identity that is different than their natal sex, they comprise a discrete group. Transgender people have faced historical discrimination and have been unable to secure equality through the political process, making them a suspect class.

132.   As such, transgender classifications are subject at least to intermediate scrutiny.

133.   The Health Care Ban does nothing to protect the health or well-being of minors. To the contrary, the Ban undermines the health and well-being of transgender minors by denying them essential medical care.

134.   By excluding transgender children and their parents from accessing medically necessary and appropriate treatment, the Health Care Ban singles out and stigmatizes the Plaintiff Families, and other families who require this care in

Georgia. The Health Care Ban "impose[s] a disadvantage, a separate status, and so a stigma" upon these plaintiffs and thus violates the guarantee of equal protection by depriving plaintiffs of equal dignity, harming them in profound ways. *United States v. Windsor*, 570 U.S. 744, 770 (2013).

135.    The Health Care Ban is not narrowly tailored to further a compelling government interest and is not substantially related to any important governmental interest. Moreover, the Ban is not even rationally related to a governmental interest. Accordingly, the Ban violates the Equal Protection Clause of the Fourteenth Amendment.

## VII.   RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

    i.    issue a judgment, pursuant to 28 U.S.C. §§ 2201, 2202, declaring that the Health Care Ban violates the federal laws for the reasons and on the Counts set forth above;

    ii.   temporarily, preliminarily, and permanently enjoin Defendants, their officers, employees, servants, agents, appointees, and successors in office from enforcing the Health Care Ban;

    iii.  declare that the Health Care Ban violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United

States Constitution;

iv.    award Plaintiffs their costs and expenses, including reasonable

attorney fees, pursuant to 42 U.S.C. § 1988 and other applicable

laws; and

v.    grant such other relief as the Court deems just and proper.

Respectfully submitted this 29th day of June 2023.

SOUTHERN POVERTY LAW
CENTER
/s/ Elizabeth Littrell
Elizabeth Littrell (GA Bar No. 454949)
Maya Rajaratnam (GA Bar No.
452753)
150 Ponce de Leon Ave.
Ste. 340, Decatur GA 30030
Fax: (404) 221-5857
Email: Beth.Littrell@splcenter.org
Phone: (404) 221-5876
Maya.Rajaratnam@splcenter.org
Phone: (334) 398-0328

Scott D. McCoy (FL Bar No. 1004965)
2 Biscayne Boulevard, Suite 3750
Miami, FL 33131
Email: Scott.McCoy@splcenter.org
Phone: (334) 224-4309

O'MELVENY & MYERS
/s/ Benjamin G. Bradshaw
Benjamin G. Bradshaw (pro hac vice
forthcoming)
Deanna M. Rice (pro hac vice
forthcoming)
Meredith Garagiola (pro hac vice
forthcoming)
Danielle Siegel (pro hac vice
forthcoming)
Patric Reinbold (pro hac vice
forthcoming)
Carly Gibbs (pro hac vice forthcoming)
O'MELVENY & MYERS LLP
1625 Eye Street N.W.
Washington, DC 20006
Tel: 202-383-5300
bbradshaw@omm.com
drice@omm.com
mgaragiola@omm.com

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
GEORGIA
Cory Isaacson
Georgia Bar No. 983797
Nneka Ewulonu
Georgia Bar No. 373718
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
GEORGIA
P.O. Box 570738
Atlanta, GA 30357
Telephone: (770) 415-5490
CIsaacson@acluga.org
NEwulonu@acluga.org


HUMAN RIGHTS CAMPAIGN
FOUNDATION
Cynthia Cheng-Wun Weaver* NY No.
5091848
Ami Rakesh Patel* CA No. 325647
1640 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 993-4180
Cynthia.Weaver@hrc.org
Ami.Patel@hrc.org

dsiegel@omm.com
preinbold@omm.com
cgibbs@omm.com

Stephen McIntyre (pro hac vice
forthcoming)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2899
Tel: 213-430-6000
smcintyre@omm.com

Paul Sieben (pro hac vice forthcoming)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025-7019
Tel: 650-473-2600
psieben@omm.com

Jennifer Beard (pro hac vice
forthcoming)
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
Tel: 415-984-8700
jbeard@omm.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on June 29, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. There is currently no Counsel of Record for Defendants, and so I certify that I will serve the foregoing on Defendants along with the Complaint.

/s/ Elizabeth Littrell

Elizabeth Littrell