# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| EMMA KOE, individually and on behalf of her minor daughter, AMY KOE; HAILEY MOE, individually and on behalf of her minor daughter, TORI MOE; PAUL VOE; ANNA ZOE, individually and on behalf of her minor daughter, LISA ZOE; TRANSPARENT, on behalf of its members,<br><br>     Plaintiffs,<br><br>  v.<br><br>CAYLEE NOGGLE, in her official capacity as Commissioner of the Georgia Department of Community Health; GEORGIA DEPARTMENT OF COMMUNITY HEALTH'S BOARD OF COMMUNITY HEALTH; NORMAN BOYD, ROBERT S. COWLES III, DAVID CREWS, RUSSELL CRUTCHFIELD, ROGER FOLSOM, NELVA LEE, MARK SHANE MOBLEY, CYNTHIA RUCKER, ANTHONY WILLIAMSON, in their official capacities as members of the Georgia Department of Community Health's Board of Community Health; THE GEORGIA COMPOSITE MEDICAL BOARD; JOHN S. ANTALIS, | CIVIL ACTION NO. |

SUBRAHMANYA BHAT,
WILLIAM BOSTOCK, KATHRYN
CHEEK, RUTHIE CRIDER, DEBI
DALTON, CHARMAINE
FAUCHER, AUSTIN FLINT,
SREENIVASULU GANGASANI,
JUDY GARDNER, ALEXANDER S.
GROSS, CHARLES E. HARRIS,
JR., J. JEFFREY MARSHALL,
MATTHEW W. NORMAN, BARBY
J. SIMMONS, in their official
capacities as members of the Georgia
Composite Medical Board; DANIEL
DORSEY, in his official capacity as
the Executive Director of the Georgia
Composite Medical Board,

        Defendants.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION

## I.      INTRODUCTION

Plaintiffs are parents, their transgender children, and a community-based support organization for parents of transgender individuals.[1] They file this challenge because Georgia Senate Bill 140 ("S.B. 140," the "Health Care Ban," or the "Ban"), which bans safe, effective, and necessary medical treatment for transgender minors, is unconstitutional. The Ban infringes parents' fundamental right to make medical decisions in the best interests of their children, and it singles out transgender minors for the denial of essential medical care, contrary to the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

S.B. 140 takes effect July 1, 2023. Absent any injunctive relief, Plaintiffs will suffer immediate and irreparable harms for which there is no adequate remedy at law. Because of the Ban, Parent Plaintiffs will be unable to obtain necessary and time-sensitive medical care for their transgender children, and Minor Plaintiffs will be unable to receive the treatment they need. In line with multiple recent decisions—two in this Circuit and four in three sister Circuits—addressing similar

---

[1] Parent and Minor Plaintiffs separately move to proceed under pseudonyms.

1

bans,[2] this Court should enjoin Defendants from enforcing S.B. 140 while this lawsuit is pending.[3]

## II.   STATEMENT OF FACTS

### A.   The Ban Prohibits Parent Plaintiffs and TransParent's Members from Making Critical Medical Decisions for Their Children.

#### 1.   *Parent and Minor Plaintiffs*

Amy Koe is a 12-year-old transgender girl who lives in Atlanta, Georgia, with her mother, Emma Koe, her father, and her sister. *See* Declaration of Emma Koe ("Koe Decl.") ¶ 3. At age 7, Amy began to persistently express that she was female and started to socially transition; she adopted a girl's hairstyle, clothing, pronouns, and name. *Id.* ¶¶ 7, 12. Amy's mental health has improved dramatically since socially transitioning; she has gained confidence, come into her own, and resolved sleeping issues. *Id.* ¶¶ 12–14, 21. Amy has been diagnosed with gender dysphoria, and has received care from a team of health care providers, including a

---

[2] *See Brandt v. Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021), aff'd 47 F.4th 661 (8th Cir. 2022); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022), appeal docketed, No. 22-11707 (11th Cir. May 18, 2022); *Doe v. Ladapo*, 2023 WL 3833848 (N.D. Fla. June 6, 2023); *K.C. v. Med. Licensing Bd. of Ind.*, 2023 WL 2895628 (S.D. Ind. June 16 2023); Memorandum Opinion and Order, *Doe v. Thornbury*, No. 3:23-cv-00230 (W.D. Ky. June 28, 2023) (ECF No. 61) ("Kentucky Order"); Memorandum Opinion, *L.W. v. Skrmetti*, No. 3:23-cv-00376 (M.D. Tenn. June 28, 2023) (ECF No. 167) ("Tennessee Order").

