# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| EMMA KOE et. al., <br><br> Plaintiffs, <br><br> v. <br><br> CAYLEE NOGGLE et. al., <br><br> Defendants. | Case No. _____ |

## DECLARATION OF ANNA ZOE

I, Anna Zoe[1], hereby declare and state as follows:

1. I am over the age of eighteen, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify completely to those facts if called to do so.

2. I am a Plaintiff in this Action, and I am the parent and next friend of my child, Lisa Zoe, who is also a Plaintiff in this action.

---

[1] Because of concerns about my child's privacy and safety, I am seeking to proceed in this case under a pseudonym. *See Motion to Proceed Pseudonymously*, filed concurrently herewith. In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration. My attorneys have a copy of that separate declaration.

3. My husband, Scott, and I have been married for fourteen years. We have two children. Lisa is a girl who is transgender and whose birth sex was male. She is ten years old. Our younger child is seven years old. Lisa and her sibling are best friends.

4. Georgia has been our home since 2017, when we moved to metro-Atlanta for my job. We have lived in the same city since moving to the state. Our children have spent the majority of their lives in Georgia. Lisa attended public school from kindergarten to 3rd grade, after which we enrolled her in private school.

5. Lisa is a funny, creative, and sensitive child. She loves technology and history, with a particular interest in out-of-date technology. She's imaginative with multiple creative outlets such as world-building video games, stop motion animation, and photography.

6. At just two years old, Lisa began expressing herself femininely. She was always drawn to typically girl-gendered things like dolls and dresses. We once found her wearing a dress and dancing to Cyndi Lauper's "Girls Just Wanna Have Fun." At the time, I didn't think she was transgender; after consulting with close friends who are gay men, I thought she might be gay or simply have a vibrant personality. No matter what Lisa ended up identifying as, my husband and I knew we would love and support her.

7. For the next several years, Lisa would wear "boy" clothes at daycare during the week, but "girl" clothes at home and on the weekends. She was uncomfortable in her "boy" clothes, at times putting them on backwards in protest of wearing them.

8. When Lisa was four years old, she told my husband that she wished she didn't have a penis. That was the first time we considered that Lisa might be a transgender girl.

9. While Lisa was in kindergarten, she began experiencing anxiety. In hindsight, I recognize that she was uncomfortable in her own skin because she was not yet able to be her authentic self.

10. When Lisa was six years old, she was distressed at having to attend a party while in "boy" clothes. When I asked her what was upsetting her, she eventually exclaimed: "I just don't feel like a boy."

11. In response, I told Lisa she would be starting a new summer camp the following week and asked if she would be more comfortable going there as a girl. She was nervous but wanted to try, and so I let the camp counselors know that Lisa is a transgender girl. By the end of the first day of camp, she was jubilant, stating that she had finally felt like "just a normal kid."

12. Lisa socially transitioned over the remainder of that summer, wearing "girl" clothes in public, using female public facilities, and using "she" and "her" pronouns.

13. When Lisa entered first grade that fall, my husband and I registered her as a girl with the school. The school was incredibly supportive and affirming, creating a lesson plan around gender identity, and providing training for Lisa's teacher. As a result of socially transitioning, and her school's steps towards inclusion, Lisa's anxiety decreased dramatically.

14. After Lisa socially transitioned in the summer of 2019, her primary care pediatrician acknowledged that Lisa identified as a girl in August 2019 and subsequently began using "she" and "her" pronouns for her in her clinic visits and patient chart. In May 2020, Lisa started seeing a therapist to discuss her general anxiety as well as her gender identity. In November 2020, she was diagnosed with gender dysphoria by a pediatric endocrinologist. Lisa's primary care pediatrician then diagnosed Lisa with gender dysphoria in February of 2023.

15. Lisa has not needed or wanted to change her first name. We had her middle name legally changed in 2023.

16. Over the four years Lisa gravitated more and more towards identifying as a girl before coming out and socially transitioning, my husband and I had time

to educate ourselves on gender identity and raising a transgender child. We have continued to learn and grow as parents of a transgender child. We have become connected with other parents of transgender children, and we have read a lot of research and literature about being transgender and parenting transgender kids.

17. Our family has been involved with several parenting support groups and have been involved with TransParent-Metro Atlanta Chapter since the chapter's first meeting. It's been refreshing and eye-opening to connect with other parents who are also raising transgender children. We realize neither we, nor Lisa, are alone in what we are going through.

18. The pediatric endocrinologist, my husband, Lisa, and I are monitoring Lisa's hormone levels. At the onset of puberty, which is imminent, her recommended treatment plan will include initiating puberty blockers.

19. Lisa, my husband and I, and her provider team, including her pediatric endocrinologist, all see hormone therapy as a medically necessary part of Lisa's treatment plan in the near future. But if S.B. 140 remains in place, this medically necessary care will not be an option for Lisa.

20. Earlier this year, our entire family went to the Georgia State Capitol to advocate against S.B. 140. I spoke with a Georgia legislator about S.B. 140's harms on Lisa and our family. He responded dismissively by saying he

wanted to be an astronaut when he was a child as a reason for why a child's self-described identity cannot be trusted.

21. I have felt scared for what being transgender might mean for Lisa in terms of how other people treat her and whether or not she will ever be victimized because of her identity. More than fear, however, I have felt happy to know Lisa feels empowered to become her true self and to confide in us about her identity.

22. My husband and I are considering leaving Georgia if S.B. 140 is not enjoined because Lisa would not be able to access the medical care she will soon need as an adolescent, and she would not be able to continue her medically necessary care with a trusted medical team who is familiar with her and her individual care. This would force us to uproot our entire family, remove Lisa and her younger sibling from their network of friends, community, and health care, move to an area with a higher cost of living, and find new jobs.

23. We love living here in Georgia and do not want to uproot our lives. But S.B. 140's passage causes instability and uncertainty in our lives. Not only does S.B. 140 deny Lisa the care she will need, but the law also leaves us concerned for other laws that could be passed in the future that target her

and us based on her transgender status, and further restrict Lisa's healthcare or identity. S.B. 140 sends the message that Lisa is not welcome in Georgia.

24. Lisa has been a confident and happy little girl since socially transitioning. If Lisa is unable to access hormone therapy to treat her gender dysphoria, and she consequently is forced to undergo male puberty, she will suffer a significant increase in anxiety and other mental health harms. Remaining on puberty blockers for any period of time beyond what is recommended by her health care professionals is not a safe or viable option, based on the adverse physical and/or mental health consequences that are likely to result.

25. S.B. 140 is outrageous and unnecessary. The law negates my right to parent my child and will deny Lisa access to medically appropriate, evidence-based medical care as soon as such care is necessary to avoid or alleviate suffering. As a mother, I am afraid of both the immediate and longstanding effects this denial of care will have on my daughter, who wants to continue to be "just a normal kid."

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of June 2023.

Respectfully Submitted,

Signature:

_Anna Zoe_

Anna Zoe