# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

EMMA KOE, et al.,
*Plaintiffs*,

v.

CAYLEE NOGGLE, et al.,
*Defendants*.

CIVIL ACTION NO.
1:23-CV-2904-SEG

## RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Over three months after Georgia enacted SB 140, which prohibits "hormone replacement therapies" for minors, Plaintiffs seek emergency relief to enjoin the law because they *might* want to violate it someday. That is, the minor children Plaintiffs and their parents, according to Plaintiffs' own declarations, assert that someday they probably want to initiate hormone replacement—but none of them contend they want to do so now and in fact, none of them assert any concrete timing or urgency at all.

A temporary restraining order (or a preliminary injunction) is an extraordinary remedy, limited to situations where a party is threatened with "'imminent' irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (citation omitted). Here, Plaintiffs do not actually seek to "imminently" perform the acts that ostensibly violate the law. Plaintiffs' own lack of urgency is confirmed by the fact that they waited over *three months* after the passage of the law to file suit, now including an eleventh-hour request for emergency relief on a breakneck schedule that could have been

entirely avoided if they had sued promptly. "[A] party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id.* That is common sense: a plaintiff disproves their own assertion of imminent harm by not acting quickly. Imminent, irreparable harm is the "sine qua non of injunctive relief," such that "even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). This Court should deny emergency relief on this basis alone.

The other factors weigh against Plaintiffs as well. As to the merits, Plaintiffs' arguments ring hollow. The parent Plaintiffs first assert that SB 140 violates a substantive-due-process right to "parental autonomy," by supposedly "preventing" them from obtaining "essential medical care" for their children. Memorandum at 15. But Georgia has broad authority to regulate the medical field, including in areas of controversy, like abortion, medical marijuana, and, yes, hormone replacement. No doubt, parents have a general right to direct their children's upbringing, but courts have consistently cautioned against framing a substantive-due-process right at too high a level of generality. And here, the right that parent Plaintiffs seek is a right to a particular medical procedure, not the far-too-general right to direct their children's upbringing. That dooms the argument, because there is *no* deeply rooted history of a right to hormone replacement treatments—the requirement for any substantive-due-process claim.

-2-

*Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). And a parent's "rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself." *Doe v. Pub. Health Trust of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983). Without a *general* substantive-due-process right to this intervention, there can be no *parental* substantive-due-process right to provide one for a child.

Likewise, Plaintiffs' equal protection claim fails. Here, Plaintiffs make two arguments. First, they argue that the prohibition discriminates on the basis of sex, because one has to "know" a minor's sex to determine whether "hormone therapy" is lawful. Mem. at 18. And according to Plaintiffs, if one has to "know" someone's sex to determine an act's legality, it must discriminate on the basis of sex. Mem. at 17–18. That legal premise is wrong—nowhere has the Supreme Court or Eleventh Circuit held that mere *knowledge* of sex would make something inherently sex-based under the Equal Protection Clause—but more importantly, Plaintiffs are wrong about the statute, which prohibits hormone replacement for all minors and makes no distinctions based on sex. One need *not* know the sex of a minor to know that hormone replacement is prohibited. No matter who wants hormone replacement, if they are a minor, they cannot get it. That is as sex-neutral as it comes. If prohibitions on abortion are not sex-based, *see Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2245–46 (2022), a prohibition on hormone replacement is not sex-based, especially where it addresses *everyone*.

Plaintiffs' second equal protection argument is just as wrong. They assert that SB 140 targets "transgender people," who are "members of a suspect class." Mem. at 19. But

neither of these premises is true. SB 140 does not target anyone—it prohibits a particular medical intervention for minors (an intervention that not all trans-identifying persons seek). And to qualify as a suspect class, a category of people must (1) have been "been subjected to discrimination" "[a]s a historical matter," (2) exhibit "immutable" "characteristics that define them as a discrete group," and (3) be "politically powerless." *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). Plaintiffs do not meaningfully attempt to prove as much. Indeed, even the mentally disabled are not a suspect class. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985). Much less so, then, are Plaintiffs.

Finally, the equities weigh against an injunction. Enjoining a state statute *always* causes irreparable injury for a state. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And here, Plaintiffs have created a purported crisis by their own actions. They have known for months that SB 140 prohibits hormone replacement, yet waited until its effective date to file suit, seeking emergency relief they could have sought months (or at least weeks) ago. Whatever one thinks about the ultimate merits of Plaintiffs' suit, they are not entitled to emergency relief.

