# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| EMMA KOE et al., <br><br> Plaintiffs, <br><br> v. <br><br> CAYLEE NOGGLE et al., <br><br> Defendants. | Civil Action No. 1:23-cv-02904-SEG |

# REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION

Attempting to defend a law that denies transgender minors a treatment every major medical organization in the country agrees is safe, effective, and medically appropriate, the State mischaracterizes its own statute, attacks claims Plaintiffs do not make, and ignores the imminent harm Plaintiffs will suffer when deprived of treatment they need. As nearly every court to consider similar laws has concluded, Georgia's ban on hormone therapy for transgender minors is likely unconstitutional. Only preliminary injunctive relief can avoid the irreparable injury Plaintiffs imminently face.

Unable to defend S.B. 140[1] on its terms, the State misrepresents it. It insists the Ban is not discriminatory because it prevents *all* minors from receiving hormone therapy. Opp. 3. But S.B. 140 prohibits hormone therapy *only* "for the treatment of gender dysphoria," a medical condition that exclusively affects transgender individuals. S.B. 140 §§ 2(a), 3(a). Because the Ban permits hormone therapy for minors whose gender identity conforms with their natal sex, while prohibiting the same treatment for transgender minors, it discriminates based on transgender status and sex in violation of the Equal Protection Clause.

The State's due process arguments fare no better. The State concedes parents

---

[1] This Reply uses the same defined terms as the memorandum in support of Plaintiffs' Motion. Dkt. 2-1 ("Pls.' Mem.").

1

have a right to direct the medical care of their children. But it claims there is no right to a particular medical treatment—here, hormone therapy—because there is no deeply rooted history of a right to "hormone replacement treatments." Opp. 2. Neither the Supreme Court nor the Eleventh Circuit has framed this long-recognized fundamental right in terms of access to a specific medical treatment.

Like many governments that have used "power as an instrument of oppression," *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990), the State tries to rationalize the Ban as "protect[ing] children." Opp. 5. Not only does this directly contradict medical consensus and scientific evidence, it collapses under the weight of the statute itself. If hormone therapy is "unnecessary and irreversible medical treatment," *id*., why does the State let non-transgender youth, and transgender minors who had already started the treatment by July 1, continue to receive that treatment? The State makes no attempt to explain these discrepancies.

The State callously argues that the Ban has not harmed and will not imminently harm Plaintiffs because they have not set a date to begin hormone therapy treatments. Opp. 9-10. But each Minor Plaintiff will begin hormone therapy, or puberty blockers to be followed by hormone therapy, in the near future. S.B. 140 strips them of access to this safe, effective, and established treatment. Unless the Court steps in, these young people will suffer physical and psychological harm

from being unable to follow the treatment plans recommended by their doctors. And their parents will continue to face an unconscionable choice: watch their children suffer or uproot their families to access treatment outside Georgia. These harms are not remote or speculative; Plaintiffs are experiencing them *right now*.

Though the State does not mention it, nearly every court to consider challenges to similar bans has concluded they are likely unconstitutional. Under Supreme Court and Eleventh Circuit precedent, (1) Plaintiffs are likely to show the Ban violates the Equal Protection and Due Process Clauses, (2) the Ban will cause imminent and irreparable harm to Plaintiffs, and (3) the equities and public interest favor injunctive relief. The Court should grant Plaintiffs' motion.

I. **ARGUMENT**

   A. **Plaintiffs Have Shown a Likelihood of Success on the Merits.**

By banning safe and effective care for "treatment of gender dysphoria in minors," the Ban singles out transgender minors for unequal treatment and infringes parents' constitutional right to make medical decisions for their children. The State's asserted interests do not justify the Ban under any level of scrutiny.[2]

---

[2] The State makes a passing reference to Eleventh Amendment immunity, Opp. 12 n.3, but that does not apply where, as here, Plaintiffs seek prospective injunctive relief. *See Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011).

### 1. *The Ban Discriminates on the Basis of Sex and Transgender Status and Targets a Quasi-Suspect Class.*

The State's arguments that the Ban does not draw lines based on sex and transgender status or target members of a suspect class fail. The Ban does both and is subject to heightened scrutiny for these two independent reasons.

