IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| EMMA KOE et al.,<br><br>            Plaintiffs,<br><br>    v.<br><br>CAYLEE NOGGLE et al.,<br><br>            Defendants. | Civil Action No. 1:23-cv-02904-SEG |

## **DECLARATION OF BARBARA F.**

I, Barbara F.,[1] declare as follows:

1. I am over the age of 18 years and am not a party to this action. I have actual knowledge of the following facts and, if called upon to testify to them, could and would do so competently. I am submitting this Declaration in support of Defendants' opposition to Plaintiffs' Motion for a Preliminary Injunction.

2. Georgia recently passed a law prohibiting "(1) Sex reassignment surgeries, or any other surgical procedures, that are performed for the purpose of altering primary or secondary sexual characteristics; or (2) Hormone replacement therapies" for minors as treatment for gender dysphoria. Ga. Code Ann. § 31-7-3.5. This Act will provide parents with necessary protections against manipulation and coercion on the part of health care providers and confused children to comply with demands for medical interventions aimed at "affirming" a child's professed discordant gender identity under threats of alienation or loss of a child to suicide.

3. There is no such parent and child-protective law in my home state, where "gender-affirming" providers and clinicians have blatantly disregarded my decisions related to my child's medical and mental health. Georgia's law will

---

[1] Declarant is submitting this Declaration using a pseudonym to protect the privacy of her children and other family members.

prevent its parents and children from suffering harm like mine and my daughter's.

4. When my daughter, B, was young, her father (my ex-husband) gave B's brother preferential treatment. B's father also ridiculed her for having traits similar to mine, such as the way we both laugh.

5. When B was 11 years old, she told me she identified as a boy and wanted me to call her by a male name she had chosen. B's father championed her new "male" identity and harassed me for not affirming it. He accused me of emotional abuse and called child protection services against me. B's father convinced B to avoid visiting me under our custody agreement unless I affirmed the discordant identity.

6. Shortly after B announced that she identified as a boy, I acted on the advice of our family physician and took B to a gender clinic. I naively believed that the clinic's psychologist would evaluate and provide counseling to discuss B's sudden identification as a boy before medical intervention to "affirm" her choice.

7. When we arrived at the clinic, the staff psychologist did an evaluation. However, the psychologist also said she did not have time to see B regularly for more in-depth psychological help. I told the clinic staff that B needed psychological counseling before starting any medical interventions (i.e., seeing an endocrinologist). As a parent, I was confused why there were two different offices: Why would we visit with an endocrinologist if the psychologist (as a gatekeeper) isn't prioritizing seeing my child regularly? I was instantly troubled by the clear lack of any regard for my child's underlying comorbidities. I could picture my child on a conveyor belt, as if she was just one more coin in their purse.

8. That same day, the clinic left me alone in a room for 2 hours. While I waited, I thought the psychologist was talking to my child, and then my ex-husband. However, it turned out that B and her father secretly met with the clinic's endocrinologist without my knowledge or consent to discuss starting her puberty blockers. After their secret meeting, the endocrinologist returned to my room to speak with me and my daughter to "get me on board" with the treatment.

9. I had researched puberty blockers and cross-sex hormone therapy and was concerned about their unproven safety and efficacy. When I raised these

concerns, the endocrinologist said no studies show that the drugs aren't safe. She also told me in front of my daughter that I needed "to get on board if I don't want my daughter to commit suicide."

10. My ex-husband and I have shared decision-making authority for our children's medical care. I have repeatedly notified clinic staff, orally and in writing, that I do not consent to them treating B. The clinic staff ignored my directions.

11. The clinic and B's father have continued with regular consultations with my daughter without my consent. I have reviewed documents from the clinic where staff noted that they plan to "convince me" to consent to the medical interventions. The notion of "informed consent" or parental decision-making was non-existent.

12. The availability and promotion of "gender-affirming" medical intervention for minors were used to drive a wedge between B and me, preventing B from receiving counseling for underlying mental health issues and exposing her to unknown long-term medical and mental health consequences without my consent.

13. Georgia's Act prevents such coercive manipulation and potential harm against its vulnerable children and should be upheld to protect children and their families.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2023.

*/s/ Barbara F.*
Barbara F. (pseudonym)