STATE OF NORTH CAROLINA
COUNTY OF GASTON

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23 CVS 2375

FILED
2023 JUL 17  P 4: 01
GASTON COUNTY, C.S.C.
BY_____

CHARLIE MOSLEY, a.k.a. PRISHA
MOSLEY, a.k.a. ABIGAIL MOSLEY,

    Plaintiff,

v.

ERIC T. EMERSON, MD; PIEDMONT
PLASTIC SURGERY AND
DERMATOLOGY, P.A.; BRIE KLEIN-
FOWLER; FAMILY SOLUTIONS, PLLC;
SHANA GORDON; TREE OF LIFE
COUNSELING, PLLC; MARTHA
FAIRBANKS PERRY, MD; and MOSES
CONE MEDICAL SERVICES, INC.,

    Defendants.

**COMPLAINT AND JURY DEMAND**

Charlie Mosley, who goes by the name Prisha Mosley and previously was known as

Abigail Mosley (hereinafter, "Prisha Mosley" or "Prisha"), hereby alleges as follows:

    1.    Prisha Mosley brings this complaint against Defendants for fraud, facilitation of

fraud, breach of fiduciary duty rising to the level of constructive fraud, civil conspiracy, medical

malpractice, negligent infliction of emotional distress, and unfair and deceptive trade practices

for the years of psychological and physical pain she has suffered, and will continue to suffer, at

the hands of doctors and counselors she trusted to take care of her and tell her the truth but

instead withheld information, concealed and misrepresented her psychological and physical

condition, and failed to perform their services in compliance with applicable standards of care.

    2.    Instead of telling Prisha the truth and informing her accurately and fully,

Defendants lied to Prisha. They lied when they told Prisha she was actually a boy; they lied when

they told her that injecting testosterone into her body would solve her numerous, profound

mental and psychological health problems; and they lied when they told her about the nature and effects of "breast reduction" surgery, which in actuality was a surgery to remove her healthy breasts and render her incapable of nursing a child (should she even be able to conceive one, which, due to her taking testosterone for years, may not be possible). And they lied by omission, withholding critical information from her about the long-term adverse health consequences and permanent damage these "treatments" would cause her, and failing to inform her of alternative courses of treatment for her psychological problems and ensure she had a clear understanding of those alternatives.

3.      Defendants lied to and withheld critical information from and about a young and vulnerable teenage girl, who was a victim of sexual assault and suffering from severe psychological impairment and disability. Instead of providing competent treatment for her depression, anxiety, suicidal ideation, self-harm, and emergent borderline personality disorder, they convinced her that changing her body to appear as the opposite sex would solve her substantial mental disabilities that had plagued her for years. As explained herein, Defendants' diagnoses were fraudulent, reckless, and rife with incompetence and they substantially and permanently compounded Prisha's physical suffering and mental anguish.

4.      These individuals whom Prisha trusted to care for her lied to and misled her into these treatments and procedures for the purpose of making money off of her and bolstering their credentials in the emerging field of so-called "gender-affirming care."

5.      Prisha was a vulnerable teenager when these individuals took advantage of her and deceived her. At the time of Defendants' "diagnoses" and "treatments," Prisha was under severe mental and emotional disability. Prisha continues to live under a degree of disability and only recently, within the past year as a result of counseling and clarity of thought, has been able

to discover and realize that Defendants committed wrongdoing against her and caused her serious injury. To this day, Prisha still does not know or realize the full extent of Defendants' wrongdoing or the damage they have caused.

6.     Despite Defendants' continued and repeated misrepresentations to the contrary – from their entrenched positions of authority over Prisha – Prisha now realizes she is not and never has been a boy. She also now realizes Defendants have caused substantial, permanent, and ongoing pain, suffering, harm, and scarring to her through their inappropriate and fraudulent "treatment." Finally lucid, Prisha only recently realized and discovered Defendants' wrongdoing, including fraud, negligence, and malpractice—years after it was perpetrated.

7.     Prisha has experienced, and expects to continue to experience, pain and suffering and emotional distress as a result of living in a body that has not developed the way it should have, with a voice which she is unable to lift up and with which she is unable to sing, without her breasts and the ability to nurse a child, with shoulders that are too broad and heavy and a waist and hips that are too small and narrow, without her natural hair growth and with unwanted and unnatural body hair growth, with vaginal atrophy, and potentially without the ability to conceive a child. Her distress is made worse by the knowledge and realization that her body is permanently harmed and will never be what it could have been if Defendants had not committed wrongdoing and had instead allowed her body to develop naturally without their life-altering interventions.

8.     No amount of money can undo the damage Prisha has suffered at the hands of Defendants. Nevertheless, to make her whole to the extent law and equity will allow, and to deter these Defendants and others like them from similar misconduct in the future, Prisha requests compensatory and punitive damages to the maximum this Court is empowered to award.

## PARTIES

9.     Prisha Mosley is presently over the age of 18 years. Prisha is the plaintiff in this action.

10.    Eric T. Emerson, MD is a plastic surgeon who performed surgery on Prisha in Gaston County, North Carolina. Dr. Emerson is a defendant in this action.

11.    Piedmont Plastic Surgery and Dermatology, P.A. is an entity through which Defendant Dr. Emerson does, and at relevant times did, business. Piedmont Plastic Surgery and Dermatology, P.A. has a principal office and maintains a place of business in Gaston County, North Carolina. Piedmont Plastic Surgery and Dermatology, P.A. is a defendant in this action.

12.    Brie Klein-Fowler is a licensed counselor in North Carolina. Ms. Klein-Fowler is a defendant in this action.

13.    Family Solutions, PLLC is an entity through which Defendant Klein-Fowler does, and at relevant times did, business. Family Solutions, PLLC is a defendant in this action.

14.    Shana Gordon, who has also been known by the name Shana R. Gordon-Cole, is a licensed counselor in North Carolina. Ms. Gordon is a defendant in this action.

15.    Tree of Life Counseling, PLLC is an entity through which Defendant Gordon does, and at relevant times did, business. Tree of Life Counseling, PLLC is a defendant in this action.

16.    Martha Fairbanks Perry, MD is a physician in North Carolina who at relevant times worked within the Cone Health system in North Carolina. Dr. Perry is a defendant in this action.

17.     Moses Cone Medical Services, Inc., upon information and belief, is an entity through which Defendant Dr. Perry does, and at relevant times did, business. Moses Cone Medical Services, Inc. is a defendant in this action.[1]

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action because it is a civil case involving more than $25,000.

19.     Venue is proper in Gaston County, North Carolina, because Piedmont Plastic Surgery and Dermatology, P.A. has a principal office and maintains a place of business in that county. Additionally, Dr. Emerson performed surgery on Prisha in Gaston County, North Carolina.

## ADDITIONAL ALLEGATIONS RELEVANT TO ALL CLAIMS

### A.  Prisha has a long history of mental health struggles, which are ongoing.

20.     Prisha's struggles with mental and psychological health began as a young girl and teenager. She suffers from a history of depression, anxiety, self-harm, obsessive-compulsive disorder, insomnia and sleep disturbances, and eating disorder. Tragically, her mental health issues were compounded by a sexual assault by an older male when she was 14 years old which resulted in a miscarried pregnancy, the trauma of which continues to impact her to this day.

21.     At age 15, she was hospitalized for a week at Moses Cone Memorial Hospital for depression. By age 16, her primary care physician listed formal diagnoses for "Major depressive disorder," "Obsessive compulsive disorder," and "Eating disorder" and showed that Prisha was prescribed two medications designed to restore the balance of serotonin in the brain –

---

[1] As with each of these Defendants, Prisha has here identified the entity she believes, based on her good faith investigation, is responsible. In the event another entity should be added or substituted, Prisha expressly reserves her right to do so.

Fluvoxamine (Luvox) (twice daily) and Trazodone (Desyrel) (nightly) – and the anti-psychotic

drug Quetiapine (Seroquel) (nightly).

22.     By November 2014, at age 16, Prisha was referred by her primary care physician

to nutrition counseling with a dietician with Cone Health. The dietician noted in her assessment

that "[f]or years[,] [Prisha] thinks that she is fat and her eating is very irregular." The dietician

noted that Prisha engaged in "self-induce[d] vomiting." The dietician noted that Prisha "has

struggled with depression and suicidal attempts," "was in [the] hospital and [tried] to drown

hersel[f]," and "is a cutter." The dietician noted that Prisha "felt like she didn't deserve to eat

because she wasn't able to take care[] of her family," members of which had faced health and

addiction challenges. The dietician noted that Prisha reported having a friend who lived in

another city and "[o]ther friends online." The dietician noted a diagnosis of "Anorexia nervosa"

and that Prisha "[w]ill need referral to Dr. Perry," a pediatrician with Cone Health and a

defendant in this case.

23.     Prisha's mental and physical health continued to deteriorate. Online social media

contacts encouraged pro-anorexia behaviors and starving herself.

24.     Anorexia nervosa is a mental illness which causes one to have an intense fear of

gaining weight or becoming fat. Diagnostic criteria also include disturbance in the way in which

one's body weight or shape is experienced.

25.     Obsessive-compulsive disorder is defined by recurrent and persistent thoughts,

urges, or impulses that are intrusive and unwanted and often cause anxiety or distress.

26.     In late January 2015, when she was 16 years old, Prisha was taken to the

emergency department at Moses Cone Memorial Hospital by the dietician she had been seeing

due to her eating disorder. Prisha had engaged the day before in an episode of self-harm by

cutting herself. Prisha ultimately was discharged from the hospital, but the dietician thought she

should be admitted to a long-term treatment center for her eating disorder.

27.     A few days after Prisha was discharged from the emergency department, on or

about January 29, 2015, Prisha was seen at Cone Health's Tim and Carolynn Rice Center for

Child and Adolescent Health for an 80-minute evaluation related to her eating disorder. Under

the supervision of Dr. Perry, Prisha was assessed by a medical resident,[2] who noted Prisha's

"[s]ignificant mental health illness history," "an inpatient psychiatric hospitalization 2 years

ago," episodes of "cutting herself," including most recently on January 26, 2015, and "3 and 12

months ago," "a history of depression," and "a strong family history of psychiatric disorders."

The resident also noted Prisha's "long history of disordered eating."

28.     The resident also noted that "[o]n further questioning, [the patient] notes that she

felt that she needs a gender role reassignment, FTM," that she wanted "top surgery" and that

"part of her anorexic drive was she was trying to not eat so her breasts would be smaller."

