# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

EMMA KOE, individually and on )
behalf of her minor daughter, AMY )
KOE; HAILEY MOE, individually )
and on behalf of her minor daughter, )        Civil Action No.
TORI MOE; PAUL VOE; ANNA )        1:23-cv-02904-SEG
ZOE, individually and on behalf of )
her minor daughter, LISA ZOE; )
TRANSPARENT, on behalf of its )
members; and NANCY DOE, individually, )
and on behalf of her minor daughter, )
LINDA DOE, )
                                       )
            Plaintiffs, )
                                       )
    v. )
                                       )
CAYLEE NOGGLE, in her official )
capacity as Commissioner of the )
Georgia Department of Community )
Health; GEORGIA DEPARTMENT )
OF COMMUNITY HEALTH'S )
BOARD OF COMMUNITY )
HEALTH; NORMAN BOYD, )
ROBERT S. COWLES III, DAVID )
CREWS, RUSSELL )
CRUTCHFIELD, )
ROGER FOLSOM, NELVA LEE, )
MARK SHANE MOBLEY, )
CYNTHIA RUCKER, ANTHONY )
WILLIAMSON, in their official )
capacities as members of the Georgia )
Department of Community Health's )
Board of Community Health; )
THE GEORGIA COMPOSITE )

1

MEDICAL BOARD; JOHN S.                )
ANTALIS, SUBRAHMANYA BHAT,            )
WILLIAM BOSTOCK, KATHRYN              )
CHEEK, RUTHIE CRIDER,                 )
DEBI DALTON, CHARMAINE                )
FAUCHER, AUSTIN FLINT,                )
SREENIVASULU GANGASANI,               )
JUDY GARDNER, ALEXANDER S.            )
GROSS, CHARLES E. HARRIS, JR.,        )
J. JEFFREY MARSHALL,                  )
MATTHEW W. NORMAN,                    )
BARBY J. SIMMONS, in their            )
official capacities as members of the )
Georgia Composite Medical Board;      )
DANIEL DORSEY, in his official        )
capacity as the Executive Director of )
the Georgia Composite Medical         )
Board,                                )
                                      )

## COMPLAINT IN INTERVENTION OF INTERVENOR PLAINTIFFS NANCY DOE, INDIVIDUALLY AND ON BEHALF OF HER MINOR DAUGHTER, LINDA DOE

## I.    PRELIMINARY STATEMENT

1.    This Action is a federal constitutional challenge to Georgia Senate Bill 140 (hereafter "S.B. 140," the "Health Care Ban," or the "Ban"), a law passed during the 2023 Georgia legislative session that prohibits medical providers from treating gender dysphoria in minors with hormone therapy, thereby denying transgender youth access to established and medically necessary care. *See* S.B. 140, 157th Gen. Assemb., Reg. Sess. (Ga. 2023). The Health Care Ban was passed despite opposition from transgender youth, parents, advocacy groups, medical

2

providers, and medical organizations in Georgia. Governor Brian Kemp nevertheless signed S.B. 140 into law on March 23, 2023, and it takes effect on July 1, 2023.

2.     The Health Care Ban violates the fundamental rights of parents to make medical decisions to ensure the health and well-being of their children. By prohibiting medical providers from treating minors with gender dysphoria—a rare condition often requiring medical and therapeutic treatment and care—in accordance with the standards of care and clinical practice guidelines, the Ban prohibits Georgia parents from seeking and obtaining appropriate medical treatment for their children.

3.     The Health Care Ban also violates the guarantees of equal protection by denying transgender youth essential, and often lifesaving, medical treatment based on their sex and on their transgender status.

4.     Defendants cannot demonstrate any rational basis, much less an important or compelling one, for the Health Care Ban, which prevents transgender youth from obtaining safe, established, and necessary medical care.

5.     Plaintiff-Intervenors seek declaratory and injunctive relief to enjoin enforcement of the Health Care Ban. Without this relief, Plaintiff-Intervenors will suffer real, immediate, and irreparable injury.

## II.    JURISDICTION AND VENUE

6.    This civil and constitutional action arises under the United States Constitution and 42 U.S.C. § 1983.

7.    This Court has subject matter jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343, and 1367.

8.    This Court is authorized to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

9.    This Court has personal jurisdiction over Defendants because Defendants are domiciled in Georgia and the denial of Plaintiff-Intervenor's rights guaranteed by federal law occurred within Georgia.

10.    Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b)(1)–(2) because one or more Defendants reside in this District and because a substantial part of the events or omissions giving rise to Plaintiff-Intervenors' claims occurred in this judicial district and division.

## III.    THE PARTIES

### A.    Plaintiff-Intervenors

11.    Plaintiff-Intervenor Nancy Doe is the mother of Plaintiff-Intervenor Linda Doe, a 10-year-old girl who is transgender, for whom she also appears in this

case as her next friend.