[3] Because Plaintiffs are not seeking surgical procedures, this challenge is limited to S.B. 140's prohibition on "[h]ormone replacement techniques," S.B. 140 § 2(a)(2).

psychologist, psychiatrist, pediatrician, and pediatric endocrinologist. *Id.* ¶¶ 14, 15. Amy has begun puberty-blocking medication at the direction of her providers. *Id.* ¶ 16. Without these medications, Amy would undergo puberty and her body would develop in ways that are inconsistent with her gender identity. *Id.* ¶ 17.

Amy's providers continue to monitor her treatment and, together with Amy and her parents, have concluded it will be medically necessary for her to receive hormone therapy. *Id.* ¶ 17. The Ban will prevent Amy from obtaining this treatment, which will have devastating physical and psychological consequences. *Id.* The Ban will also deprive Amy's mother, Emma, of the ability to pursue the safe and effective course of medical care that her daughter needs. *Id.* ¶¶ 20, 22.

Tori Moe is a 12-year-old transgender girl who lives with her mother, Hailey Moe, her father, and her two brothers in Atlanta, Georgia. *See* Declaration of Hailey Moe ("Moe Decl.") ¶ 3. Tori started dressing as a girl on occasion as early as four years old, and was happier dressing in "girls'" clothing. *Id.* 4. Tori came out as transgender soon after the family moved from Florida to Georgia in January 2021, telling her parents that she is a girl, and that she wanted to go to school as a girl. *Id.* ¶¶ 9–10. Tori began using she/her pronouns at this time. *Id.* ¶ 6. Tori has been seeing a therapist for the past eight months, and during that time was diagnosed with gender dysphoria. *Id.* ¶ 11. In January 2023, Tori's pediatrician and

pediatric endocrinologist prescribed puberty-blocking medication; she has taken two doses so far. *Id.* ¶ 12. Hormone therapy is the next step in Tori's recommended treatment plan and is expected to be necessary in the near future. *Id.* ¶¶ 13, 14. If the Ban takes effect, Tori will be denied the appropriate medical care she needs and the Moe family will be forced to consider moving to another state. *Id.* ¶ 14.

Mia Voe is an 11-year-old transgender girl who lives with her father, Paul Voe, and her brother, in Athens, Georgia. *See* Declaration of Paul Voe ("Voe Decl.") ¶¶ 4–5. Mia has known she was a girl since pre-kindergarten; she would regularly declare, "I'm a girl" and has exclusively worn "girls'" clothing since she was around 5 years old. *Id.* ¶¶ 9–11. Mia began using a female name around age 7. *Id.* ¶ 15. Two years later, and after she never wavered in usage, Mia legally changed her name. *Id.* Mia has been seeing a psychologist for the past three years and during that time was diagnosed with gender dysphoria. *Id.* ¶ 17. Her pediatric endocrinologist is monitoring her hormone levels, and her health care providers, in consultation with Mia and her parents, have determined that the appropriate treatment plan will include starting Mia on puberty-blocking medication, followed by hormone therapy, when the time is right. *Id.* ¶ 16. If not enjoined, the Ban will prevent the Voe family from accessing this necessary treatment recommended for Mia's gender dysphoria.

Lisa Zoe is a 10-year-old transgender girl who lives with her parents, Anna and Scott Zoe, and her sibling, in Atlanta, Georgia. *See* Declaration of Anna Zoe ("Zoe Decl.") ¶¶ 3–4. Lisa has been transgender essentially her whole life. *Id.* ¶ 6. She started wearing dresses at two, and socially transitioned around six. *Id.* ¶¶ 6, 10–14. Shortly thereafter, her pediatric endocrinologist diagnosed Lisa with gender dysphoria. *Id.* ¶ 14. Lisa's pediatrician also diagnosed her with gender dysphoria in February 2023. *Id.* Because Lisa has not started puberty yet, she has not begun puberty-blocking medication. *Id.* ¶ 18. Her pediatric endocrinologist is monitoring her hormone levels to determine when puberty-blocking medication will be appropriate, after which she will undergo hormone therapy based on the recommendation of her providers in consultation with Lisa and her parents. *Id.* ¶¶ 18–19. If the Ban takes effect, this medically necessary treatment will not be an option for Lisa. *Id.* ¶ 19. Unless the Ban is enjoined, the Zoe family are strongly considering moving to another state or leaving the country to ensure they can access the medical care Lisa needs. *Id.* ¶¶ 22–23.

### 2.   *TransParent*

TransParent is a community-based organization that serves parents and caregivers of transgender and gender-expansive children. *See* Declaration of Susan Halla ("Halla Decl.") ¶¶ 2–4. Founded in 2011, TransParent now has 19 local

chapters in 11 states, including Georgia. *Id*. ¶ 11. TransParent's mission is to bring compassionate support to parents and caregivers navigating complex issues faced by their transgender and gender-expansive children. *Id*. ¶ 2. TransParent facilitates confidential, peer-led group meetings that provide support, connection, and resources to members, including connecting families of transgender children to practitioners who provide gender-affirming medical care. *Id*. ¶¶ 3–5.