## STATEMENT

### I.   Statutory Background

Georgia's General Assembly passed SB 140 in the 2023 legislative session, on March 23. *See* 2023 Ga. Laws 4. The General Assembly found that there "has been a massive unexplained rise in diagnoses of gender dysphoria among children over the past

ten years, with most of those experiencing this phenomenon being girls." *Id.* § 1. And "[g]ender dysphoria is often comorbid with other mental health and developmental conditions, including autism spectrum disorder." *Id.* Moreover, a "significant portion of children with gender dysphoria do not persist in their gender dysphoric conditions past early adulthood." *Id.* "Certain medical treatments for gender dysphoria," such as "surgeries, have permanent and irreversible effects on children," but "[n]o large-scale studies have tracked people who received gender-related medical care as children to determine how many remained satisfied with their treatment as they aged and how many eventually regretted transitioning." *Id.* Instead, "the General Assembly is aware of statistics showing a rising number of such individuals who, as adults, have regretted undergoing such treatment and the permanent physical harm it caused." *Id.*

So, in fulfilling its obligation to protect children from "unnecessary and irreversible medical treatment," Georgia's legislature amended the Georgia code, relating to the regulation of hospitals and related institutions, to prohibit (save for exceptions): "[s]ex reassignment surgeries," and, as relevant here, "[h]ormone replacement therapies." *Id.* § 2; *see also* O.C.G.A. § 31-7-3.5. Likewise, "licensed physicians" are prohibited from the same operations, again with exceptions. 2023 Ga. Laws 4, § 3; *see also* O.C.G.A. § 43-34-15.[1]

_____

[1] The Act exempts: "(1) Treatments for medical conditions other than gender dysphoria or for the purpose of sex reassignment where such treatments are deemed medically necessary; (2) Treatments for individuals born with a medically verifiable disorder of sex development, including individuals born with ambiguous genitalia or chromosomal

The Department of Community Health is tasked with establishing "sanctions, by rule and regulation," for institutions that violate the law. O.C.G.A. § 31-7-3.5. The Georgia Composite Medical Board is charged with adopting rules and regulations, as well as sanctions, for licensed physicians. O.C.G.A. § 43-34-15. Neither the Department nor the Medical Board has adopted any regulations or identified any sanctions for any of the prohibited conduct.

## II.    Factual Background

Plaintiffs are three minors, Amy, Tori, and Lisa (each of whom has at some point been diagnosed with gender dysphoria), their parents, a parent of a fourth minor, Mia (also diagnosed with gender dysphoria), and an organization (TransParent) that purports to bring suit on behalf of its members. Doc. 1, ¶¶ 11–15. Over three months after SB 140 was enacted into law (in March), Plaintiffs filed this suit on June 29, 2023, waiting until two days before the law's effective date. *See id.* They named as Defendants the Department of Community Health (along with its Commissioner and the members of the Department's Board of Community Health), and the Georgia Composite Medical Board (along with its members and executive director). *Id.*, ¶¶ 16–44. They also requested a temporary restraining order and preliminary injunction. Doc. 2-1. Plaintiffs here

---

abnormalities resulting in ambiguity regarding the individual's biological sex; (3) Treatments for individuals with partial androgen insensitivity syndrome; and (4) Continued treatment of minors who are, prior to July 1, 2023, being treated with irreversible hormone replacement therapies." 2023 Ga. Laws 4, § 3.

challenge only the prohibition on hormone replacement therapies. *See* Doc. 1 at 26 n.5; *see also* Doc. 2-1 at 4 n.3.

In support of their motion, Plaintiffs submitted a number of declarations. But the declarations show that not one of the minor Plaintiffs (or their parents acting for them) has made the decision to undergo hormone replacement therapy for their condition. Instead, the sworn declarations indicate that each wants to continue to consider (for an unspecified time) whether that treatment will be appropriate in their situation and for their condition at some (also unspecified) time in the future. With respect to Tori, for instance, Plaintiff's mother avers: "I want to obtain hormone therapy for my daughter at the right time and this law bars me from making that decision. … This is a month-by-month consideration for our family, based on Tori's medical, social, and mental health and progress." Doc. 2-3, ¶ 13. Mia has not even reached puberty: "Mia is now eleven, and according to her most recent laboratory work, she has not yet begun puberty. Once she starts puberty, her recommended treatment plan includes puberty blockers and hormone therapy. Mia, her mother, and I will make this decision in consultation with her providers." Doc. 2-4, ¶ 16. Lisa, too, has not even undergone puberty. "The pediatric endocrinologist, my husband, Lisa, and I are monitoring Lisa's hormone levels. At the onset of puberty, which is imminent, her recommended treatment plan will include initiating puberty blockers." Doc. 2-5, ¶¶ 18–19. The most they can aver is that "hormone therapy [is] a medically necessary part of Lisa's treatment plan in the *near future*." *Id.* (emphasis added). Amy is explicitly not "ready … to start hormones yet." Doc. 11, ¶ 18.