To start, there is no question the Ban prohibits hormone therapy for minors *only* when prescribed for gender dysphoria. S.B. 140 §§ 2(a), 3(a). Transgender identity is inherent in a gender dysphoria diagnosis: an individual suffers from gender dysphoria *only* when their natal sex is misaligned with their gender identity. Shumer Decl. ¶¶ 25, 37. The State argues that the Ban nonetheless does not discriminate against transgender minors because not all transgender minors experience clinical gender dysphoria or seek treatment the Ban prohibits. Opp. 18. But the salient point is that all minors who *do* seek prohibited treatment are by definition transgender, given that the ban applies only to treatment of *gender dysphoria*.

The Supreme Court and Eleventh Circuit have recognized that classifications based on transgender status are sex-based distinctions. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020) ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) ("[D]iscriminating against someone on the basis of his or her gender non-conformity

4

constitutes sex-based discrimination under the Equal Protection Clause."). The State's argument that the Ban does not draw sex-based lines because it prohibits all minors from accessing hormone therapy to treat gender dysphoria (Opp. 15-16) cannot be sustained under *Bostock* and *Brumby*.

The State ignores *Brumby*, and its efforts to sidestep *Bostock* fail. Nothing in *Bostock* confines the Court's core logic that transgender discrimination necessarily is sex discrimination to Title VII. *See Bostock*, 140 S. Ct. at 1741-43. The Eleventh Circuit in any event has directly held that "discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause." *Brumby*, 663 F.3d at 1316.

The State further argues that, even if discrimination based on transgender status is sex-based discrimination for employment purposes, the medical context is different because the sexes purportedly are not "similarly situated." Opp. 17. Inherent differences between the sexes, however, are potentially relevant only in determining whether a law *survives* intermediate scrutiny—not whether a law is *subject to* intermediate scrutiny. *See, e.g.*, *Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022); *Doe v. Ladapo*, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023).

The State's reliance on cases involving pregnancy and abortion to argue that "mere knowledge of the sex of the recipient" of a treatment is not "sufficient to

5

invoke a sex-based distinction under the Equal Protection Clause" gets it nowhere. Opp. 16 (citing *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022); *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). This case does not involve medical care that only patients of one natal sex would receive, so there is no need to evaluate whether the Ban is "a mere pretext designed to effect an invidious discrimination against members of one sex." *Dobbs*, 142 S. Ct. at 2246. The Ban addresses treatments all minors can receive, but which the State has chosen to prohibit only for transgender minors. *See Ladapo*, 2023 WL 3833848, at *10 (distinguishing *Geduldig*). Because the Ban imposes "differential treatment based on sex and transgender status," it is subject to heightened scrutiny. *Id.*

The Ban is also separately subject to heightened scrutiny because transgender individuals constitute a suspect class. The State argues in conclusory fashion that transgender individuals do not satisfy the relevant criteria for a suspect class. Opp. 18-19. Courts overwhelmingly disagree. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610-13 (4th Cir. 2020) (collecting cases and holding "transgender persons constitute a quasi-suspect class").

> 2. *The Ban Infringes Parents' Fundamental Right to Direct the Medical Care of Their Children.*

The Fourteenth Amendment protects parents' right to make decisions about "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57,

66 (2000) (plurality). Parents' ability to make medical decisions for their children is central to this right. *Bendiburg*, 909 F.2d at 470; *see* Opp. 15. Since this right is well established—it is "perhaps the oldest of the fundamental liberty interests" the Supreme Court has recognized, *Troxel*, 530 U.S. at 65—the State's reliance on cases urging caution in recognizing *new* rights, Opp. 12-13, is misplaced.

The State recasts the parental right at issue as a "right to give or deny hormone replacement to their children," arguing that this right could not be "deeply rooted in this Nation's history and tradition" given the treatment's relative "novelty." Opp. 13. But courts recognizing the fundamental right to direct the medical care of one's children do not define the right as treatment-specific.[3] Under the State's distorted view, the parental right would extend only to treatments available at the Founding—ruling out virtually all modern medicine. That is not the law, as nearly every court considering challenges to similar statutes has recognized.[4]

The State is also wrong that parents' right to direct the medical care of their

---

[3] *See, e.g.*, *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (parents "retain plenary authority to seek [mental health] care for their children, subject to a physician's independent medical judgment"); *Bendiburg*, 909 F.2d at 470 ("the state cannot willfully disregard the right of parents to generally make decisions concerning the treatment to be given their children").