29.     The resident noted her observation that Prisha and her parents agreed that it was

important to address: "1) management of eating disorder and 2) managing emotional distress and

its multiple manifestations."

30.     Despite Prisha's history of sexual assault, years-long history of documented

mental health disorders and eating problems, and pro-anorexia influence from individuals she

communicated with online, the resident concluded on the basis of this single visit that Prisha's

---

[2] At all relevant times, Dr. Perry supervised and was responsible for the treatment provided
to Prisha at the Tim and Carolynn Rice Center for Child and Adolescent Health. When residents
were involved, Dr. Perry signed the residents' notes with the following language: "I saw and
evaluated the patient, performing the key elements of the service. I developed the management
plan that is described in the resident's note, and I agree with the content."

"gender identity crisis," as the resident termed it, "is most likely the underlying issue that drives her eating disorder and emotional distress."

31.     As the supervising doctor, Dr. Perry adopted the resident's note as her own and noted she (Dr. Perry) "validated gender dysphoria and discussed pursuing resources." Dr. Perry also noted that she discussed Prisha's "continued anxiety and possibility of making medication changes."

32.     Dr. Perry noted that Prisha completed certain psychological tests and received the following scores: PHQ-15: 4; GAD-7: 6; and PHQ-9: 3. As set forth below, as Defendants' "treatments" of Prisha progressed, her test results worsened over time.

33.     PHQ-15 evaluates somatization, i.e., the expression of psychological or emotional factors as physical (somatic) symptoms. This evaluation measures the degree of a patient's psychological and emotional distress. A score greater than or equal to 5 represents mild somatization, greater than or equal to 10 represents moderate somatization, and greater than or equal to 15 represents severe somatization.

34.     GAD-7 evaluates general anxiety disorder. A score of 0-4 represents minimal anxiety, 5-9 represents mild anxiety, 10-14 represents moderate anxiety, and greater than 15 represents severe anxiety.

35.     PHQ-9 evaluates depression. A score of 5-9 represents mild depression, 10-14 represents moderate depression, 15-19 represents moderately severe depression, and 20 or greater represents severe depression.

36.     Dr. Perry also noted that "reported problems make it somewhat difficult to complete activities of daily functioning." It is not clear from Dr. Perry's notes that she in fact saw

8

Prisha on January 29, 2015, and if she did, how much of the 80-minute visit involved her or the resident only.

37.     The next day, on January 30, 2015, Dr. Perry met with Prisha for a 40-minute visit. Dr. Perry noted that her parents reported "being concerned that [Prisha] 'copies'" a family member's "psychiatric issues to try to get attention," and they reported that "they think she meets the diagnostic criteria for Borderline Personality disorder." Instead of following up on the parents' concerns regarding attention seeking and borderline personality disorder, Dr. Perry noted "[w]e discussed the importance of validating her symptoms, particularly the gender dysphoria and reviewed importance of encouraging the patient's positive behaviors as well as asking the patient to come up with a life plan." Dr. Perry also noted "OCD symptoms since age 14 yrs," the age at which Prisha was sexually assaulted, although Dr. Perry did not refer to the assault in her notes.

38.     Borderline personality disorder is marked by a variety of symptoms including frantic efforts to avoid real or imagined abandonment; a pattern of unstable and intense relationships; identity disturbance with persistent unstable self-image or sense of self; impulsivity in potentially self-damaging areas; recurrent suicidal behavior, gestures, threats, or self-mutilating behavior; instability due to reactive mood; chronic feelings of emptiness; inappropriate, intense anger; and transient, stress-related paranoid ideation or severe dissociative symptoms.

39.     At the same visit on January 30, 2015, Dr. Perry noted she continued Prisha's prescriptions for Luvox and Seroquel, started Lexapro (another drug designed to restore the balance of serotonin in the brain) (daily), and started Ativan (a powerful tranquilizer) (to be taken as needed) for "severe anxiety."

9

40.     Dr. Perry noted that she "discussed" "resources" "to gain support for gender dysphoria and possible transition," but there was no diagnosis or plan indicating Prisha was "transgender" or should engage in any "transition."

**B.  Despite Prisha's long history of mental health struggles, Defendant Dr. Perry guided Prisha into medicalized gender transition through deception and negligence.**

41.     Over the next several months, Prisha was seen at the Tim and Carolynn Rice Center for Child and Adolescent Health by Dr. Perry and residents under her supervision. Prisha, still age 16, was seen for insomnia and obsessive-compulsive disorder in February 2015. At that visit, a resident noted "Depo shot given, Mom not aware." This appears to have been done in order to stop Prisha from having periods and to move her into a gender transition. As the note indicates, it was done without her parents' knowledge even though she was a vulnerable minor at the time.

42.     Other notes produced by Cone Health also show that Dr. Perry was going behind Prisha's parents' backs to push Prisha into a gender transition. For instance, on or about February 22, 2015, the dietician noted that Dr. Perry told the dietician that Prisha could see Dr. Perry in the dietician's office so the parents would not know about it (the parents would think Prisha had just visited the dietician). Dr. Perry also said "it was illegal for [Prisha's] parents to stop [her] from getting sexual medical help," the term Dr. Perry used for guiding Prisha into a medicalized gender transition. The dietician communicated Dr. Perry's comments to Prisha on Dr. Perry's behalf.

43.     On or about March 6, 2015, it was noted that Prisha, age 17, reported to a resident under Dr. Perry's supervision that she found her "OCD symptoms improving." It was noted that Prisha also reported that she was eating better, as she was following her meal plan and was "able

to eat cereal and Doritos chips without having to count them." It was noted that Prisha also connected concern about her "weight" with "feminized appearance of [her] body."

44.     Despite Prisha's apparent improvement regarding OCD symptoms and eating, and despite relating concerns about her weight to the feminized appearance of her body, Dr. Perry proceeded to guide Prisha into gender transition instead of guiding Prisha into counseling and helping her develop a healthy understanding and acceptance of her body. In so doing, Dr. Perry deceived Prisha, misrepresented her medical condition, and withheld from her the true facts regarding so-called medical transition, such as that Prisha's mental health problems would not be cured by changing her body to look like a boy's body. Dr. Perry also deceived Prisha by withholding from her the alternatives to medicalized transition, such as counseling, and by withholding pertinent information, such as scientific evidence (or lack thereof) pertaining to medicalized transition.

45.     On or about March 20, 2015, a resident under Dr. Perry's supervision noted that she asked Prisha about what transition would "look like," and Prisha responded that she could not "wait to turn 18 and have the surgery" and said she (Prisha) did "not think that [she] wants hormonal therapy" – i.e., testosterone injections – because she was "worried" she "'wouldn't be able to handle having any body hair with my OCD.'" The resident noted that the medical plan, which was adopted by Dr. Perry, involved providing "the contact information for the Transgender evaluation," which later records indicate was the contact information for Defendant Gordon at Defendant Tree of Life Counseling, PLLC. The resident noted the contact information was "[d]iscussed" with Prisha at the March 20 visit.

46.     On or about April 10, 2015, a resident under Dr. Perry's supervision noted Prisha was "[i]nterested in having hormones and surgery when old enough to consent for self." There is

no acknowledgement in the resident's note (or in Dr. Perry's note adopting the resident's note) of Prisha's previous concerns about testosterone causing body hair growth and how that would exacerbate her OCD. The resident noted Prisha was "interested in having Transgender evaluation," and Dr. Perry was to email her information. At the April 10 visit, it also was noted that Prisha again completed psychological tests as on January 29, and her scores were higher (reflecting increased levels of somatization, general anxiety disorder, and depression): PHQ-15: 7; GAD-7: 7; and PHQ-9: 4. And it was again noted that "[r]eported problems make it somewhat difficult to complete activities of daily functioning."

47.     In May 2015, Prisha was depressed and experiencing anxiety and insomnia despite increased and new medication. In an email exchange on May 27 and 28, 2015, when she was 17, Prisha expressed to Dr. Perry a desire to move out of her parents' home and live with a 22-year-old female friend instead. Dr. Perry related to Prisha, "I understand and want what is best for you." When Prisha asked Dr. Perry if it was acceptable for her to leave her parents' home, Dr. Perry stated, "[y]ou can leave," that Prisha should notify her parents of her plans, and also said, "[l]et me know where you will be and how to reach you." Prisha related to Dr. Perry, "[t]hank you for being here for me" and Dr. Perry responded: "You will get through this and be able to live as the person you should be. You have support from me." This is evidence of Dr. Perry's effort to establish a relationship of trust with Prisha and of her influence over Prisha as an authority figure.

48.     On or about June 12, 2015, when Prisha was still 17, a resident under Dr. Perry's supervision noted that Prisha "expresse[d] feelings of 'wanting to be dead' and wanting to hurt [her]self because [s]he feels like [s]he cannot go outside" due to feeling "fat" and "uncomfortable in a female body" and expressed feelings that she is a "disappointment" and

"burden" to her family. Neither the resident nor Dr. Perry appeared to explore these psychological issues.

49.     The resident noted Prisha "has decided to proceed with testosterone injections when [s]he is 18, but would like very much to go to a therapist who specializes in transgender issues to prepare for [her] physical transition." It was noted that Prisha's parents had not let her see a transgender therapist. After what was described in the notes as an "extensive" "mediated" "discussion," it was noted that Prisha's mother "agreed to let [her] see the transgender therapist if all of [her] doctors and therapists recommend it." At the June 12 visit, Dr. Perry provided contact information for such a "transgender therapist," Defendant Gordon, "for the transgender evaluation."

50.     Prisha did not discover Dr. Perry's misrepresentations, concealment, and wrongdoing until recently, within the last year, and could not have discovered it prior to that time in the exercise of reasonable diligence because she was vulnerable and suffered from a host of mental health issues, she was under Dr. Perry's influence and trusted Dr. Perry to take care of her, and she relied on and believed Dr. Perry as an authority figure. Likewise, Prisha was under a disability, was incompetent, and lacked capacity to discover the wrongdoing earlier because Prisha lacked sufficient capacity to manage her own affairs in this regard, and her host of mental health issues and illnesses, including borderline personality disorder, caused her to lack sufficient capacity to exercise her legal rights or to make or communicate important decisions concerning her person. Those mental health issues, illnesses, or similar conditions caused her to repress from her memory or disassociate, akin to repression, the wrongful acts of Dr. Perry until Prisha recently underwent therapy, which began to uncover some of those past events in her mind and

eventually helped her to realize that wrongdoing occurred and appropriate care was not provided. Coincident with this realization, Prisha has suffered extreme emotional distress.