12.     Nancy and Linda Doe ("Doe Family") are both residents of Richmond Hill, Georgia. Because of concerns about their privacy and safety, both the members of the Doe Family are proceeding pseudonymously. See Doe Motion to Proceed Under Pseudonyms, filed concurrently herewith.

### B.     Defendants

13.     Defendant Caylee Noggle is the Commissioner of the Georgia Department of Community Health. The Commissioner of the Georgia Department of Community Health is subject to appointment and removal by the Governor. O.C.G.A. § 31-2-6 (2022). By statute, the Commissioner is the chief administrative officer of the Department of Community Health and supervises, directs, accounts for, organizes, plans, administers, and executes the functions vested in the Department. *Id.* § 31-2-6. Thus, in her official capacity as Commissioner, Defendant Noggle directs and supervises the process of establishing sanctions, by rule and regulation, for violating the Health Care Ban. *Id.* §§ 31-7-2.1(a), 31-7- 3.2(h). Further, in her official capacity as Commissioner, Defendant Noggle administers and executes sanctions for violations of rules and regulations, including revocation of an institution's permit to operate, pursuant to the Department of Community Health's authority. *See, e.g.*, *id.* §§ 31-7-3, 31-7-3.2(g), 31-7-4. Defendant Noggle's official place of business is Atlanta, Fulton County, Georgia. Defendant Noggle is sued in her

official capacity.

14.     The Georgia Department of Community Health's Board of Community Health (the "Board") comprises nine members appointed by the Governor and confirmed by the State Senate. O.C.G.A. § 31-2-2, 31-2-3(a) (2022). The Board establishes the general policy to be followed by the Department of Community Health. *Id.* The Board has the authority to adopt and promulgate rules and regulations for violations of the Health Care Ban. *Id.* §§ 31-2-3, 31-7-2.1(a), 31-7-3.2(h). The Board also has the authority to execute and enforce violations of rules and regulations, including revocation of an institution's permit to operate. *See, e.g.*, *id*. §§ 31-7-3, 31-7-3.2(g), 31-7-4. The Board is based and headquartered in, and the official place of business for the members of the Georgia Department of Community Health is, Atlanta, Fulton County, Georgia.

15.     Defendant Norman Boyd is a board member and the Chairman of the Georgia Department of Community Health. Defendant Boyd is sued in his official capacity.

16.     Defendant Robert S. Cowles III, M.D., F.A.C.S., is a board member of the Georgia Department of Community Health. Defendant Cowles is sued in his official capacity.

17.     Defendant David Crews is a board member of the Georgia Department of Community Health. Defendant Crews is sued in his official capacity.

18.     Defendant Russell Crutchfield, Ed.D., is a board member and the Secretary of the Georgia Department of Community Health. Defendant Crutchfield is sued in his official capacity.

19.     Defendant Roger Folsom is a board member and the Vice Chairman of the Georgia Department of Community Health. Defendant Folsom is sued in his official capacity.

20.     Defendant Nelva Lee, Ph.D., is a board member of the Georgia Department of Community Health. Defendant Lee is sued in her official capacity.

21.     Defendant Mark Shane Mobley is a board member of the Georgia Department of Community Health. Defendant Mobley is sued in his official capacity.

22.     Defendant Cynthia Rucker, D.N.P., RN-BC, NE-BC, is a board member of the Georgia Department of Community Health. Defendant Rucker is sued in her official capacity.

23.     Defendant Anthony Williamson is a board member of the Georgia Department of Community Health. Defendant Williamson is sued in his official capacity.

24.     The Georgia Composite Medical Board comprises 16 members (i.e., 15 voting members and one ex-officio member) appointed by the Governor and

confirmed by the State Senate. O.C.G.A. § 43-34-2(a) (2022). By statute, the Georgia Composite Medical Board has the power to adopt rules and regulations necessary for the proper administration and enforcement of physicians' practice. *Id.* § 43-34-5(c). Further, the Georgia Composite Medical Board has the authority to execute and enforce violations of rules and regulations—of any state, the Georgia Composite Medical Board, the United States, or any other lawful authority—by taking disciplinary action, including probation and suspension, administration of a reprimand, revocation of a license, and imposition of a fine. *Id.* § 43-34-8(a), (b). The Georgia Composite Medical Board is based and headquartered in, and the official place of business for the members of the Georgia Composite Medical Board is, Atlanta, Fulton County, Georgia.

25.    Defendant John S. Antalis, M.D., is a member of the Georgia Composite Medical Board. Defendant Antalis is sued in his official capacity.