The interests at stake in this litigation are germane to TransParent's mission. *See id*. ¶¶ 12–14. If the Ban takes effect, TransParent members will lose the right to pursue safe and effective gender-affirming medical care for their children. *Id*. ¶¶ 12–13. For example, TransParent member and Georgia resident Rita Soe has a 15-year-old transgender son, Brent Soe. Declaration of Rita Soe ("Soe Decl.") ¶ 6. Shortly after Brent reached puberty, his body began to develop in ways inconsistent with his sense of self—causing significant distress. *Id*. ¶ 8. Last year, a psychologist diagnosed Brent with gender dysphoria. *Id.* ¶¶ 10, 15. Brent has since informed his parents, brother, and classmates about his male gender identity and has socially transitioned—which has dramatically improved his mental health. *Id*. ¶¶ 10–14, 23. Brent's health care providers continue to monitor his treatment and have concluded, together with Brent and his mother Rita, that he will need to begin

hormone therapy soon. *Id*. ¶¶ 15–17. The Ban will deprive the Soe family of the ability to pursue this necessary medical care for Brent. *Id*. ¶¶ 19–22, 25–26.

### B.  Gender-Affirming Medical Care Is the Safe and Established Course of Treatment for Gender Dysphoria in Minors.

"Gender identity" refers to a person's internal, innate, and immutable sense of belonging to a particular gender. Declaration of Dr. Daniel Shumer ("Shumer Decl.") ¶ 25; Declaration of Dr. Ren Massey ("Massey Decl.") ¶¶ 17–18, 21. Although the exact factors influencing an individual's gender identity are unknown, medical consensus indicates that there is a significant biological component. *See* Shumer Decl. ¶¶ 25; Massey Decl. ¶ 20.

Everyone has a gender identity. For most, that identity coincides with their "natal sex" (i.e., the sex that was assigned to them at birth based on their external genitalia). For transgender children, their gender identity departs from their natal sex. Shumer Decl. ¶ 25; Massey Decl. ¶ 17. This can lead to a serious medical condition called gender dysphoria, a diagnosis that describes the clinical physical and mental distress a transgender person experiences as a result of the conflict between their natal sex and gender identity. Shumer Decl. ¶ 37; Massey Decl. ¶¶ 22–23. Diagnosing "gender dysphoria" requires a marked incongruence between a person's gender identity and their natal sex that has persisted for at least six months. Shumer Decl. ¶¶ 35–37. The incongruence must also be accompanied

by clinically significant distress or impairment in social, occupational, or other important areas of functioning. Shumer Decl. ¶ 37. Left untreated, gender dysphoria can cause a number of discrete harms, including anxiety, depression, self-harm, and suicidal ideations. Shumer Decl. ¶ 42; Massey Decl. ¶ 50.

There is a safe and established course of medical treatment for gender dysphoria that allows transgender individuals to live happy, healthy, and productive lives. *See* Shumer Decl. ¶¶ 33, 79, 93; Massey Decl. ¶ 24. The standard of care lays out a highly individualized and interdisciplinary treatment plan for minors. Shumer Decl. ¶ 40, 77; Massey Decl. ¶¶ 37–42. First, a minor undergoes an extensive health evaluation by endocrinologists, pediatricians, clinical psychologists, and other qualified providers to confirm the diagnosis. *See* Shumer Decl. ¶¶ 44; Massey Decl. ¶ 41–43. Should the physicians, parents, and child agree to pursue gender-affirming care, providers undertake a rigorous informed consent process to counsel the family about what the care will entail. Shumer Decl. ¶¶ 41, 64, 71, 75; Massey Decl. ¶ 42.

Once the family and physician are ready to move forward with transition, they usually pursue two paths: social transition and medical intervention. Shumer Decl. ¶ 59; Massey Decl. ¶¶ 26–28. When a child socially transitions, they start to present themselves to the public as their gender identity, which may include

changing their pronouns, altering their physical appearance, and correcting identity documents. Shumer Decl. ¶ 46; Massey ¶ 26. This is often accompanied by ongoing supportive therapy. Shumer Decl. ¶ 46.

Medical interventions may be pursued either concurrently with or after social transition. *Id.* ¶¶ 59, 56–57; Massey Decl. ¶¶ 26–27. For children at or near the onset of puberty, puberty-blocking medication is the first step. Shumer Decl. ¶ 47; Massey Decl. ¶ 27. These medications delay the onset or continuation of puberty and reduce the development of secondary sex characteristics that are inconsistent with the patient's gender identity. Shumer Decl. ¶¶ 62, 65; Massey Decl. ¶ 27.