"Due in part to her ADHD and the impact that has on her executive functioning, [Amy's mother] want[s] to give her some time before taking this next step." *Id.*; *see also* Doc. 2-6, ¶¶ 15–16 ("We are in alignment with continuing to treat [Brent's] dysphoria by supporting his gender identity and starting hormone therapy in the *foreseeable future*. … My husband and I would like to … allow Brent to continue with psychotherapy and living in conformity with his gender identity for *some time* before initiating a hormone regimen." (emphasis added)).

## ARGUMENT

Plaintiffs' motion fails at every level. A preliminary injunction is an "extraordinary and drastic remedy," and Plaintiffs have not come close to establishing they even need an injunction, much less are entitled to it. *Canal Auth. of Florida v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974). To start, they are unlikely to establish standing, because there is no imminent injury. And even if Plaintiffs could establish injury in the Article III sense, they certainly have not established the sort of "imminent, irreparable harm" that is required for *preliminary* injunctive relief. Their merits arguments fail, too. SB 140 makes the carefully calculated legislative decision that hormone replacement interventions are too risky and too understudied to allow in minors. That is a run-of-the-mill medical regulatory decision, exactly the kind that States have broad power to make. And if there were any remaining doubt, the equities also weigh against relief, because Plaintiffs have unduly delayed and would seek to enjoin the operation of a duly enacted state law.

## I.  Plaintiffs lack standing because they failed to establish injury.

The Constitution restricts judicial power "to redress[ing] or prevent[ing] actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). Plaintiffs must therefore establish injury in fact, traceability, and redressability. *City of S. Miami v. Governor*, 65 F.4th 631, 636 (11th Cir. 2023); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). "When, as here, 'plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *City of S. Miami*, 65 F.4th at 636 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)).

Plaintiffs have failed to show any injury that is "certainly impending." *Id.* (citation omitted). On the contrary, the declarations show an *absence* of "impending" injury. Several of the Plaintiff parents state that their children do not wish to undergo puberty, but as Plaintiffs themselves acknowledge, their own physicians have recommended puberty blockers as the first line of treatment to address this concern. *See* Doc. 2-4, ¶ 16, Doc. 2-5, ¶ 24. And SB 140 does not prohibit the administration of puberty blockers, so Plaintiffs face no threat of imminent harm due to the onset of puberty. And with respect to hormone replacement, none of the minor children (or their parents) have decided to undergo hormone replacement therapy or made plans to begin such therapy at any specific point. There are, at best, vague indications that the Plaintiffs generally intend to do so at *some point*—but of course, minds can change, and Plaintiffs have not established that the law prevents them from doing anything they immediately intend to do. There

simply is no showing of a concrete injury that is "certainly impending." *See City of S. Miami*, 65 F.4th at 636.[2]

## II.  Plaintiffs have failed to demonstrate imminent irreparable harm.

Even if Plaintiffs' speculative allusions future injury suffice for Article III standing, it certainly does *not* suffice for a preliminary injunction. To repeat: None of the Plaintiffs claim that they have decided upon but cannot receive hormone therapies at this time. Speculation about what might or might not be needed at some future point cannot possibly sustain the extraordinary relief sought. Indeed, even if Plaintiffs had a date certain when they would plan to engage in the prohibited conduct, unless that date were imminent, there is no need for emergency relief. Irreparable harm is an absolute prerequisite for a preliminary injunction—the mere "possibility" of such harm is not enough. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Plaintiffs appear to recognize that they have no irreparable harm, as they assert that the "harm" is the lack of a "choice." Mem. at 22. But until someone actually *makes the choice*, there is no harm. If simply being denied a potential option in the future were sufficient to transform a harm from hypothetical into irreparable, it would remove the "emergency" aspect of emergency relief.