[4] *See, e.g.*, *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1146 (M.D. Ala. 2022); *Ladapo*, 2023 WL 3833848, at *11; *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892-93 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022).

children is dependent on a "general substantive due process right to hormone replacement." Opp. 13. No precedent suggests that parents' right to make decisions about their children's care depends on the existence of an underlying right belonging to the child. The Supreme Court has held that parents have a right to decide whether their child attends public or private school, *Pierce v. Soc'y of Sisters of Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925), even though children do not have a constitutional right to public education, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973). Cases in which courts have declined to recognize a fundamental right to particular treatment (Opp. 14) are beside the point.[5]

The State's attempt to label hormone therapy as "experimental" (Opp. 14) ignores extensive evidence demonstrating that hormones "are established medical treatments essential to the well-being of many transgender children: every major medical organization in the United States agrees that these treatments are safe,

---

[5] *Doe v. Public Health Trust of Dade County*, 696 F.2d 901 (11th Cir. 1983) (per curiam), does not help the State. The Eleventh Circuit affirmed that "parents have the right to decide what medical attention should or should not be provided for their children" and recognized that the plaintiff exercised that right by voluntarily admitting his child for treatment. *Id.* at 903. The court observed that a father's "rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself" in explaining that a parent does not have a right to dictate a treatment plan to medical staff. *Id.* By contrast, the Ban interferes with parents' ability to make treatment decisions that health care providers agree are appropriate and medically necessary for their children.

effective, and appropriate when used in accordance with clinical guidelines." *Doe v. Thornbury*, 2023 WL 4230481, at *6 (W.D. Ky. June 28, 2023); *see also, e.g.*, Pls.' Mem. 7-11; McNamara Decl. ¶¶ 13, 18-21, 27, 28.[6] The State cites no case holding that the government can prohibit parents from accessing established, effective care for their children. The Constitution does not permit that result.

        3.     *The Ban Cannot Survive Any Level of Review.*

The State's purported interests in "protecting children" from "risky," "understudied," or "experimental" treatments (Opp. 8, 19-20) do not withstand any level of scrutiny. Hormone therapy is a critical element of the standard of care adopted by every major professional medical and mental health association in the country. McNamara Decl. ¶¶ 21, 63; Massey Decl. ¶¶ 8, 51. Before initiating hormone therapy, a multidisciplinary team conducts a comprehensive physical and mental evaluation, creates an individualized treatment plan, and obtains informed consent from the patient and their parents. Shumer Decl. ¶¶ 40, 59, 75. Medically

---

[6] The Sixth Circuit broke from other courts on this issue based largely on the premise that the absence of FDA approval for a treatment for a specific condition suggests there is "medical and scientific" uncertainty about its safety or efficacy. *See L.W. v. Skrmetti*, 2023 WL 4410576, at *4-5 (6th Cir. July 8, 2023). That view is inconsistent with medical practice, as other courts have recognized. *See, e.g.*, *United States v. Carolina*, 703 F.3d 149, 153 (2d Cir. 2012); *see also Dekker v. Weida*, 2023 WL 4102243, at *19 (N.D. Fla. June 21, 2023) ("That the FDA has not approved [hormones] for treatment of gender dysphoria says precisely nothing about whether the drugs are safe and effective when used for that purpose.").

9

appropriate hormone therapy is effective: it reduces gender dysphoria, improves psychological functioning, and reduces suicide risk. McNamara Decl. ¶¶ 35-41.[7]

The State dismisses this evidence as "cherry-picked," arguing that other countries have reached "*very* different conclusions." Opp. 20. Not so. Even the supposed expert the State cites admits that no country has categorically banned hormone therapy for treating gender dysphoria in minors like Georgia has. *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1143 (M.D. Ala. 2022). The weight of scientific evidence establishes that banning safe, effective, and medically necessary care will harm, rather than protect, transgender minors. McNamara Decl. ¶¶ 46-50; Shumer Decl. ¶¶ 42-44, 91-93; Massey Decl. ¶¶ 30-35, 45, 51; *see* Brief of Amici Curiae American Academy of Pediatrics et al., Dkt. No. 23-1 at 29-33.

The State's repeated assertion that the Ban is necessary to "protect children" (*e.g.*, Opp. 5, 20) cannot be squared with the fact that the Ban permits hormone treatment "for medical conditions other than gender dysphoria" and for transgender minors who began treatment prior to July 1. S.B. 140 § 3(b). "[T]he protection of children in general [is not] a sufficiently persuasive justification [for the Ban] given the statute allows the same treatments for [non-transgender] minors."

---

[7] By contrast, no research demonstrates psychotherapy alone is an effective treatment for gender dysphoria in adolescents. McNamara Decl. ¶¶ 51-54.