**C.** **Defendant Gordon assisted Dr. Perry and also guided Prisha into medicalized gender transition through deception and negligence.**

51.     On or about July 1, 2015, at age 17, Prisha visited Defendant Tree of Life Counseling, PLLC, where she met with a counselor, Defendant Gordon. The session was brief – lasting only minutes – but that was somehow long enough for Defendant Gordon to determine and tell Prisha that she was actually a boy and that changing her body to look more like a boy's body would solve her many psychological and mental health problems.

52.     By making certain misrepresentations, such as telling Prisha that she was in fact a boy, and by concealing certain material facts, such as that Prisha's psychological problems stemmed from other causes and were likely to persist absent proper counseling, Defendant Gordon misled Prisha into believing that she was a boy and that by changing her body she would solve her longstanding psychological and mental health problems.

53.     Defendant Gordon's misrepresentations continued as she provided a letter recommending Prisha for cross-sex hormones (i.e., testosterone injections) in furtherance of the deception that Prisha was a boy. Instead of showing an evaluation of Prisha's long-standing mental health and psychological issues, and the role gender dysphoria might play, the letter, which appears to be a boilerplate form letter, shows that Defendant Gordon assessed Prisha based solely on "the requirements for cross-sex hormone therapy, under the guidelines of the WPATH Standards of Care, 7th Edition."[3] While Prisha and her experts in this case do not accept

---

[3] WPATH stands for the World Professional Association for Transgender Health, which described itself in its "Standards of Care, 7th Version" (hereinafter, "SOC 7") as "an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, advocacy, public policy, and respect for transgender health." While dubbed

the WPATH "Standards of Care" to equate to the applicable standard of care in this case, even

those guidelines were not met by Defendants, including Defendant Gordon.

54.     In its SOC 7, WPATH sets forth its "recommended minimum credentials" for

"mental health professionals who assess, refer, and offer therapy to children and adolescents

presenting with gender dysphoria." These minimum criteria include: a master's degree in a

clinical behavioral science field; competence in using the *Diagnostic Statistical Manual of*

*Mental Disorders* or the *International Classification of Diseases* for diagnostic purposes; ability

to recognize and diagnose co-existing mental health concerns and to distinguish these from

gender dysphoria; documented supervised training and competence in psychotherapy or

counseling; knowledgeable about gender nonconforming identities and expressions, and the

assessment and treatment of gender dysphoria; continuing education in the assessment and

treatment of gender dysphoria; trained in childhood and adolescent developmental

psychopathology; and competent in diagnosing and treating the ordinary problems of children

---

"Standards of Care," WPATH clarified that the goal of the publication is to provide "clinical guidance" and WPATH emphasized its role in promoting public policy "advocacy." Accordingly, WPATH's "Standards of Care" are WPATH's own self-professed guidance and cannot be said to be equivalent to the applicable standard of care for legal purposes in this or any other case. *See also, e.g., New standards of transgender health care raise eyebrows: Controversial recommendations on everything from transition to castration*, The Economist, Sept. 22, 2022 ("[T]he public launch of the latest standards of care by the World Professional Association for Transgender Health (WPATH) on September 15th was a mess. Known as SOC8, they originally included a list of minimum ages for treatments—**14 for cross-sex hormones, 15 for removal of breasts, 17 for testicles**. Hours later, a 'correction' eliminated the age limits.") (emphasis added), *available at* https://www.economist.com/united-states/2022/09/22/new-standards-of-transgender-health-care-raise-eyebrows. In fact, at the WPATH annual conference in September 2022, Amy Tishelman, the lead author of SOC 8's chapter on adolescent treatment, explained that the very reason for the "correction" eliminating the age recommendations was to address "the potential uses of the chapter for legal and insurance contexts . . . . What we didn't want to do was create a chapter that would make it more likely that practitioners would be sued because they weren't following exactly what we said." Tishelman further explained that the change was to mitigate the "risk for being held in court for not sticking completely to these standards" with the goal to "not face malpractice lawsuits."

and adolescents. In her July 1, 2015, letter, Defendant Gordon did not state that she met any of these criteria. After her name on her signature line, she listed the following letters: "M.A., LPC, LPCS, CRC." Under her name, she listed "Transgender Specialist/Therapist." She did not list any credential relating to gender dysphoria or transgender health.

55.     WPATH's SOC 7 provides certain guidelines for assessing adolescents who present with gender dysphoria, including that mental health professionals "should not dismiss or express a negative attitude towards nonconforming gender identities or indications of gender dysphoria. Rather, they should acknowledge the presenting concerns of children, adolescents, and their families; offer a thorough assessment for gender dysphoria and any co-existing mental health concerns; and educate clients and their families about therapeutic options, if needed." Defendant Gordon did not comply with this guideline. Instead, Defendant Gordon dismissed any concerns Prisha or her parents presented; she conducted no assessment – much less a thorough one – of Prisha's gender dysphoria and co-existing mental concerns; and she failed to educate Prisha or her family about therapeutic options – instead, "clearing" Prisha – a teenage girl – for drastic and permanent testosterone injections.

56.     WPATH's SOC 7 also provides, "Assessment of gender dysphoria and mental health should explore the nature and characteristics of a child's or adolescent's gender identity. A psychodiagnostic and psychiatric assessment – covering the areas of emotional functioning, peer and other social relationships, and intellectual functioning/school achievement – should be performed. Assessment should include an evaluation of the strengths and weaknesses of family functioning. Emotional and behavioral problems are relatively common, and unresolved issues in a child's or youth's environment may be present (de Vries, Doreleijers, Steensma, & Cohen-

Kettenis, 2011; Di Ceglie & Thümmel, 2006; Wallien et al., 2007)." Defendant Gordon did not do this either in her visit with Prisha, which lasted mere minutes.

57.     WPATH's SOC 7 also provides, "For adolescents, the assessment phase should also be used to inform youth and their families about the possibilities and limitations of different treatments. This is necessary for informed consent, but also important for assessment. The way that adolescents respond to information about the reality of sex reassignment can be diagnostically informative. Correct information may alter a youth's desire for certain treatment, if the desire was based on unrealistic expectations of its possibilities." Defendant Gordon did not discharge this responsibility either. In her July 1, 2015, letter, Defendant Gordon stated her conclusion, based on only one short visit, that Prisha "demonstrated more than adequate knowledge of the benefits and potential risks of the cross-sex hormone treatment" and "understands the side effects" and "is also aware of the benefits" of such treatment. However, Defendant Gordon did not list a single one of the supposed "benefits" in the letter and listed only a non-inclusive list of the so-called "side effects." From all that appears in the letter, no benefits were actually discussed other than Defendant Gordon's misrepresentation to Prisha that she was a boy and should change her body to look like a boy's body.

58.     WPATH's SOC 7 provides the following criteria for providing cross-sex hormones: "[p]ersistent, well-documented gender dysphoria;" "[c]apacity to make a fully informed decision and to consent for treatment;" and "[i]f significant medical or mental health concerns are present, they must be reasonably well-controlled." Defendant Gordon did not document observation of these criteria in her July 1, 2015, letter. Defendant Gordon did not document that Prisha had persistent, well-documented gender dysphoria, because she did not have such. Defendant Gordon did not document that Prisha had the capacity to make a fully

17

informed decision and to consent for treatment, because Prisha could not have done so in her troubled mental state and at age 17. And Defendant Gordon did not document that Prisha's significant medical and mental health concerns were reasonably well-controlled, because Defendant Gordon did not acknowledge or recognize that Prisha had such medical and mental health concerns.[4]

59.     WPATH's SOC 7 also provides that the individual receiving the cross-sex hormones must be of the "[a]ge of majority" or else the provider must follow the guidelines outlined in section VI of SOC 7, which pertain to minors, including the guidelines for assessing adolescents set out above, which Defendant Gordon did not follow in Prisha's case. Additionally, section VI of SOC 7 requires that "[b]efore any physical interventions are considered for adolescents, extensive exploration of psychological, family, and social issues should be undertaken, as outlined above." Defendant Gordon conducted no such "extensive exploration;" she met with Prisha for mere minutes before signing the July 1, 2015, boilerplate form letter.

60.     Instead of conducting the extensive, holistic, and wide-ranging assessment called for by the WPATH so-called standards referenced in her July 1, 2015, letter, Defendant Gordon took what appears to be a boilerplate form letter and plugged in purported snippets from Prisha's life gleaned from a short interview, some of which were demonstrably incorrect, and stated conclusions that would have been impossible to form in such a short amount of time.

---

[4] Regarding Prisha's significant medical and mental health concerns, while Defendant Gordon mentioned none in her July 1, 2015, letter, a version of clinical notes produced on behalf of Defendant Gordon and Tree of Life Counseling, PLLC shows a "[d]iagnosis" of "Major Depressive Disorder, Recurrent, Moderate." This diagnosis does not appear in a different version of notes from the same production, and that difference has not been explained. In both versions of the notes, there is a reference to Prisha engaging in "[c]utting." In any event, it appears Defendant Gordon was in fact aware of Prisha's mental health problems and intentionally chose to omit them from her July 1, 2015, letter. That omission was contrary to WPATH's SOC 7, and it was fraudulent, reckless, and negligent.

61.     For instance, Defendant Gordon stated that Prisha "referred [herself] to treatment in June of 2015 for evaluation as part of the requirements to begin cross-sex hormone therapy." Defendant Gordon here appears to be stating that Prisha referred herself to Defendant Gordon, which is demonstrably incorrect. As records produced by Cone Health and Dr. Perry show, as set out above, Dr. Perry referred Prisha to Defendant Gordon.

62.     Defendant Gordon stated Prisha "came out" "as a transsexual to [her] sister at the age of 14" and at that time "cut [her] hair short." Defendant Gordon did not mention that age 14 is when Prisha was sexually assaulted. Defendant Gordon did not point to any documentation for the supposed fact of Prisha "coming out" "as a transsexual" at age 14 and thus failed to show that gender dysphoria was well-documented, as WPATH's SOC 7 requires. Defendant Gordon also stated in her letter that Prisha "ha[d] been presenting as a male [as of] January 2015" – a mere five or six months prior. Defendant Gordon thus failed to document that Prisha had persistent, well-documented gender dysphoria as WPATH's SOC 7 requires.