26.    Defendant Subrahmanya Bhat, M.D., is a member of the Georgia Composite Medical Board. Defendant Bhat is sued in his official capacity.

27.    Defendant William Bostock, D.O., is a member of the Georgia Composite Medical Board. Defendant Bostock is sued in his official capacity.

28.    Defendant Kathryn Cheek, M.D., is a board member of the Georgia Composite Medical Board. Defendant Cheek is sued in her official

capacity.

29.    Defendant Ruthie Crider, M.D., is a member of the Georgia Composite Medical Board. Defendant Crider is sued in her official capacity.

30.    Defendant Debi Dalton, M.D., is a member of the Georgia Composite Medical Board. Defendant Dalton is sued in her official capacity.

31.    Defendant Charmaine Faucher, PA-C, is an ex-officio member of the Georgia Composite Medical Board. Defendant Faucher is sued in her official capacity.

32.    Defendant Austin Flint, M.D., is a member of the Georgia Composite Medical Board. Defendant Flint is sued in his official capacity.

33.    Defendant Sreenivasulu Gangasani, M.D., is a member of the Georgia Composite Medical Board. Defendant Gangasani is sued in his official capacity.

34.    Defendant Judy Gardner, Pharm.D., is a consumer member of the Georgia Composite Medical Board. Defendant Gardner is sued in her official capacity.

35.    Defendant Alexander S. Gross, M.D., is a member of the Georgia Composite Medical Board. Defendant Gross is sued in his official capacity.

36.    Defendant Charles E. Harris, Jr., is a consumer member of the Georgia Composite Medical Board. Defendant Harris is sued in his official

capacity.

37.     Defendant J. Jeffrey Marshall, M.D., is a member of the Georgia Composite Medical Board. Defendant Marshall is sued in his official capacity.

38.     Defendant Matthew W. Norman, M.D., is a member and the Chair of the Georgia Composite Medical Board. Defendant Norman is sued in his official capacity.

39.     Defendant Andrew Reisman, M.D., is a member of the Georgia Composite Medical Board. Defendant Reisman is sued in his official capacity.

40.     Defendant Barby J. Simmons, D.O., is a member of the Georgia Composite Medical Board. Defendant Simmons is sued in her official capacity.

41.     Defendant Daniel Dorsey is the Executive Director of the Georgia Composite Medical Board. The Executive Director is appointed by the Georgia Composite Medical Board. O.C.G.A. § 43-34-6 (2022). By statute, the Executive Director has the power to carry out investigations for the purpose of discovering violations of the Board's rules and regulations. Id. §§ 43-34-5, 43-34-6, 43-34-8(d). Defendant Dorsey's official place of business is Atlanta, Fulton County, Georgia. Defendant Dorsey is sued in his official capacity.

## IV.   FACTUAL BACKGROUND

### A.   Background on Gender Dysphoria

42.    "Gender identity" refers to a person's internal, innate, and immutable sense of their particular gender. Gender identity is a core, defining trait, which cannot be changed voluntarily or through medical intervention, and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

43.    A person's gender identity is a fundamental aspect of human development.

44.    Everyone has a gender identity. A person's gender identity is durable and cannot be altered through medical intervention.

45.    A person's gender identity usually, but not always, matches the sex they were designated at birth based on their external genitalia.

46.    The term "natal sex" is more precise than the term "biological sex" because there are many biological sex characteristics and they do not always align with each other in a single direction. For example, some people with intersex characteristics may have a chromosomal configuration typically associated with a male sex designation but genital characteristics typically associated with a female sex designation. For these reasons, the Endocrine Society, an international medical

organization of over 18,000 endocrinology researchers and clinicians, advises practitioners that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.

47. For most people, their gender identity aligns with their natal sex. But for people who are transgender, their gender identity differs from their natal sex. A boy who is transgender is someone whose natal sex is female while persistently, consistently, and insistently identifying as male. A girl who is transgender is someone whose natal sex is male while persistently, consistently, and insistently identifying as female.

48. Gender identity emerges early in life for transgender and non-transgender people alike. Most people develop a strong sense of their gender identity by the onset of puberty, though it can also occur much earlier. Some transgender people become aware early in childhood that their gender identity differs from their natal sex. For others, this awareness occurs closer to the onset of puberty, when physical changes in their bodies result in the recognition that their gender identity is not aligned with their natal sex.