Puberty-blocking medications alone are not a long-term solution for treating gender dysphoria. Rather, they are almost always prescribed as a short-term, temporary first step in a series of interventions including hormone therapy. Shumer ¶ 79, 97. This is in part because long-term use of these medications can increase the risk of lower bone mineral density and vitamin D deficiency. *Id.* ¶ 82. But it is also because puberty-blocking medications are intended to be a bridge to the next treatment phase. *Id.* ¶ 79, 97. If, after a set time, the patient's gender dysphoria desists (which is rare), they go off puberty-blocking medications and their body continues to undergo puberty consistent with their natal sex. *Id.* ¶97. In the more

common scenario, a patient's gender dysphoria persists and hormone therapy is medically necessary. *Id.* ¶ 35, 97.

Hormone therapy may be prescribed following puberty-blocking medication or natal puberty. *Id.* ¶ 54, 89; Massey Decl. ¶ 28. The benefit of hormone therapy is that it allows a transgender minor to have the same typical levels of testosterone/estrogen as a non-transgender peer. Shumer Decl. ¶¶ 54, 76. Before a physician will begin this phase of treatment, a mental health professional must confirm the persistence of gender dysphoria, evaluate any coexisting medical problems, confirm those conditions are stable enough to initiate hormones, and verify that the minor is capable of understanding the consequences of the treatment. Shumer Decl. ¶¶ 75–76; Massey Decl. ¶ 41. A pediatric endocrinologist or other medical doctor must also carefully monitor treatment. Shumer Decl. ¶ 89.

This thorough and established standard of care for treating gender dysphoria in minors was developed by the World Professional Association for Transgender Health, which represents an expert consensus based on the best available science on transgender health care. Shumer Decl. ¶¶ 40, 48–50; Massey Decl. ¶ 8. The

standard has been endorsed and followed by every relevant expert industry association.[4] *See* Shumer Decl. ¶ 56.

Moreover, the standard was established through rigorous study, is continuously monitored, and is highly effective. Shumer Decl. ¶¶ 48–53, 79; Massey Decl. ¶¶ 30-35. Studies consistently demonstrate the positive results of gender-affirming care for minors, including reductions in gender dysphoria, improved psychological functioning, and reduced rates of depression and suicidality. Shumer Decl. ¶¶ 34, 87; Massey Decl. ¶ 31–33. In contrast, clinical experience shows that untreated gender dysphoria can result in severe anxiety and depression, eating disorders, substance abuse, self-harm, and suicidality. Shumer Decl. ¶ 39; Massey Decl. ¶¶ 41–42.

### C.   Georgia's Ban Interferes with the Safe and Established Standard of Care for Treating Gender Dysphoria in Minors.

The Georgia Legislature passed S.B. 140 on March 21, 2023, and Governor Brian Kemp signed it into law on March 23, 2023. The Ban becomes effective July 1, 2023. *See* S.B. 140, 157th Gen. Assemb., Reg. Sess. (Ga. 2023).

---

[4] This includes the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the Pediatric Endocrine Society, and the Endocrine Society.

The Ban prevents health care professionals from providing transgender minors with the established care described above. Specifically, the Ban regulates hospitals, related institutions, and physicians licensed by the Georgia Composite Medical Board by prohibiting "irreversible procedures or therapies . . . performed on a minor for the treatment of gender dysphoria."[5] *Compare* S.B. 140 § 2(a), *with* S.B. 140 § 3(a). Relevant here, the Ban prohibits "[h]ormone replacement therapies."[6] S.B. 140 § 2(a); S.B. 140 § 3(a).

The Ban directs the Georgia Department of Community Health ("Department") to "establish sanctions, by rule and regulation, for violations of this Code section up to and including the revocation of an institution's permit issued pursuant to Code Section 31-7-3." S.B. 140 § 2(c).[7] The Ban will force health care

---

[5] The Ban has exceptions for: (1) medical conditions other than gender dysphoria or for the purpose of sex reassignment if medically necessary; (2) individuals born with a medically verifiable disorder of sex development; (3) individuals with partial androgen insensitivity syndrome; and (4) continued treatment of minors who are, prior to July 1, 2023, being treated with irreversible hormone therapies. S.B. 140 § 3(b); *see also* S.B. 140 § 2(b) (citing O.C.G.A. § 43-34-15).

[6] S.B. 140 also prohibits "[s]ex reassignment surgeries, or any other surgical procedures, that are performed for the purpose of altering primary or secondary sexual characteristics," S.B. 140 § 2(a)(1); S.B. 140 § 3(a)(1), but as mentioned above, because Plaintiffs are not seeking surgical procedures, Plaintiffs' challenge is limited to S.B. 140's prohibition on hormone therapies.