_____

[2] TransParent also lacks standing. "An organization can establish Article III standing either through its members or through its own injury in fact." *City of S. Miami*, 65 F.4th at 637 (quotation omitted). Here, TransParent asserts its claims through its members.  *See* Doc. 1, ¶ 15. But TransParent makes no contention that a member sought or is currently seeking to obtain the prohibited treatments but cannot because of the challenged statutes.

Plaintiffs' delay in filing this suit confirms their lack of irreparable harm. The "very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal*, 840 F.3d at 1248. So a "failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id.* Again, it makes sense that Plaintiffs did not rush; they aren't actually trying to engage in the prohibited conduct yet. But that is fatal to a claim for emergency relief.

And there is another problem: Even if these Defendants are enjoined, the misdemeanor provision, O.C.G.A. § 31-5-8, would still apply and other state officials could continue to enforce these prohibitions—meaning there would be no real relief for Plaintiffs anyway. "Even if [the Court] were to issue a decision in the plaintiffs' favor," the law "would remain on the books, [hormone replacement] would remain illegal, and they would remain in the same position they were in when they filed the operative complaint." *Support Working Animals, Inc. v. Governor of Florida*, 8 F.4th 1198, 1205 (11th Cir. 2021). An injunction against these Defendants "wouldn't significantly increase the likelihood of redressing the plaintiffs' injuries because" an injunction against these Defendants "would bind only [them], and not other parties not before this Court." *Id.* Put together, Plaintiffs are seeking to stop something that will not harm them by enjoining only some of the people that could enforce the supposedly harmful prohibition. That is not remotely sufficient for emergency preliminary relief.

### III.  Plaintiffs are unlikely to succeed on the merits.

Plaintiffs press claims under substantive due process and equal protection. Neither succeeds, because SB 140 is a reasonable regulation of the medical field, which is at the absolute core of a state's police power. It interferes with no fundamental right, and it does not discriminate on the basis of sex.[3]

### A. Plaintiffs' substantive due process claim fails because there is no deeply rooted historical right to hormone-replacement treatments.

Facially, "the Due Process Clause guarantees no substantive rights, but only (as it says) process." *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) (quotation omitted). Accordingly, "the Supreme Court has been reluctant to expand the concept of substantive due process." *Id*. (quotation omitted). Courts therefore must "exercise the utmost care whenever [they] are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of" the judiciary. *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005) (quotation omitted).

Courts "must analyze a substantive due process claim by first crafting a careful description of the asserted right." *Id*. (quotation omitted). And courts must be careful not to draw the right at a high level of generality—applying a general right to "procreation,"

---

[3] Plaintiffs' claims against the Department and Board are also barred by the Eleventh Amendment, which prohibits federal lawsuits against States absent the State's consent or an unequivocal congressional abrogation of that immunity.  *Schultz v. Alabama*, 42 F.4th 1298, 1314 (11th Cir. 2022). Neither circumstance—waiver or abrogation—applies here, and Plaintiffs do not argue to the contrary.

for instance, when really the claimed right is "to procreate via an IVF process." *Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017); *see also, e.g. Dobbs*, 142 S. Ct. at 2247 ("Historical inquiries" of the specific right in question "are essential" because the term "'liberty' alone provides little guidance."). Courts must then decide whether the claimed right is "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." *Glucksberg*, 521 U.S. at 721 (quotations omitted).

Plaintiffs claim that they have a substantive due process right to give or deny hormone replacement to their children, Mem. at 15–16, but this argument never gets off the ground. Plaintiffs do not appear to assert that *people*, generally, have a substantive-due-process right to any particular medical treatment, much less hormone replacement, specifically. And how could they? Such a right would not even arguably be "objectively, deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721 (quotations omitted). The "novelty" of Plaintiffs' claim alone "is reason enough to doubt that 'substantive due process' sustains it." *Reno v. Flores*, 507 U.S. 292, 303 (1993).

And because there is no general substantive due process right to hormone replacement, there is no *parental* substantive-due-process right to hormone replacement for minor children either. A parental claim cannot be stronger than the child's own claim, *Doe v. Pub. Health Trust of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983), and no one

-13-

has a right to this particular medical intervention. Because "[a parent's] rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself," *id.*, Plaintiffs' claim fails.