10

*Thornbury*, 2023 WL 4230481, at *4. The State does not explain why hormone therapy is unsafe for transgender minors starting treatment after July 1, but sufficiently safe for all other minors in the State to access that treatment option.[8]

Even if Georgia's purposes were compelling, the Ban is not properly tailored. There are "numerous and obvious less-burdensome alternatives" short of a blanket prohibition that would advance the State's purported objectives. *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1299 (11th Cir. 2017). The State does not deny that there are transgender minors in Georgia who would greatly benefit from treatment with hormone therapy prohibited by the Ban. To the extent the State has concerns about a risk of inaccurate diagnosis or rushed treatment, *see* S.B. 140 § 1, there are ways to address that issue without instituting a flat prohibition on hormone therapy for any transgender minor who had not started the treatment before July 1. *See, e.g.*, *Eknes-Tucker*, 603 F. Supp. 3d at 1146.

### B.     Plaintiffs Have Shown Article III Injury and Irreparable Harm.

The State's arguments that Plaintiffs have not shown Article III injury or irreparable harm absent injunctive relief misconstrue the facts and law. The State

---

[8] The State offers no evidence that hormone therapy is "risky" (Opp. 8) for minors relative to other accepted medical treatments, but the fact that a treatment "involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603.

11

does not dispute that denial of medically necessary care constitutes irreparable harm. *See, e.g.*, *Edmonds v. Levine*, 417 F. Supp. 2d 1323, 1342 (S.D. Fla. 2006). The State argues only that such harm is too remote in this case, because Plaintiffs supposedly have not "decided to undergo hormone replacement therapy or made plans to begin such therapy at any specific point." Opp. 10. That is wrong.

Each Minor Plaintiff has been diagnosed with gender dysphoria; has been receiving some form of gender-affirming care for years; and has decided in consultation with their parents and physicians to begin hormone therapy, or puberty blockers to be followed by hormone therapy, in the near future. *See* Pls.' Mem. 2-7, 23. These are not treatment choices Plaintiffs *may* make in the future; they are choices Plaintiffs have already made. Indeed, Amy Koe and Tori Moe are already taking puberty blockers and will transition to hormone therapy soon. *See* Pls.' Mem. 2-4. That their parents and medical providers have not rushed them onto hormone therapy to beat an arbitrary deadline does not change the fact that when they would otherwise begin that treatment in the near future, they will be unable to access it.[9]

---

[9] The availability of puberty-blocking medication does not solve the problem: due to the risks of prolonged use of these medications, it would be contrary to the standards of care for Minor Plaintiffs to continue to take them until they turn 18. Shumer Decl. ¶¶ 88, 96-98. These Plaintiffs thus risk losing access to all gender-affirming care absent a preliminary injunction, and every Plaintiff family will lose the right to pursue individualized care in consultation with their medical providers.

Both the Article III and irreparable harm inquiries ask whether injury is "imminent." *See Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) (Article III); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (preliminary injunction). Imminence is "somewhat elastic," and it "requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Fla. State Conf. of NAACP*, 522 F.3d at 1161. To establish standing and irreparable harm, Plaintiffs need not prove they are presently experiencing—or will experience within days or weeks—harms that are extremely likely to materialize in the near future. *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("[O]ne does not have to await the consummation of threatened injury to obtain preventative relief."); *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1281 (11th Cir. 2020) (injury expected to "occur only months from now" was "certainly impending").[10]

The State also wrongly asserts that the timing of Plaintiffs' suit defeats any showing of imminent harm. Opp. 11, 22. The State's lone case offers no support:

---

[10] The State's argument that TransParent has not shown an Article III injury (Opp. 10 n.2) fails for the same reason. Brent Soe, the child of a TransParent member, is 16 and "will need to start hormone therapy to treat his gender dysphoria soon." Soe Decl. ¶ 17. This is imminent harm.

13

the plaintiffs in *Wreal* waited five months *after* filing suit to seek a preliminary injunction and "failed to offer any explanation" why. 840 F.3d at 1248. Where, as here, purported delay results from taking time to understand the impact of the law, consider options, and gather evidence, courts regularly find a few-month delay reasonable. *See Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238, 1285-86 (N.D. Fla. 2021) (three-month delay); *Georgia v. United States*, 398 F. Supp. 3d 1330, 1347 (S.D. Ga. 2019) (two-and-a-half-month delay); *Intec, Inc. v. Monster Cable Prods. Inc.*, 2011 WL 13223537, at *3 (S.D. Fla. Sept. 6, 2011) (three-month delay filing suit and additional two-month delay seeking preliminary injunction).