63.     Perhaps most glaringly, in her July 1, 2015, letter Defendant Gordon, having met Prisha for only minutes, proceeded to conclude, wrongly and fraudulently, that there was "an absence of problems related to mood," that Prisha did "not evidence any symptoms of psychosis or disturbances in personality," and that there was "no evidence of psychopathology or impaired judgment." Defendant Gordon made no mention of Prisha's long history of mental health and psychological disturbances, her repeated hospitalizations and incidents of self-harm, or the many medications she was taking at that time to deal with those and related problems. Additionally, Defendant Gordon misrepresented under the "Diagnosis" heading at the end of her July 1, 2015, letter that Prisha's "[a]norexia" had been in "remission x6 months." Defendant Gordon made this

misrepresentation knowingly and intentionally, despite her clinical note that in connection with Prisha's eating disorder she had gone up to "2 days without eating."

64.     Without conducting an assessment necessary to do so, Defendant Gordon stated that Prisha "met all the eligibility and readiness criteria" in WPATH's SOC 7 and "certif[ied]" Prisha "to be a fit candidate for cross-sex hormone treatment."

65.     Defendant Gordon's statements and actions did not meet the applicable standard of care. Further, they were fraudulent and deceptive, and they did in fact deceive and harm Prisha by clearing the way for Dr. Perry to prescribe testosterone, which, unbeknownst to Prisha at the time, would cause her irreparable physical damage and would worsen her mental and psychological problems instead of solving them.

66.     Prisha did not discover Defendant Gordon's misrepresentations, concealment, and wrongdoing until recently, within the last year, and could not have discovered it prior to that time in the exercise of reasonable diligence because she was vulnerable and suffered from a host of mental health issues, she was under Defendant Gordon's influence and trusted Defendant Gordon to take care of her, and she relied on and believed Defendant Gordon as an authority figure. Likewise, Prisha was under a disability, was incompetent, and lacked capacity to discover the wrongdoing earlier because Prisha lacked sufficient capacity to manage her own affairs in this regard, and her host of mental health issues and illnesses, including borderline personality disorder, caused her to lack sufficient capacity to exercise her legal rights or to make or communicate important decisions concerning her person. Those mental health issues, illnesses, or similar conditions caused her to repress from her memory or disassociate, akin to repression, the wrongful acts of Defendant Gordon until Prisha recently underwent therapy, which began to uncover some of those past events in her mind and eventually helped her to realize that

wrongdoing occurred and appropriate care was not provided. Coincident with this realization, Prisha has suffered extreme emotional distress.

D. **Dr. Perry deceived Prisha into receiving prescribed testosterone injections that were not medically necessary or appropriate for her.**

67. Having guided Prisha into changing her body to look like a boy's body under the false pretense that doing so would solve her mental health problems, Dr. Perry proceeded to medicalize Prisha by prescribing testosterone injections for her.

68. On or about July 14, 2015, Prisha was seen by a resident under Dr. Perry's supervision and Dr. Perry for a "pre-visit" to starting testosterone injections. As usual, the resident signed the visit notes and Dr. Perry also signed them with the following language: "I saw and evaluated the patient, performing the key elements of the service. I developed the management plan that is described in the resident's note, and I agree with the content." The notes include several significant red flags, but Dr. Perry did not acknowledge or recognize any of those issues as red flags and instead proceeded with her plan to guide Prisha into medicalized gender transition by injecting large amounts of life-altering testosterone into her body.

69. One of those red flags was the note that Prisha "thinks about death often and has occasional passive suicidal ideation."

70. Another red flag was that Prisha had been "determined to be psychologically fit to initiate sex hormone therapy by [her] transgender therapist." This was a reference to Defendant Gordon's brief meeting with Prisha on July 1, 2015, which resulted in the boilerplate form letter that was riddled with inaccuracies and misrepresentations, as described above. As the physician who purportedly diagnosed gender dysphoria in Prisha, and who also knew about the host of other mental and psychological problems Prisha faced and her long history of mental health issues, and who was in fact prescribing powerful anti-psychotic medications for those issues, Dr.

21

Perry knew or callously and recklessly disregarded that Defendant Gordon's July 1, 2015, boilerplate form letter was a lie. It was a sham letter and Dr. Perry knew that, based on her significant history with Prisha. Nevertheless, Dr. Perry proceeded to deceive Prisha and guide her into medicalized gender transition by misrepresenting that testosterone would cure Prisha's psychological problems and was medically necessary and appropriate and that there were no viable alternatives. In fact, the treatments did not cure Prisha but instead increased her pain and suffering and led to permanent damage to her body.

71.     Another red flag was that during the visit, Prisha "demonstrate[d] poor understanding" of "emotional process in the room and [was] verbally combative with [her] mother." After being initially pleasant, Prisha's affect became blunt (i.e., she was not showing much emotion or seemed to be emotionally detached), and she was tearful at times during the interview.

72.     Another red flag was that Prisha again completed psychological tests as on January 29 and April 10, and her scores, again, were higher, indicating her co-existing mental health concerns were worsening not improving: PHQ-15: 16; GAD-7: 10; and PHQ-9: 8. This time it was noted that "[r]eported problems make it very difficult to complete activities of daily functioning."

73.     Another red flag was that laboratory test results indicated "ongoing use of possibly toxic medication."

74.     Despite these and other obvious issues, Dr. Perry designed a "Transition Plan" for Prisha, as shown in notes from the July 14, 2015, visit which consisted of, among other things, starting the testosterone injections and seeing Defendant Gordon "2-3 times more" before continuing solely with a regular therapist who did not specialize in transgender issues. Signifying

the extent of Prisha's vulnerable and strained mental state, the plan also called for Prisha to increase her "exposure to home and outside world" by spending an "[h]our outside [of her] room" and "[w]alk[ing] 30 minutes per day with mom or dad or cat."

75.    After Defendant Gordon made misrepresentations and concealments related to Prisha's mental and psychological health, and Dr. Perry furthered the misrepresentations and concealments and concealed Prisha's ongoing use of possibly toxic medication, Dr. Perry prescribed testosterone to Prisha on or about July 17, 2015. Upon information and belief, Dr. Perry told Prisha at the time of the prescription that injecting testosterone into her body was medically necessary and appropriate and would cure her psychological problems, reinforcing Defendant Gordon's misrepresentations and further misleading Prisha.

76.    Not only did Dr. Perry mislead Prisha into accepting this prescription through her affirmative misrepresentations, but she also misled Prisha by suppressing material facts. Dr. Perry wrote there were "no contraindications" for Prisha to begin testosterone therapy, despite her many serious and ongoing mental health issues and previous expressed reservations about and aversion to taking testosterone. Notably, Dr. Perry did not inform Prisha that taking testosterone causes vaginal atrophy; inability to have intercourse; enlarged clitoris; permanent voice change; pain in shoulders, neck, and vaginal area; and fertility impacts. Prisha has now suffered these very effects that Dr. Perry failed to fully inform Prisha of and warn her about.

77.    While Dr. Perry wrote that "[f]amily and patient are aware of possible side effects and consent to initiation of testosterone therapy," there does not appear to be a written and signed consent form specific to testosterone injections in the records Cone Health provided in response to a request from Prisha prior to filing this case. Further, true, accurate, and full informed consent was not possible in the circumstances because Dr. Perry affirmatively misrepresented that

testosterone injections were medically necessary and appropriate and that there was no alternative, and Dr. Perry failed to explain the scientific basis – and lack thereof – for the testosterone injections and failed to accurately describe any benefits and failed to disclose to Prisha the permanent, detrimental consequences from taking testosterone.

78.     Prisha has suffered these health problems and continues to suffer from a host of medical issues and severe physical pain and psychological and emotional anguish as a result of Defendants' actions. Her body did not develop the way it should have and does not function normally. She does not know if she will be able to conceive or give birth to a child.

79.     Dr. Perry continued to treat Prisha for mental health issues and gender dysphoria yet concealed that the treatment was not curing or treating Prisha's mental health issues and illnesses. As stated above, Prisha did not discover Dr. Perry's misrepresentations, concealment, and wrongdoing until recently, within the last year, and could not have discovered it prior to that time in the exercise of reasonable diligence because she was vulnerable and suffered from a host of mental health issues, she was under Dr. Perry's influence and trusted Dr. Perry to take care of her, and she relied on and believed Dr. Perry as an authority figure. Likewise, Prisha was under a disability, was incompetent, and lacked capacity to discover the wrongdoing earlier because Prisha lacked sufficient capacity to manage her own affairs in this regard, and her host of mental health issues and illnesses, including borderline personality disorder, caused her to lack sufficient capacity to exercise her legal rights or to make or communicate important decisions concerning her person. Those mental health issues, illnesses, or similar conditions caused her to repress from her memory or disassociate, akin to repression, the wrongful acts of Dr. Perry until Prisha recently underwent therapy, which began to uncover some of those past events in her mind and

eventually helped her to realize that wrongdoing occurred and appropriate care was not provided. Coincident with this realization, Prisha has suffered extreme emotional distress.

80.     After writing the letter recommending Prisha for testosterone therapy, Defendant Gordon met with Prisha on or about July 28 and August 18, 2015, according to records produced by Defendant Gordon and Tree of Life Counseling, PLLC. For the August 18 visit, it was noted that Prisha was "still more in bed" but Defendant Gordon did not appear to explore this issue.

81.     Defendant Gordon continued to exert influence over Prisha and communicated with her by email. In September 2015, in response to Prisha relaying concerns she had about Dr. Perry, Defendant Gordon described certain actions of Dr. Perry as potentially involving "blackmailing" and advised Prisha to report Dr. Perry to the medical board: "If the doctor is blackmailing you that she won't continue your treatment on [testosterone] if you don't do certain things, then you need to report her to the medical board immediately!" When Prisha responded that she had spoken with Dr. Perry about her concerns and planned to "give her another chance," Defendant Gordon responded: "This is about you and not her," referring to Dr. Perry. Also in September 2015, Defendant Gordon advised Prisha on how to change her name with the government and encouraged Prisha as providing "awesome news!" when she told Defendant Gordon she had taken a step to change her name. Among other things, these exchanges demonstrate Defendant Gordon's influence over Prisha as an authority figure and of Defendant Gordon's efforts to build a relationship of trust with Prisha, who was a vulnerable teenager at the time.