### B.    Standards of Care for Treating Minors with Gender Dysphoria

49. Health care providers in Georgia use established guidelines to diagnose and treat youth with gender dysphoria.

50.     According to the Text Revision of the Fifth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5-TR"), which is the most current edition of the DSM, "gender dysphoria" is the diagnostic term for the clinically significant distress that can result from the lack of congruence between a person's gender identity and natal sex.[1]

51.     Being transgender is not itself a medical condition. But gender dysphoria resulting from being transgender is a serious medical condition that, if left untreated, frequently results in debilitating anxiety, severe depression, self- harm, and suicide.[2]

52.     In the past, mental health professionals sought to treat gender dysphoria by trying to change the person's gender identity to correspond to their natal sex; these efforts were unsuccessful and gravely detrimental. Today, the medical profession recognizes that such efforts put transgender individuals at risk of profound harm, including dramatically increased rates of suicidal ideation and suicide.

53.     The World Professional Association for Transgender Health

---

[1] The DSM is the handbook used by health care professionals in the United States as the authoritative guide for the diagnosis of mental disorders, including descriptions, symptoms, and other criteria for establishing consistent and reliable diagnoses.

[2] *See, e.g.*, Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, 37 J. Interpersonal Violence 2696 (2022) ("Data from the U.S. Transgender Survey indicate that 82% of transgender individuals have considered killing themselves and 40% have attempted suicide. . . . Within the transgender population, suicidality is highest among young people.").

("WPATH") has published widely accepted standards of care for the treatment of gender dysphoria, most recently in S*tandards of Care for the Health of Transgender and Gender Diverse People, Version 8*, which was published in the International Journal of Transgender Health.[3] The WPATH standards of care offer medical providers evidence-based guidance on how to effectively treat gender dysphoria, which most often entails treatment that enables a transgender person to live more fully in alignment with their gender identity. This treatment is sometimes referred to as "transition-related medical care" or "gender-affirming care."

54.     The Endocrine Society has also promulgated a standard of care and clinical guidelines in line with the WPATH standards of care that are specific to the provision of hormone therapy for treating gender dysphoria in minors and adults. *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender- Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (2017).

55.     Both of these standards of care have been adopted by major medical and mental health associations in the United States, such as the American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and the Endocrine

---

[3] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health (2022).

Society.

56.    The precise treatment for gender dysphoria depends on each patient's particular needs, and the general medical standards of care differ based on the person's age and development.

57.    The standards of care for a minor with gender dysphoria who has not yet reached puberty do not include any medical interventions and, instead, are limited to supporting "social transition," which means allowing a transgender child to live and be socially recognized in accordance with their gender identity. Social transition can include adopting a name, pronouns, hairstyle, and clothing consistent with the person's gender identity.

58.    Under the standards of care and clinical guidelines, medical interventions may become necessary and appropriate as transgender youth reach puberty. The standards of care direct pediatric endocrinologists and other providers treating transgender patients to work in close consultation with qualified mental health professionals experienced in diagnosing and treating gender dysphoria, as well as with patients and their parents, to determine whether medical treatment is appropriate.

59.    Medication that delays puberty is one common medical intervention for transgender minors with gender dysphoria who would experience extreme distress if they were to go through puberty in accordance with their natal sex.

60.     Puberty-delaying treatment is only appropriate if several rigorous medical and psychosocial factors are met as determined by a minor's health care providers. When puberty-delaying treatment is determined to be appropriate, it is typically started prior to the development of secondary sex characteristics during puberty.

61.     Health care providers often prescribe minors puberty-delaying treatment to prevent the distress of developing permanent, unwanted physical characteristics that do not align with the minor's gender identity. Puberty-delaying treatment works by pausing endogenous puberty at whatever stage it is at when the treatment begins, which limits the influence of a person's endogenous hormones on their body and thereby prevents them from going through puberty in accordance with their natal sex.

62.     If determined to be medically necessary and appropriate for a transgender minor with gender dysphoria to undergo puberty in alignment with their gender identity, hormone therapy is initiated to enable them to do so.

63.     Under the Endocrine Society's Clinical Guidelines, hormone therapy is appropriate for transgender minors if:

- A qualified mental health professional has confirmed:

  - persistence of gender dysphoria;
  - any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the

adolescent's environment and functioning are stable enough to start sex hormone treatment;

- the adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment.

- And the adolescent:

  - has been informed of the partly irreversible effects and side effects of treatment (including potential loss of fertility and options to preserve fertility);
  - has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

- And a pediatric endocrinologist or other clinician experienced in pubertal induction:

  - agrees with the indication for sex hormone treatment;
  - has confirmed that there are no medical contraindications to hormone treatment.

64.    If a minor receives puberty-blocking treatment, they do not develop the secondary sex characteristics of their natal sex. If a minor's gender dysphoria persists and certain other guidelines are met, they can then receive hormone treatment in accordance with their gender identity so they go through puberty around the same age as their peers. Hormone treatment results in developing the secondary sex characteristics that match their gender identity. However, for youth who have already

gone through natal puberty, puberty-blocking treatment is not a prerequisite for hormone treatment. Hormone therapy may be medically necessary and appropriate treatment for people with gender dysphoria who have undergone natal puberty.