[7] As of this filing, the Department has not established specific sanctions for these violations. If the Department does not do so by the effective date of the Ban, health care institutions will face unknown sanctions.

institutions to choose between withholding medically necessary treatment for their

minor transgender patients or facing financial and professional ruin. In addition,

O.C.G.A. § 31-5-8 provides that any person violating the provisions of Title 31

shall be guilty of a misdemeanor, which puts individual health care professionals at

risk of criminal prosecution for providing safe and effective medical care to minor

transgender patients. The Ban further provides that "[a] licensed physician who

violates this Code section shall be held administratively accountable to the

[Georgia Composite Medical Board]." S.B. 140 § 3(c). The Ban will force licensed

physicians to choose between withholding medically necessary treatment from

their transgender patients and jeopardizing their careers and livelihood.

If the Ban takes effect, it will create a medical scenario never envisioned

when evidence-based protocols pertaining to this care were being created. Schumer

Decl. ¶ 36. Providers will be faced with impossible medical, logistical, and ethical

challenges, while transgender minors and their families will be left without

essential care. Shumer Decl. ¶ 36. The result will be devastating to those families.

## III.   ARGUMENT

To obtain a preliminary injunction, a movant must demonstrate (1) a

"substantial likelihood of success on the merits," (2) "irreparable injury," (3) that

the injury "outweighs whatever damage the proposed injunction may cause the

opposing party," and (4) that "the injunction would not be adverse to the public interest." *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020) (per ciruaim) *rev'd en banc*, 975 F.3d 1016 (11th Cir. 2020). A court may issue a temporary restraining order to "preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *CCA & B, LLC v. Anhui Subang Energy Conservation Tech. Co.*, 2023 WL 3627885, at *1 (N.D. Ga. Feb. 3, 2023) (citing *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001)) (internal quotation marks omitted). A party requesting a temporary restraining order must demonstrate the same four factors. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam)).

These factors strongly support entry of a preliminary injunction in this case. If the Court is unable to rule on the merits of Plaintiffs' preliminary injunction motion before July 1, 2023, the effective date of the Ban, these factors also warrant entry of a temporary restraining order. It is in the public interest to preserve the status quo and continue to allow parents of transgender minors in Georgia to seek, and transgender minors in Georgia to access, essential, life-affirming medical care.

### A. Plaintiffs Will Likely Succeed on the Merits of Their Claims Because the Ban Is Unconstitutional.

Plaintiffs are likely to succeed on the merits. The Ban does not advance any important state interests, but infringes parents' constitutional right to make medical

decisions for their minor children and singles out transgender minors for unequal treatment. Federal courts reviewing other states' similar bans on gender-affirming medical care have come to this conclusion and issued preliminary injunctions.[8] This Court should do the same.

      1.      *The Ban Infringes Parental Autonomy by Preventing Parents from Obtaining Essential Medical Care for Their Children (Count I).*

The Ban violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. U.S. Const. amend. XIV. The Due Process Clause affords parents the right to make decisions "concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality op.). As the Supreme Court has emphasized, this right is "perhaps the oldest of the fundamental liberty interests recognized by this Court," and presumes—appropriately—that "fit parents act in the best interests of their children." *Id.* at 65,

---

[8] *See Brandt*, 551 F. Supp. 3d at 891 (enjoining Arkansas's ban) (After a bench trial, the Eastern District of Arkansas permanently enjoined Arkansas' ban on gender-affirming medical care, finding that the law violates parents' due process rights and impermissibly discriminates against transgender minors on the basis of sex and transgender status. *See* Findings of Fact and Conclusions of Law at 64–67, 74–76; *Brandt v. Rutledge*, No. 4:21-cv-00450 (E.D. Ark. June 20, 2023) (ECF No. 283) ("Arkansas Decision")); *Eknes-Tucker*, 603 F. Supp. 3d at 1138, 1145, 1148 (enjoining Alabama's ban); *Ladapo*, 2023 WL 3833848, at *10–11 (enjoining Florida's ban); *Med. Licensing Bd. of Ind.*, 2023 WL 2895628, at *1 (enjoining Indiana's ban); Kentucky Order at 15 (enjoining Kentucky's ban); Tennessee Order at 68–69 (enjoining Tennessee's ban).

66, 68–69; *see also Parham v. J.R.*, 442 U.S. 584, 602 (1979) (collecting cases). A

law that substantially interferes with this right is subject to strict scrutiny. *Lofton v.*

*Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004).

The ability to make medical decisions in a child's best interest is a critical

aspect of this right. The law recognizes that in almost all cases, the government is

no substitute for a fit parent's judgment "concerning the growth, development, and

upbringing of their children." *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir.