To the extent Plaintiffs *do* claim a general right to hormone replacement treatments under substantive due process, their argument fails again. Federal appellate courts have virtually unanimously rejected substantive-due-process claims to a wide variety of supposed rights to medical procedures or therapies. The Supreme Court has rejected a substantive-due-process right to abortion—a procedure that was at least historically *known* if not historically protected. *Dobbs*, 142 S. Ct. at 2242–43. The Eleventh Circuit has rejected the assertion of "a fundamental right to father a child through the use of advanced IVF procedures." *Morrissey*, 871 F.3d at 1269. Among other reasons, the Court emphasized that the procedure was a "decidedly modern phenomen[on]," dating only to the late 1970s. *Id.* So too for "experimental drugs," *Abigail Alliance for Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695, 711 (D.C. Cir. 2007) (en banc), and medical marijuana, *Raich v. Gonzales*, 500 F.3d 850, 866 (9th Cir. 2007), among others.

Hormone replacement is a "decidedly modern phenomen[on]." *Morrissey*, 871 F.3d at 1269. And when applied to children, it is outright experimental: for instance, the National Institutes of Health funded its first long term study for adolescent transitioning treatments in only *2015. See* Juliana Bunim, *First U.S. Study of Transgender Youth Funded by NIH*, U.C. SAN FRANCISCO (Aug. 17, 2015), https://www.ucsf.edu/news/2015/08/131301/first-us-study-transgender-youth-funded-nih.

Parents, of course, have the right to direct the medical care of their children, but they can't obtain medical interventions for their children that *no one* has a right to, simply because it is for their child rather than for themselves. Such a holding would actually make children *uniquely* vulnerable to experimental treatments, since parents would be able to deny their children the general protection of the state's laws where even adults could not. That is not right, and Plaintiffs' substantive due process claim is likely to fail.

### B. Plaintiffs' equal protection claim is unlikely to succeed because SB 140 does not discriminate.

Plaintiffs' equal protection claim is no more successful. SB 140 does not discriminate based on sex or gender identity: no male or female, whether trans-identifying or otherwise, can access hormone replacement interventions. Nor does it "target" any particular class. Plaintiffs toss together sloppy logic and *Bostock* and hope to come out the other side with an equal protection claim. They don't. Georgia has wide latitude to regulate medical procedures, and it did so appropriately here.

**1.** Plaintiffs first argue that SB 140 discriminates on the basis of sex, Mem. at 17–18, but it plainly doesn't. The Act does not even purport to differentiate between the sexes. It explicitly bans hormone replacement for *all minors*. 2023 Ga. Laws 4, § 3. To overcome this, Plaintiffs assert that SB 140 nevertheless differentiates between the sexes because a physician would have to "know" a child's sex to know whether he could prescribe a therapy. Mem. at 18. But that simply isn't true. All the physician would have to know is that the child seeks "hormone replacement therapies." 2023 Ga. Laws 4, § 3. If

so, they are prohibited. If not, then not. Plaintiffs try to reframe the question as whether a physician could provide "testosterone" to a child—to a male, yes, to a female, no—so it must be a sex-based distinction. Mem. at 18. But that misunderstands the analysis. Physicians don't just hand out testosterone to males any more than they would hand out prescription drugs or perform particular surgeries on a lark. They respond to a particular *pathology*. A male child *might* need testosterone if he has low testosterone levels, but he would *not* if he wants extra testosterone so he can hit more home runs. SB 140 simply says that a child—any child, male or female—cannot obtain hormone replacement to treat gender dysphoria. No physician needs to "know" a child's sex to know that.

Moreover, Plaintiffs are wrong that mere knowledge of the sex of the recipient is sufficient to invoke a sex-based distinction under the Equal Protection Clause. Just last year, the Supreme Court reaffirmed that this is *not* the case in rejecting an equal protection argument for abortion. "The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245–46 (*quoting Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). This, despite the fact that the physician "knows" that only a woman would have an abortion. Likewise, just because only a minor female seeking hormone replacement would use testosterone does not mean that SB 140 somehow discriminates between females and males. (And whatever one says about SB 140, there is no plausible case that it is a "mere pretext" to discriminate against one *sex*.)