### C. Plaintiffs Have Satisfied Article III's Redressability Requirement.

As the State acknowledges, the Department of Community Health and Georgia Composite Medical Board are charged with enforcing the Ban. Opp. 6. It follows that an injunction against them will "significantly increase the likelihood of redressing plaintiffs' injuries"—unlike in cases where the plaintiff sued only officials whose enforcement authority was "highly speculative at best and non-existent at worst." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1205 (11th Cir. 2021). The State argues that an injunction may not provide *complete* relief because "other state officials could ... enforce" the misdemeanor provision (Opp. 11), but complete relief is not required for standing. *See Losch v. Nationstar*

*Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) (plaintiff had standing even if only "a small part of the [total] injury [was] attributable to" defendant).[11] Moreover, under Rule 65(d), an injunction would be binding upon Defendants, "their officers, agents, servants, employees, and attorneys, *and upon those persons in active concert or participation with them* who receive actual notice of the order by personal service or otherwise," which would encompass "other state officials" with enforcement authority. *Am. Booksellers Ass'n, Inc. v. Webb*, 590 F. Supp. 677, 693 (N.D. Ga. 1984); *see also ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999).

### D. The Balance of Equities and Public Interest Favor an Injunction.

The State's arguments on the remaining factors—the balance of equities and public interest—add nothing to the analysis. The State simply repeats its assertion that Plaintiffs unreasonably delayed filing suit and presumes the Ban is constitutional such that the State has a valid interest in enforcing it. Opp. 21-22. As shown above, neither argument has merit. A preliminary injunction is warranted.

## II. CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction.

---

[11] Under S.B. 140's amendment to Title 31, it is the Department of Community Health, *not* other state agencies or officials, that has authority to "establish sanctions, by rule and regulation, for violations of this Code."

15

Respectfully submitted this 12th day of July, 2023.

SOUTHERN POVERTY LAW CENTER
Elizabeth Littrell
Maya Rajaratnam
150 Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
Phone: (404) 221-5876
Beth.Littrell@splcenter.org
Maya.Rajaratnam@splcenter.org

Scott D. McCoy*
2 Biscayne Boulevard, Suite 3750
Miami, FL 33131
Phone: (334) 224-4309
Scott.McCoy@splcenter.org


AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA
Cory Isaacson
Nneka Ewulonu
P.O. Box 570738
Atlanta, GA 30357
Phone: (770) 415-5490
CIsaacson@acluga.org
NEwulonu@acluga.org


HUMAN RIGHTS CAMPAIGN FOUNDATION
Cynthia Cheng-Wun Weaver*
Ami Rakesh Patel*
1640 Rhode Island Avenue NW

O'MELVENY & MYERS
/s/ Benjamin G. Bradshaw
Benjamin G. Bradshaw*
Deanna M. Rice*
Meredith Garagiola*
Danielle Siegel*
Patric Reinbold*
Carly Gibbs*
O'MELVENY & MYERS LLP
1625 Eye Street N.W.
Washington, DC 20006
Phone: (202) 383-5300
bbradshaw@omm.com
drice@omm.com
mgaragiola@omm.com
dsiegel@omm.com
preinbold@omm.com
cgibbs@omm.com

Stephen McIntyre*
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Phone: (213) 430-6000
smcintyre@omm.com

Paul Sieben*
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025
Phone: (650) 473-2600
psieben@omm.com

Jennifer Beard*

Washington, DC 20036  
Phone: (202) 993-4180  
Cynthia.Weaver@hrc.org  
Ami.Patel@hrc.org  

O'MELVENY & MYERS LLP  
Two Embarcadero Center  
28th Floor  
San Francisco, CA 94111  
Phone: (415) 984-8700  
jbeard@omm.com  

*Admitted pro hac vice  

*Attorneys for Plaintiffs*

## **CERTIFICATE OF COMPLIANCE WITH FONT REQUIREMENT**

As required by Local Rule 7.1(D), I hereby certify that this brief has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).

/s/ Benjamin G. Bradshaw
Benjamin G. Bradshaw

## CERTIFICATE OF SERVICE

I hereby certify that, on July 12, 2023, I electronically filed the foregoing with the Court and served it on opposing counsel through the Court's CM/ECF system. All counsel of record are registered ECF users.

/s/ Benjamin G. Bradshaw
Benjamin G. Bradshaw