82.     Dr. Perry also communicated with Prisha by email. On or about July 23, 2015, shortly after Dr. Perry started her on testosterone injections, Prisha wrote to Dr. Perry expressing concern about discharge from one of her nipples that frightened her. Dr. Perry responded with the

following, which Prisha understood to mean she was undergoing male puberty: "We are re-inducing puberty and thus you will have the same symptoms a male can have when starting puberty.  Some breast swelling and tenderness can occur.  That is normal." Upon information and belief, around this time Dr. Perry told Prisha that she was undergoing male puberty, and that as part of this process, she would grow a penis. Prisha did not grow a penis. She did experience an enlarged clitoris, but that is not the penis she thought she would grow when Dr. Perry told her she would grow one.

83.     The "Transition Plan" Dr. Perry designed for Prisha, referenced in the July 14, 2015, visit notes, also called for "weekly visits with Dr. Perry." Prisha did not meet weekly with Dr. Perry, yet Dr. Perry continued to prescribe testosterone injections and continued her medicalization of Prisha in order to "transition" Prisha into a boy.

84.     On or about September 10, 2015, Prisha had a visit with Dr. Perry. The notes from the visit indicate she last saw Dr. Perry on July 17, 2015, the day Dr. Perry started her on testosterone injections – almost two months prior to the September 10 visit. In the meantime, Prisha had received regular testosterone injections pursuant to Dr. Perry's prescriptions even though she had not seen Dr. Perry. With regard to Prisha's obsessive-compulsive disorder, Dr. Perry noted "OCD symptoms have increased." Dr. Perry also noted Prisha was experiencing "[i]ncreasing anxiety." Dr. Perry noted Prisha wasn't going to bed until 3:00 a.m. because of an extensive routine she had before going to bed. Prisha was waking up around 9:30 or 10 a.m. but was not getting out of bed until 11:30 a.m. or noon because of a morning routine of rituals also "and staying in bed help[ed] [her] avoid those rituals."

85.     These issues were so severe that Dr. Perry noted she was increasing the prescribed Lexapro dose. With respect to Prisha's OCD, Dr. Perry also noted Prisha "would benefit from

26

structured CBT," a form of counseling, "to decrease[] rituals." Dr. Perry did not note the need for

counseling with respect to gender dysphoria. Nevertheless, Dr. Perry continued prescribing

testosterone injections for Prisha and increased the dosage plan.

86.    At a visit on or about October 8, 2015, Dr. Perry again noted that there were

"[s]till significant anxiety symptoms, OCD symptoms, night-time rituals." Dr. Perry also noted

Prisha was experiencing neck and back pain, and "was concerned about need[ing] a pelvic

exam." Despite these reports, Dr. Perry did not note that she considered or discussed with Prisha

the possibility of stopping the testosterone injections. Dr. Perry continued the testosterone

injections.

**E.    Defendant Klein-Fowler furthered the deception by recommending Prisha for "top surgery" even though Klein-Fowler had no basis to do so and was not a transgender specialist.**

87.    Starting in September 2015 at age 17, and continuing in January 2016, when she

was still 17, Prisha was seeing Defendant Brie Klein-Fowler at Defendant Family Solutions,

PLLC for general counseling. Prisha had been with a different counselor at Family Solutions,

PLLC prior to Defendant Klein-Fowler. Neither Klein-Fowler nor the prior therapist were gender

specialists or held themselves out as specializing in transgender health. They provided general

counseling only.

88.    On or about January 5, 2016, Prisha wrote to Defendant Klein-Fowler, asking if

she would write "a letter of recommendation to get top surgery" and stating that if Klein-Fowler

could not write one, Prisha would need Defendant Gordon to do so. Defendant Gordon had

provided the surgeon's name – Defendant Dr. Emerson – to Prisha. Prisha explained that

Defendant Gordon did not take Medicaid and would require payment of $220 for such a letter.

89.     Reflecting her vulnerable and immature state of mind and Defendant Klein-Fowler's lack of experience with transgender counseling, Prisha told Klein-Fowler: "All you would need to do is say that you are my therapist, know me, and confirm that I am trans, have severe gender dysphoria, and need top surgery. You know that I am making this decision because I am trans. It is my own decision and no one else is influencing/forcing me to make it. I know the risks of the surgery and everything envolved [sic]." Klein-Fowler responded, on January 6, 2016, "OK, let's talk more about it on [January 7] and I'll write one after we speak. I hope I will be able to help you get what you need!"

90.     The day Klein-Fowler responded to Prisha's email, on January 6, 2016, Prisha visited with Caroline Hacker, FNP, a nurse practitioner working under Dr. Perry's supervision. Ms. Hacker noted that at a previous visit Prisha had raised the issue of breast pain and nipple discharge, and at this visit Prisha reported "crampy lower abdominal pains about every day" for the last three weeks and infrequently before that. Despite this, there was no mention in the notes of considering stopping testosterone. The testosterone injections continued to be prescribed. Ms. Hacker noted a "major incident" Prisha had in connection with anxiety and OCD "where something was out of [her] control so [s]he bleached the whole house." Nevertheless, Ms. Hacker noted "improve[ment]" in Prisha's anxiety and OCD "since the holidays are over." The "Review of Systems" for this visit show Prisha had "malaise/fatigue" and "myalgias" (aches and pain) and was "nervous/anxious."

91.     The next day, on January 7, 2016, Prisha visited with Defendant Klein-Fowler and the notes show a focus of the session was on "preparing for a doctor's consult for so called 'top surgery.'" Klein-Fowler did not note any detail that was discussed in this regard, such as what the procedure would entail, why it might be considered appropriate or inappropriate, and whether

alternatives were discussed. Instead, Klein-Fowler noted only, "[a]s requested by client and [her] doctor, therapist [i.e., Klein-Fowler] will write a letter stating the clinical necessity of the surgery." Klein-Fowler also noted that Prisha struggled to manage her stress and anxiety such that the following treatment goal remained unachieved, indicating Prisha's "daily functioning" continued to be "impaired:" "Reduce overall frequency, intensity, and duration of the anxiety so that daily functioning is not impaired at school or at home."

92.     That night, after the counseling session, on January 7, 2016, Prisha wrote to Klein-Fowler: "About the letter, I was told you must follow the WPATH SOC guidelines as there are several criteria that the must represent [sic] in the evaluation letter or it could get rejected."

93.     On January 11, 2016, Klein-Fowler responded with a draft letter along with the following cover email: "Seems you have to buy the text to have access to the specific guidelines. Do you have access to them? I have attached the letter I wrote, but if it needs to be changed I'm happy to do so." Not surprisingly, since Klein-Fowler did not know what the WPATH SOC guidelines were, she did not refer to them in her draft letter. In the letter, Klein-Fowler stated that Prisha had made "significant progress" since "embark[ing] on the gender transition process" and noted the testosterone prescriptions. There was no mention of "top" or "breast" surgery at all, only "surgical transition," with respect to which Klein-Fowler stated Prisha had "researched" "options extensively" and Klein-Fowler felt "confident" Prisha was "making this decision from a well informed place." Klein-Fowler stated she was "hopeful that [Prisha] will be able to continue forward on [her] path to self realization with the help of this procedure." Klein-Fowler did not mention Prisha's ongoing mental health problems, including the stress and anxiety she was struggling to manage which was impairing her daily functioning.

F.  **Defendant Dr. Emerson furthered the deception by misleading Prisha into "top surgery" that was not medically necessary or appropriate.**

94.     On or about January 13, 2016, when she was still 17 years old, Prisha met with Defendant Dr. Emerson at Defendant Piedmont Plastic Surgery and Dermatology, P.A. for a consultation regarding what Dr. Emerson described in his notes as "top surgery."

95.     Dr. Emerson noted that Prisha had a history of anxiety and anorexia nervosa and family history of depression, but he did not appear to follow up on and perform a thorough assessment regarding these issues. Dr. Emerson also did not appear to form an evidence-based, independent judgment that the proposed surgical procedure was necessary and appropriate despite these issues.

96.     Dr. Emerson misled and deceived Prisha into thinking that surgery on her healthy breasts would benefit her and that she needed this surgery. Further, Dr. Emerson concealed the detrimental effects such surgery would have, such as the loss of Prisha's breasts, loss of ability to nurse a child, and physical and psychological pain.

97.     Prisha did not discover Dr. Emerson's misrepresentations, concealment, and wrongdoing until recently, within the last year, and could not have discovered it prior to that time in the exercise of reasonable diligence because she was vulnerable and suffered from a host of mental health issues, she was under Dr. Emerson's influence and trusted Dr. Emerson to take care of her, and she relied on and believed Dr. Emerson as an authority figure. Likewise, Prisha was under a disability, was incompetent, and lacked capacity to discover the wrongdoing earlier because Prisha lacked sufficient capacity to manage her own affairs in this regard, and her host of mental health issues and illnesses, including borderline personality disorder, caused her to lack sufficient capacity to exercise her legal rights or to make or communicate important decisions concerning her person. Those mental health issues, illnesses, or similar conditions caused her to

30

repress from her memory or disassociate, akin to repression, the wrongful acts of Dr. Emerson until Prisha recently underwent therapy, which began to uncover some of those past events in her mind and eventually helped her to realize that wrongdoing occurred and appropriate care was not provided. Coincident with this realization, Prisha has suffered extreme emotional distress.

**G. Dr. Perry continued her deception of Prisha and convinced her that removing her uterus and ovaries at age 18 was medically appropriate, despite Prisha's ongoing mental health struggles, which testosterone injections had not cured.**

98.     On or about January 15, 2016, Dr. Perry noted that laboratory tests showed Prisha's testosterone was higher than Dr. Perry's "goal" for Prisha. Dr. Perry did not stop the testosterone prescription. Instead, she noted she would "consider adjusting testosterone dose if the level increases further."

99.     On or about February 12, 2016, Ms. Hacker, the nurse practitioner working under Dr. Perry's supervision, noted that Prisha's anxiety was "not well controlled," that this had been the case for some time, and that a medication change would be considered if this continued: "Continue Ativan [as needed]. Consider med change to SNRI [serotonin and norepinephrine reuptake inhibitors] in the future if [s]he still continues to have anxiety that is not well controlled." On or about April 5, 2016, after Prisha had turned 18, it appeared this problem continued, as Dr. Perry noted "discuss[ing] trying other anxiety reduction strategies" and "ask[ing] patient to track [her] anxiety and when [s]he is taking ativan so we can better understand the trend of use." Dr. Perry did not disclose to Prisha that the testosterone injections were not curing her mental health problems. Dr. Perry did not note considering or discussing stopping the testosterone prescriptions, and instead continued them.