65.    Minors with gender dysphoria diagnoses, who need medical care to alleviate or avoid pain and suffering, are prescribed hormone therapy when medically necessary as determined by a pediatric endocrinologist or another qualified medical care provider and in alignment with the standards of care and clinical practice guidelines. Although hormone therapy is generally prescribed during the time of puberty and, with minors, typically follows puberty-blocking medications, the need for hormone treatment is highly individualized and can present itself at any time. It is imperative that when the need for hormone treatment arises, these lifesaving medications are available.

66.    Minors with gender dysphoria who are prescribed puberty-blocking medications but are not able to begin hormone therapy at the appropriate time may suffer negative consequences of being on puberty blockers for a prolonged period. Although puberty-blocking medications are a safe and effective treatment for delaying puberty in transgender youth, remaining on puberty-blocking medication until the age of majority is not a viable or recommended option. Medical providers generally aim to limit the number of years of treatment with puberty blockers due to the risk of lower bone mineral density and vitamin D deficiency. The Health Care

Ban prevents minors on puberty-blocking medication from beginning hormone therapy, forcing them to either face the negative consequences of prolonged puberty-blocking therapy or stop the puberty-blocking medication and go through natal puberty—options that present grave risks. For those not already on puberty-blocking medication, the Health Care Ban discourages providers from prescribing them in the first place because allowing individuals to take puberty- blocking medications until the age of majority without access to hormone therapy is not a viable option under the appropriate standards of care.

67.     The medical treatment for transgender minors with gender dysphoria is effective. It can substantially reduce lifelong gender dysphoria. Longitudinal studies have shown that transgender minors with gender dysphoria who receive essential medical care, including puberty blockers and hormones, show levels of mental health and stability consistent with non-transgender minors. Lily Durwood et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. Child & Adolescent Psychiatry 116 (2017); Kristina Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics 1 (2016). In contrast, transgender youth suffering from gender dysphoria who do not receive appropriate medical care are at risk of serious harm, including increased rates of major depression, suicidal ideation, and suicide.

**C.      Georgia's Health Care Ban for Transgender Minors, S.B. 140**

68.      On March 21, 2023, the Georgia General Assembly passed the Health Care Ban, which prohibits health care providers in the state of Georgia from treating transgender minors with hormone therapy.

69.      The Health Care Ban further directs the Georgia Composite Medical Board to "adopt rules and regulations regarding the prohibitions" and specifies that "[a] licensed physician who violates this Code section shall be held administratively accountable to the board for such violation." S.B. 140 §§ 3(b), (c).

70.      In passing the Ban, the General Assembly ignored guidance from more than 500 Georgia medical providers—including pediatricians, psychiatrists, endocrinologists, and other health care providers—opposed to S.B. 140.[4] Those providers underscored the benefits of gender-affirming care for their transgender minor patients and the grave harm to their patients' health and well-being if they are denied access to this care.

71.      Only one doctor—who does not have expertise in treating transgender youth—testified in support of the Health Care Ban. In her testimony, she summarily and inaccurately compared changing one's body in alignment with their gender identity with the decision to change one's middle name. Georgia House of

---

[4] *OPINION: An Open Letter to Gold Dome on Transgender Bill*, Atlanta Journal Constitution (Mar. 16, 2023), https://www.ajc.com/opinion/opinion-an-open-letter-to-gold-dome-on-transgender-bill/S47QAWV6DZBSTNK4W5DJICFZH4/.

Representatives, *Public Health 03.14.23*, YouTube, at 1:43:45, 1:46:35 (Mar. 14, 2023),  https://www.youtube.com/watch?v=REs3xP8H-Wg&t=6226s.

72.     The limited testimony provided during the hearing process for S.B. 140 erroneously described gender dysphoria as "experimental" and not life- threatening for minors. Georgia State Senate, *2/22/23 – Committee on Health & Human Services*, YouTube, at 44:40 (Mar. 14, 2023),

https://www.youtube.com/watch?v=WsGBigfkYro. This testimony ignores reputable data which demonstrate that youth who need but do not receive gender- affirming care are at serious risk of harm, including the risk of major depression, suicidal ideation, developing a suicide plan, and dying by suicide. Austin, *supra* note 2 ("Data from the U.S. Transgender Survey indicate that 82% of transgender individuals have considered killing themselves and 40% have attempted suicide. . . . Within the transgender population, suicidality is highest among young people.").

73.     The General Assembly passed the bill despite the testimony of transgender people who shared their painful, personal experiences with gender dysphoria and explained the critical need for access to medical care.