1990) (internal quotation marks omitted). A state cannot "willfully disregard the

right of parents to generally make decisions concerning the [medical] treatment to

be given to their children." *Id.*

The Ban strips parents of this constitutional right. It prohibits them from

making medical choices that protect their children from the anguish of prolonged

gender dysphoria, despite the availability of medically appropriate and safe

treatment. The Constitution does not tolerate this intrusion on parental liberty. *See*

Arkansas Decision at 76 (finding that Arkansas's ban on gender-affirming medical

care took away "parents' fundamental right to provide healthcare for their children

and [gave] that right to the [] Legislature")*; Eknes-Tucker*, 603 F. Supp. 3d at 1146

("Parents [and physicians]—not the State or this Court—are best qualified to

determine whether [gender-affirming medications] are in a child's best interest on a case-by-case basis.").

2. *The Ban Violates Equal Protection by Barring Medical Treatments for Transgender Minors (Count II).*

The Ban also violates the Fourteenth Amendment's Equal Protection Clause. U.S. Const. amend. XIV. The Ban discriminates on the basis of sex and transgender status and is subject to intermediate scrutiny. Because the Ban cannot meet even rational basis review, much less intermediate scrutiny, Plaintiffs have a substantial likelihood of succeeding on this claim. Indeed, several other federal courts have rightly concluded that similar laws violate the Equal Protection Clause.[9]

a. The Ban Is Subject to Heightened Scrutiny Because It Denies Medical Treatment to Minors on the Basis of Sex and Transgender Status.

A law that draws a line based on sex is subject to intermediate scrutiny. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc). "If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex." *Ladapo*, 2023 WL

---

[9] *See Eknes-Tucker*, 603 F. Supp. 3d at 1131; *Ladapo*, 2023 WL 3833848, at *10; *Med. Licensing Bd. of Ind.*, 2023 WL 2895628, at *1; Kentucky Order at 10; Tennessee Order at 14.

3833848, at *8 (citing *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1737 (2020)).

The Ban draws that line. To lawfully prescribe hormone therapy to a minor in Georgia, a physician must know the minor's natal sex. If the minor's natal sex is female, the physician cannot prescribe testosterone. But if the minor's natal sex is male, the physician can do so. This is a textbook example of sex-based discrimination. *See* Arkansas Decision at 64 (the ban "discriminates on the basis of sex because a minor's sex at birth determines whether the minor can receive certain types of medical care under the law"); *Ladapo*, 2023 WL 3833848, at *19.

The Ban also discriminates on the basis of sex for another reason—it targets transgender individuals, which courts agree constitutes sex-based discrimination. *Glenn v. Brumby*, 663 F.3d 1313, 1316 (11th Cir. 2011). As the Supreme Court recently instructed, "discrimination based on . . . transgender status necessarily entails discrimination based on sex." *Bostock*, 140 S. Ct. at 1747. Accordingly, "classification based on an individual's gender nonconformity" implicates the Equal Protection Clause. *Eknes-Tucker*, 603 F. Supp. 3d at 1147. The Ban is discriminatory on its face. It prohibits "procedures or therapies . . . performed on a minor *for the treatment of gender dysphoria*." S.B. 140 § 2(a) (emphasis added). It targets safe, effective, and medically necessary treatment provided to minors on the

sole basis of their transgender status, denying them treatment that would be lawful for their non-transgender peers.

Heightened review is appropriate here for yet another reason. Even if considered as an independent classification, discrimination based on sex meets the criteria for suspect classification. *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). As many courts across the country have held, transgender people are members of a suspect class. They have suffered a history of discrimination; being transgender is an immutable trait; and they lack the political power to achieve full equality through the political process.[10]

Because the Ban discriminates on the basis of sex and transgender status, the State must demonstrate that "the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 524 (1996) (internal quotation marks omitted). The justification for the classification must be "exceedingly persuasive," *id.*, and cannot

---

[10] *E.g.*, *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Toomey v. Arizona*, 2019 WL 7172144, at *8 (D. Ariz. Dec. 23, 2019). *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018) *Bd. of Educ. Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016).

"rely on overbroad generalizations." *Sessions v. Morales-Santana*, 582 U.S. 46, 62 (2017). Post hoc justifications will not suffice. *Id.* at 70. The State cannot make this showing.

> **b.** Defendants Cannot Establish That Their Asserted Justifications Serve Important Governmental Objectives.

Georgia lacks any legitimate interest in enforcing S.B. 140, much less the type of important government interest necessary for a law to survive heightened scrutiny. The State's justifications for the Ban have no basis in medical science and undermine, rather than advance, its purported goal of protecting children.