Plaintiffs erroneously try to press *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), into service, arguing that it stands for the proposition that a law that "targets transgender individuals … constitutes sex-based discrimination." Mem. at 18. But SB 140 does not target any particular class, and *Bostock* stands for no such thing. *Bostock* simply held (in interpreting a statute, *not* the Equal Protection Clause) that firing a trans-identifying individual on the basis of their gender identity is discrimination "based on" sex, because sex is a "but for" cause of the firing. 140 S. Ct. at 1739, 1745. If the person's biological sex were different, they would not be fired, hence, sex was a cause for the firing. *Id.*

But that reasoning doesn't translate here for at least two reasons. First, as explained above, nothing here *is* dependent on a child's sex. Whether male or female, they cannot obtain hormone replacement. If a girl were instead a boy, the physician *still* could not prescribe hormone replacement. Second, *Bostock* interpreted Title VII to mean that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." 140 S. Ct. at 1741. By its own terms, *Bostock* did not resolve the interpretation of any other statute (or even other circumstances under Title VII), much less the Equal Protection Clause. *Id.* at 1753. And its reasoning does not translate to the medical context, where males and females are *not* "similarly situated." *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A physician does not wrongly discriminate based on sex by screening women for cervical cancer and men for testicular cancer. Likewise, even if a physician were somehow required to treat sexes

-17-

slightly different based on SB 140, it would be based on the *inherent* differences in the sexes. If anything, it would be more akin to sex discrimination if the law prohibited *only* hormone replacement interventions using, e.g., testosterone. That would mean, in practical terms, that only females were protected from the practice. Yet in Plaintiffs' world, that would *not* be a sex-based determination because physicians are ostensibly prohibited from prescribing testosterone to both sexes. This sort of thinking blinks reality, and it certainly isn't mandated by the Equal Protection Clause.

**2.** Plaintiffs next argue that SB 140 targets "transgender people," who "are members of a suspect class." Mem. at 19. Not so. SB 140 does not target trans-identifying people. It prohibits a certain type of intervention as a treatment for gender dysphoria. Not all those with gender dysphoria seek hormone replacement, not all with gender dysphoria identify as trans, and not all who identify as trans experience clinical levels of gender dysphoria. (Or, if Plaintiffs disagree with any of this, they haven't said so, much less proven it.) In any event, even if a particular procedure affected only one class, regulation of that procedure is not therefore regulation of that class. *See Dobbs*, 142 S. Ct. at 2245–46.

Moreover, there is no suspect class at issue here. Trans-identifying persons are not "politically powerless," and Plaintiffs have hardly tried to establish either that point or any other indicia tending to show a suspect class. *Lyng*, 477 U.S. at 638. Plaintiffs baldly *assert* that they "lack the political power to achieve full equality through the political process." Mem. at 19. But even those suffering mental illness are not a suspect class. *City*

*of Cleburne*, 473 U.S. at 442. Plaintiffs cannot justify a claim to suspect class status, and they have barely tried.

### C. SB 140 passes even heightened scrutiny.

Because no fundamental right is at stake, Georgia's law, "like other health and welfare laws, is entitled to a 'strong presumption of validity." *Dobbs*, 142 S. Ct. at 2284 (quotation omitted). "It must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Id*. SB 140 easily survives such scrutiny.

But even assuming that, for some reason, SB 140 did require heightened scrutiny under the Equal Protection Clause, it would pass muster. To satisfy the heightened (or "intermediate") scrutiny applied to sex-selective classifications, a policy must "(1) advance an important governmental objective and (2) be substantially related to that objective." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 (11th Cir. 2022) (en banc). Laws premised on biological differences are "consistent with the constitutional guarantee of equal protection." *Nguyen v. I.N.S.*, 533 U.S. 53, 59 (2001). Where the law "takes into account a biological difference," "differential treatment is inherent in a sensible statutory scheme" and "is neither surprising nor troublesome from a constitutional perspective." *Id*. at 63–64. Put another way, "[t]he two sexes are not fungible." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (quotation omitted).

Georgia has a number of important governmental objectives and SB 140 is plainly related to those objectives. "It is indisputable 'that a State's interest in safeguarding the

physical and psychological well-being of a minor is compelling.'" *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020) (*quoting New York v. Ferber*, 458 U.S. 747, 756–57 (1982)). Georgia also has an interest in regulating medicine and experimental medical treatments on minors in Georgia. *See Dobbs*, 142 S. Ct. at 2268 ("[C]ourts [generally] defer to the judgments of legislatures in areas fraught with medical and scientific uncertainties" (quotation omitted)); *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (States have "a significant role to play in regulating the medical profession").