100.     On or about April 13, 2016, Dr. Perry wrote to Prisha regarding laboratory results, stating her estrogen was "nicely suppressed" and her testosterone level was "in the range we

31

would like," meaning the range Dr. Perry deemed appropriate. Prisha, demonstrating her continued vulnerability even after turning 18, her dependence on Dr. Perry, and her lack of medical training and understanding, responded: "I am so glad my testosterone is a good range again! It would make me sad to lower it, just psychologically I suppose. I am also glad my estrogen is going down finally." Dr. Perry, showing that she had built a rapport with Prisha and had gained her trust replied, "Yes - it is good to see your hormones doing what we want them to do. :-)"

101.     On or about June 30, 2016, nearly a year after starting testosterone injections in July 2015, Prisha again completed psychological tests, and her scores remained elevated: PHQ-15: 14; GAD-7: 11; and PHQ-9: 10. It was noted that "[r]eported problems make it very difficult to complete activities of daily functioning." Despite this, Dr. Perry continued to prescribe testosterone injections and failed to disclose to Prisha that the testosterone "therapy" was not curing her severe mental illnesses.

102.     Records produced by Cone Health indicate that in July and August 2016, Dr. Perry discussed surgery with Prisha, including the idea of removing her uterus and ovaries (Prisha was still a teenager, only 18 years old at this time), and Dr. Perry's comments caused "excite[ment]" for Prisha: "I am so excited about the things you told me about the surgery; I am calling the doctor about the ultrasound on Tuesday and I will tell you then when my appointment is." Dr. Perry reported that Prisha's pelvic ultrasound was normal and described this as "good news from a health standpoint," but characterized it in negative terms for the hysterectomy Dr. Perry hoped to guide Prisha into getting: "You may have already seen that your pelvic ultrasound was normal. This is good news from a health standpoint but means we have to seek another avenue for hysterectomy."

103.    Dr. Perry even went so far as to "contact[] several OB/GYNs to ask about hysterectomy" and stated "unfortunately" she "did not learn anything new." Dr. Perry explained that according to those OB/GYNs, "a diagnosis" would be needed "to remove your uterus and ovaries," but suggested that Prisha contact "local support groups" – presumably to see if they could get around the diagnosis requirement. Dr. Perry thus continued her deception and misrepresenting to Prisha that medicalization and changing her body to look like a boy's body would solve her mental health problems. As described and alleged in this Complaint and Jury Demand, Prisha did not discover the fraud and wrongdoing until recently because she trusted Dr. Perry and lacked the capacity to understand that Dr. Perry was harming her and misleading her.

## H. **Defendant Klein-Fowler again misrepresented and concealed material facts to recommend Prisha for "top surgery" and failed to follow her own cited standards in the process.**

104.    After what appears to be a perfunctory discussion of plans for "top surgery" with Defendant Klein-Fowler on or about January 7 and 28, 2016, this issue does not appear again in Klein-Fowler's notes until November 17, 2016. As with the discussion in January, Klein-Fowler did not appear to explore or question the necessity, appropriateness, or basis for such a drastic procedure. Klein-Fowler's notes indicate that she focused on Prisha "processing" the "decision" to undergo surgery. Klein-Fowler noted Prisha had "negative automatic thoughts" which Klein-Fowler "challenged." She also noted that she prompted Prisha to use "coping skills to manage the anxiety as it arose" regarding the surgery.

105.    A few days later, on or about November 21, 2016, Prisha wrote to Defendant Klein-Fowler, asking if she would write a recommendation letter again. It is unclear whether the letter Klein-Fowler wrote in January 2016 was presented to the surgeon. Again demonstrating her vulnerability and trust of and reliance upon her doctors and counselors, Prisha stated: "It just

needs to say I am really trans, on T [testosterone] (1.6 years), and not crazy!" Klein-Fowler responded only a few hours later: "Hey, I couldn't find the other one, so I wrote a new one. Just insert your doctor's name, and it should be good to go! If not, let me know and I'll tweak it :)"

106.    The "new one" Klein-Fowler wrote was different from the first in that Klein-Fowler referred to WPATH guidelines in the new letter, but it was materially misleading and was not an appropriate basis for any surgery.

107.    As a preliminary matter, Klein-Fowler did not state that she was qualified to write a letter recommending a vulnerable teenager for surgery to remove her healthy breasts. She stated she had been meeting with Prisha in "sessions to address issues related to Gender Dysphoria," but that was misleading and deceptive because Klein-Fowler was not a transgender specialist and instead provided general counseling to Prisha.

108.    As noted above in allegations regarding Defendant Gordon, WPATH's SOC 7 (which was the version in force at all relevant times) sets forth "recommended minimum credentials" for counselors assisting patients with gender dysphoria. These minimum criteria include: a master's degree in a clinical behavioral science field; competence in using the *Diagnostic Statistical Manual of Mental Disorders* or the *International Classification of Diseases* for diagnostic purposes; ability to recognize and diagnose co-existing mental health concerns and to distinguish these from gender dysphoria; documented supervised training and competence in psychotherapy or counseling; knowledgeable about gender nonconforming identities and expressions, and the assessment and treatment of gender dysphoria; continuing education in the assessment and treatment of gender dysphoria; and for counselors working with children and adolescents, trained in childhood and adolescent developmental psychopathology and competent in diagnosing and treating the ordinary problems of children and adolescents. In

her November 21, 2016, letter, Defendant Klein-Fowler did not state that she met any of these criteria. After her name on her signature line, she listed the following letters: "M.Ed., NCC, LPC." She did not list any credential or title relating to gender dysphoria or transgender health.

109.    Despite Klein-Fowler's lack of qualifications, she proceeded to write a letter representing Prisha – falsely – as an excellent candidate for "mastectomy surgery to aid in [her] medical transition." Despite Prisha's documented history of mental health problems, and ongoing struggles with anxiety, including just a few days before, on November 17, when discussing the prospect of surgery, Klein-Fowler misrepresented Prisha's condition as "present[ing] no apparent residual psychiatric symptoms" and "quite stable."

110.    Klein-Fowler concluded that Prisha "me[t] and exceed[ed] the criteria as set forth by" WPATH, but she did not state what those criteria were.

111.    For instance, WPATH's SOC 7 provides "tasks" related to assessment and referral, including (1) "[a]ssess gender dysphoria;" (2) "[p]rovide information regarding options for gender identity and expression and possible medical interventions;" and (3) "[a]ssess, diagnose, and discuss treatment options for co-existing mental health concerns." Klein-Fowler did not state that she had completed any of these tasks.

112.    Under the task "assess eligibility, prepare, and refer for surgery," SOC 7 lists "recommended content of the referral letters for surgery," including, among other things, "[r]esults of the client's psychosocial assessment, including any diagnoses;" "[a]n explanation that the criteria for surgery have been met, and a brief description of the clinical rationale for supporting the patient's request for surgery;" and "[a] statement about the fact that informed consent has been obtained from the patient." Klein-Fowler did not include these items in her November 21, 2016, letter. She did not disclose Prisha's numerous mental health issues and

diagnoses. She did not explain that the criteria for surgery were met (other than proclaiming that they were) – she did not even list the criteria. Neither did she include a description of the clinical rationale for supporting the patient's request for surgery. Additionally, there was no mention of informed consent.

113.    WPATH's SOC 7 also provides criteria for "[m]astectomy and creation of a male chest," which includes "[p]ersistent, well-documented gender dysphoria;" "[c]apacity to make a fully informed decision and to consent for treatment;" "[a]ge of majority in a given country;" and "[i]f significant medical or mental health concerns are present, they must be reasonably well controlled." Klein-Fowler did not identify these criteria in her letter, much less explain how Prisha supposedly met each one of them in light of her diminished capacity, vulnerable state, and ongoing mental health challenges.

114.    Thus, Defendant Klein-Fowler misrepresented Prisha's supposed fitness for drastic breast removal surgery and deceived Prisha into thinking that surgery was necessary and appropriate. Klein-Fowler also may have deceived the surgeon, Defendant Dr. Emerson, in certain respects, as this letter was placed in Prisha's surgical file.

115.    Prisha did not discover Defendant Klein-Fowler's misrepresentations, concealment, and wrongdoing until recently, within the last year, and could not have discovered it prior to that time in the exercise of reasonable diligence because she was vulnerable and suffered from a host of mental health issues, she was under Klein-Fowler's influence and trusted Klein-Fowler to take care of her, and she relied on and believed Klein-Fowler as an authority figure. Likewise, Prisha was under a disability, was incompetent, and lacked capacity to discover the wrongdoing earlier because Prisha lacked sufficient capacity to manage her own affairs in this regard, and her host of mental health issues and illnesses, including borderline personality

disorder, caused her to lack sufficient capacity to exercise her legal rights or to make or communicate important decisions concerning her person. Those mental health issues, illnesses, or similar conditions caused her to repress from her memory or disassociate, akin to repression, the wrongful acts of Klein-Fowler until Prisha recently underwent therapy, which began to uncover some of those past events in her mind and eventually helped her to realize that wrongdoing occurred and appropriate care was not provided. Coincident with this realization, Prisha has suffered extreme emotional distress.

I. **Dr. Emerson removed Prisha's healthy breasts without true and accurate written authorization and informed consent.**

116.    On or about November 29, 2016, Prisha attended a preoperative appointment with Defendant Dr. Emerson. According to records produced in response to a request prior to filing this case, this was the first time Prisha met with Dr. Emerson after the initial consultation on January 13, 2016. Dr. Emerson did not perform a second consultation, prior to the preoperative appointment.

117.    At the November 29 preoperative appointment, Prisha appeared to sign an "informed consent" document that Defendant Piedmont Plastic Surgery and Dermatology, P.A. provided. The document states "I hereby authorize Dr. Gregory Swank and such assistants as may be selected to perform Reduction Mammaplasty Surgery." There does not appear to be any consent document authorizing Dr. Emerson to perform surgery on Prisha.

118.    Additionally, the "informed consent" document indicated the procedure that would be performed was a "breast reduction" designed for "[w]omen who have large breasts" and as a result experience back, neck, and shoulder pain and skin irritation. This was not an accurate reflection of Prisha's situation.