74.     The General Assembly passed the bill despite the testimony of parents who pleaded for the legislature not to interfere with the health and well-being of their children by depriving them of the medical care they need to thrive and, sometimes, survive.

75.     On March 23, 2023, Governor Brian Kemp signed the Health Care Ban into law.

76.     The Ban went into effect on July 1, 2023.

**D.     The Health Care Ban Created by S.B. 140**

77.      S.B. 140 amends two separate Titles of the Official Code of Georgia Annotated. *See* S.B. 140, 157th Gen. Assemb., Reg. Sess. (Ga. 2023).

78.     The Health Care Ban prevents health care professionals from providing established medically necessary care to minors. Specifically, the Health Care Ban regulates hospitals and related institutions (under Title 31) by prohibiting certain procedures and therapies for treating gender dysphoria in minors from being performed or administered in those hospitals and institutions. *See* S.B. 140 § 2. Similarly, the Health Care Ban regulates physicians licensed by the Georgia Composite Medical Board (under Title 43) by prohibiting physicians from performing or administering the same procedures and therapies for treating gender dysphoria in minors. *See* S.B. 140 § 3. Both amendments also provide for penalties and limited exceptions. S.B. 140 § 2; S.B. 140 § 3.

**1.     The Health Care Ban Prohibits Surgical Procedures and Hormone Therapies for Treating Gender Dysphoria**

79.     The Health Care Ban is substantively similar under Titles 31 and 43. In each case, the Ban prohibits "irreversible procedures or therapies . . . performed on a

minor for the treatment of gender dysphoria." *Compare* S.B. 140 § 2(a), *with* S.B. 140 § 3(a). Specifically, the Ban prohibits "(1) Sex reassignment surgeries, or any other surgical procedures, that are performed for the purpose of altering primary or secondary sexual characteristics; or (2) Hormone replacement therapies." S.B. 140 § 2(a); S.B. 140 § 3(a).[5]

80.     The primary difference between the two amendments is their applicability to health care providers. The amendment to Title 31 applies to hospitals and related institutions, whereas the amendment to Title 43 applies to physicians licensed by the Georgia Composite Medical Board. S.B. 140 § 2(a); S.B. 140 § 3(a).

## 2.     The Health Care Ban Has Exceptions

81.     The amendment to Title 43 provides limited exceptions for:

> (1) Treatments for medical conditions other than gender dysphoria or for the purpose of sex reassignment where such treatments are deemed medically necessary; (2) Treatments for individuals born with a medically verifiable disorder of sex development, including individuals born with ambiguous genitalia or chromosomal abnormalities resulting in ambiguity regarding the individual's biological sex; (3) Treatments for individuals with partial androgen insensitivity syndrome; and (4) Continued treatment of minors who are, prior to July 1, 2023, being treated with irreversible hormone replacement therapies.

---

[5] Because Plaintiffs-Intervenors are not seeking surgical procedures, this challenge is limited to S.B. 140's prohibition on "[h]ormone replacement techniques," S.B. 140 § 2(a)(2).

S.B. 140 § 3(b).

82.     The amendment to Title 31 incorporates the same exceptions by reference to the amendment to Title 43. S.B. 140 § 2(b) (citing Code Section 43-34-15).

### 3.     The Health Care Ban Imposes Harsh Penalties for Violations

86.     The amendment to Title 31 provides that the Department of Community Health "shall establish sanctions, by rule and regulation, for violations of this Code section up to and including the revocation of an institution's permit issued pursuant to Code Section 31-7-3." S.B. 140 § 2(c). As of filing this Complaint, the Georgia Department of Community Health has not yet established relevant sanctions for these violations.

87.     After S.B. 140's effective date, health care institutions will be forced to choose between withholding medically necessary treatment for their minor transgender patients, on one hand, and facing still unknown sanctions on the other. In addition, O.C.G.A. § 31-5-8 (2022) states that any person violating the provisions of Title 31 shall be guilty of a misdemeanor. Thus, even though the Health Care Ban's amendment to Title 31 focuses on hospitals and other institutions, individual health care providers may face criminal prosecution if they provide medically necessary care to minor transgender patients.

24

88.     The amendment to Title 43 provides that "[a] licensed physician who violates this Code section shall be held administratively accountable to the [Georgia Composite Medical Board] for such violation." S.B. 140 § 3(c). Thus, licensed physicians will be faced with the impossible choice of withholding medically necessary treatment from their transgender patients or facing administrative sanctions by the Georgia Composite Medical Board, including revocation of their license. O.C.G.A. § 43-34-8(a), (b).