For example, the Ban names an "unexplained rise in diagnoses of gender dysphoria" as one legislative finding underpinning S.B. 140 § (1)(1). Although a diagnosis of gender dysphoria remains rare, there is an obvious explanation for any perceived "rise in diagnoses": a reduction in stigma and mistreatment of the condition. *See* Shumer Decl.¶ 39. In the past, mental health professionals unsuccessfully sought to treat gender dysphoria by trying to change the person's gender identity to match their natal sex. *Id.* ¶ 27. Today, the profession recognizes that such efforts put transgender individuals at risk of harm, including dramatically increased rates of suicide. *Id.* ¶¶ 27.

The General Assembly further attempts to justify the Ban by arguing that a "wait-and-see" approach to treating gender dysphoria in minors "do[es] no harm."

S.B. 140 § (1)(6). But the clinical evidence shows that forcing minors to wait until adulthood to pursue gender-affirming medical care will likely lead to a significant increase in mental health issues for transgender minors in Georgia. Shumer Decl. ¶¶ 64, 99; Massey Decl. ¶ 29. For instance, a study comparing over 21,000 patients who desired gender-affirming hormone care found that those who were able to access this care had lower odds of suicidality within a year than those who were not. *Id.* ¶ 99. In addition, indefinitely delaying puberty without a path to hormone therapy is contrary to global medical practices. *Id.* ¶ 35–36.

The Ban also fails heightened scrutiny because it deprives Minor Plaintiffs of established medical care to treat a serious medical condition. The irrationality— and harmfulness—of that result is underscored by the fact that the Ban permits minors who are already receiving hormone therapy to continue doing so. If the banned medications are safe and effective for minors already receiving them to continue treatment, there is no legitimate reason to prohibit those treatments for youth with the same medical condition simply because they have yet to start treatment. This discrepancy defies logic and confirms that the justifications are nothing more than post hoc rationalizations for impermissible discrimination.

The Ban does not protect children; it harms transgender minors by taking away the safe and effective medical care that will help them grow into healthy and

21

happy adults. The State cannot demonstrate that the Ban can survive even a cursory review, much less the heightened scrutiny that applies here.

**B.    The Ban Will Cause Immediate, Irreparable Harm to Plaintiffs.**

Plaintiffs will suffer immediate and irreparable constitutional, medical, emotional, and psychological injury unless the Ban is enjoined. The Ban harms Parent Plaintiffs and TransParent members by preventing them from obtaining safe and time-sensitive medical care for their children. Like other parents, Parent Plaintiffs and TransParent members want to be able to obtain medical care that their children's treating physicians recommend—and that the parents agree is essential to their children's well-being. The denial of this choice is a serious and irreparable harm. *See Eknes-Tucker*, 603 F. Supp. 3d at 1148, 1150 (finding parent plaintiffs demonstrated imminent irreparable harm where gender-affirming care ban prevented them "from treating their children . . . subject to medically accepted standards"); *Brandt*, 551 F. Supp. 3d at 892–93 ("Parent Plaintiffs face the irreparable harm of having to watch their children experience physical and emotional pain[.]"). Additionally, Parent Plaintiffs and TransParent's members face the immediate and irreparable harm of having to seriously consider uprooting their families from Georgia in order to access necessary medical care for their children.

Second, the Ban deprives Minor Plaintiffs of necessary care for a serious medical condition. Courts have consistently recognized that denial of medically necessary care is sufficient to show immediate and irreparable harm.[11] Due to the nature of gender dysphoria and its time-sensitive treatments, every day Plaintiff Minors are unable to obtain the medical care they need or are unable to plan for future receipt of that care has a detrimental effect on their immediate and long-term health. Without gender-affirming treatment, Amy Koe will not be able to go through puberty in alignment with her gender identity, causing devastating physical and psychological consequences as a result. Koe Decl. ¶ 17. Tori Moe, who is currently on puberty-blocking medication and would start hormone therapy in the near future, will be unable to do so—which will exacerbate her gender dysphoria. Moe Decl. ¶ 12–16. Mia Voe and Lisa Zoe have both socially transitioned and are thriving as a result but will be unable to access medical treatments to continue on the path toward health and happiness. Voe Decl. ¶¶ 9–11, 13–15, 18–21; Zoe Decl. ¶¶ 3, 10–14, 19, 22–24.

---

[11] *See, e.g.*, *Bowen v. City of New York*, 476 U.S. 467, 483–84 (1986) (finding denial of benefits caused irreparable injury by exposing plaintiffs to "severe medical setback[s]"); *Gayle v. Meade*, 614 F. Supp. 3d 1175, 1206–07 (S.D. Fla. 2020) (increased likelihood of serious illness constitutes an irreparable injury).