Life-altering transition treatments implicate Georgia's interest in protecting children. Georgia made clear what its view is, finding that many children with gender dysphoria "do not persist," hormone replacement has "irreversible effects," and many individuals "regret[] undergoing such treatment and the permanent physical harm it caused." 2023 Ga. Laws 4, § 1. Plaintiffs cite their own cherry-picked evidence, but it does not hold up on closer inspection. Comprehensive reviews in numerous other countries, including Finland, Sweden, Norway, and England, have led to *very* different conclusions than what Plaintiffs put forth here. *See, e.g.*, Expert Declaration of James Cantor, PhD, *L.W. v. Skrmetti*, No. 23-CV-376 (M.D. Tenn. May 19, 2023), Doc. 113-3. In any event, Georgia need not take the word of Plaintiffs' experts: it can come to its own conclusions on the scientific evidence. *See, e.g.*, *Marshall v. United States*, 414 U.S. 417, 427 (1974) ("When Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation …."); *Jones v. United States*, 463 U.S. 354, 364 n.13

(1983) ("We do not agree with the suggestion that Congress' power to legislate in this area depends on research conducted by the psychiatric community.").

And of course, prohibiting these interventions is a narrowly tailored path to protecting children from the harm Georgia identified. Notably, given the State's particular interest in protecting children, it did not ban the procedures for consenting adults (though it could have done that too, given the medical uncertainties and harms involved). Nor did it restrict other, safer treatments for treating gender dysphoria, such as psychotherapy. Finally, SB 140 exempts minors born with a "medically verifiable disorder of sex development, including individuals born with ambiguous genitalia or chromosomal abnormalities resulting in ambiguity regarding the individual's biological sex" or "partial androgen insensitivity syndrome," and minors who already were receiving hormone replacement treatment when SB 140 went into effect, recognizing that these cases may involve different considerations. 2023 Ga. Laws 4, § 3(b)(2)–(4). SB 140 does what it needs to and no more. It is valid.

## IV. The balance of equities leans against Plaintiffs.

Plaintiffs have made little effort to establish that the equities lean in their favor. The State's interests here, as well as the public interest, weigh against an injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party."). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567 U.S. at 1303. The General Assembly and the Governor, in enacting SB 140 and signing it

into law, have already weighed the public's interest and determined that it is best served by the enforcement of the laws relating to the regulation of hospitals and related institutions and physicians, as amended by SB 140. And the public has an interest in seeing its own statutes enforced.

Finally, Plaintiffs' delay in commencing this action weighs against the entry of injunctive relief (in addition to disproving their claims of irreparable harm). Plaintiffs have asked this Court, on short notice and without the benefit of full and considered briefing by the parties, to take the extraordinary step of enjoining the operation of a state law that was enacted to protect the health of minors. Plaintiffs offer no explanation for why they waited three months to file this challenge. That is a significant period of time. If Plaintiffs had sought emergency relief even a month ago (never mind three months ago), it would have allowed for a much more orderly process. Plaintiffs' sudden desire for speed now, when it threatens to preclude the level of advocacy that one would hope for and expect, is inexplicable, and it fatally undermines their request.

## CONCLUSION

For the reasons given above, Plaintiffs' motion (Doc. 2) should be denied.

Defendants do not waive and instead reserve their rights to a hearing, to present affidavits and/or other evidence in opposition to the motion, and to request a bond, in the event an injunction is entered.

Respectfully submitted on July 3, 2023,

> _/s/ Stephen J. Petrany_
> Christopher M. Carr
> _Attorney General_
> Georgia Bar No. 112505
> Stephen J. Petrany
> _Solicitor General_
> Georgia Bar No. 718981
> Ross W. Bergethon
> _Principal Deputy Solicitor General_
> Georgia Bar No. 054321
> Georgia Department of Law
> 40 Capitol Square SW
> Atlanta, Georgia, 30334
> 404-458-3408
> spetrany@law.ga.gov

## **CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief conforms to the requirements of L.R. 5.1C. The brief is prepared in 14 point Times New Roman font.

*s/ Stephen J. Petrany*
Counsel for Defendants

## **CERTIFICATE OF SERVICE**

I certify that I have this day served the foregoing pleading with the Clerk of Court using the CM/ECF system which will automatically send email notification to the attorneys of record.

This 3rd day of July, 2023.

*s/ Stephen J. Petrany*
Counsel for Defendants