119.    The "informed consent" document stated that the patient "may have more difficulty breast feeding after this operation." The document also stated that pregnancy could cause the breast skin to stretch and "offset the results of surgery." It did not state breast feeding would be impossible.

120.    The "informed consent" document did not state that the surgery would be irreversible and permanent.

121.    As referenced above, Defendant Klein-Fowler's letter appears in Prisha's surgical file, but Dr. Emerson did not note any discussion of WPATH standards or guidelines or assessment of Prisha's candidacy for surgery with respect to such standards or guidelines. Dr. Emerson did not perform an independent assessment of Prisha' fitness for surgery, despite WPATH's SOC 7 statement that "[m]ental health professionals who recommend surgery share the ethical and legal responsibility for that decision with the surgeon."

122.    On or about December 8, 2016, Dr. Emerson surgically removed Prisha's breasts. Dr. Emerson's notes indicate that Prisha's nipples were severed and reattached.

123.    As a result of the surgery Dr. Emerson performed, Prisha is unable to nurse a child. And she has suffered, and expects to continue to suffer, severe physical pain and psychological and emotional anguish.

124.    Each of the Defendants owed a fiduciary duty to Prisha—Gordon and Klein-Fowler and the entities through which they operated as her counselors, and Dr. Perry and Dr. Emerson and the entities through which they operated as her doctors.

125.    Each of the Defendants breached that duty as described herein. They misled Prisha into changes to her body to make it look more like a boy's body.

126.    The Defendants did this to benefit themselves financially by receiving money for the so-called treatment they imposed on Prisha and to build up and enhance their respective reputations as providers of gender-affirming care.

127.    For example, around July 2015, when she met with Prisha briefly, Defendant Gordon held herself out in her bio on the Tree of Life Counseling, PLLC website as a "Transgender Specialist for children, adolescents, and adults," but there was no mention of WPATH in her bio.

128.    After meeting with Prisha, Gordon amended her bio to show as of around March 2016 that she was engaged in "Evaluations for cross-sex hormones and gender reassignment surgery (currently working towards WPATH Certification)."

129.    And as of around June 2022, Gordon held herself out as a "WPATH GEI Certified gender specialist."[5]

130.    Similarly, Dr. Perry holds herself out as providing "gender-affirming care" to "adolescents."

131.    And before operating on Prisha, Dr. Emerson indicated to her that he was eager to break into the gender-affirming care field and to perform such surgeries and that hers would be his first.

132.    After operating on Prisha, Dr. Emerson became a founding member of the Charlotte Transgender Healthcare Group and upon information and belief received reputational benefit and referrals for surgery as a result of performing "top surgery" on Prisha.

---

[5] As of some point in 2023, Gordon appeared to be no longer listed on the Tree of Life Counseling, PLLC website, but she was listed as that entity's registered agent on the North Carolina Secretary of State's website.

133.    As alleged in this Complaint and Jury Demand, a relation of trust and confidence was created between each of the Defendants and Prisha.

134.    Each Defendant took advantage of that position of trust to Prisha's detriment by misleading her into changing her body to look more like a boy's body and in the process incurring significant injuries and huge expenses for the Defendants' "services" and for dealing with the detrimental effects Defendants caused for the rest of her life.

135.    Upon information and belief, the Defendants conspired together to mislead Prisha into changes to her body to make it look more like a boy's body.

136.    For instance, Defendants Gordon and Dr. Perry conspired to mislead Prisha into taking testosterone, with Gordon writing a letter of recommendation for the prescription and Dr. Perry writing the prescription.

137.    Similarly, Defendants Gordon, Klein-Fowler, and Dr. Emerson conspired to mislead Prisha into surgery, with Gordon, Klein-Fowler, and Dr. Emerson promoting the surgery, Klein Fowler writing letters of recommendation, and Dr. Emerson performing the surgery.

138.    Each of Defendant Dr. Emerson's actions, misrepresentations, concealments, and omissions were committed in the line and scope of his employment and on behalf of Piedmont Plastic Surgery and Dermatology, P.A.

139.    Each of Defendant Klein-Fowler's actions, misrepresentations, concealments, and omissions were committed in the line and scope of her employment and on behalf of Family Solutions, PLLC.

140.    Each of Defendant Gordon's actions, misrepresentations, concealments, and omissions were committed in the line and scope of her employment and on behalf of Tree of Life Counseling, PLLC.

141.     Each of Defendant Dr. Perry's actions, misrepresentations, concealments, and omissions were committed in the line and scope of her employment and on behalf of Moses Cone Medical Services, Inc.

## COUNT ONE – FRAUD
## ALL DEFENDANTS

142.     The preceding allegations are repeated and incorporated herein.

143.     Defendants falsely represented or concealed material facts. For instance, as alleged in this Complaint and Jury Demand:

    a.   Each of the Defendants misrepresented to Prisha that she was actually a boy and that changing her body to look like a boy's body would solve her psychological and mental health problems.

    b.   Defendants Dr. Perry and Gordon misrepresented to Prisha that injecting testosterone into her body would solve her psychological and mental health problems.

    c.   Defendants Dr. Emerson, Klein-Fowler, and Gordon misrepresented to Prisha that breast surgery would solve her psychological and mental health problems.

    d.   Defendant Dr. Emerson misrepresented the nature and effects of "breast reduction" surgery, which in actuality was a surgery to remove her healthy breasts and render her incapable of nursing a child.

    e.   Each of the Defendants omitted, withheld, and suppressed critical information from Prisha about the long-term adverse health consequences and permanent damage these purported "treatments" would cause her, and they failed to inform her of alternative courses of treatment for her psychological problems and ensure she had a clear understanding of those alternatives.

41

f.  On or about February 22, 2015, Dr. Perry misrepresented to Prisha that it was "illegal" for her parents to be involved in decision-making regarding whether she would undergo medicalized gender transition.

g.  At least as of on or about March 6, 2015, and continuing through 2015, 2016 and 2017, and continuing thereafter, Dr. Perry deceived Prisha, misrepresented her medical condition, and withheld from her the true facts regarding so-called medical transition, such as that Prisha's mental health problems would not be cured by changing her body to look like a boy's body. Dr. Perry also deceived Prisha by withholding from her the alternatives to medicalized transition, such as counseling, and by withholding pertinent information, such as scientific evidence and basis (or lack thereof) pertaining to medicalized transition.

h.  At least as of on or about June 12, 2015, and continuing through 2015, 2016 and 2017, and continuing thereafter, Dr. Perry misrepresented to Prisha that she was transgender and that testosterone injections were medically necessary and appropriate and would cure Prisha's psychological and mental health problems. At the same time, Dr. Perry failed to disclose to Prisha the full, true, and accurate supposed benefits and risks, and the permanent, detrimental consequences of testosterone injections. Dr. Perry did not inform Prisha that taking testosterone causes vaginal atrophy; inability to have intercourse; enlarged clitoris; permanent voice change; pain in shoulders, neck, and vaginal area; and fertility impacts.

i.  On or about July 1, 2015, and continuing thereafter, Defendant Gordon misrepresented to Prisha that she was a boy and concealed certain material

facts, such as that Prisha's psychological problems stemmed from other causes and were likely to persist absent proper counseling.

j.   On or about July 1, 2015, and continuing thereafter, Defendant Gordon misrepresented that WPATH's SOC 7 guidelines, requirements, and criteria had been followed and were satisfied with respect to Prisha and that Prisha was an appropriate candidate for cross-sex hormone therapy.

k.   On or about July 1, 2015, and continuing thereafter, Defendant Gordon did not make full and accurate disclosure to Prisha of the supposed benefits and risks of cross-sex hormone therapy, despite representing that she had done so.

l.   On or about July 1, 2015, and continuing thereafter, Defendant Gordon misrepresented that cross-sex hormone therapy was necessary and appropriate and failed to make Prisha aware of alternatives to cross-sex hormone therapy.

m.  At least as of July 14, 2015, and continuing through 2015, 2016 and 2017, and continuing thereafter, Dr. Perry furthered the misrepresentations and concealments and concealed Prisha's ongoing use of possibly toxic medication.

n.   At least as of July 17, 2015, and continuing through 2015, 2016 and 2017, and continuing thereafter, Dr. Perry misled Prisha by suppressing the facts of "contraindications" for Prisha to begin or continue on testosterone therapy.

o.   At least as of September 10, 2015, and continuing through 2015, 2016 and 2017, and continuing thereafter, Dr. Perry concealed that the cross-sex hormone therapy was not curing or treating Prisha's mental health issues and illnesses and that it was in fact harming Prisha.

p.  On or about July 23, 2015, and at previous times and thereafter, Dr. Perry misrepresented to Prisha that she was undergoing male puberty, she would have the symptoms of male puberty, and she would grow a penis.

q.  On or about January 7, 2016, and at previous times and thereafter, Defendant Klein-Fowler suppressed the fact that Prisha was struggling with impaired daily functioning and misrepresented that she was an appropriate candidate for so-called "top surgery."

r.  On or about January 13, 2016, and at previous times and thereafter, Defendant Dr. Emerson misrepresented to Prisha that surgery on her healthy breasts would benefit her and that she needed this surgery. Around the same time, Dr. Emerson concealed the detrimental effects such surgery would have, such as the loss of Prisha's breasts, loss of ability to nurse a child, and physical and psychological pain.

s.  On or about April 13, 2016, and at previous times and thereafter, Dr. Perry misrepresented to Prisha that her estrogen was "nicely suppressed" and her testosterone level was "in the range we would like," misleading Prisha into believing that these levels were healthy and medically necessary and appropriate.

t.  In July and August 2016, by encouraging Prisha to remove her uterus and ovaries, Dr. Perry continued to deceive Prisha into thinking that medicalized "transition" was medically necessary and appropriate to treat and cure her psychological and mental health problems.

u.  On or about November 21, 2016, and at previous times and thereafter, Defendant Klein-Fowler misrepresented that she was qualified to recommend Prisha for so-called "top surgery" and that Prisha met the WPATH criteria for "mastectomy surgery to aid in [her] medical transition."

v.  On or about November 21, 2016, and at previous times and thereafter, Defendant Klein-Fowler misrepresented Prisha's condition as "present[ing] no apparent residual psychiatric symptoms" and "quite stable."

w.  On or about November 21, 2016, and at previous times and thereafter, Defendant Klein-Fowler failed to disclose Prisha's numerous mental health issues and diagnoses.

x.  On or about November 29, 2016, and at previous times and thereafter, Defendant Dr. Emerson again misrepresented to Prisha that surgery on her healthy breasts would benefit her and that she needed this surgery. Around the same time, Dr. Emerson concealed the detrimental effects such surgery would have, such as the loss of Prisha's breasts, loss of ability to nurse a child, and physical and psychological pain.

y.  On or about November 29, 2016, and at previous times and thereafter, Dr. Emerson misrepresented that the procedure that would be performed was a "breast reduction" designed for "[w]omen who have large breasts" and as a result experience back, neck, and shoulder pain and skin irritation.

z.  On or about November 29, 2016, and at previous times and thereafter, Dr. Emerson misrepresented that Prisha "may have more difficulty breast feeding after this operation" and that pregnancy could cause the breast skin to stretch

45

and "offset the results of surgery" such that breast feeding would not be

impossible for Prisha after the surgery.

aa. On or about November 29, 2016, and at previous times and thereafter, Dr.