### E.     The Health Care Ban Will Irreparably Harm Plaintiff-Intervenors

89.     S.B. 140 causes irreparable harm to each of the Plaintiff-Intervenors.

#### 1.     The Health Care Ban Will Irreparably Harm Parent and Minor Plaintiff-Intervenors

90.     Linda Doe is a 10-year-old girl who resides with her mother Nancy Doe, in Richmond Hill, Georgia. When Linda was 4 years old and attending daycare, she started expressing a preference for "girl's" clothing. Nancy provided her with such clothing which Linda started consistently wearing at home.

91.     When Linda was 7, she started telling her classmates that she was 1/2 boy and 1/2 girl. She told Nancy that God had put her "in the wrong body."

92.     Nancy discussed with the administration at Linda's school various issues that the administration had noticed and heard from Linda and other students. Nancy's decision was to support Linda, allow her to wear gender conforming

clothing at school, and for the school to make a note that Linda was identifying as female.

93.     The next school year, per Linda's request, which Nancy supported, she began going by the name Linda at school.

94.     Linda has socially transitioned, adopting a "girl's" hairstyle and clothing along with exclusively using the name Linda and female pronouns. Linda is much happier since socially transitioning. Although she still faces bullying and teasing at school, she is confident in who she is and consistently expresses herself and identifies as female.

95.     Linda has been diagnosed with gender dysphoria and has received care from her pediatrician and a counselor who specializes in gender dysphoria. Nancy has discussed with both parties Linda's long-term treatment and care plans. In conjunction with their advice, she has determined the next step for Linda is to begin puberty blockers.  Since Linda is 10 years old, the onset of puberty could begin at any time.

96.     Nancy, along with Linda's pediatrician and counselor are continuing to monitor when puberty-blocking medication will be appropriate for Linda, after which it is anticipated she will undergo hormone therapy.

97.     The effect of the Health Care Ban, however, would prevent Linda from having the option for hormone therapy.

98.     Nancy desires for Linda to continue to develop with all the benefits of medically necessary healthcare as soon as she and her providers feel it is appropriate.

99.     Unless the Health Care Ban is enjoined, it will have devastating physical and psychological consequences for Linda. Further, it will deprive Nancy of the ability  to make medical decisions in the best interest of her child, and within the appropriate and necessary timeframe for Linda.

## V.    THE HEALTH CARE BAN WILL CAUSE SEVERE HARM TO TRANSGENDER YOUTH

100.   Preventing transgender minors with gender dysphoria from accessing medically necessary hormone therapy risks extreme harm to their present and future health and well-being.

101.   When gender dysphoria is not treated appropriately, the results are significant and often include increased distress, major depression, anxiety, self-harm, suicidal ideation, and suicide.

102.   As a result of laws like the Ban, 93% of transgender youth now worry about their ability to access gender-affirming care. Elana Redfield et al., *Prohibiting Gender-Affirming Medical Care for Youth*, The Williams Institute (Mar. 2023), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Youth-Health-Bans-Mar-2023.pdf. Studies demonstrate that laws like the Ban have

resulted in reported worsened mental health and increased risk of suicidality in transgender youth.[6]

103.   Studies show that when minors are able to access hormone therapy, which allows them to go through puberty consistent with their gender identity, their distress is more likely to recede and their mental health improves.[7] Both clinical experience and medical studies support that for many young people, this treatment is transformative, and they go from painful suffering to thriving.

_____

[6] *See, e.g.*, Austin, *supra* note 2 ("Data from the U.S. Transgender Survey indicate that 82% of transgender individuals have considered killing themselves and 40% have attempted suicide ....... Within the transgender population, suicidality is highest among young people.").

[7] *See, e.g.*, Amy E. Green et al., *Association of Gender- Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643 (2022) (explaining the correlation between gender-affirming hormone therapy and reduced rates of depression and suicidality among transgender youth); Jack L. Turban et al., *Access to Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, PLoS ONE (2022) (explaining that access to gender-affirming hormone therapy in adolescence is associated with favorable mental health outcoms in adulthood, when compared to individuals who desired but could not access hormonal interventions); Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014).

## VI.   CLAIMS FOR RELIEF

### COUNT I
### DEPRIVATION OF SUBSTANTIVE DUE PROCESS – INTERFERENCE WITH FUNDAMENTAL RIGHT OF PARENTS TO DIRECT THE CARE OF THEIR CHILDREN
### U.S. Const. Amend. XIV
### Plaintiffs-Intervenor Nancy Doe Against All Defendants in Their Official Capacities

104.   Plaintiff-Intervenor Nancy Doe incorporates the preceding paragraphs of this Complaint as if set forth fully herein.