These harms are imminent, serious, and irreparable—and potentially life-threatening. *See* Shumer Decl. ¶ 42; Massey Decl. ¶¶ 29, 50–52. As another court recently put it, without gender-affirming medical treatment, "[n]ot all adolescents with gender dysphoria will live to age 18." Arkansas Decision at 49.

### C.    The Equities Weigh in Favor of Injunctive Relief.

The balance of the equities strongly favors an injunction. The Ban will needlessly cause irreparable harm by stripping parents of their fundamental right to make choices that allow their children to thrive, and denying children access to safe, effective, and necessary medical care. An injunction would prevent these harms by maintaining the status quo while Plaintiffs pursue this challenge.

The state of Georgia, meanwhile, will not be harmed by an injunction. Enforcing an unconstitutional law is not a legitimate government interest. *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). And as another court in this Circuit observed, enjoining a law banning gender-affirming medical treatments "will affect the patients themselves, nobody else, and will cause the defendants no harm." *Ladapo*, 2023 WL 3833848, at *16.

### D.    A Preliminary Injunction Is in the Public Interest.

Finally, an injunction would not be adverse to the public interest. "To the contrary, enjoining [the Ban] upholds and reaffirms the enduring American

tradition that parents—not the States or federal courts—play the primary role in nurturing and caring for their children." *Eknes-Tucker*, 603 F. Supp. 3d at 1151 (internal quotation marks omitted). Moreover, "[a]dherence to the Constitution is always in the public interest." *Ladapo*, 2023 WL 3833848, at *16.

## IV.    REQUEST FOR RELIEF FROM REQUIREMENT TO POST BOND

Plaintiffs request an exemption from Rule 65(c). "[T]he amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court . . . [and] the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005). Waiving the bond requirement is particularly appropriate in public interest litigation, where Plaintiffs allege the infringement of their constitutional rights. *Id.*

## V.    CONCLUSION

For the foregoing reasons, this Court should enjoin the enforcement of the Ban while this lawsuit is pending. Plaintiffs further request the Court enter a temporary restraining order if the Court is unable to rule on Plaintiffs' preliminary injunction motion before July 1, 2023, when the Ban is scheduled to take effect.

Respectfully submitted this 29th day of June, 2023.


SOUTHERN POVERTY LAW                    O'MELVENY & MYERS
CENTER                                  /s/ Benjamin G. Bradshaw

/s/ Elizabeth Littrell
Elizabeth Littrell (GA Bar No. 454949)
Maya Rajaratnam (GA Bar No. 452753)
150 Ponce de Leon Ave.
Ste. 340, Decatur GA 30030
Fax: (404) 221-5857
Email: Beth.Littrell@splcenter.org
Phone: (404) 221-5876
Maya.Rajaratnam@splcenter.org
Phone: (334) 398-0328

Scott D. McCoy (FL Bar No. 1004965)
2 Biscayne Boulevard, Suite 3750
Miami, FL 33131
Email: Scott.McCoy@splcenter.org
Phone: (334) 224-4309


AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
GEORGIA
Cory Isaacson
Georgia Bar No. 983797
Nneka Ewulonu
Georgia Bar No. 373718
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
GEORGIA
P.O. Box 570738
Atlanta, GA 30357
Telephone: (770) 415-5490
CIsaacson@acluga.org
NEwulonu@acluga.org


HUMAN RIGHTS CAMPAIGN
FOUNDATION

Benjamin G. Bradshaw (pro hac vice
forthcoming)
Deanna M. Rice (pro hac vice
forthcoming)
Meredith Garagiola (pro hac vice
forthcoming)
Danielle Siegel (pro hac vice
forthcoming)
Patric Reinbold (pro hac vice
forthcoming)
Carly Gibbs (pro hac vice forthcoming)
O'MELVENY & MYERS LLP
1625 Eye Street N.W.
Washington, DC 20006
Tel: 202-383-5300
bbradshaw@omm.com
drice@omm.com
mgaragiola@omm.com
dsiegel@omm.com
preinbold@omm.com
cgibbs@omm.com

Stephen McIntyre (pro hac vice
forthcoming)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2899
Tel: 213-430-6000
smcintyre@omm.com

Paul Sieben (pro hac vice forthcoming)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025-7019
Tel: 650-473-2600
psieben@omm.com

Cynthia Cheng-Wun Weaver* NY No. 5091848
Ami Rakesh Patel* CA No. 325647
1640 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 993-4180
Cynthia.Weaver@hrc.org
Ami.Patel@hrc.org

Jennifer Beard (pro hac vice forthcoming)
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
Tel: 415-984-8700
jbeard@omm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 29, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. There is currently no Counsel of Record for Defendants, and so I certify that I will serve the foregoing on Defendants along with the Complaint.

/s/ Elizabeth Littrell
Elizabeth Littrell