Emerson suppressed that the surgery would be irreversible and permanent.

144.   Defendants' misrepresentations and concealment were reasonably calculated to

deceive.

145.   Defendants' misrepresentations and concealment were made with intent to

deceive.

146.   Defendants' misrepresentations and concealment did in fact deceive.

147.   Each of the Defendants convinced Prisha that changing her body to appear as the

opposite sex would treat, cure, and solve her psychological and mental health problems.

148.   Defendants' misrepresentations and concealment resulted in damage to Prisha, in

the form of a deeply injured body that did not develop as it should have and suffers from ongoing

problems and pain, and exacerbated and additional mental health and psychological problems

and anguish. Defendants defrauded Prisha of money, health, body parts, reputation, time, and

well-being. Defendants defrauded Prisha of the opportunity to overcome her mental health

challenges and flourish as a teenager and young adult.

149.   Prisha did not discover Defendants' misrepresentations, concealment, and

wrongdoing until recently, within the last year, and could not have discovered it prior to that time

in the exercise of reasonable diligence because she was vulnerable and suffered from a host of

mental health issues, she was under Defendants' influence and trusted Defendants to take care of

her, and she relied on and believed Defendants as authority figures. Likewise, Prisha was under a

disability, was incompetent, and lacked capacity to discover the wrongdoing earlier because

Prisha lacked sufficient capacity to manage her own affairs in this regard, and her host of mental health issues and illnesses, including borderline personality disorder, caused her to lack sufficient capacity to exercise her legal rights or to make or communicate important decisions concerning her person. Those mental health issues, illnesses, or similar conditions caused her to repress from her memory or disassociate, akin to repression, the wrongful acts of Defendants until Prisha recently underwent therapy, which began to uncover some of those past events in her mind and eventually helped her to realize that wrongdoing occurred and appropriate care was not provided. Coincident with this realization, Prisha has suffered extreme emotional distress.

## COUNT TWO – FACILITATING FRAUD
### ALL DEFENDANTS

150. The preceding allegations are repeated and incorporated herein.

151. Upon information and belief, Defendants agreed to defraud Prisha.

152. The Defendants committed an overt tortious act in furtherance of the agreement to defraud Prisha.

153. Prisha suffered damages from that act.

## COUNT THREE – BREACH OF FIDUCIARY DUTY RISING TO THE LEVEL OF
### CONSTRUCTIVE FRAUD
### ALL DEFENDANTS

154. The preceding allegations are repeated and incorporated herein.

155. Each of the Defendants owed Prisha a fiduciary duty.

156. Each of the Defendants breached that duty.

157. Each of the Defendants sought to benefit himself, herself, or itself in the transactions and indeed did benefit through their respective transactions. Each Defendant benefited monetarily with every visit from Prisha and every treatment and procedure provided to her (and to be clear, by pushing and misleading her down a path of irreversible medicalization,

they were creating a potentially life-long patient and source of income). Additionally, each Defendant benefited by using Prisha as a means of increasing their "gender-affirming care" bona fides and boosting their reputations and practices in the burgeoning money-making field of "gender-affirming care."

158.    Through the transactions with Prisha, each of the Defendants took advantage of their positions of trust to the hurt and detriment of Prisha.

## COUNT FOUR – CIVIL CONSPIRACY
## ALL DEFENDANTS

159.    The preceding allegations are repeated and incorporated herein.

160.    Defendants agreed to do an unlawful act or to do a lawful act in an unlawful way.

161.    That agreement resulted in injury to Prisha inflicted by one or more of the conspirators.

162.    This occurred pursuant to a common scheme.

## COUNT FIVE – MEDICAL MALPRACTICE
## ALL DEFENDANTS

163.    The preceding allegations are repeated and incorporated herein.

164.    Each of the Defendants, in their respective roles as health care providers, furnished or failed to furnish professional services in the performance of medical or other health care.

165.    Defendants' furnishings or failures to furnish were not in accordance with the standards of practice among members of the same health care professions with similar training and experience situated in the same or similar communities under the same or similar circumstances throughout Prisha's treatment.

166.    Defendants furnished or failed to furnish professional health care services without Prisha's informed consent.

    a.  Any consent obtained by Defendants was not for the treatment or procedures Defendants actually provided;

    b.  Any consent obtained by Defendants was not based on full, accurate, and true information and lacked information necessary to make an informed decision and provide informed consent;

    c.  Any consent obtained by Defendants was obtained by fraud, deception, or misrepresentation or concealment of a material fact; and/or

    d.  Prisha was incapable of providing informed consent for all relevant periods for the treatments and procedures at issue given her psychological disability and instability, and Defendants knew or reasonably should have known the same.

167.    With respect to each Defendant, the medical care and all medical records pertaining to the alleged negligence that are available to Prisha after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care.

168.    Defendants' alleged wrongful acts or failures were the proximate cause of Prisha's injuries.

169.    Alternatively, Defendants' alleged wrongful acts or failures that were the proximate cause of Prisha's injuries were committed in reckless disregard of her rights, grossly negligent, fraudulent, intentional, or with malice.

170.    As a result of Defendants' alleged malpractice, Prisha has been disfigured, has lost use of parts of her body, and has sustained permanent injury.

171.    Upon memory and realization of Defendants' allegedly wrongful conduct, Prisha

suffered emotional and psychological pain and suffering from the damage and mutilation she

received or was encouraged to receive from Defendants, as well as the pain and suffering that

accompanies knowing Defendants' acts or failures were wrongful.

## COUNT SIX – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## ALL DEFENDANTS

172.    The preceding allegations are repeated and incorporated herein.

173.    Defendants negligently engaged in conduct.

174.    It was reasonably foreseeable that such conduct would cause Prisha severe

emotional distress (also referred to as mental anguish).

175.    The conduct did in fact cause Prisha severe emotional distress.

176.    As a foreseeable and proximate result of the Defendants' negligence, Prisha

experienced the past, present, and future pain and suffering and emotional distress described

herein, including living in a body that has not developed the way it should have, with the

knowledge that her body has been disfigured and permanently harmed as a result of Defendants'

wrongful actions.

## COUNT SEVEN – UNFAIR AND DECEPTIVE TRADE PRACTICES
## DEFENDANTS GORDON, TREE OF LIFE COUNSELING, PLLC, KLEIN-FOWLER,
## AND FAMILY SOLUTIONS, PLLC

177.    The preceding allegations are repeated and incorporated herein.

178.    Defendants Gordon, Tree of Life Counseling, PLLC, Klein-Fowler, and Family

Solutions, PLLC made a series of willful, material misrepresentations and concealments to

Prisha about the nature of her condition, the nature of Defendants' recommended "treatments"

and procedures and the purported necessity and appropriateness of those treatments and

procedures, Prisha's supposed suitability for those treatments and procedures, and Defendants'

supposed qualifications to properly assess Prisha for those treatments and procedures, and each of such Defendants also withheld critical information from Prisha about the long-term adverse health consequences and permanent damage their recommended treatments and procedures would cause her.

179.   The actions alleged were in or affecting commerce as Defendants charged money for their counseling services.

180.   Prisha relied on Defendants' misrepresentations and concealments such that Prisha affirmatively incorporated Defendants' alleged misrepresentations and concealments into her decision-making process.

181.   Prisha's reliance on Defendants' misrepresentations and concealments was reasonable under the circumstances.

182.   Due to Prisha's reliance on Defendants' misrepresentations and concealments, she suffered injury, including permanent bodily injury, pain, and suffering.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

Wherefore, Prisha Mosley requests that the Court enter the following relief:

A.  Adjudicate and find in favor of Prisha and against Defendants on all claims;

B.  Award Prisha compensatory damages in an amount to be determined at trial;

C.  Award Prisha punitive damages to the maximum extent allowable in order to punish Defendants' willful misconduct as alleged herein and deter similar conduct in the future;

D.  Award Prisha treble damages and attorneys' fees pursuant to N.C. Gen. Stat. §§ 75-16

and 75-16.1;

E.  Award Prisha pre and post judgment interest pursuant to N.C. Gen. Stat. § 24-5; and

F.  Award Prisha all other relief the Court deems necessary and proper to do justice in

this case.

This the 17th day of July 2023.

Respectfully submitted,

Adam P. Banks
NC State Bar No. 47,559
Anthony J. Biller
NC State Bar No. 24,117
James R. Lawrence, III
NC State Bar No. 44,560
Allison Joelle Harvill
NC State Bar No. 60279
2601 Oberlin Rd, STE 100
Raleigh, NC 27608
Telephone: (919) 715.1317
Facsimile: (919) 782.0452
ajbiller@envisage.law
jlawrence@envisage.law
jharvill@envisage.law

/s/ Joshua Payne
Joshua Payne (*pro hac vice* pending)
Alabama Bar No. ASB-1041-A55P
Jordan Campbell (*pro hac vice* pending)
Texas Bar No. 24087251
Ronald Miller (*pro hac vice* pending)
Texas Bar No. 24095424
Daniel Sepulveda (*pro hac vice* pending)
Texas Bar No. 24100910
**Campbell Miller Payne, PLLC**
5955 Alpha Rd #1491
Dallas, Texas 75240
Telephone: (214) 316-7156

josh@cmppllc.com
jordan@cmppllc.com
ron@cmppllc.com
daniel@cmppllc.com