105.   Plaintiff-Intervenor Nancy Doe brings this Count against all Defendants.

106.   The Fourteenth Amendment to the United States Constitution protects the rights of parents to make decisions "concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). As the Supreme Court has repeatedly emphasized, this right is "perhaps the oldest of the fundamental liberty interests recognized by this Court," and presumes— appropriately—that "fit parents act in the best interests of their children." *Id.* at 65, 66, 68–69; *see also Parham v. J.R.*, 442 U.S. 584, 602 (1979) (collecting cases). Accordingly, a law that substantially interferes with parental autonomy is subject to strict scrutiny. *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 815 (11th Cir. 2004).

107.   The ability to make medical decisions—especially those that are recognized to be safe, effective, and medically necessary—in a child's best interest is

29

a critical aspect of this parental right. The law recognizes that in almost all cases, the government is no substitute for a fit parent's judgment "concerning the growth, development, and upbringing of their children." *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990) (quoting *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 313 (11th Cir. 1989)). Thus, a state cannot "willfully disregard the right of parents to generally make decisions concerning the [medical] treatment to be given to their children." *Id.*

108.   The Health Care Ban violates this fundamental right by preventing Plaintiff-Intervenor Nancy Doe from obtaining medically necessary care for her minor child.

109.   By intruding upon the Plaintiff-Intervenor Nancy Doe's fundamental right to direct the care and upbringing of her minor child, the Health Care Ban is subject to strict scrutiny.

110.   Defendants lack even a legitimate interest in preventing Plaintiff-Intervenor Nancy Doe from ensuring her child can receive necessary medical care, much less a compelling one.

## COUNT II
## DEPRIVATION OF EQUAL PROTECTION – DISCRIMINATION ON THE BASIS OF SEX AND TRANSGENDER STATUS
### U.S. Const. Amend. XIV
**Plaintiff-Intervenors Doe Family Against All Defendants in Their Official Capacities**

111.    Plaintiff-Intervenors Doe Family incorporate Paragraphs 1-103 of this Complaint as if set forth fully herein.

112.    The Doe Family brings this Count against all Defendants.

113.    The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

114.    The Health Care Ban singles out transgender minors and prohibits them from obtaining medically necessary treatment based on their sex and transgender status. Importantly, the Ban's discriminatory purpose is carried out by prohibiting the use of medically necessary treatment only when that treatment is provided to transgender youth who did not begin treatment with hormone therapy before July 1, 2023, not when provided to non-transgender youth.

115.    Transgender-based government classifications are subject, at a minimum, to heightened scrutiny because they are sex-based classifications. Under the Equal Protection Clause, government classifications based on sex are subject to heightened scrutiny and are presumptively unconstitutional.

116.     Moreover, because transgender people have obvious, immutable, and distinguishing characteristics, including having a gender identity that is different than their natal sex, they comprise a discrete group. Transgender people have faced historical discrimination and have been unable to secure equality through the political process, making them a suspect class.

117.     As such, transgender classifications are subject at least to intermediate scrutiny.

118.     The Health Care Ban does nothing to protect the health or well-being of minors. To the contrary, the Ban undermines the health and well-being of transgender minors by denying them essential medical care.

119.     By excluding transgender children and their parents from accessing medically necessary and appropriate treatment, the Health Care Ban singles out and stigmatizes the Doe Family, and other families who require this care in Georgia. The Health Care Ban "impose[s] a disadvantage, a separate status, and so a stigma" upon these plaintiffs and thus violates the guarantee of equal protection by depriving plaintiffs of equal dignity, harming them in profound ways. *United States v. Windsor*, 570 U.S. 744, 770 (2013).

120.     The Health Care Ban is not narrowly tailored to further a compelling government interest and is not substantially related to any important governmental interest. Moreover, the Ban is not even rationally related to a governmental interest.

Accordingly, the Ban violates the Equal Protection Clause of the Fourteenth Amendment.

## VII.   RELIEF REQUESTED

WHEREFORE, Plaintiff-Intervenors respectfully request that this Court:

i.        issue a judgment, pursuant to 28 U.S.C. §§ 2201, 2202, declaring that the Health Care Ban violates the federal laws for the reasons and on the Counts set forth above;

ii.       temporarily, preliminarily, and permanently enjoin Defendants, their officers, employees, servants, agents, appointees, and successors in office from enforcing the Health Care Ban;

iii.      declare that the Health Care Ban violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution;

iv.       award Plaintiff-Intervenors their costs and expenses, including reasonable attorney fees, pursuant to 42 U.S.C. § 1988 and other applicable laws; and

v.        grant such other relief as the Court deems just and proper.

Respectfully submitted this 5th day of July 2023.

*/s/ Edward D. Buckley*
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@bbwmlaw.com
Thomas J. Mew IV
Georgia Bar No. 503447
tmew@bbwmlaw.com

33

BUCKLEY BALA WILSON MEW LLP
600 Peachtree Street NE, Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101

*Counsel for Nancy Doe individually and on behalf of her minor daughter Linda Doe*