1

2

3

4

5

6

7

8

9    THE FOLLOWING IS THE PDF OF AN OFFICIAL TRANSCRIPT. OFFICIAL

10   TRANSCRIPTS MAY BE FILED IN CM/ECF ONLY BY THE OFFICIAL COURT

11   REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90

12   DAYS.  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY

13   THE DOCKET ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER,

14   ONLY AFTER THE COURT REPORTER HAS FILED THE OFFICIAL

15   TRANSCRIPT; HOWEVER, YOU ARE PROHIBITED FROM ATTACHING A FULL

16   OR PARTIAL TRANSCRIPT TO ANY DOCUMENT FILED WITH THE COURT.

17

18

19

20

21

22

23

24

25

1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3
EMMA KOE, ET AL.,                    )
4                                    )
        PLAINTIFFS,                  )
5                                    ) CIVIL ACTION
                V.                   ) NO. 1:23-CV-02904-SEG
6                                    )
CAYLEE NOGGLE, ET AL.,               ) VOLUME 2 OF
7 INC., ET AL,                       )
                                     )
8          DEFENDANTS.               )

9

10              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE SARAH E. GERAGHTY,
11             UNITED STATES MAGISTRATE JUDGE
                   AUGUST 11, 2023.
12

13 A P P E A R A N C E S:

14 ON BEHALF OF THE PLAINTIFF:

15        BENJAMIN BRADSHAW, ESQ.
          STEPHEN MCINTYRE, ESQ.
16        MEREDITH GARAGIOLA,ESQ.
          O'MELVENY & MYERS
17
          CYNTHIA CHENG-WUN WEAVER, ESQ.
18        HUMAN RIGHTS CAMPAIGN FOUNDATION

19        ELIZABETH LYNN LITTRELL, ESQ.
          SOUTHERN POVERTY LAW CENTER
20
          CORY ISAACSON, ESQ
21        AMERICAN CIVIL LIBERTIES UNION

22
ON BEHALF OF THE INTERVENORS:
23
          EDWARD D. BUCKLEY, ESQ.
24        THOMAS JOSEPH MEW, IV, ESQ.

25

251

1   ON BEHALF OF THE DEFENDANTS:

2

3       PATRICK STRAWBRIDGE, ESQ.
        JEFFREY MATTHEW HARRIS, ESQ.
        TIFFANY BATES,ESQ.
4       CONSOVOY MCCARTHY PLLC

5

6

7

8       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
    TRANSCRIPT PRODUCED BY COMPUTER.
9

10

11              MELISSA BROCK, RMR, RPR
            FEDERAL OFFICIAL COURT REPORTER
           75 TED TURNER DRIVE, SW, SUITE 1949-B
12             ATLANTA, GEORGIA  30303-3309

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                I N D E X

3   WITNESSES                          D        C        RD       RC

4

5   RENELLE MASSEY                     257      310

6   MICHAEL LAIDLAW                    324      335 --

7

8   CLOSING

9   BY MR. BRADSHAW                    358

10  BY MR. HARRIS                      383

11  BY MR. BRADSHAW                    404

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2      THE COURT:  GOOD MORNING.  PLEASE BE SEATED.

3      ALL RIGHT.  COUNSEL, WE HAVE TWO MORE WITNESSES

4  TODAY; IS THAT CORRECT?

5      MR. BRADSHAW:  THAT'S CORRECT, YOUR HONOR.  ONE FOR

6  THE PLAINTIFFS AND ONE FOR THE DEFENDANTS.

7      THE COURT:  ALL RIGHT.  AND WHO WILL YOU BE CALLING

8  FIRST?

9      MR. BRADSHAW:  WE WILL BE CALLING DR. MASSEY, REN,

10  MASSEY.

11      THE COURT:  OKAY.  ALL RIGHT.  JUST A FEW

12  HOUSEKEEPING MATTERS BEFORE WE GET STARTED.

13      ONE IS THAT THERE IS AN OUTSTANDING MOTIONS ON THE

14  DOCKET FOR LEAVE TO FILE AN AMICUS BRIEF ON BEHALF OF THE

15  AMERICAN ACADEMY OF PEDIATRICS AND SOME ADDITIONAL NATIONAL

16  AND STATE MEDICAL AND MENTAL HEALTH ORGANIZATIONS.  I DIDN'T

17  SEE ANY OPPOSITION TO THAT MOTION ON THE DOCKET, SO I'M GOING

18  TO --

19      MR. STRAWBRIDGE:  WE DON'T OPPOSE.

20      THE COURT:  OKAY.  THANK YOU.

21      SO I'M GOING TO GRANT IT AND THE CLERK IS DIRECTED

22  TO FILE DOCUMENT 23-1 ON THE DOCKET.

23      THE OTHER THING WAS JUST A QUESTION I HAD FOR YOU

24  ALL ABOUT EXPERTS.  I NOTICE NO ONE MOVED TO QUALIFY ANY OF

25  THE WITNESSES AS EXPERTS.  I ASSUME THAT'S BECAUSE YOU-ALL

1  HAVE AGREED THAT YOU DO NOT -- THAT ALL EXPERTS SHOULD BE SO

2  QUALIFIED; IS THAT CORRECT?

3          MR. BRADSHAW:  THAT'S CORRECT, YOUR HONOR.  JUST FOR

4  PURPOSES OF THIS HEARING.

5          THE COURT:  OKAY.

6          MR. STRAWBRIDGE:  THAT'S FAIR.  I THINK THE PARTIES

7  AGREE THAT A FORMAL PROFFER WASN'T REQUIRED AND ALL

8  QUALIFICATIONS WERE PROPER.  EVERYBODY RESERVES THE RIGHT TO

9  ARGUE, YOU KNOW, BASED ON THE WEIGHT OF THE TESTIMONY.

10          THE COURT:  CERTAINLY.  OKAY.  THANKS.

11          AND THEN THE OTHER THING I JUST WANTED TO SAY IS I'M

12  LOOKING FORWARD TO THE ARGUMENT LATER TODAY.

13          IN THINKING FURTHER ABOUT THE ISSUES AFTER

14  YESTERDAY'S TESTIMONY, THERE ARE SOME QUESTIONS THAT I JUST

15  WANTED TO PREVIEW FOR YOU ALL, SO THAT WE MIGHT TALK ABOUT

16  THEM IN CLOSING TODAY.

17          SO THE FIRST IS THIS:  WE'VE HEARD FROM A NUMBER OF

18  MEDICAL EXPERTS AND WE ARE DUE TO HEAR FROM OTHERS TODAY, AND

19  THE TESTIMONY AND THE VOLUMINOUS DECLARATIONS HAVE GIVEN ME A

20  GREAT DEAL OF CONTEXT, WHICH I CERTAINLY APPRECIATE.

21          BUT MY ROLE, OF COURSE, IS NOT TO BE AN ARBITER OF

22  MEDICAL DECISION MAKING, BUT TO DETERMINE THE

23  CONSTITUTIONALITY OF THE STATUTE.  SO IT WOULD BE HELPFUL IF

24  EACH SIDE WOULD LIFT UP FOR ME WHAT YOU SEE AS THE CRUCIAL

25  FACTS EMERGING FROM THE EXPERT TESTIMONY AND HOW THOSE FACTS

1  FIT INTO THE CONSTITUTIONAL ANALYSIS.  YOU ALL LIKELY PLANNED

2  TO DO THAT FOR ME, I RECOGNIZE, BUT I'D BE EAGER TO HEAR WHAT

3  EACH SIDE HAS TO SAY.

4          SECOND, PLAINTIFFS, I WILL WANT TO HEAR YOUR

5  POSITION ON WHETHER THIS IS A FACIAL OR AN AS APPLIED

6  CHALLENGE TO THE STATUTE.  IT WOULD BE HELPFUL FOR ME TO HEAR

7  FROM BOTH SIDES ABOUT THE REDRESSABILITY ASPECT OF STANDING IN

8  LIGHT OF THE STATUTORY PROVISION CRIMINALIZING PHYSICIANS FOR

9  THE PROVISION OF CROSS HORMONE THERAPY.

10         WITH RESPECT TO THE SUBSTANTIVE DUE PROCESS CLAIM,

11 FOR PLAINTIFFS, IT WOULD BE HELPFUL IF YOU COULD DISCUSS ANY

12 BINDING ELEVENTH CIRCUIT PRECEDENT, BINDING PRECEDENT, THAT

13 HAS APPLIED THE TROXEL CASE TO GRANT PARENTS A RIGHT TO A

14 PARTICULAR DESIRED TREATMENT FOR THEIR CHILD.

15         AND THEN, FINALLY, I'D LIKE EACH OF YOU TO ADDRESS

16 THE ISSUES THAT THE DEFENDANTS HAVE RAISED ABOUT THE SCOPE OF

17 ANY POTENTIAL INJUNCTION.

18         ALL RIGHT.  WITH THAT SAID --

19         MR. HARRIS:  THE LACK OF THE SCOPE OF ANY -- I'M

20 SORRY.

21         THE COURT:  POTENTIAL INJUNCTION.

22         MR. HARRIS:  THANK YOU, YOUR HONOR.

23         THE COURT:  NO PROBLEM.

24         MR. BRADSHAW:  YOUR HONOR, MY APOLOGIES.

25         COULD YOU REPEAT THE THIRD QUESTION THAT YOU HAD.

1          THE COURT:  LET'S SEE.  I THOUGHT I HAD MORE THAN

2    THREE.

3          MR. BRADSHAW:  JUST THE THIRD.  ABOUT STANDING.

4          THE COURT:  ABOUT REDRESSABILITY?

5          MR. BRADSHAW:  YES.

6          THE COURT:  SURE.  SO THIS IS THE -- AS I UNDERSTAND

7    IT, THE DEFENDANTS HAVE CHALLENGED STANDING ON A NUMBER OF

8    GROUNDS, ONE OF WHICH IS REDRESSABILITY.  AND THE ARGUMENT

9    PRESENTED IN THE BRIEFING HAS TO DO WITH THE STATUTORY

10   PROVISION THAT CRIMINALIZES OR POTENTIALLY CRIMINALIZES

11   PHYSICIANS FOR THE PROVISION OF CROSS HORMONE THERAPY.

12         MR. BRADSHAW:  I UNDERSTAND.  THANK YOU.

13         THE COURT:  OKAY.  ALL RIGHT.  WITH ALL OF THAT

14   SAID, IS THERE ANYTHING ELSE THAT YOU ALL WOULD LIKE TO RAISE,

15   BEFORE WE MOVE ON TO THE ADDITIONAL PRESENTATION OF EVIDENCE?

16         ALL RIGHT.  IF YOU-ALL COULD CALL YOUR NEXT WITNESS,

17   PLEASE.

18         MS. LITTRELL:  WE CALL DR. REN MASSEY.

19         COURTROOM DEPUTY:  IF YOU WOULD PLEASE RAISE YOUR

20   RIGHT HAND.

21                        **RENELLE MASSEY,**

22   **A WITNESS** HEREIN, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED

23   AND TESTIFIED AS FOLLOWS:

24         COURTROOM DEPUTY:  YOU MAY BE SEATED.

25         SIR, I JUST WANT TO REMIND YOU THAT YOUR TESTIMONY

1   IS IMPORTANT FOR THE ENTIRE COURTROOM TO HEAR, SO PLEASE SPEAK

2   DIRECTLY INTO THE MICROPHONE, AND YOU MAY HELP YOURSELF TO ANY

3   OF THE WATERS.

4           AT THIS TIME YOU, CAN STATE AND SPELL YOUR FIRST AND

5   LAST NAME FOR THE RECORD.

6           THE WITNESS:  YES.  THANK YOU.

7           MY NAME IS RENELLE MASSEY.  R-E-N-E-L-L-E.  LAST

8   NAME MASSEY, M-A-S-S-E-Y..

9           COURTROOM DEPUTY:  THANK YOU, SIR.

10                          **DIRECT EXAMINATION**

11  BY MS. LITTRELL:

12  Q    GOOD MORNING, DR. MASSEY.  WE'VE MET.  MY NAME IS BETH

13  LITTRELL AND I REPRESENT THE PLAINTIFFS.

14          CAN WE JUST START OFF BY LETTING YOU TELL US A LITTLE

15  BIT ABOUT YOUR EDUCATIONAL BACKGROUND.

16  A    YES.  I RECEIVED A BACHELOR'S DEGREE IN PSYCHOLOGY FROM

17  STETSON UNIVERSITY 1982.  I COMPLETED A MASTERS DEGREE IN

18  EXPERIMENTAL PSYCHOLOGY, MEANING FOCUSING ON RUNNING

19  EXPERIMENTS AT FLORIDA ATLANTIC UNIVERSITY AND THEN I

20  COMPLETED MY DOCTORATE 34 YEARS AGO TODAY FROM THE UNIVERSITY

21  OF SOUTH FLORIDA, WHICH IS A PROGRAM APPROVED BY THE AMERICAN

22  PSYCHOLOGICAL ASSOCIATION AND THE SCIENTIST PRACTITIONER

23  MODEL.  I COMPLETED MY INTERNSHIP AT -- IN GAINESVILLE,

24  FLORIDA.

25  Q    AND WHAT IS YOUR CURRENT PROFESSION?

1   A    I AM A LICENSED PSYCHOLOGIST IN THE STATE OF GEORGIA

2   WHERE I HAVE PRACTICED SINCE 1989 WITH A PROVISIONAL LICENSE

3   AND A FULL LICENSE IN 1990.

4   Q    AND DO YOU HAVE ANY ACADEMIC OR ADVISORY ROLES IN

5   ADDITION TO YOUR CURRENT PRACTICE?

6   A    I DO.  I AM AN ADJUNCT ASSISTANT PROFESSOR AT EMORY

7   UNIVERSITY SCHOOL OF MEDICINE IN THE DEPARTMENT OF PSYCHIATRY

8   AND BEHAVIORAL SCIENCES AND I HAVE SOME OTHER ROLES WITHIN --

9   THAT I HAVE HAD AND CURRENTLY HAVE WORKING WITH THE WORLD

10  PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH OR WPATH --

11  Q    OKAY.

12  A    -- IN ADDITION TO MY CLINICAL PRACTICE, WHICH IS MY

13  FULL-TIME WORK.

14  Q    OKAY.  WE'LL TALK A LITTLE BIT ABOUT YOUR ROLE WITH

15  WPATH.

16       DO YOU HAVE -- DO YOU HOLD ANY POSITIONS IN WHICH YOU

17  PEER REVIEW MEDICAL OR MENTAL HEALTH JOURNALS?

18  A    YES.  I AM A REVIEWER ON THE SPECIALTY TOPIC OF

19  TRANSGENDER AND GENDER-DIVERSE HEALTH CARE WITH GENERAL SEXUAL

20  MEDICINES SINCE 2016.

21  Q    OKAY.  AND WHAT IS YOUR AREA OF SPECIALTY WITH RESPECT TO

22  YOUR CLINICAL PRACTICE?

23  A    IT HAS BECOME TRANSGENDER AND GENDER-DIVERSE HEALTH CARE.

24  Q    OKAY.  AND WHAT PERCENTAGE OF YOUR CURRENT PATIENT LOAD

25  ARE TRANSGENDER OR GENDER-DIVERSE ADOLESCENTS?

1  A     APPROXIMATELY 70 PERCENT.

2  Q     OKAY.  OVER THE PAST FIVE YEARS, WHAT IS THE PERCENTAGE

3  OF YOUR PATIENT LOAD THAT HAS BEEN TRANSGENDER OR

4  GENDER-DIVERSE ADOLESCENTS?

5  A     IN THE LAST FIVE YEARS, IT HAS INCREASED FOR A COUPLE OF

6  REASONS.  ONE IS THERE HAS BEEN MORE DEMAND AND I BROUGHT ON

7  AN ASSOCIATE TO MY PRACTICE WHO I -- SOME OF THE ADULT

8  PATIENTS WHO CALL MY OFFICE ARE WILLING TO SEE SOMEBODY WHO I

9  HAVE TRAINED AND SO I CAN FOCUS ON THE ADOLESCENTS, SINCE MY

10  ASSOCIATE DOESN'T WORK WITH ADOLESCENTS.

11  Q     BUT OVER THE LAST FIVE YEARS, CAN YOU GIVE US A SENSE OF

12  THE PERCENTAGE OF THE PATIENT LOAD THAT FALLS INTO THE

13  CATEGORY THAT IS THE TARGET OF S.B. 140, THAT IS TRANSGENDER

14  AND GENDER-DIVERSE ADOLESCENTS?

15  A     WELL -- LIKE I THOUGHT I ANSWERED AROUND 70 PERCENT.

16  Q     OKAY.

17  A     I'M SORRY.

18  Q     THAT WAS CURRENT PATIENT LOAD, BUT THAT'S ALSO REFLECTIVE

19  OF THE LAST FIVE YEARS OF YOUR PRACTICE AS WELL?

20  A     SOMEWHAT.  AS I MENTIONED, IT HAS INCREASED SOME.

21  Q     IT HAS INCREASED SOME.  OKAY.

22     HOW ABOUT OVER THE COURSE OF YOUR CAREER?  HOW MANY

23  TRANSGENDER GENDER-DIVERSE ADOLESCENTS HAVE YOU TREATED?

24  A     I WOULD ESTIMATE AROUND 600 OR MORE.

25  Q     OKAY.  THANK YOU.  WAS THAT HERE IN GEORGIA?

1  A    IT IS ALL HERE IN GEORGIA.  ACTUALLY A FEW PEOPLE HAVE

2  DRIVEN FROM OTHER STATES BECAUSE I'M ONLY LICENSED IN GEORGIA.

3  Q    OKAY.  YESTERDAY WE HEARD TESTIMONY ABOUT WPATH.  AND

4  DR. SHUMER, I BELIEVE, TESTIFIED THAT WPATH HAS PUBLISHED

5  INTERNATIONALLY RECOGNIZED STANDARDS OF CARE FOR THE TREATMENT

6  OF TRANSGENDER INDIVIDUALS.

7       WOULD YOU AGREE WITH THAT CHARACTERIZATION?

8  A    YES.

9  Q    AND YOU ARE FAMILIAR WITH WPATH?

10  A    I AM.

11  Q    WHAT IS WPATH?

12  A    WPATH, THE WORD PROFESSIONAL ASSOCIATION FOR TRANSGENDER

13  HEALTH, IS AN INTERNATIONAL ORGANIZATION THAT'S BEEN AROUND

14  SINCE 1979.  IT HAD A DIFFERENT NAME PREVIOUSLY AND ITS GOAL

15  IS TO PROMOTE RESEARCH, EDUCATION, AND HEALTH CARE POLICES FOR

16  TRANSGENDER AND GENDER-DIVERSE INDIVIDUALS.

17  Q    AND WHO COMPRISES WPATH?  WHO MAKES UP WPATH?

18  A    THE MEMBERSHIP, I BELIEVE NOW, IS OVER FIVE -- AROUND 4

19  OR 5000.  I KNOW IT'S OVER 4000 PEOPLE FROM AROUND THE GLOBE,

20  ALL OVER THE WORLD.  AND THE WPATH BOARD HAS INTERNATIONAL

21  MEMBERS FROM ALL CONTINENTS, I THINK, EXCEPT THE ANTARCTIC AND

22  IT'S GLOBAL IN THE RESEARCH, JOURNAL, AND IN THE EDUCATION

23  ARM.

24  Q    AND ARE THE PEOPLE THAT YOU HAVE MENTIONED THAT COMPRISE

25  WPATH, ARE THEY AFFILIATED WITH THE HEALTH-CARE INDUSTRY OR

1   ACADEMIA PROFESSIONALS IN ANY WAY?  CAN YOU TELL US A LITTLE

2   BIT ABOUT THEIR AFFILIATIONS?

3   A    MOST OF THE PEOPLE, PARTICULARLY IN LEADERSHIP ROLES, ARE

4   ACADEMIC RESEARCHERS AS WELL AS CLINICIANS.

5   Q    OKAY.  AND ARE YOU AFFILIATED WITH WPATH IN ANY WAY?  YOU

6   REFERENCED -- CAN YOU TELL US A LITTLE BIT ABOUT YOUR

7   AFFILIATION WITH WPATH.

8   A    YES.  I'M A MEMBER AND THEN I BECAME A BOARD MEMBER FROM

9   2018 TO 2020.  I BECAME A FACULTY MEMBER OF THE GLOBAL

10  EDUCATION INSTITUTE OF WPATH BACK IN 2016 AND THEN SERVED ON

11  THE STEERING GROUP FOR THE GLOBAL EDUCATION INSTITUTE OR GEI,

12  IF I MAY, AND THEN I WAS SELECTED TO BE THE MENTAL HEALTH

13  CHAIR OF THE PROGRAMMING GLOBAL EDUCATION INSTITUTE OFFERS.  I

14  HAVE A MEDICAL CO-CHAIR.  TOGETHER WE ARE THE CO-CHAIRS.  I

15  OVERSEE THE MENTAL HEALTH SIDE OF THE PROGRAMMING FOR THE

16  EDUCATIONAL PROGRAMS THAT WPATH GEI OFFERS AROUND THE GLOBE.

17  Q    AND DO YOU HAVE ANY ROLE IN THE DEVELOPMENT OF THE

18  STANDARDS OF CARE THAT WPATH HAS PUT OUT?

19  A    YES.  I SERVED ON THE COMMITTEE REVISING THE STANDARDS OF

20  CARE, INCLUDING THE ADOLESCENT CHAPTER IN PARTICULAR.

21  Q    WERE YOU INVOLVED IN DRAFTING THE STANDARDS OF CARE FOR

22  THE ADOLESCENT CHAPTER?

23  A    YES, I WAS.

24  Q    STEPPING BACK TO THE STANDARDS OF CARE AT LARGE, HOW WERE

25  THE STANDARDS OF CARE DEVELOPED BY WPATH?

1   A    SO THE STANDARDS OF CARE DEVELOPED OVER FIVE YEARS AND

2   THERE IS A STEERING GROUP THAT IS NOT THE SAME AS THE GLOBAL

3   EDUCATION INSTITUTE, DIFFERENT BODY -- THERE IS A STEERING

4   GROUP TO OVERSEE THE SELECTION FIRST OF THE CHAIR, DR. ELI

5   COLEMAN, WHO ALSO OVERSAW THE ADULT STANDARDS OF CARE 7 FOR

6   CONTINUITY SAKE.  AND THEN THERE IS THE SELECTION OF CO-CHAIRS

7   WHO HAD INTERNATIONAL STATUS AND EXPERTISE, DR. ASA RADIX WAS

8   FROM BERMUDA; TRAINED IN THE UK, NOW IS PRACTICING IN NEW

9   YORK.  AND DR. JON ARCELUS, WHO'S FROM SPAIN AND NOW LIVES IN

10  AND WORKS IN THE UNITED KINGDOM.  THOSE WERE THE CO-CHAIRS

11  OVERSEEING THE DIFFERENT CHAPTERS THAT HAD MENTAL HEALTH AND

12  MEDICAL CONCERNS.

13      AND THEN PEOPLE HAD TO APPLY TO BECOME THE CHAPTER LEADS.

14  THERE WERE ABOUT 50 APPLICATIONS.  24 CHAPTER LEADS WERE

15  SELECTED, AFTER THE CHAPTERS HAD BEEN IDENTIFIED FOR THE TOPIC

16  AREAS AND THEN APPROXIMATELY I THINK I READ A HUNDRED FIFTY OR

17  SO PEOPLE APPLIED TO BE MEMBERS OF THE DIFFERENT CHAPTERS AND

18  I THINK I SAW A HUNDRED TWENTY WERE SELECTED REPRESENTING 18

19  DIFFERENT COUNTRIES.

20  Q    OKAY.  AND WHAT ARE THE STANDARDS OF CARE BASED ON?

21  A    THE STANDARDS OF CARE ARE BASED ON A MIXTURE OF

22  SYSTEMATIC REVIEWS PROVIDED BY JOHNS HOPKINS CONSULTANTS AND

23  THE EXPERT CONSENSUS AROUND THE HEALTH CARE NEEDS FOR THE

24  DIFFERENT POPULATIONS, WHETHER THEY BE ADULTS OR YOUTH AND FOR

25  THE DIFFERENT SPECIALTY AREAS.

1    Q    OKAY.  AND WE'RE TALKING ABOUT WPATH STANDARDS OF CARE.

2    AT THIS TIME, I WOULD LIKE TO ASK MY COLLEAGUE TO PULL UP

3    PLAINTIFF'S EXHIBIT -- WHAT'S BEEN PREMARKED PLAINTIFFS' 9

4    WPATH STANDARDS OF CARE AND ASK YOU A FEW QUESTIONS.

5         DO YOU RECOGNIZE THE DOCUMENT THAT'S ON THE SCREEN?

6    A    I DO.

7    Q    AND WHAT IS IT?

8    A    IT'S THE FRONT PAGE LISTING THE TITLE AND THE AUTHORS OF

9    THE WPATH STANDARDS OF CARE VERSION 8.

10   Q    OKAY.  AND IF I COULD GET MY COLLEAGUE TO SCROLL DOWN TO

11   THE NEXT -- PAGE 3.  IT WILL BE A PAGE IN BETWEEN THAT.

12        WHAT DO YOU SEE LISTED ON THIS PAGE OF THIS STANDARDS OF

13   CARE?

14   A    THE MANY, MANY AFFILIATIONS.  I THINK IT'S OVER A HUNDRED

15   FIFTY OR SO AFFILIATIONS OF THE DIFFERENT PROFESSIONALS WHO'S

16   CONTRIBUTED TO THE STANDARDS OF CARE.

17   Q    WOULD THE NAMES OF THESE BE AUTHORS?

18   A    YES.

19   Q    AND THEN THE FOOTNOTES IS -- IF YOU'LL SCROLL DOWN A

20   LITTLE BIT FURTHER -- YOU SEE IN THE SMALLER PRINT THOSE ARE

21   FROM INSTITUTIONAL AFFILIATIONS OF THOSE DOCTORS?

22   A    CORRECT.

23   Q    OKAY.  AND YOU SAY IT'S BASED ON SYSTEMATIC REVIEWS.  ARE

24   THERE ALSO CITATIONS TO STUDIES CONTAINED WITHIN THE STANDARDS

25   OF CARE?

1   A    YES.   THE STANDARDS OF CARE AS A WHOLE HAVE ABOUT 68

2   RANGES OF REFERENCES AND THE ADOLESCENT CHAPTER I THINK HAD

3   OVER A HUNDRED SIXTY CITATIONS ALONE.   AND I ALSO MEANT TO

4   MENTION THAT ADDITIONALLY, IN ADDITION TO DOING THE SYSTEMATIC

5   REVIEW ON SPECIFIC QUESTIONS, WENT THROUGH WHAT'S CALLED THE

6   DELPHI PROCESS WHERE 75 PERCENT OF ALL OF THE AUTHORS AROUND

7   THE GLOBE HAVE TO AGREE WITH THE RECOMMENDATIONS, THE

8   STATEMENTS THAT ARE MADE.   AND THEY DIDN'T WRITE ALL THE

9   BACKGROUND TEXT, THE SPECIALISTS ON THE CHAPTER WROTE THE

10  BACKGROUND EXPLANATORY TEXT, BUT 75 PERCENT OF VOTING MEMBERS

11  VOTING AUTHORS AROUND THE GLOBE OF THAT 120 MEMBERS HAD TO

12  AGREE WITH THE STANDARDS OF CARE RECOMMENDATIONS.

13  Q    AND YOU MENTIONED THERE WERE OVER A HUNDRED SEVENTY

14  CITATIONS IN THE ADOLESCENT CHAPTER.   ARE THOSE JUST STUDIES?

15  A    THOSE WERE AROUND 170.   MANY OF THOSE ARE STUDIES THAT

16  COVER A RANGE OF THE LITERATURE THAT'S RELEVANT WORKING WITH

17  THIS POPULATION AND SOME OF THOSE ARE ABOUT THE CONSISTENCY

18  AND PERSISTENCE OF ADOLESCENT GENDER IDENTITY.   SOME OF THEM

19  WERE IN ADOLESCENCE IN GENERAL.   SOME OF -- THERE'S A BODY

20  ABOUT THE BENEFITS OF PUBERTY SUPPRESSION.   ABOUT AFFIRMING

21  HORMONE THERAPY AND ABOUT INVOLVING PARENTS AND NUMBER OF

22  ISSUES THAT ARE COVERED IN THOSE CITATIONS.

23  Q    OKAY.   NEXT WE'RE TALKING ABOUT CHAPTER 6 WHICH IS THE

24  ADOLESCENT CHAPTER.   IF I COULD GET YOU TO GO TO PAGE 45 SO

25  YOU WILL KNOW WHAT WE WHERE TALKING ABOUT.

1      IS THIS THE CHAPTER REFERENCING THAT YOU HELPED TO

2  CO-AUTHOR REFLECTS THE STANDARDS OF CARE FOR ADOLESCENTS?

3  A    YES, IT IS.

4  Q    OKAY.  CAN YOU BRIEFLY DESCRIBE WHAT'S IN THIS CHAPTER?

5  A    SO THERE IS BACKGROUND INFORMATION ABOUT THE HISTORY OF

6  THE STANDARDS OF CARE ITSELF IN RELATION TO ADOLESCENT CARE,

7  WHICH THIS IS THE FIRST TIME THERE'S BEEN A FULL CHAPTER ON

8  ADOLESCENTS ALONE, BECAUSE OF THE NEED TO PAY ATTENTION TO

9  THEM SEPARATELY FROM CHILDREN OR ADULTS GENDER DIVERSION IN

10 CHILDHOOD IS A SEPARATE CHAPTER.  AND WE RECOGNIZE THAT'S A

11 VERY DIFFERENT SET OF ISSUES POTENTIALLY.

12     WE ALSO TALKED ABOUT THE BODY OF EVIDENCE IN GENERAL THAT

13 IS THERE.  WE TALKED ABOUT RECOGNIZING THERE'S LIMITATIONS IN

14 THE EVIDENCE AND WE ALSO TALKED ABOUT RECOGNIZING THE NEED FOR

15 CLINICAL CARE GUIDELINES BECAUSE THERE ARE PEOPLE LIKE ME OUT

16 IN THE WORLD HAVING FAMILIES, PARENTS, YOUNG PEOPLE, WHO NEED

17 CARE RIGHT NOW.  AND SO WE DEVELOP GUIDELINES THAT ARE MEANT

18 TO BE USED WITHIN A CULTURAL CONTEXT APPLIED BY THE

19 CLINICIANS' EXPERTISE IN THIS AREA.

20 Q    OKAY.  AND WAS THERE ANYTHING IN THE CHAPTER BASED ON THE

21 HISTORICAL CONTEXT OF ANY OTHER INFORMATION THAT ACKNOWLEDGED

22 OR MENTIONED A RISE IN PRESENTATION OF ADOLESCENTS WITH

23 TRANSGENDER OR GENDER-DIVERSE ISSUES?

24 A    YES.  THAT'S ACKNOWLEDGED IN THE CHAPTER AND IN THE FIELD

25 OVERALL.

1  Q    WERE THERE ANY CITATIONS OR ARE THERE ANY STUDIES THAT

2  YOU'RE AWARE OF THAT EXPLAIN THAT RISE, BASED ON SOCIAL MEDIA

3  AS THE BASIS FOR YOUNG PEOPLE NEEDING CARE FOR GENDER

4  DYSPHORIA?

5  A    WE HAVE NOT FOUND THAT TO BE THE CASE.  I CAN SAY MORE

6  ABOUT THAT, IF YOU WOULD LIKE, BUT NOT IN THE CHAPTER.

7  Q    YEAH.

8  A    BECAUSE THAT DATA DOES NOT EXIST.

9  Q    THANK YOU.  OKAY.  LET'S JUMP TO PAGE 50.  PULL THIS UP.

10  WHICH IF YOU CAN -- CAN WE MAKE IT SMALL ENOUGH TO SEE IT ALL

11  ON ONE PAGE?

12      OKAY.  WHAT ARE WE LOOKING AT ON PAGE -- IT'S AT THE TOP

13  S43.

14  A    THAT'S A SUMMARY OF THE RECOMMENDATIONS WITHOUT ALL THE

15  EXPLANATORY TEXT.  THERE ARE 12 SPECIFIC RECOMMENDATIONS BUT

16  THE FIRST ONE AND THE LAST ONE ALSO HAVE SEVERAL SUB

17  RECOMMENDATIONS, INCLUDING EDUCATION THAT SHOULD BE, YOU KNOW,

18  BACKGROUND PROFICIENCY WORKING WITH YOUTH IN GENERAL TO

19  UNDERSTAND THE DIFFERENCE BETWEEN GENDER-IDENTITY ISSUES AND

20  OTHER MENTAL HEALTH CONCERNS, ONGOING EDUCATION, EXPERTISE IN

21  AUTISM OR NEURO DIVERSE NEURO DIVERSITY AND/OR WORKING WITH

22  EXPERTS IN COLLABORATION, IF ONE HAS PATIENTS WHO ARE NEURO

23  DIVERSE, NEURO DIVERGENT.

24      THERE ARE A NUMBER OF OTHER RECOMMENDATIONS, INCLUDING

25  TAKING AN APPROACH TO CARE.  6.2 RECOMMENDS THAT NO OUTCOME NO

1   GENDER IDENTITY SHOULD BE PRIORITIZED OR SEEN AS PREFERRED.

2   AND THEN INVOLVING FAMILY INVOLVING MULTIPLE HEALTH CARE

3   PROFESSIONALS ACROSS DISCIPLINES.  SO THERE IS QUITE A LOT OF

4   CONTENT.  I DON'T KNOW IF YOU WANT ME TO CONTINUE.

5   Q    IS THERE CRITERIA SPECIFICALLY ABOUT WHEN TO PROVIDE

6   MEDICAL CARE, SO HORMONES OR PUBERTY BLOCKERS TO ADOLESCENTS

7   IN THE RECOMMENDATIONS?

8   A    SO PUBERTY SUPPRESSION CAN, ONE, ONLY BE PROVIDED AFTER

9   THERE'S BEEN A COMPREHENSIVE BIOSOCIAL ASSESSMENT, AND THAT'S

10  OFTEN TYPICALLY DONE BY A MENTAL HEALTH PROFESSIONAL SUCH AS

11  MYSELF, WHO GATHERS MANY DATA POINTS ABOUT THE YOUNG PERSON'S

12  HISTORY WITH GENDER ISSUES, GETS INFORMATION FROM THE PARENTS

13  FAMILY OF THE CAREGIVERS, SOMETIMES EXTENDED FAMILY, OTHER

14  HEALTH CARE PROFESSIONALS, PEDIATRICIAN, OTHER THERAPISTS,

15  SOMETIMES SCHOOL SYSTEMS, TEACHERS, PRINCIPALS.  SO GETTING

16  MULTIPLE DATA POINTS INDICATING THAT A YOUNG PERSON HAS HAD

17  THIS CONCERN AROUND THEIR GENDER IDENTITY FOR AN EXTENDED

18  PERIOD OF TIME AND THAT THIS INVENTION IS WARRANTED.

19      WE WOULD -- TYPICALLY IF THEY HAVE NOT GONE VERY FAIR IN

20  PUBERTY, THEN PUBERTY SUPPRESSION IS USUALLY RECOMMENDED.  THE

21  TECHNICAL TERM -- THIS IS PARTLY DR. SHUMER'S TERM IS TANNER

22  STAGE 2, WHICH IS THE INDICATION THAT PUBERTY IS STARTING, A

23  YOUNG PERSON IS STARTING TO DEVELOP OR FURTHER IN DEVELOPMENT.

24      AND ALSO YOU GET AFFIRMING-HORMONE THERAPY.  THERE IS A

25  RECOMMENDATION TO HAVE A COUPLE OF YEARS BEFORE ANY

1  GENDER-AFFIRMING HORMONE THERAPY -- YEARS OF HISTORY BEFORE

2  GENDER-AFFIRMING HORMONE THERAPY IS UTILIZED.

3  Q    OKAY.  SO THERE ARE SPECIFIC CRITERIA THAT STANDARDS OF

4  CARE REQUIRE TO BE APPLIED BEFORE SOMEONE IS RECOMMENDED TO

5  TRY -- TO TAKE MEDICAL STEPS TO ASSIST IN THEIR CARE; IS THAT

6  RIGHT?

7  A    THAT'S CORRECT.  AND WE CONTINUE TO MONITOR CLOSELY HOW

8  THE PATIENT, THE YOUNG PERSON RESPONDS TO CARE AND MAKE

9  ADJUSTMENTS AS NEEDED AND RARELY HAVE I SEEN ANYBODY

10 DISCONTINUE, BUT THERE HAVE BEEN A FEW CASES.

11 Q    JUST STICKING WITH THE CRITERIA --

12 A    YES.

13 Q    -- ITSELF, IS THERE ANY RECOMMENDATIONS IN THE STANDARDS

14 OF CARE REGARDING INFORMING THE ADOLESCENTS, THE PATIENT, AND

15 THEIR PARENTS?

16 A    YES.  THAT IS SPECIFICALLY ONE OF THE RECOMMENDATIONS.  I

17 WOULD HAVE TO PUT MY GLASSES ON.  I THINK IT'S NUMBER 11.

18 MIGHT BE NUMBER 10 AND IT IS PART OF MY PRACTICE EVERY TIME I

19 HAVE A PROCEDURE GOING THROUGH THIS DISCUSSION AROUND RISKS

20 AND REVERSIBLE IRREVERSIBLE EFFECTS AND THE FERTILITY

21 IMPLICATIONS GO OVER THAT WITH THE YOUNG PERSON SEPARATELY, GO

22 OVER THAT WITH THE PARENTS SEPARATELY, HAVE CONVERSATIONS WITH

23 THEM TOGETHER TO ENSURE THAT THIS HAS BEEN DISCUSSED.  I HAVE

24 A QUESTIONNAIRE I UTILIZE TO FACILITATE THE DISCUSSION AROUND

25 FERTILITY.

1  Q    DO THE CRITERIA THEMSELVES IN THE STANDARDS OF CARE SAY

2  ANYTHING ABOUT ENSURING THAT THE PATIENT HAS THE CAPACITY TO

3  UNDERSTAND THE IMPLICATIONS IN ASSENT TO THE TREATMENT?

4  A    YES, IT DOES.  THAT'S ESSENTIAL TO ETHICAL CARE.

5  Q    OKAY.  AND WHAT DOES THE STANDARDS OF CARE SAY ABOUT

6  DECISIONS TO MOVE FORWARD WITH MEDICAL TREATMENT?

7  A    THAT IT IS A TEAM DECISION WITH THE YOUNG PERSON, THE

8  PARENTS, OR CAREGIVERS AND HEALTH CARE PROVIDERS AND

9  DETERMINED BY THE BENEFITS THAT HAVE BEEN TAKEN FROM OTHER

10 STEPS AND SEEING ANY BENEFITS.

11     YOU KNOW IF, FOR EXAMPLE, FROM A SOCIAL TRANSITION STEPS,

12 CHANGING HAIR, CHANGING CLOTHES, NAME, ET CETERA, TO BENEFITS

13 IN THEIR PUBERTY SUPPRESSION TO BENEFITS FROM THE

14 GENDER-AFFIRMING HORMONE THERAPY TO CONTINUE TO BE MONITORED.

15 Q    OKAY.  SO IT SOUNDS LIKE THE RECOMMENDATIONS REFLECT THAT

16 THE DECISIONS FOR MEDICAL CARE SHOULD BE MADE CAREFULLY,

17 THOUGHTFULLY, FULLY INFORMED.

18     IS THAT ACCURATE WITH RESPECT TO THE STANDARDS OF CARE?

19 A    THAT IS ACCURATE.

20 Q    OKAY.  WHAT DOES STANDARDS OF CARE FOR ADOLESCENTS

21 RECOMMEND WITH RESPECT TO PSYCHOTHERAPY?

22 A    IT'S RECOMMENDED THAT SUPPORTIVE PSYCHOTHERAPY BE

23 PROVIDED BUT IT'S RECOGNIZED THAT IN AND OF ITSELF,

24 PSYCHOTHERAPY IS NOT ENOUGH TO TREAT THESE YOUNG -- SOME OF

25 THESE YOUNG PEOPLE.

1  Q    OKAY.  DOES IT SAY ANYTHING ABOUT CONVERSION THERAPY?

2  A    YES.  IT'S RECOMMENDED AGAINST BECAUSE OF THE HARMS THAT

3  HAVE BEEN OBSERVED.

4  Q    OKAY.  AND YOU MENTIONED SUPPORTIVE THERAPY.

5       DOES SUPPORTIVE THERAPY MEAN THAT THE MENTAL HEALTH

6  PRACTITIONER DOES NOT ASSESS WHETHER THERE MAY BE OTHER CAUSES

7  FOR THE ADOLESCENT'S DISTRESS, BEYOND GENDER DYSPHORIA?

8  A    NO.  PART OF THE COMPREHENSIVE ASSESSMENT IN ANY GOOD

9  CLINICAL CARE IS GOING TO BE EXAMINING, EXPLORING ANY OTHER

10 MENTAL HEALTH CONCERNS.  I OFTEN END UP DIAGNOSING SOMETHING

11 THAT HAS NOT BEEN FOUND BUT -- OR TREATED BEFORE, SUCH AS AN

12 ATTENTION DEFICIT ISSUE.  SO THERE ARE OTHER PSYCHIATRIC

13 CONCERNS THAT CAN COME UP IN THE PROCESS.

14 Q    OKAY.  SO IT'S FAIR TO SAY THAT SUPPORTIVE CARE,

15 GENDER-AFFIRMING CARE DOES NOT MEAN THAT THE MENTAL HEALTH

16 PRACTITIONER DOES NOT DO AN INDEPENDENT ASSESSMENT WITH

17 RESPECT TO OTHER ISSUES BEYOND GENDER DYSPHORIA; CORRECT?

18 A    RIGHT.  THAT WOULD BE INADEQUATE CARE.

19 Q    YOU MENTIONED THAT YOUR ROLE AS A TRAINER OR AS PART OF

20 THE EDUCATION ARM OF WPATH.  CAN YOU JUST TELL US A LITTLE BIT

21 MORE ABOUT THAT?  WHAT DOES IT MEAN?  HOW MANY PEOPLE HAVE YOU

22 TRAINED?  WHO DO YOU TRAIN?

23 A    SO OVERALL, THE ORGANIZATIONS HAD AROUND OVER 7000

24 ATTENDEES.  I KNOW FROM OVER 58 COUNTRIES WE WERE DOING

25 IN-PERSON TRAININGS BUT WE WITH THE PANDEMIC WENT TO ONLINE

1  TRAININGS, WHICH MADE IT A LOT EASIER FOR OUR FOLKS FROM ALL

2  OVER THE GLOBE TO ACCESS US, OUR TRAININGS, AND WE TRAIN

3  FOUNDATIONAL INFORMATION IN OUR FOUNDATIONS COURSE.  AND THEN

4  WE HAVE ADVANCED MEDICAL AND ADVANCED MENTAL HEALTH COURSES.

5  AND WE ALSO HAVE SPECIALTY COURSES, FOR EXAMPLE, IN

6  NEURO-DIVERSITY AND PRE-PRODUCTIVE HEALTH AND OTHER TOPIC

7  AREAS THAT ARE IMPORTANT, PARTICULARLY IN CHILD ADOLESCENT

8  CARE.

9  Q    OKAY.  AND ARE YOU DIRECTLY INVOLVED IN EITHER CREATING

10  THE TRAININGS, ENSURING THAT THE PEOPLE WHO ARE GIVING THE

11  TRAININGS ARE QUALIFIED OR WHAT IS YOUR ROLE IN TERMS OF

12  EITHER THE CURRICULA OR PROVIDING THE TRAINING THEMSELVES?

13  A    I'M RESPONSIBLE FOR THE MENTAL HEALTH SIDE OF THE

14  TRAINING.  SO I COORDINATE THEM WITH THE ASSISTANCE OF STAFF,

15  AND I OFTEN KIND OF SET THE AGENDAS TO THE TOPIC TO BE

16  COVERED.  I WORK WITH THE EXPERTS AROUND THE GLOBE TO HAVE A

17  GLOBAL FACULTY AND I'M DEEPLY INVOLVED IN IT DAY-TO-DAY, EVEN

18  THOUGH IT'S BASICALLY A VOLUNTARY JOB.

19  Q    OKAY.  IS IT YOUR EXPERIENCE MOST HEALTH CARE

20  PROFESSIONALS IN THE STATE OF GEORGIA FOLLOW WPATH STANDARDS

21  OF CARE?

22  A    I KNOW THE ONES THAT I WORK WITH AND ARE REFERRED TO DO.

23  I HAVE MONITORED A COUPLE THEM IN THEIR CERTIFICATIONS FOR

24  WPATH AND YES.

25  Q    WHAT IS YOUR RESPONSE -- YOU HAVE TALKED A LOT ABOUT

1   WPATH.  WHAT IS YOUR RESPONSE TO THE ASSERTION THAT WE HEARD

2   YESTERDAY THAT THERE WERE -- THIS CAME FROM DR. CANTOR'S

3   DECLARATION -- THAT THERE'S AN INTERNATIONAL REJECTION OF

4   WPATH STANDARDS?

5   A    THAT SEEMS -- THAT'S JUST UNTRUE.  I MEAN IT'S AN

6   INTERNATIONAL ORGANIZATION.  THE COMPOSITION OF THE AUTHORS

7   WAS INTERNATIONAL AND THERE ARE MANY COUNTRIES AROUND THE

8   GLOBE RIGHT NOW WORKING TO TRANSLATE THE STANDARDS OF CARE

9   INTO THEIR LANGUAGE FROM CROATIA TO THE CZECH REPUBLIC,

10  FRANCE, INDIA, COLUMBIA.  SOME OF THOSE COUNTRIES ARE WORKING

11  TO ADOPT THE STANDARDS OF CARE OFFICIALLY AS THEIR HEALTH CARE

12  POLICIES.

13      I WAS AT THE EUROPEAN PROFESSIONAL ASSOCIATION FOR

14  TRANSGENDER HEALTHCARE IN APRIL OF THIS YEAR AND IT'S THE

15  LARGEST IT'S EVER BEEN.  THEY HAD MORE SCIENTIFIC ABSTRACTS

16  SUBMITTED FOR TOPICS AND I HAD THE HONOR OF -- DR. DE VRIES

17  WHO'S CITED IN LOT OF THIS RESEARCH AND ASKED ME TO TAKE HER

18  PLACE TO RUN THE ONE OF THE PROGRAMS THAT WAS ON PROVISIONAL

19  CARE TO YOUTH IN GERMANY AND THE ONE OF THEM -- HEALTH

20  OFFICIALS FROM GERMANY CAME TO TALK WITH US ABOUT HOW TO

21  IMPLEMENT THE STANDARDS OF CARE IN GERMANY.  I MEAN WE ARE

22  WORKING ON TRAINING PROGRAMS IN SPAIN NEXT YEAR, PORTUGAL AND

23  SWITZERLAND 2025.  IT'S INACCURATE TO SAY THEY'RE NOT GLOBALLY

24  RESPECTED.

25      AND, IN FACT, CANADA, WHERE DR. CANTOR I GUESS WORKS, HAS

1   A VERY PROGRESSIVE SET OF POLICIES AND THEY HAVE A CENTRALIZED

2   HEALTH SYSTEM AND THEY PROVIDE GENDER-AFFIRMING CARE.  AND, IN

3   FACT, THE YUKON GOVERNMENT BROUGHT SEVERAL TO TRAIN THEIR

4   HEALTHCARE PROFESSIONALS.

5   Q    OKAY.  AND ARE YOU FAMILIAR ENOUGH WITH THE GUIDELINES

6   THAT WERE ISSUED WITH RESPECT TO -- TALKED ABOUT YESTERDAY,

7   ENGLAND, FRANCE, AND FINLAND, TO BE ABLE TO RESPOND TO THE

8   QUESTION OF WHETHER OR NOT THOSE RECOMMENDATIONS ARE IN

9   ALIGNMENT WITH THE STANDARDS OF CARE?

10  A    I'M FAMILIAR ENOUGH TO SAY, YES, THEY APPEAR TO BE

11  CONSISTENT WITH THE STANDARDS OF CARE.

12  Q    AND CAN YOU TELL US SORT OF WHAT ARE THE QUALITY USE OF

13  THE RECOMMENDATIONS THAT MAKE THEM ALIGNED WITH THE STANDARDS

14  OF CARE?

15  A    WELL, THEY SAY THINGS LIKE INVOLVING PARENTS AND

16  FAMILIES, PROVIDING A FULL RANGE OF SUPPORT, OFFERING BETTER

17  ACCESS TO CARE IN THE LOCAL LEVEL WHERE PROFESSIONALS ARE --

18  CAN BE AVAILABLE WHO ARE COMPETENT TO PROVIDE THE CARE.

19  Q    UM-HMM.  SUPPORTIVE CARE IS PART OF RECOMMENDATIONS?

20  A    YES.

21  Q    THOROUGH ASSESSMENT --

22  A    YES.

23  Q    -- IS PART OF THE RECOMMENDATIONS IN THESE COUNTRIES.

24       ACCESS TO PUBERTY SUPPRESSION IS PART OF THE

25  RECOMMENDATIONS?

1  A    YES.  PUBERTY SUPPRESSION AND HORMONE TREATMENTS ARE ALSO

2  INCLUDED IN THE RECOMMENDATIONS.

3  Q    THANK YOU.

4      SO WE'VE TALKED ABOUT THE STANDARDS OF CARE.  AND IN YOUR

5  ANSWERS, I RECOGNIZE THAT YOU'VE TALKED A LITTLE BIT ABOUT HOW

6  YOU APPLIED THEM.  I WANT TO TALK A LITTLE BIT MORE

7  COMPREHENSIVELY ABOUT YOUR PRACTICE.

8      FIRST, PREFATORY QUESTION SELF EVIDENT.  DO YOU FOLLOW

9  THE WPATH STANDARDS OF CARE IN YOUR PRACTICE WITH RESPECT TO

10  TREATING ADOLESCENTS?

11  A    YES, I DO.

12  Q    CAN YOU WALK US THROUGH HOW YOU APPLY THE STANDARDS OF

13  CARE WITH RESPECT TO ASSESSING A MINOR PATIENT WHO COMES INTO

14  YOUR OFFICE EXPRESSING SOME DISTRESS OR ISSUES WITH THEIR

15  GENDER IDENTITY?

16  A    OFTEN I WILL MEET THE PARENT OR PARENTS FIRST.  SOMETIMES

17  THE INITIAL MEETING MAY BE WITH THE PARENT AND THE YOUNG

18  PERSON AND THEN I'LL HAVE INDEPENDENT CONVERSATIONS OVER A

19  NUMBER OF SESSIONS TO DETERMINE WHAT IS THIS YOUNG PERSON'S

20  HISTORY WITH GENDER-IDENTITY ISSUES, WHAT ARE THE AFFECTS IN

21  THEIR LIFE DAY-TO-DAY.

22      SO, FOR EXAMPLE, ARE THEY HAVING TROUBLE SLEEPING?  ARE

23  THEY DEPRESSED?  ARE THEY HAVING DIFFICULTY INTERACTING WITH

24  OTHERS?  ARE THEY HAVING TROUBLE FOCUSING ON THEIR SCHOOLWORK?

25  ARE THEY HAVING SELF-HARM THOUGHTS OR BEHAVIORS, SELF-HARM

1  SUICIDAL THOUGHTS OR ACTIONS?

2       SO I WANT TO GET A FULL ASSESSMENT OF HOW THIS IS

3  IMPACTING THIS YOUNG PERSON TO UNDERSTAND WHAT LEVEL OF CARE

4  IS NEEDED.  I ALSO WANT TO UNDERSTAND WHAT THEIR HISTORY IS

5  BECAUSE SOME PEOPLE COME TO ME AND THEY HAVE ALREADY SOCIALLY

6  TRANSITIONED FOR SEVERAL YEARS WHEN THE YOUNG PERSON WAS IN

7  ELEMENTARY SCHOOL, FOR EXAMPLE, AND IS DOING WELL WITH THEIR

8  SOCIAL TRANSITION AND THEY'RE COMING TO ME NOW BECAUSE THEY'RE

9  CONSIDERING PUBERTY SUPPRESSION AND WANT TO HAVE SOME

10 CONSULTATION AROUND THAT.

11      THAT'S DIFFERENT THAN SOMEBODY WHO'S COMING TO ME WHO HAS

12 NOT SOCIALLY TRANSITIONED.  SO I HAVE TO TAKE INTO ACCOUNT

13 WHAT IS THE SPECIFIC INDIVIDUAL'S SITUATION AND INDIVIDUALIZE

14 THEIR CARE AND RECOMMENDATIONS ACCORDINGLY.  AND THEN AS I

15 MENTIONED, I WILL ALSO TALK WITH THE PARENTS AND OTHER

16 PROFESSIONALS, WHEN POSSIBLE.  I WANT TO GATHER AS MANY DATA

17 POINTS AS POSSIBLE TO INFORM MY RECOMMENDATIONS AND MY

18 CONVERSATION WITH THE YOUNG PERSON AND THEIR CAREGIVERS.

19 Q    AND HOW DO YOU DIAGNOSIS GENDER DYSPHORIA, IF, IN FACT,

20 IT'S PRESENT IN A PATIENT?

21 A    WELL, THROUGH THAT CONVERSATION, I CAN RECOGNIZE WHETHER

22 OR NOT THEY MEET THE DIAGNOSTICS CRITERIA ABOUT HAVING THE --

23 SHORTHAND, I WOULD USE SOCIAL DYSPHORIA AS WELL AS ANATOMICAL

24 DYSPHORIA.  DISCOMFORT WITH ASPECTS OF THEIR BODY TO THE POINT

25 THAT IT IS IMPAIRING SOME ASPECTS OF THEIR FUNCTIONING AND

1   SIGNIFICANTLY DISTRESSING THEM.

2   Q    AND YOU MENTIONED APPLYING CRITERIA.  IS THAT THE DSM-5?

3   A    YES, IT IS.

4   Q    OKAY.  HOW ARE YOU ABLE TO DISCERN GENDER DYSPHORIA AS A

5   DIAGNOSIS FROM OTHER MENTAL HEALTH CONDITIONS?

6   A    BECAUSE IN MY QUESTIONS, MY DIAGNOSTIC INTERVIEWS, I CAN

7   DISCERN WHETHER OR NOT THIS CHILD, FOR EXAMPLE, WAS DOING FINE

8   AND THEN THEIR BODY STARTED TO CHANGE, AND IT IS THE CHANGE

9   THAT IS RELATED TO THEIR GENDER IDENTITY ASPECTS OF PUBERAL

10  CHANGES.  THAT INFORMS ME THAT THIS ONE PERSON'S ACADEMICS

11  USED TO BE FINE.  THEY USED TO SOCIALIZE AND NOW THEY'RE

12  WITHDRAWN.  NOW THEY DON'T WANT TO COME OUT OF THEIR ROOM.

13  THEY DON'T WANT TO TALK TO THEIR FAMILY.

14      AND THIS ISN'T JUST TYPICAL ADOLESCENCE.  THIS IS SEVERE

15  IMPAIRMENT AND STRUGGLING BECAUSE THEIR BODY IS CHANGING IN A

16  WAY THAT HAS PEOPLE RESPOND TO THEM IN A WAY THAT IS

17  INCONGRUENT WITH HOW THEY EXPERIENCE THEMSELVES AND THEIR BODY

18  IS CHANGING IN WAYS THAT THEY SEE ARE GOING TO BE SECONDARY

19  SEX CHARACTERISTICS OF A MAN OR A WOMAN AND THAT IS NOT HOW

20  THEY IDENTIFY.

21  Q    CAN YOU DISTINGUISH AS A MENTAL HEALTH PRACTITIONER

22  BETWEEN GENDER DYSPHORIA AND, FOR EXAMPLE, BODY DYSMORPHIC

23  DISORDER?

24  A    YES.  BODY DYSMORPHIC DISORDER DOES NOT CONTAIN THE

25  GENDER IDENTITY PIECE.  IT MAY BE DISCOMFORT WITH AN ASPECT OF

1  ONE'S BODY BUT IT'S NOT ABOUT THE GENDER IDENTITY.

2  Q    OKAY.  CAN YOU DISTINGUISH BETWEEN SAME SEX ATTRACTION,

3  FOR EXAMPLE, SOMEONE WHO IS STRUGGLING WITH SEXUAL ORIENTATION

4  IN GENDER DYSPHORIA?

5  A    YES, I CAN.

6  Q    ARE YOU ABLE TO DISCERN BETWEEN SOMEONE WHO HAS GENDER

7  DYSPHORIA ACCORDING TO THE DSM AND SOMEONE WHO IS EXPLORING

8  THEIR GENDER OR HAVING SOME ISSUES RELATED TO THEIR GENDER?

9  A    YES.  I FOLLOW THE STANDARDS WHICH -- AND I SAY TYPICALLY

10  IN MY FIRST APPOINTMENT THAT I, YOU KNOW, HAVE NO INVESTMENT

11  IN WHAT THEIR IDENTITY ENDS UP BEING.  IF THEY END UP

12  TRANSITIONING OR NOT, I WANT THEM TO FIND OUT WHO THEY ARE.

13  THAT IS MY JOB.  AND I CAN DEFINITELY HELP THEM DISTINGUISH

14  AND TRY TO HELP THEM DISCERN.  AND WE HAVE CONVERSATIONS ABOUT

15  GENDER ISSUES AND EXPLORING AND THE DIFFERENCE BETWEEN GENDER

16  EXPRESSION, GENDER DIVERSITY, OTHER OUTCOMES THAT DON'T NEED

17  MEDICAL INTERVENTION OR SOME THAT DO.

18  Q    OKAY.  IS IT THE CASE THAT YOU HAVE YOUNG PEOPLE WHO COME

19  INTO YOUR PRACTICE AND WHO ARE QUESTIONING OR HAVE ISSUES

20  AROUND GENDER WHO YOU RECOGNIZE DO NOT HAVE GENDER DYSPHORIA?

21  A    I DO.  AND IT'S A POSITIVE THING EITHER WAY WHEN THEY GET

22  CLARITY ABOUT WHO THEY ARE.

23  Q    IS IT FAIRLY EASY FOR A QUALIFIED MENTAL HEALTH

24  PRACTITIONER TO BE ABLE TO DISTINGUISH BETWEEN GENDER

25  DYSPHORIA OR QUESTIONS AROUND GENDER?

1   A    YES.   THERE IS CERTAINLY EXPLORATION AND EXPERIMENTATION

2   AND THINGS THAT YOUNG PEOPLE ARE DOING NOWADAYS THAT ARE

3   PLAYING WITH GENDER EXPRESSION AND GENDER ROLES.   THAT IS

4   DISTINCTLY DIFFERENT THAN HAVING GENDER DYSPHORIA ARISING TO

5   THE LEVEL OF NEEDING MORE INTERVENTION, INCLUDING MEDICAL

6   INTERVENTIONS.

7   Q    AND CAN YOU EXPLAIN HOW YOU ARE ABLE TO IDENTIFY WHETHER

8   THERE IS ANY CONTRIBUTING FACTORS TO THE PRESENTATION OF

9   GENDER DYSPHORIA THAT COULD EXCLUDED GENDER DYSPHORIA AS A

10  DIAGNOSIS?

11  A    THAT'S PART OF THAT THOROUGH ASSESSMENT THAT I DO.   AND

12  YOU KNOW, IF I HAVE ANY QUESTIONS, THEN THE CONVERSATIONS AND

13  THE CONSULTATIONS CONTINUE UNTIL IT BECOMES REALLY CLEAR THIS

14  IS GENDER DYSPHORIA ALONE OR GENDER DYSPHORIA AND SOMETHING

15  ELSE.   AND EVEN IF THERE IS SOMETHING ELSE, THAT NEEDS TO BE

16  TREATED AS WELL.   AND SOMETIMES IT MAY JUST BE SOMETHING ELSE

17  BUT SOMETIMES IT'S GENDER DYSPHORIA AND SOMETHING ELSE AND

18  BOTH CONDITIONS NEED TO BE TREATED.

19  Q    THAT'S WHAT -- IS THAT WHAT IS REFERENCED TO IN YOUR

20  PROFESSION AS CO-OCCURRING DISORDERS?

21  A    YES.

22  Q    IT SOUNDS LIKE YOUR TESTIMONY IS THAT MENTAL HEALTH

23  PRACTITIONERS KNOW HOW TO DEAL WITH CO-OCCURRING DISORDERS?

24  A    THAT IS OUR RESPONSIBILITY, YES.

25  Q    AND THAT INCLUDES AUTISM OR SOMEONE WHO PRESENTS WITH

1  NEURO-ATYPICAL FEATURES?

2  A    YES, IT IS.

3  Q    WHAT HAPPENS IN THE EVENT THAT AN ADOLESCENT PATIENT HAS

4  AUTISM, NEURO-TYPICAL FEATURES AND GENDER DYSPHORIA?  ARE

5  THERE ANY PARTICULAR EXTRA STEPS OR CAUTION OR ANYTHING THAT

6  YOU DO?

7  A    YES.  I WILL TAKE A SLOWER APPROACH WHEN A PERSON HAS AN

8  AUTISM SPECTRUM DISORDER.  I WANT TO EXPLORE IS THIS, FOR

9  EXAMPLE, A COMMON FEATURE OF AUTISM SPECTRUM DISORDER.  IT IS

10 A HYPER FIXATION.

11       AND SO, FOR EXAMPLE, A WEEK OR TWO AGO, I HAD A FIRST

12 APPOINTMENT WITH A FAMILY AND ASKED THE MOTHER HOW LONG THE

13 YOUNG PERSON'S HYPER FIXATIONS TYPICALLY LAST?  AND SHE

14 INDICATED USUALLY THEY ARE ABOUT THREE MONTHS AND THEN IT

15 PASSES.  AND I SAID HOW LONG HAS YOUR CHILD BEEN DESCRIBING TO

16 YOU THESE GENDER ISSUES?  SEVERAL YEARS.

17       SO THERE ARE WAYS OF FUSING A PART WHAT IS ABOUT AUTISM

18 AND WHAT IS GENDER DYSPHORIA A PART FROM THAT.  AND STILL, I

19 THINK ANYBODY IN THE FIELD IS GOING TO BE MORE CAUTIOUS,

20 RESPONSIBLE AND ETHICAL WITH SOMEBODY WITH CO-OCCURRING

21 CONDITIONS.

22 Q    THE STANDARDS OF CARE RECOMMEND THAT EITHER THE CLINICIAN

23 IS -- HAS EXPERIENCE AND KNOWLEDGE AND SKILLS WITH RESPECT TO

24 HOW TO TREAT SOMEONE ON THE AUTISM SPECTRUM OR AFFILIATE WITH

25 SOMEONE WHO HAS THAT EXPERTISE.

1  A    YES, THAT'S CORRECT.

2  Q    OKAY.  WE HEARD SOME TESTIMONY YESTERDAY ABOUT A METEORIC

3  RISE IN ADOLESCENTS PRESENTING WITH EITHER GENDER DYSPHORIA OR

4  CLAIMING TO BE TRANSGENDER.

5      DOES THAT REFLECT YOUR EXPERIENCE?

6  A    THERE HAS BEEN DEFINITELY A LARGE INCREASE.  AND, AGAIN,

7  AS I MENTIONED I BROUGHT ON AN ASSOCIATE AND LET HER SEE THE

8  ADULTS SINCE THEY DIDN'T SEE ADOLESCENTS, SO THAT HAS SKEWED

9  MY VIEW A LITTLE BIT, BUT I WOULD AGREE THAT THERE IS A LARGE

10 INCREASE IN THE -- I BELIEVE THAT IT'S DUE TO SEVERAL THINGS.

11      ONE IS THE AMOUNT OF INFORMATION THAT PEOPLE CAN ACCESS

12 NOW.  PARENTS COME TO ME, THEY CALL ME.  USUALLY THEY HAVE

13 BEEN REFERRED TO ME BY THEIR PEDIATRICIAN OR CHILD THERAPIST

14 OR SOMETHING, BUT THEY HAVE HEARD INFORMATION IN THE NEWS

15 WHEREVER.  AND SO PARENTS ARE LISTENING.  THEY'RE MORE

16 INFORMED AND ARE BRINGING THEIR KIDS IN, BECAUSE THEY ARE

17 RECOGNIZING THIS IS SOMETHING THEY NEED TO PAY ATTENTION TO,

18 PARTICULARLY AT AN AGE WHERE THEY CAN DO SOMETHING ABOUT IT.

19 Q    OKAY.  SO BASED ON YOUR RESEARCH AND CLINICAL EXPERIENCE,

20 THE REASON FOR THE RISE INCLUDES ACCESS TO INFORMATION.  IS

21 WHAT I HEARD YOU SAY; CORRECT?

22 A    YES.

23 Q    ANY OTHER -- WELL, LET ME ASK IT THIS WAY:  DO YOU

24 BELIEVE THAT SOCIAL MEDIA IS CAUSING ADOLESCENTS TO BELIEVE

25 THEY'RE TRANSGENDER OR THAT THEY HAVE GENDER DYSPHORIA AS THE

1   CAUSE FOR THE RISE?

2   A    I HAVE NOT SEEN THAT IN MY PRACTICE.

3   Q    OKAY.  DO YOU BELIEVE THAT TO BE THE CASE, BASED ON YOUR

4   KNOWLEDGE, YOUR EXTENSIVE KNOWLEDGE IN?

5   A    I DO NOT BELIEVE THAT THERE HAS BEEN SOCIAL MEDIA CAUSING

6   YOUNG PEOPLE TO THINK THAT THEY ARE TRANSGENDER MISTAKENLY.

7   Q    OKAY.  AND IF A PRACTITIONER APPLIES THE STANDARDS OF

8   CARE THAT WE HAVE TALKED ABOUT, WOULD THEY BE ABLE TO IDENTIFY

9   WHETHER THAT ADOLESCENT IS INFLUENCED BY SOCIAL MEDIA OR, IN

10  FACT, HAS GENDER DYSPHORIA?

11  A    YES.

12  Q    OKAY.  ANYONE COME INTO YOUR OFFICE SAYING THAT SOCIAL

13  MEDIA INFLUENCERS ARE THE REASON THAT THEY BELIEVE THEY HAVE

14  GENDER DYSPHORIA?

15  A    NO.

16  Q    OKAY.  OR TRANSGENDER EVEN?

17  A    NO.

18  Q    OKAY.  THERE IS -- WE TALKED ABOUT CO-OCCURRING

19  DISORDERS.  I JUST WANT TO ASK YOU SPECIFICALLY AS WELL,

20  BECAUSE THERE WAS A REFERENCE IN ONE OF THE EXPERTS'

21  DECLARATIONS ABOUT BORDERLINE PERSONALITY DISORDER AND

22  CLINICIANS CONFLATING BORDERLINE PERSONALITY WITH GENDER

23  DYSPHORIA.

24       IS THAT SOMETHING THAT YOU WOULD AGREE WITH OR DISAGREE

25  WITH?

1  A    I WOULD DISAGREE WITH THAT.  THE DIAGNOSTIC

2  CHARACTERISTICS OF BORDERLINE PERSONALITY DISORDER IS VERY

3  DIFFERENT FROM GENDER DYSPHORIA.

4  Q    THANK YOU.  YOU TALKED A LITTLE BIT ABOUT THIS BUT I WANT

5  TO JUST LET YOU SPEAK A LITTLE BIT MORE ABOUT HOW THE MAJORITY

6  OF YOUR TRANSGENDER GENDER-DIVERSE ADOLESCENTS FIND YOU.

7  A    SO MOST OF THEM THE PARENTS HAVE LISTENED TO THEIR KID OR

8  THEIR KID HAS BEEN HAVING MENTAL HEALTH SYMPTOMS OF SOME TYPE

9  AND THE YOUNG PERSON HAS EITHER TALKED TO THEIR PEDIATRICIAN

10 OR THE PARENTS HAVE TAKEN THE KID TO ANOTHER THERAPIST AND,

11 THEN, WHEN THE GENDER ISSUES ARE BROUGHT UP TO THE THERAPIST

12 BECAUSE THE PARENTS BROUGHT IN THE KID WHY IS MY KID DEPRESSED

13 TO THE THERAPIST AND THE KID FINALLY TELLS THE THERAPIST, THE

14 THERAPIST WILL REFER THEM TO ME.

15 Q    OKAY.

16 A    SO PROFESSIONALS ARE USUALLY REFERRING PARENTS TO ME OR

17 OTHER PARENTS ARE REFERRING PARENTS TO ME.

18 Q    SO IT SOUNDS LIKE THESE ARE KIDS WHO HAVE -- TO SOME

19 EXTENT, YOU HAVE A LOT OF PATIENTS, ADOLESCENT PATIENTS WHO

20 HAVE BEEN RECEIVING PSYCHOTHERAPY FOR THE ANXIETY OR DISTRESS

21 THAT THEY ARE FEELING AND IT'S NOT RESOLVING?

22 A    RIGHT.

23 Q    HAVE YOU -- YOU SAID ABOUT 600 ADOLESCENTS OVER -- THAT

24 YOU HAVE TREATED OVER THE COURSE --

25 A    YES, AT LEAST.

1  Q     -- YOUR CAREER?

2       HAVE YOU DIAGNOSED ANY OF THOSE WITH GENDER DYSPHORIA?

3  A     MANY OF THEM.

4  Q    OKAY.  HOW SERIOUS OF A MEDICAL CONDITION IS GENDER

5  DYSPHORIA?

6  A    IT CAN CAUSE SIGNIFICANT DISTRESS AND IT CAN BE A

7  LIFE-OR-DEATH MATTER.  I MEAN WHEN -- I SEE EVERYTHING FROM

8  SCHOOL WITHDRAWAL, ACADEMIC DECLINE, PROBLEMS WITH FAMILY

9  RELATIONSHIPS, WITHDRAWAL FROM PEER RELATIONSHIPS.  SOME FOLKS

10 DEVELOP EATING DISORDERS TO TRY TO CONTROL THEIR BODY

11 DEVELOPMENT.  SUBSTANCE ABUSE DISORDERS.  OFTEN THERE MAY BE

12 SELF HARM.  IN FACT, I WAS STUNNED HOW MUCH THE SELF HARM AND

13 SUICIDAL THOUGHTS WENT UP AS I -- IN MY CASELOAD AS I WAS

14 SEEING MORE OF THESE ADOLESCENTS.  AND SOMETIMES PEOPLE KILL

15 THEMSELVES.  I MET SOMEBODY THIS WEEK WHO TOLD ME THEIR

16 SIBLING HAD COMMITTED SUICIDE WHO WAS TRANSITIONING BECAUSE OF

17 SOCIAL REJECTION.

18 Q    HAVE YOU TREATED ANY ADOLESCENT PATIENTS WHO NEEDED

19 HORMONES TO TREAT THEIR GENDER DYSPHORIA?

20 A    YES.  MANY OF THEM.

21 Q    MANY.  JUST TO GIVE A SENSE OF YOUR KNOWLEDGE BASE, WOULD

22 YOU SAY THAT'S MORE THAN A HUNDRED?

23 A    DEFINITELY.

24 Q    OKAY.  CAN YOU DESCRIBE THE MENTAL HEALTH IMPACTS YOU

25 HAVE OBSERVED IN THE PATIENTS AFTER HORMONE -- YOUR

1  PATIENTS -- AFTER HORMONE THERAPY HAS BEEN INITIATED?

2  A    WELL, LIKE DRS. SHUMER AND MCNAMARA DESCRIBED IN THEIR

3  TESTIMONY, I HAVE SEEN SOME STUNNING IMPROVEMENTS AND EVEN

4  THINGS THAT I'VE BEEN SURPRISED AT SOMETIMES WITH ACADEMIC

5  IMPROVEMENT, REENGAGEMENT WITH FAMILY.

6      I HAD A YOUNG PERSON A COUPLE OF MONTHS AGO WHO STARTED

7  HORMONE THERAPY WHO CAME TO ME IN AN APPOINTMENT AND SAID, YOU

8  KNOW, I USED TO STRUGGLE TO SHOWER ONCE OR TWICE A WEEK.  I

9  MEAN ONCE EVERY WEEK OR TWO.  SORRY, ONCE EVERY WEEK OR TWO.

10 AND HE WAS PROUD.  HE SAID I HAVE SHOWERED TEN TIMES IN THE

11 LAST 14 DAYS.  AND HE WAS ENGAGED IN HIS ACADEMICS AGAIN.  HIS

12 SUICIDAL SELF-HARM THOUGHTS WERE MOSTLY ABATED AND IMPROVING

13 AND I SEE JUST AMAZING FLOURISHING WITH FOLKS WHO GET THE

14 TREATMENT THAT THEY NEED.

15 Q    WITH RESPECT TO THE ANTIDOTE YOU JUST SHARED, IS THAT

16 BECAUSE HORMONES CREATED A NEED FOR CLEANLINESS?

17 A    IT WAS BECAUSE THIS YOUNG PERSON WAS FEELING HOPEFUL

18 ABOUT THEIR BODY DEVELOPING IN A WAY THAT FELT BETTER AND

19 WANTING TO BE ABLE TO ENGAGE SOCIALLY NOW.  AND SO HE WAS

20 WILLING -- INTERESTED IN SHOWERING TO BE ABLE TO INTERACT WITH

21 PEOPLE NOW.

22 Q    OKAY.  AND DIRECTLY RELATED TO THE CHANGES THAT THE

23 HORMONES CREATED; IS THAT RIGHT?

24 A    RIGHT.

25 Q    IN YOUR EXPERIENCE, HAVE YOU -- DO YOU HAVE ANY

1   ADOLESCENT PATIENTS WHO STARTED HORMONES WHOSE MENTAL HEALTH

2   DETERIORATED?

3   A    I HAVE HAD A COUPLE OF PATIENTS WHO INITIALLY HAD SOME

4   ANXIETY STARTING HORMONE THERAPY.  PARTICULARLY FOLKS WHO WERE

5   MALE AT BIRTH TRANSITIONING TO FEMALE ESPECIALLY CONCERNED

6   ABOUT SOCIAL REJECTION BUT THEY STILL, AS WE TALK ABOUT

7   TREATMENT OPTIONS, THEY WANT TO CONTINUE WITH THEIR TREATMENT.

8   Q    IS THAT PART OF THE THERAPIST'S ROLE, IS TO SUPPORT THE

9   PATIENT WITH RESPECT TO CONSEQUENCES, EXTERNAL CONSEQUENCES OF

10  HORMONE THERAPY?

11  A    YES.  TO FACILITY DEVELOPMENT OF COPING SKILLS AND

12  RESILIENCE.

13  Q    HAVE YOU TREATED ANY ADOLESCENT PATIENTS WHO IN YOUR

14  OPINION NEEDED HORMONE THERAPY BUT COULD NOT ACCESS HORMONES?

15  A    I HAVE.

16  Q    CAN YOU TELL US ABOUT YOUR EXPERIENCE WITH THAT?

17  A    IT'S REALLY HARD AS A PROVIDER TO SEE THIS.  TYPICALLY,

18  THESE YOUNG PEOPLE DO NOT IMPROVE.  THEIR MENTAL HEALTH, THEIR

19  ACADEMICS, THEY'RE STUCK.  MANY OF THEM HAVE A HARD TIME

20  SEEING THE FUTURE, PLANNING FOR THE FUTURE.  I'VE SEEN THEM

21  END UP IN TREATMENT CENTERS AND PRESCRIBED PSYCHIATRIC

22  MEDICATIONS TO TRY TO ADDRESS, BUT IT'S NOT REALLY ADDRESSING

23  THE GENDER ISSUE.  I HAVE SEEN SELF HARM, SUICIDE ATTEMPTS AND

24  IT'S TRAGIC TO WATCH BECAUSE IT COULD BE SO EASILY TREATED.

25  Q    OKAY.  AND THOSE CASE STUDIES THAT YOU ARE TALKING ABOUT

1  NOW, THE EFFECT OF THIS LAW S.B. 140 WOULD BE SIMILAR TO THE

2  EFFECTS THAT YOU'VE JUST TALKED ABOUT WITH YOUR PAST PATIENTS

3  WHO COULDN'T ACCESS HORMONE?

4  A    EXACTLY.  AND ONE OTHER THING THAT I SHOULD MENTION IS

5  THAT SEVERAL OF THESE YOUNG PEOPLE HAVE SNUCK AROUND THEIR

6  PARENTS AND GOTTEN THE HORMONES ONLINE.  SO I COULD ANTICIPATE

7  THAT AS WELL.

8  Q    THAT WOULD BE A CONSEQUENCES OF THIS LAW?

9  A    YES.  INSTEAD OF HAVING MEDICALLY-SUPERVISED TREATMENT

10 THEY WILL SNEAK AND GET THE TREATMENT FOR THEMSELVES AND WHO

11 KNOWS WHAT THEY WILL ACTUALLY GET.

12 Q    GIVE US A SENSE OF HOW MANY -- LET ME ASK YOU THIS FIRST:

13 DO YOU SEE YOUR ADOLESCENT PATIENTS WHO HAVE BEEN DIAGNOSED

14 WITH GENDER DYSPHORIA WHO YOU CONTINUE TO SEE AFTER 18?  AFTER

15 THEY TURN 18?

16 A    DO I CONTINUE TO SEE THEM?  OH, YES.  YEAH.  JUST THIS

17 WEEK I SAW A YOUNG MAN WHO WAS ABLE TO TRANSITION WITH

18 HORMONES DURING HIGH SCHOOL, WHICH LET HIM DO ALL HIS SOCIAL

19 AWKWARDNESS AT THE SAME TIME AS HIS PEERS AND THEN HAD AN

20 AMAZING COLLEGE CAREER AND IS NOW APPLYING FOR GRADUATE-LEVEL

21 TRAINING.  I MEAN I HAVE MANY OF THOSE KINDS OF STORIES.

22 Q    OKAY.  SO YOU HAVE MORE THAN JUST THAT ONE PATIENT THAT

23 YOU HAVE TREATED WHO BEGAN HORMONES IN ADOLESCENCE WHO YOU

24 FOLLOW OR CONTINUE TO SEE AFTER THEY TURN 18; IS THAT RIGHT?

25 A    YES.  SOMETIMES I SEE THEM REGULARLY LIKE THIS YOUNG

1  PERSON LIKES TO CHECK IN ONCE A QUARTER.  SOME PEOPLE COME

2  BACK TO ME AFTER A PERIOD OF TIME FOR DISCUSSION AROUND

3  SURGICAL OPTIONS OR OTHER LIFE-DEVELOPMENT EVENTS.

4  Q    AND HOW MANY OF THOSE PATIENTS HAVE POSITIVE MENTAL

5  HEALTH OUTCOMES AS A RESULT OF THEIR TREATMENT?

6  A    IT APPEARS TO ME THAT ALL OF THEM HAVE BENEFITED.  THERE

7  HAVE BEEN A COUPLE WHO HAVE DISCONTINUED HORMONE TREATMENT OR

8  DISCONTINUED PUBERTY SUPPRESSION.  BUT I HAD ONE OF THESE EVEN

9  RECENTLY I ASKED HOW THEY FELT ABOUT THE PUBERTY SUPPRESSION

10 AND THE STEPS THEY HAVE TAKEN.  AND THEY SAID, NO, I'M GLAD I

11 EXPLORED THIS BECAUSE NOW I UNDERSTAND BETTER.  I MEAN PUBERTY

12 SUPPRESSION DID WHAT IT WAS SUPPOSED TO DO, GIVING A PERIOD OF

13 TIME TO REFLECT AND EXPLORE THESE -- THE ISSUES.

14 Q    YOU DON'T HAVE ANY EXPERIENCE WITH ANY PATIENTS WHO'S

15 STARTED MEDICATION WHO HAS -- WHOSE MENTAL HEALTH

16 DECOMPENSATED OR DETERIORATED AS A RESULT OF THE TREATMENT.

17 A    NO.

18 Q    IS THAT ACCURATE?

19 A    THAT'S ACCURATE.

20 Q    SO BASED ON YOUR CLINICAL EXPERIENCE, WHAT'S YOUR EXPERT

21 OPINION ON WHETHER IN PARTICULAR CASES APPLYING THE STANDARDS

22 OF CARE WE HAVE TALKED ABOUT, HORMONE THERAPY FOR AN

23 ADOLESCENT WITH GENDER DYSPHORIA IS SAFE AND EFFECTIVE?

24 A    IN THE CASES WHERE THERE HAS BEEN A COMPREHENSIVE

25 ASSESSMENT AND THE HEALTH CARE PROFESSIONALS INVOLVED AGREE

1  WHO HAVE THE EXPERTISE, I HAVE SEEN THE BENEFITS AND BELIEVE

2  THAT THESE YOUNG PEOPLE NEED THIS CARE.

3  Q    AND DOES THAT REFLECT NOT ONLY THE ADOLESCENT PATIENTS

4  REFLECTIONS BUT ALSO THAT OF THEIR FAMILIES?

5  A    DEFINITELY.  THE PARENTS ARE GRATEFUL FOR THE HELP.  I'VE

6  HAD PARENTS EVEN CALL ME BACK A COUPLE OF YEARS LATER AND SAY,

7  YOU KNOW, I DIDN'T BELIEVE IT EARLY ON, BUT NOW I SEE HOW MUCH

8  BETTER MY KID IS DOING.  AND THAT WAS LIKE A YOUNG ADULT

9  PATIENT.  BUT THE PARENTS IN APPOINTMENTS WHEN THE BILL WAS

10 BEING DEBATED AND VOTED ON, THEY WERE CRYING IN APPOINTMENTS

11 AS WERE THE YOUNG PEOPLE, THEIR KIDS.  SOME OF THE PARENTS

12 WERE LOOKING FOR JOBS IN OTHER CITIES AND STATES, DISRUPTING

13 THEIR CAREERS, DISRUPTING THEIR OTHER CHILDREN'S LIVES,

14 PUTTING INCREDIBLE BURDEN ON THEM.

15 Q    AND IS THAT -- DOES THAT CONTINUE TO BE THE CASE NOW, NOW

16 THAT THE BILL PASSED INTO LAW?

17 A    YES.  AND I HAVE HAD SEVERAL YOUNG PEOPLE WHO HAVE

18 GRADUATED COLLEGE, WHO MAKE A POINT OF MOVING TO ANOTHER STATE

19 SO THAT THEY DIDN'T HAVE TO FEEL LIKE THEY WERE IN A NEGATIVE

20 ENVIRONMENT.

21 Q    AND WHAT ARE THE MENTAL HEALTH IMPACTS THAT YOU HAVE SEEN

22 ON YOUR PATIENTS AND THEIR FAMILIES AS A RESULT OF THIS LAW

23 PASSING AND THE INABILITY TO GET THE MEDICAL CARE THAT THEY

24 WOULD NEED?

25 A    IT HAS BEEN A GREAT DEAL OF DISTRESS TO THE ADULT

1  PATIENTS I SEE WHO ARE WORRIED THAT THEY WILL COME FOR OUR

2  HEALTH CARE NEXT.  IT HAS ALSO BEEN DISTRESSING FOR THE

3  PARENTS AND THE YOUNG PEOPLE WHO FEEL THEY'VE BEEN TARGETED

4  AND FEEL THAT CARE IS NOT BEING PROVIDED EQUALLY OR FAIRLY OR

5  APPROPRIATELY, AND IT IS A VERY DISTRESSING THING TO FEEL LIKE

6  THE ANSWER AND THE SOLUTION IS EASY BUT NOW LAW IS BLOCKING

7  THAT.

8  Q    WHAT IS YOUR CLINICAL OPINION ABOUT THE WAIT-AND-SEE

9  APPROACH THAT IS PROVIDING -- ALLOWING A CHILD TO GET PUBERTY

10  SUPPRESSION BUT PROHIBITING THEM FROM ACCESSING HORMONES?

11  A    IT'S HARMFUL.  I DESCRIBED A LITTLE BIT, YOU KNOW, WHEN I

12  SEE YOUNG PEOPLE AND THE PARENTS REFUSE TO LET THEM START

13  HORMONES, THEY OFTEN WILL SEEK THE HORMONE -- NOT OFTEN.  THEY

14  WILL SOMETIMES SEEK HORMONES THEMSELVES BUT OFTEN THEIR MENTAL

15  HEALTH DETERIORATES EVEN FURTHER.

16  Q    WHAT ABOUT -- DOESN'T ACCESSING PUBERTY SUPPRESSION

17  PROVIDE ALL THE MEDICATION OR TREATMENT THAT'S NECESSARY?  WHY

18  DON'T WE JUST WAIT AND SEE WHAT -- LET THEM DECIDE BETWEEN

19  WHEN THEY START PUBERTY AND WHEN THEY BECOME AN ADULT?  DO YOU

20  SEE ANY CONSEQUENCES AS A CLINICIAN ABOUT THAT?

21  A    SO IF PUBERTY BLOCKERS ARE STARTED WHEN A YOUNG PERSON IS

22  11 OR 12 YEARS OLD, FOR EXAMPLE, IMAGINE, YOU LOOK LIKE THAT

23  ALL THROUGH HIGH SCHOOL.  EVEN IF YOU GROW SOMEWHAT

24  PHYSICALLY, YOU'RE GOING TO HAVE FEATURES THAT MAKE YOU STILL

25  LOOK LIKE A YOUNG CHILD.  AND SO THAT ISOLATES YOU SOCIALLY.

1    IT MAKES IT HARD TO INTERACT.  YOU DON'T GET TO HAVE THE

2    SOCIAL DEVELOPMENT ALONG WITH YOUR PEERS.  THE FAMILIES ARE

3    DENIED THE OPPORTUNITY TO EXPERIENCE AND GUIDE THEIR YOUNG

4    PERSON GROWING UP.

5        ONE FATHER TOLD ME ONE OF THE GREAT BENEFITS OF THE KID

6    TRANSITIONING IN HIGH SCHOOL WAS THEY GOT TO HAVE A MORE

7    INTIMATE RELATIONSHIP AS THAT KID BECAME WHO THEY WERE.

8    Q    MENTAL HEALTH CONSEQUENCES OF BEING STUCK IN THAT

9    PREPUBERTY POSITION FOR AN ADOLESCENT.

10   A    I CAN'T EVEN BEGIN TO SAY HOW HARMFUL THAT COULD BE.  I

11   MEAN THE TARGETING, THE BULLYING, THE OSTRACISM BY PEERS

12   BECAUSE YOU LOOK DIFFERENT OR BECAUSE NOW WE KNOW FOR SURE YOU

13   ARE TRAN AND SOCIETY SAYS YOU CAN'T BE A MAN OR YOUNG MAN OR

14   YOUNG WOMAN LIKE THE REST OF US YET.  IT'S REALLY STRESS ON

15   THESE YOUNG PEOPLE AND THEIR FAMILIES AND IT'S VERY DAMAGING

16   TO THEIR DEVELOPMENT AND PUTS THEM BEHIND.  IT DISADVANTAGES

17   THE YOUNG PEOPLE OF GEORGIA WHO ARE TRANSGENDER.

18   Q    OKAY.  AND CAN YOU JUST BRIEFLY DESCRIBE ANY EXPERIENCE

19   YOU HAVE OR EXPERTISE YOU HAVE WITH ETHICS FOR HEALTH CARE

20   PRACTITIONERS?

21   A    YES.  I DIDN'T TALK ABOUT MY INVOLVEMENT WITH THE GEORGIA

22   PSYCHOLOGICAL ASSOCIATION EARLIER.

23       I HAVE BELONGED TO GEORGIA PSYCHOLOGICAL ASSOCIATION

24   SINCE 1989 WHEN I MOVED TO GEORGIA AND OVER THE YEARS, HAVE

25   BEEN INVOLVED IN A NUMBER OF COMMITTEES AND I HAVE SERVED,

1  BEEN SELECTED TO SERVE ON THE ETHNICS COMMITTEE FOR SEVERAL

2  YEARS.  I THINK THAT WAS 2014 TO 2017.  I KNOW I HAD TO STEP

3  OFF OF IT IN 2017 BECAUSE I HAD BEEN NOMINATED AND ELECTED

4  PRESIDENT OF THE GEORGIA PSYCHOLOGICAL ASSOCIATION EFFECTIVE

5  JULY 1 OF 2017.

6  Q    WHAT IS YOUR EXPERT OPINION ON THE ETHICS OF THIS LAW

7  THAT WE ARE TALKING S.B. 140?

8  A    IT'S UNETHICAL.  IT'S WITHHOLDING TREATMENT THAT WE KNOW

9  IS BENEFICIAL.

10  Q    DO YOU AGREE WITH THE TESTIMONY THAT YOU HEARD YESTERDAY

11  ABOUT THE ETHICS INVOLVED IN RANDOMIZED CONTROLLED TRIALS FOR

12  TRANSGENDER ADOLESCENTS?

13  A    I AGREE WITH DR. MCNAMARA'S TESTIMONY.  I THINK IT'S ALSO

14  PRACTICALLY IMPOSSIBLE TO HAVE A RANDOMIZED CONTROLLED TRIAL

15  BECAUSE THE YOUNG PEOPLE WILL KNOW WHETHER OR NOT THEIR BODIES

16  ARE CHANGING.

17  Q    AND WHAT ABOUT THE ETHICS OF PUTTING A COHORT INTO A

18  GROUP WHO IS UNABLE TO ACCESS HORMONES?

19  A    IT'S NOT ETHICAL.  I MEAN THAT'S WHY WE RECOMMEND

20  PROCEEDING WITH CARE FOR THE YOUNG PEOPLE WHO HAVE BEEN

21  COMPREHENSIVELY ASSESSED AND FOUND TO BE NEEDING THIS CARE.

22  Q    AND I PROMISE NOT TO TALK ABOUT STUDIES IN ANY DETAIL

23  WHATSOEVER BUT I DO WANT TO GIVE YOU AN OPPORTUNITY TO RESPOND

24  TO THE ASSERTIONS OR ACCUSATIONS IN DR. CANTOR'S DECLARATIONS

25  CLAIMING THAT YOU MISREPRESENTED STUDIES IN YOUR DECLARATION.

1        DO YOU HAVE A RESPONSE TO THAT?

2   A    I WOULD NOT MISREPRESENT FINDINGS THAT WOULD BE UNETHICAL

3   AND I JUST CAN'T CONCEIVE OF DOING THAT.

4   Q    DO YOU AGREE THAT IT'S A MISREPRESENTATION OF A STUDY NOT

5   TO MENTION THAT THE AUTHOR RECOMMENDED ADDITIONAL RESEARCH

6   INTO THE SUBJECT?

7   A    I'M SORRY.  COULD YOU ASK THAT QUESTION AGAIN?

8   Q    DO YOU THINK THAT IT'S A MISREPRESENTATION NOT TO

9   DISCLOSE THAT THE AUTHOR OF THE STUDY RECOMMENDED ADDITIONAL

10  STUDY INTO THE TOPIC AREA?

11  A    THAT'S NOT MISREPRESENTATION.  I MEAN IN ALL LITERATURE

12  IN ANY HEALTH CARE FIELD, YOU ARE ALWAYS GOING TO SEE A CALL

13  FOR MORE RESEARCH.  I DON'T THINK I HAVE EVER WRITTEN A PAPER

14  THAT DOESN'T SAY WE NEED MORE RESEARCH.

15  Q    WHAT ABOUT NITPICKING ABOUT RESEARCH METHODOLOGY OR

16  MONDAY-NIGHT QUARTERBACKING, MONDAY QUARTERBACKING OF RESEARCH

17  METHODS?  HOW RELEVANT IS THAT IN ACADEMIA?

18  A    I THINK THAT ANYBODY WHO'S REVIEWING LITERATURE AND WANTS

19  TO EVALUATE STUDIES IS GOING TO TAKE A CLOSE LOOK AND WE WILL

20  ALWAYS BEEN CONTINUING TO ADVANCE SCIENCE AND APPROACHES TO

21  RESEARCH METHODOLOGY MEASURES AND USE, ET CETERA.

22  Q    LAST QUESTION.  AND THAT IS A RESPONSE TO OR A

23  CLARIFICATION OF SOME TESTIMONY YESTERDAY.

24       IT WAS ASSERTED THAT THE AMERICAN ACADEMY OF PEDIATRICS

25  HAS RECOGNIZED THE NEED FOR A SYSTEMIZED REVIEW -- I DON'T

1  WANT TO MISREPRESENT THE TESTIMONY -- BUT THERE WAS SOME

2  CONVERSATIONS IN THE TESTIMONY ABOUT THAT NEW GUIDELINE FROM

3  THE AMERICAN ACADEMY OF PEDIATRICS.

4      ARE YOU FAMILIAR WITH THAT RECENTLY-PUBLISHED GUIDELINE

5  FROM THE AMERICAN ACADEMY OF PEDIATRICS?

6  A    THEY -- MY UNDERSTANDING IS THEY VOTED TO REAFFIRM THEIR

7  ENDORSEMENT OF THE WPATH STANDARDS OF CARE AND THEY DID CALL

8  FOR A SYSTEMATIC REVIEW.  I THINK THAT THERE'S A LOT MORE

9  RESEARCH NOW.  EVEN IN THE LAST COUPLE OF YEARS, YEAR AND A

10 HALF SINCE THE GUIDELINES CAME OUT LAST YEAR, THERE WERE

11 STUDIES GETTING PUBLISHED EVEN AS THAT WAS IN PRESS.  AND SO,

12 BECAUSE THERE IS MORE RECOGNITION OF THE ISSUE AND PARENTS ARE

13 BRINGING THEIR KIDS IN FOR TREATMENT MORE, THERE NEEDS TO BE

14 AND THERE IS MORE RESEARCH.

15 Q    OKAY.  SO YOU ARE SUPPORTIVE OF A SYSTEMIZED REVIEW; IS

16 THAT RIGHT?

17 A    A SYSTEMATIC REVIEW.

18 Q    A SYSTEMATIC REVIEW.  THANK YOU.

19     DO YOU THINK WE SHOULD WITHHOLD TREATMENT, BASED ON THE

20 STANDARDS OF CARE, WHILE THESE SYSTEMATIC REVIEWS ARE

21 CONDUCTED?

22 A    NO AND NO.  THE WORLD  HEALTH ORGANIZATION HAS A HANDBOOK

23 ON DEVELOPMENT OF GUIDELINES IN WHICH THEY SAY THAT SOMETIMES

24 EVEN DEPENDING ON THE QUALITY OF EVIDENCE FOR CLINICAL CARE,

25 WE STILL NEED TO PROVIDE GUIDELINES.

1  Q    OKAY.  AND HERE IS THE LAST THING.  I JUST WANT TO MAKE

2  SURE THAT WE HAVEN'T MISREPRESENTED ANYTHING.  I THINK WE HAVE

3  THE GUIDELINES FROM THE AMERICAN ACADEMY OF PEDIATRICIAN READY

4  TO PULL UP ON THE SCREEN.  LET'S SEE WHAT THEY SAID ABOUT THE

5  STANDARDS OF CARE.

6       FIRST THEY REAFFIRMED THE GENDER-AFFIRMING CARE POLICY;

7  CORRECT?

8  A    YES.

9  Q    THEY DIDN'T HAVE TO REAFFIRM THE STANDARDS OF CARE OR

10 GENDER-AFFIRMING CARE.  THEY COULD HAVE CHANGED THEIR

11 POSITION; IS THAT RIGHT?

12 A    TRUE.

13 Q    THEY DID NOT; RIGHT?

14 A    THAT'S TRUE.

15 Q    CAN YOU JUST SCROLL DOWN PLEASE TO WHERE THE FIRST -- THE

16 SENTENCE THE DECISION TO AUTHORIZE SYSTEMATIC REVIEW.  WILL

17 YOU READ THAT FOR US.

18 A    THE DECISION TO AUTHORIZE A SYSTEMATIC REVIEW REFLECTS

19 THE BOARDS' CONCERNS ABOUT RESTRICTIONS TO HAVE ACCESS TO

20 HEALTH CARE WITH BANS ON GENDER-AFFIRMING CARE IN MORE THAN 20

21 STATES.

22 Q    SO THE SYSTEMATIC REVIEW THAT THEY HAVE AUTHORIZED IS NOT

23 A REFLECTION OF THEIR CONCERN ABOUT THE BODY OF EVIDENCE THAT

24 SUPPORTS STANDARDS OF CARE; CORRECT?

25 A    CORRECT.

1          MS. LITTRELL:  NOTHING FURTHER.

2          THE COURT:  THANK YOU, MS. LITTRELL.

3          MR. STRAWBRIDGE, HOW LONG DO YOU ANTICIPATE?

4          MR. STRAWBRIDGE:  IT COULD BE 30 OR 40 MINUTES.  IF

5   YOU WANT TO TAKE A FIVE-MINUTE BREAK BEFORE I START, THAT'S

6   FINE.

7          THE COURT:  WHY DON'T WE DO THAT.  LET'S TAKE A

8   QUICK BREAK FOR FIVE MINUTES AND WE'LL COME BACK.

9          (WHEREUPON, A RECESS WAS TAKEN.)

10          THE COURT:  READY FOR CROSS-EXAMINATION.

11          MR. STRAWBRIDGE:  YES, YOUR HONOR.

12                     **CROSS-EXAMINATION**

13   BY MR. STRAWBRIDGE:

14   Q    GOOD MORNING, DR. MASSEY.

15   A    HELLO.

16   Q    MY NAME IS PATRICK STRAWBRIDGE.  I REPRESENT THE

17   DEFENDANTS IN THIS CASE.  I WANT TO START WITH A FEW

18   HOUSEKEEPING MATTERS.  THIS IS YOUR FIRST TIME TESTIFYING AS

19   AN EXPERT IN ANY LITIGATION; IS THAT RIGHT?

20   A    IN LITIGATION OF THIS TYPE.

21   Q    OKAY.  YOU HAVE TESTIFIED BEFORE?

22   A    MANY YEARS AGO I USED TO DO SOME CONSULTATION ON FORENSIC

23   EVALUATIONS.

24   Q    OKAY.  IS THIS YOUR FIRST TIME TESTIFYING IN AN EXPERT

25   CAPACITY IN LITIGATION OR WERE YOU AN EXPERT IN FORENSICS?

1  A     I WAS AN EXPERT IN THOSE CASES AS WELL.

2  Q     FIRST TIME TESTIFYING AS AN EXPERT ON ISSUES OF GENDER

3  DYSPHORIA, FOR EXAMPLE?

4  A     YES, I HAVE BEEN ASKED TO TESTIFY IN OTHER CASES, BUT

5  HAVE DECLINED.

6  Q     OKAY.  YOU HAVE BEEN PAID FOR YOUR WORK IN THIS CASE;

7  RIGHT?

8  A     YES.

9  Q     $400 AN HOUR?

10  A     YES, THAT'S CORRECT, FOR MY TIME.

11  Q     AND WHEN WERE YOU FIRST RETAINED AS AN EXPERT IN THIS

12  CASE?

13  A     I THINK THE AGREEMENT WAS REACHED IN JUNE.

14  Q     DO YOU REMEMBER WHEN IN JUNE APPROXIMATELY?

15  A     SOMEWHERE LATE MID-JUNE.  I REMEMBER I WAS IN SWITZERLAND

16  WORKING ON THE TRAINING WHEN WE WERE ARRANGING, SO SOMETIME

17  AFTER JUNE 15TH.

18  Q     OKAY.  THAT'S GREAT.  AND HOW MUCH TIME DO YOU THINK YOU

19  HAVE SPENT SO FAIR PREPARING YOUR REPORT AND PREPARING FOR

20  YOUR TESTIMONY?

21  A     I DON'T KNOW.  SINCE THIS IS THE FIRST TIME PREPARING AS

22  AN EXPERT WITNESS, IT TOOK A LOT OF TIME.  I'M THINKING

23  PROBABLY 40 HOURS TOTAL.  I'M NOT SURE.

24  Q     OKAY.  AND HOW MUCH OF THAT WAS ON THE REPORT ITSELF?

25  A     THE REPORT I'M ESTIMATING AROUND 20.

1   Q    ABOUT HALF THE TIME ON THE REPORT AND HALF THE TIME IN

2   PREPARATION FOR YOUR TESTIMONY?

3   A    YES.  I'M NOT EXACTLY SURE.

4   Q    I DON'T NEED IT DOWN TO THE MINUTE.

5   A    OKAY.

6   Q    AND I ASSUME THAT YOU STAND BY THE OPINIONS EXPRESSED IN

7   YOUR REPORT?

8   A    YES, I DO.

9   Q    YOU DON'T HAVE ANY CORRECTIONS TO MAKE TO THAT REPORT?

10  A    NOT AT THIS TIME.

11  Q    I THINK YOU HAVE A COPY OF YOUR REPORT UP THERE, IF YOU

12  NEED TO REFER TO IT, BUT YOUR REPORT DOES LIST ALL THE WRITTEN

13  MATERIALS THAT YOU PERSONALLY RELIED UPON WHEN YOU PREPARED

14  YOUR REPORT; IS THAT CORRECT?

15  A    OH, NO.  THAT WOULD BE WAY TOO EXHAUSTIVE.

16  Q    CAN YOU LOOK EXHIBIT B OF THAT REPORT, PLEASE.

17  A    WHICH BINDER SHOULD I BE LOOKING AT?

18  Q    SHOULD BE A BINDER THAT HAS ALL THE EXPERT REPORTS.  I'M

19  NOT SURE WHICH ONE IS IT.

20  A    PLAINTIFF'S EXHIBIT.

21  Q    NOT THAT ONE.

22  A    JOINT BINDER OF EXPERT REPORTS.  YES.

23  Q    OKAY.  WHAT IS EXHIBIT B?

24  A    MY DECLARATION.

25  Q    WELL, I'M SORRY, I MEANT EXHIBIT B TO THE RIGHT.  THE

1   DECLARATION HAS A DECLARATION.  I THINK EXHIBIT A IS YOUR CV

2   AND EXHIBIT B IS A LIST OF THE MATERIALS.

3   A    YES.

4   Q    IS THIS NOT A LIST OF MATERIALS THAT YOU RELIED UPON IN

5   PREPARING YOUR REPORT?

6   A    THESE ARE THE ONES THAT I CITED, A NUMBER OF THEM.

7   Q    I UNDERSTAND THAT YOU DIDN'T LIST EVERY REPORT YOU HAVE

8   EVER READ IN YOUR LIFE THAT CONFORMS TO WPATH STANDARDS;

9   CORRECT?

10  A    CORRECT.

11  Q    THAT'S WHAT YOU MEANT WHEN YOU SAID IT DOESN'T CONTAIN

12  EVERYTHING?

13  A    CORRECT.

14  Q    YOU ARE FAMILIAR WITH A PERSON NAMED AARON JENSEN, ARE

15  YOU NOT?

16  A    YES.

17  Q    DR. JENSEN IS A PSYCHIATRIST WHO PRACTICES IN THE SAME

18  AREA THAT YOU DO?

19  A    YES, HE DOES.

20  Q    AND, INDEED, YOU CO-PRESENTED ON ONE CONFERENCE WITH

21  DR. JENSEN, HAVEN'T YOU?

22  A    YES.

23  Q    I'M GOING TO HAND YOU AN EXHIBIT.  I HAVE COPIES FOR THE

24  COURT.

25          MR. STRAWBRIDGE:  MAY I APPROACH, YOUR HONOR?

1           THE COURT:  SURE.

2    BY MR. STRAWBRIDGE:

3    Q    DO YOU RECOGNIZE THIS DOCUMENT?

4    A    I BELIEVE SO.

5    Q    THIS IS AS FILING OF A LAWSUIT IN THE WESTERN DISTRICT OF

6    KENTUCKY; IS THAT CORRECT?

7    A    YES.

8    Q    DOE V. THORNBURY?

9    A    YES.  THAT'S WHAT IT SAYS.

10   Q    AND IT APPEARS TO BE THE DECLARATIONS THAT DR. JENSEN

11   SUBMITTED THIS THAT CASE; IS THAT CORRECT?

12   A    YES.

13   Q    AND YOU HAVE GOT YOUR COPY OF YOUR REPORT WITH YOU, TOO;

14   RIGHT?

15   A    YES.

16   Q    I WANT TO MAKE SURE YOU ARE ABLE TO REFER TO IT.

17        LET'S START WITH THE DATE OF DR. JENSEN'S DECLARATIONS.

18   IF YOU WILL LOOK ACROSS THE TOP MARGIN, DO YOU SEE IT WAS

19   FILED ON MAY 22ND, 2023?

20   A    THAT PART WAS CUT OFF.  YES.

21   Q    THAT WOULD BE ABOUT A MONTH BEFORE YOUR DECLARATION IN

22   THIS CASE WAS FILED?

23   A    THAT'S CORRECT.

24   Q    AND, I BELIEVE THAT WOULD BE BEFORE YOU WERE RETAINED IN

25   THIS MATTER; CORRECT?

1  A    CORRECT.

2  Q    CAN YOU TURN TO PARAGRAPH 8 OF DR. JENSEN'S REPORT.

3       HAVE YOU GOT PARAGRAPH 8 NOW?

4  A    YES.

5  Q    I WANT TO LOOK AT PARAGRAPH 8 OF YOUR REPORT.

6  A    YES.

7  Q    TAKE A MOMENT AND WOULD YOU AGREE WITH ME THAT

8  PARAGRAPH 8 OF BOTH OF THESE REPORTS IS WORD FOR WORD

9  IDENTICAL?

10 A    I BELIEVE SO.

11 Q    PLEASE TURN TO PARAGRAPH 11 OF DR. JENSEN'S REPORT.  I'D

12 LIKE FOR YOU TO REVIEW PARAGRAPH 11 IN HIS REPORT AND

13 PARAGRAPH 11 OF YOUR REPORT.  LET ME KNOW WHEN YOU HAVE DONE

14 THAT.

15 A    YES.

16 Q    DO YOU AGREE THAT THESE PARAGRAPHS ARE VIRTUALLY

17 IDENTICAL?

18 A    THERE IS A LOT OF THE SIMILARITY, YES.

19 Q    WELL, THE ONLY DIFFERENCE, CORRECT ME IF I'M WRONG, IS

20 THAT WHERE DR. JENSEN'S REPORTS USES THE NUMERAL 1000 YOUR

21 REPORT WRITES IT OUT?

22      THAT'S ONE DIFFERENCE; CORRECT?

23 A    ACTUALLY HE SAID HE'S TAUGHT A NUMBER OF COURSES DURING

24 THE WPATH GLOBAL EDUCATION INITIATIVE -- THAT WAS THE NAME

25 BEFORE IT BECAME THE GLOBAL EDUCATION INSTITUTE -- WHEREAS I

1  REFERENCE THE GLOBAL EDUCATION INSTITUTE AND I INDICATE THAT

2  I'M ALSO A MASTER MENTOR FOR THE GLOBAL EDUCATION INSTITUTE,

3  THE CERTIFICATION PROGRAM.

4  Q    YES, I AGREE THERE IS AN ADJUSTMENT TO YOUR EXPERIENCE

5  WITH THE GLOBAL -- WITH WPATH GLOBAL EDUCATION INSTITUTE, BUT

6  THE LAST CLAUSE OF THAT SENTENCE IS WORD FOR WORD IDENTICAL,

7  IS IT NOT?

8  A    YES.

9  Q    PARAGRAPHS READ IN THE BACKGROUND AND QUALIFICATION

10 SECTION OF THESE REPORTS.  THAT APPEARS TO BE CORRECT?  FEEL

11 FREE TO CHECK.

12 A    YES.

13 Q    THE NEXT SECTION OF EACH OF THESE REPORTS IS ENTITLED

14 BASIS FOR OPINIONS; IS THAT CORRECT?

15 A    YES.

16 Q    TAKE A MOMENT.  ARE THESE PARAGRAPHS WORD FOR WORD

17 IDENTICAL?

18         THE COURT:  SORRY, MR. STRAWBRIDGE.  WHICH

19 PARAGRAPH?

20         MR. STRAWBRIDGE:  PARAGRAPH 15 IN THE JANSEN

21 AFFIDAVIT.  PARAGRAPH 16 IN DR. MASSEY'S REPORT.

22 BY MR. STRAWBRIDGE:

23 Q    LET ME ADJUST MY QUESTION.  IS THE FIRST SENTENCE OF

24 THESE TWO PARAGRAPHS IDENTICAL WORD FOR WORD?

25 A    IT LOOKS LIKE IT.

1  Q    THE NEXT SECTION OF BOTH YOUR AND DR. JENSEN'S REPORTS

2  ARE ENTITLED DISCUSSION; CORRECT?

3  A    YES.

4  Q    AND BEFORE WE MOVE ON, IS IT FAIR TO SAY THAT THIS IS

5  REALLY THE MEAT OF YOUR REPORT YOUR OPINIONS, THE DISCUSSION

6  SECTION?

7  A    YES.

8  Q    DO YOU AGREE WITH ME THE FIRST SUBHEADING OF DR. JENSEN'S

9  REPORT AND OF YOUR REPORT ARE WORD FOR WORD IDENTICAL?

10  A    YES.

11  Q    GENDER IDENTITY DEVELOPMENT AND GENDER DYSPHORIA IN

12  CHILDREN OF ADOLESCENTS?

13  A    YES.

14  Q    LOOK AT PARAGRAPH 16 OF DR. JENSEN'S REPORT AND

15  PARAGRAPH 17 OF YOUR REPORT AND IDENTIFY FOR ME, SIR, THE

16  DIFFERENCES IN THOSE TWO PARAGRAPHS.

17  A    I USED THE TERM SEX ASSIGNED AT BIRTH WHERE HE USED THE

18  TERM NATAL.

19  Q    OTHER THAN THAT, THEY ARE IDENTICAL?

20  A    IT APPEARS SO.

21  Q    IS PARAGRAPH -- I'M SORRY.  IS PARAGRAPH 17 -- I'M SORRY,

22  IS PARAGRAPH 18 AND 19 IN YOUR REPORT WORD FOR WORD IDENTICAL

23  TO PARAGRAPHS 17 AND 18 OF DR. JENSEN'S REPORT?

24  A    YOU'RE SAYING HIS 18 AND MY 18?

25  Q    HIS 17 AND 18 AND YOUR 18 AND 19?

1   A    YES.

2   Q    TURNING TO THE NEXT PARAGRAPH, WHICH WOULD BE

3   PARAGRAPH -- I'M  TRYING TO MAKE SURE I KEEP THIS CLEAR.

4   PARAGRAPH 20 IN YOUR REPORT AND DR. JENSEN'S PARAGRAPH 19, DO

5   YOU AGREE THESE PARAGRAPHS ARE IDENTICAL?

6   A    WHICH ONES?  I'M SORRY.  20?

7   Q    20 IN YOURS; 19 IN JENSEN'S?

8   A    YEAH.  I ADDED SOME CITATIONS.

9   Q    YOU ADDED A CITATION AT THE END; CORRECT?

10      DR. JENSEN'S PARAGRAPH 20 COMPARED TO YOUR PARAGRAPH 21,

11  WHAT DIFFERENCE, IF ANY, EXIST BETWEEN THOSE TWO PARAGRAPHS?

12  A    I THINK THEY'RE THE SAME.

13  Q    YOUR PARAGRAPH 22 AND 23, COMPARE THOSE TO DR. JENSEN'S

14  PARAGRAPH 21 AND 22.  TELL ME IF THERE ARE ANY DIFFERENCES.

15  A    YES.

16  Q    THEY'RE THE SAME?

17  A    YES.

18  Q    WORD FOR WORD?

19  A    I BELIEVE SO.

20  Q    THE NEXT SUBHEADING IN YOUR REPORT IS STANDARD OF CARE

21  FOR TREATMENT OF GENDER DYSPHORIA IN YOUTH; IS THAT CORRECT?

22  A    HOLD ON A SECOND.  YES, THERE WAS A SLIGHT EDIT CHANGE ON

23  MINE.  RIGHT.

24  Q    ON WHICH PARAGRAPH?

25  A    23 WHERE I INSTEAD OF USING THE PRONOUNCE USED THE GENDER

1  DYSPHORIA.

2  Q    YOU SUBSTITUTED THE WORD ITSELF WITH GENDER DYSPHORIA?

3  A    NO, HE USED IT.

4  Q    YOU SUBSTITUTED THE WORD GENDER DYSPHORIA FOR ITSELF?

5  A    YES.

6  Q    THAT'S THE ONLY DIFFERENCE?

7  A    I BELIEVE SO.

8  Q    MOVING TO THE SUBHEADING STANDARDS OF CARE FOR THE

9  TREATMENT OF GENDER DYSPHORIA IN YOUTH.

10  A    YELL.

11  Q    THAT'S IDENTICAL IN BOTH REPORTS; RIGHT?

12  A    YES.

13  Q    I'D LIKE YOU -- I'M GOING TO TRY TO SAVE A LITTLE BIT OF

14  TIME HERE.  AS YOU GO THROUGH THE SECTION AND YOU LOOK AT

15  DR. JENSEN'S REPORT, THIS SUBSECTION, PLEASE LET ME KNOW WHERE

16  YOU SEE ANY DIFFERENCES IN THE WORDS IN THE FOLLOWING

17  PARAGRAPHS.

18  A    IT WOULD TAKE ME SOME TIME.  I DON'T KNOW IF YOU REALLY

19  WANT ME TO GO THROUGH AND TRY TO FIND IT.

20  Q    LET'S START WITH PARAGRAPH 24 IN YOUR REPORT VERSUS 23 IN

21  DR. JENSEN'S REPORT.  DO YOU AGREE THESE ARE IDENTICAL?

22  A    YES.

23  Q    DO YOU AGREE WITH ME THAT YOUR PARAGRAPH 25 IS IDENTICAL

24  TO DR. JENSEN'S PARAGRAPH 24 WITH THE EXCEPTION THAT THE WORD

25  OFTEN IS CHANGED TO TYPICALLY?

1  A    YES.

2  Q    DO YOU AGREE WITH ME THAT PARAGRAPH 26 IN YOUR REPORT IS

3  IDENTICAL TO DR. JENSEN'S PARAGRAPH 25 EXCEPT FOR THE

4  INSERTION OF THE THREE WORDS AND GENDER DIVERSE IN THE SECOND

5  TO LAST SENTENCE?

6  A    YES.

7  Q    DO YOU AGREE WITH ME THAT PARAGRAPH 27 IN YOUR REPORT IS

8  WORD FOR WORD IDENTICAL WITH DR. JENSEN'S PARAGRAPH 26 WITH

9  THE EXCEPTION OF THE ADDITIONAL OF WORDS BEGINNING OF AND THE

10 CLAUSE IN SOME CASES IRREVERSIBLE?

11 A    YES.

12 Q    WHEN WE GET TO YOUR PARAGRAPH 28 VERSUS DR. JENSEN'S

13 PARAGRAPH 27, THERE ARE A FEW DIFFERENCES HERE THAT I CAN SEE.

14 PLEASE CORRECT ME IF I'M WRONG.

15     GENDER AFFIRMING IN DR. JENSEN'S DECLARATION IS REPLACED

16 WITH -- JUST DELETED, SO JUST HORMONE THERAPY AT THE START OF

17 YOURS; CORRECT?

18 A    YES.

19 Q    AFTER THE WORD MEDICATION AT THE END OF THAT SENTENCE,

20 YOU WRITE BECAUSE HORMONE THERAPY IS NECESSARY TO INDUCE, AND

21 THAT'S A SLIGHTLY DIFFERENT WORDING THAN DR. JENSEN HAD;

22 CORRECT?

23 A    YES.

24 Q    BUT THE REST OF THAT SENTENCE IS THE SAME UNTIL THE VERY

25 END WHERE YOU HAVE USED THE WORD TRANSGENDER.  I TAKE THAT

1   BACK.  THAT'S NOT A DIFFERENCE.

2   A     YEAH.

3   Q     THE LAST SENTENCE IS THE SAME.

4   A     CORRECT.

5   Q     THAT SAME EFFECTIVE TREATMENT FOR GENDER DYSPHORIA.  DO

6   YOU SEE THAT?

7   A     YES.

8   Q     IT'S IDENTICAL IN BOTH REPORTS?

9   A     UM-HMM.

10  Q     DO YOU AGREE WITH ME THAT YOUR PARAGRAPH 30 IS IDENTICAL

11  WORD FOR WORD TO PARAGRAPH 29 FROM DR. JENSEN'S DECLARATION?

12  A     YES.

13  Q     DO YOU AGREE WITH ME THAT PARAGRAPH 31 IN YOUR REPORT IS

14  WORD FOR WORD IDENTICAL TO PARAGRAPH 30 IN DR. JENSEN'S

15  REPORT?

16  A     YES.

17  Q     DO YOU AGREE THAT PARAGRAPH 33 THE BODY TEXT IN YOUR

18  REPORT IS IDENTICAL TO DR. JENSEN'S PARAGRAPH 32?

19  A     YES.

20  Q     AND DO YOU AGREE WITH ME THE FOOTNOTE IN THOSE RESPECTIVE

21  PARAGRAPHS IS IDENTICAL EXCEPT FOR THE FACT THAT YOU DELETED A

22  CITATION THAT DR. JENSEN HAD INCLUDED IN THAT FOOTNOTE?  I

23  TAKE THAT BACK.  THERE IS NO CITATION, IS THERE?

24  A     YES.

25  Q     THE FOOTNOTES ARE IDENTICAL?

1  A     YES.

2  Q     YOUR PARAGRAPH -- OH, WAIT, PARAGRAPH 34 AND IN

3  DR. JENSEN'S PARAGRAPH 33, ALSO WORD FOR WORD IDENTICAL?

4  A     YES.

5  Q     PARAGRAPH 35 IN YOUR REPORT IS A PARAGRAPH THAT DOES NOT

6  APPEAR IN DR. JENSEN'S REPORT; CORRECT?

7  A     THAT'S CORRECT.

8  Q     THE NEXT SUBHEADING IN DR. JENSEN'S REPORT IS THE ROLE OF

9  MENTAL HEALTH PROVIDERS IN ACCESSING THE NECESSITY OF MEDICAL

10 TREATMENT FOR GENDER DYSPHORIA; CORRECT?

11 A     YES.

12 Q     YOUR SUBHEADING ADDS THREE WORDS AT THE END, IN YOUNG

13 PEOPLE.  THAT IS OTHERWISE IDENTICAL; CORRECT?

14 A     YES.

15 Q     DO YOU AGREE WITH ME THAT THE FOLLOWING PARAGRAPH 36 IN

16 YOUR REPORT IS IDENTICAL TO DR. JENSEN'S PARAGRAPH 34?

17 A     YES.

18 Q     YOUR PARAGRAPH 37 IS WORD FOR WORD IDENTICAL TO

19 DR. JENSEN'S PARAGRAPH 35?

20 A     YES.

21 Q     YOUR PARAGRAPH 38 IS IDENTICAL TO DR. JENSEN'S

22 PARAGRAPH 36 EXCEPT THAT IN THE SECOND SENTENCE, YOU SAY AND

23 AT THE VERY END WHEREAS DR. JENSEN SAID OR PUBERTY BLOCKERS

24 AND HORMONE THERAPY.

25 A     YES.

1   Q    YOUR PARAGRAPH 39 IS IDENTICAL TO DR. JENSEN'S

2   PARAGRAPH 37 WITH THE EXCEPTION OF THE LAST THREE WORDS;

3   CORRECT?

4   A    YES.

5   Q    AND THAT'S WHERE YOU WROTE YEARS OF CLINICAL INFORMATION

6   COMPARED TO DR. JENSEN'S YEARS OF INFORMATION?

7   A    YES.

8   Q    PARAGRAPH 40 IS IDENTICAL TO DR. JENSEN'S 38?

9   A    YES.

10          THE COURT:  COUNSEL, MAY I SEE YOU AT SIDE-BAR.

11          MR. STRAWBRIDGE:  SURE.

12          THE COURT:  I WILL LET YOU MAKE YOUR RECORD AND

13   CONTINUE IN THIS VEIN IF YOU WOULD LIKE TO BUT CONSIDER

14   WHETHER YOU HAVE MADE YOUR POINT.

15          MR. STRAWBRIDGE:  I WILL PROBABLY TRUNCATE THIS

16   ALONG.

17          THE COURT:  ALL RIGHT.

18   BY MR. STRAWBRIDGE:

19   Q    I APOLOGIZE.  WAS THERE'S A QUESTION PENDING.

20       DR. JENSEN -- I'M SORRY, DR. MASSEY.  I WANT YOU TO READ

21   YOUR REPORT AND DR. JENSEN'S REPORT UP UNTIL YOUR PARAGRAPH 44

22   AND TELL ME IF YOU SEE ANY SUBSTANTIVE DIFFERENCES BETWEEN

23   WHAT YOU WROTE AND DR. JENSEN WROTE.

24   A    UP TO WHICH PARAGRAPH?

25   Q    UP TO PARAGRAPH 42.

1   A    OKAY.

2   Q    DO YOU SEE ANY SUBSTANTIVE DIFFERENCES?

3   A    I DO NOT.

4   Q    BRIEFLY, THE NEXT SUBHEADING IN BOTH OF YOUR REPORT AND

5   DR. JENSEN'S REPORT IS IDENTICAL.  DO YOU AGREE WITH THAT?

6   A    YES.

7   Q    INCLUDING THE AMPERSAND USED IN THE MIDDLE OF THAT

8   HEADING.

9   A    YES.

10  Q    THE NEXT PARAGRAPH 46 IS IDENTICAL TO DR. JENSEN'S 43?

11  A    YES.

12  Q    CAN YOU JUST GO THROUGH THE REMAINING PARAGRAPHS OF THE

13  REPORT.  LET ME KNOW IF YOU IDENTIFY ANY SUBSTANTIVE

14  DIFFERENCES BETWEEN YOUR REPORT AND DR. JENSEN'S REPORT.

15  A    YES.

16  Q    THEY ARE VIRTUALLY IDENTICAL?

17  A    YES.

18  Q    ONE MORE QUESTION ALONG THIS LINE.  CAN YOU RETURN TO B

19  OF DR. JENSEN'S REPORT AND COMPARE IT TO B OF YOUR REPORT.

20  A    YES.

21  Q    WOULD YOU AGREE WITH ME THAT THE ONLY DIFFERENCE IN THE

22  APPENDIXES REFERENCING THE MATERIAL CITED RELIED UPON IN THESE

23  REPORTS IS THAT YOU ADDED CITATION THE OLSON PAPER INTO THE

24  ROSENTHAL PAPER.

25          MS. LITTRELL:  YOUR HONOR, I WANT TO OBJECT BRIEFLY

1  TO THE CHARACTERIZATION.  THERE MAY BE A CITATION THAT IS

2  ADDITIONAL, BUT I OBJECT TO THE CHARACTERIZATION THAT HE ADDED

3  A CITATION.

4          MR. STRAWBRIDGE:  I'M HAPPY TO REPHRASE THE

5  QUESTION.

6          THE COURT:  OKAY.

7  BY MR. STRAWBRIDGE:

8  Q    DOES THE EXHIBIT -- THE ONLY DIFFERENCE BETWEEN YOUR

9  EXHIBIT B AND DR. JENSEN'S EXHIBIT B IS THAT IT CONTAINS TWO

10  ADDITIONAL CITATIONS, ONE TO OLSON AND ONE TO ROSENTHAL.

11  A    THAT IS CORRECT.

12  Q    LOOKING AT YOUR APPENDIX B, DR. JENSEN'S DECLARATION

13  FILED A MONTH BEFORE YOURS, IS NOT LISTED IN HERE; CORRECT?

14  A    THAT'S CORRECT.

15  Q    IT'S NOT LISTED ANYWHERE ELSE IN YOUR REPORT, IS IT?

16  A    THAT'S CORRECT.

17          MR. STRAWBRIDGE:  YOUR HONOR, I REQUEST A BRIEF

18  SIDE-BAR.

19          **(THE FOLLOWING DISCUSSION WAS HELD AT THE BENCH**

20  **BETWEEN THE COURT AND COUNSEL.)**

21          MR. STRAWBRIDGE:  IT'S A BIT OF AN UNPRECEDENTED

22  SITUATION AT LEAST TO MY EXPERIENCE.  IT'S A BIT OF AN

23  UNPRECEDENTED SITUATION IN MY EXPERIENCE BUT I DO THINK IT'S

24  APPROPRIATE TO MOVE TO STRIKE THE REPORT, GIVING THE

25  PLAGIARISM AND THE FAILURE TO DISCLOSE THE INFORMATION.  I

1  THINK IT GOES TO CREDIBILITY AND RELIABILITY.  I'M PREPARED TO

2  PROCEED WITH EXAMINATION BUT I JUST WANT -- I THINK THAT IT

3  WOULD BE APPROPRIATE -- OR IF COUNSEL WOULD LIKE SOME TIME TO

4  DECIDE WHETHER THEY WOULD LIKE TO WITHDRAW, THAT'S

5  APPROPRIATE, TOO.

6          THE COURT:  I UNDERSTAND WHY YOU ARE SO MOVING.  IT

7  IS TROUBLING.  WHAT I'M GOING TO WANT TO HEAR FROM COUNSEL FOR

8  THE PLAINTIFFS IS WHETHER -- WELL, WHETHER YOU WANT TO CONSENT

9  TO STRIKE THIS OR WHETHER THIS IS SOMETHING THAT I SHOULD

10 EXAMINE AS TO THE WEIGHT AND CREDIBILITY OF THE TESTIMONY.

11         MR. BRADSHAW:  WE ABSOLUTELY THINK THAT IT SHOULD

12 COME IN.  WE DO NOT AGREE THAT IT SHOULD BE STRICKEN.  YOUR

13 HONOR IS FREE TO CONSIDER THE WEIGHT OF THE REPORT.

14         DR. MASSEY HAS TESTIFIED THAT HE BELIEVES AND STANDS

15 BY ALL OF OPINIONS THAT ARE REFLECTED IN THE REPORT.  I DON'T

16 THINK IT'S AN UNPRECEDENTED SITUATION IN ANY WAY, SHAPE OR

17 FORM.

18         SO OUR POSITION IS THAT WE WOULD OBJECT TO ANY

19 MOTION TO STRIKE THE REPORT.  OF COURSE, YOUR HONOR HAS

20 DISCRETION TO CONSIDER THE WEIGHT YOU THINK IS APPROPRIATE --

21         THE COURT:  OKAY.

22         MR. BRADSHAW:  -- BASED ON THE TESTIMONY OF

23 DR. MASSEY.

24         THE COURT:  I'M GOING TO DENY THE MOTION TO STRIKE

25 BUT YOU CAN CONTINUE TO EXAMINE THE WITNESS AND I WILL

1  CONSIDER THE WEIGHT OF -- I MEAN YOU HAVE ELICITED THE FACT

2  THAT THIS IS ESSENTIALLY WORD FOR WORD REPRODUCTION OF

3  SOMEBODY ELSE'S WORK.

4          MR. STRAWBRIDGE:  THANK YOU.

5          THE COURT:  I WILL CONSIDER THAT IN ASSESSING THE

6  TESTIMONY.

7          MR. STRAWBRIDGE:  UNDERSTOOD.

8  BY MR. STRAWBRIDGE:

9  Q    DR. MASSEY, I WANT TO TALK TO YOU BRIEFLY ABOUT YOUR

10 CLINICAL EXPERIENCE.  YOU'VE BEEN SEEING CHILDREN WHO IDENTIFY

11 AS TRANSGENDER FOR MORE THAN TEN YEARS; IS THAT CORRECT?

12 A    YES.

13 Q    AND SINCE ROUGHLY 2013, YOU'VE SEEN MORE THAN 600

14 CHILDREN OR ADOLESCENTS WITH GENDER DYSPHORIA?

15 A    THAT'S MY ESTIMATE.

16 Q    I THINK IT SAYS IT IN YOUR REPORT AND YOU TESTIFIED TODAY

17 THAT THESE CASES MAKE UP ABOUT 70 PERCENT OF YOUR PRACTICE?

18 A    CORRECT.

19 Q    AND I THOUGHT I HEARD YOU SAY THAT YOU HAD SHIFTED YOUR

20 PRACTICE SO THAT YOU WERE FOCUSING MORE ON ADOLESCENTS WHO

21 WERE COMING YOU TO; CORRECT?

22 A    THAT'S CORRECT.

23 Q    WHAT PERCENT OF YOUR CURRENT CASES INVOLVE PATIENTS WHO

24 FIRST PRESENTED AS ADOLESCENTS?

25 A    APPROXIMATELY 70 PERCENT.

1  Q    YOU ARE AWARE THAT THE NUMBER OF CHILDREN REFERRED FOR

2  TREATMENT FOR GENDER DYSPHORIA HAS INCREASED SUBSTANTIALLY IN

3  RECENT YEARS?

4  A    YES.

5  Q    AND YOU ARE AWARE THAT THE MAJORITY OF CURRENT REFERRALS

6  ARE FOR NATAL FEMALES WHO NOW IDENTIFY AS MALES?

7  A    THAT HAS BEEN OBSERVED.

8  Q    IS THAT YOUR EXPERIENCE IN YOUR PRACTICE?

9  A    IT SEEMED LIKE IT FOR A WHILE, BUT AS OF LATE THAT SEEMS

10 MORE EQUAL.

11 Q    DO YOU HAVE AN ASSESSMENT AS TO HOW MANY OF THE 600

12 CHILDREN OR ADOLESCENTS YOU HAVE TREATED FALL IN THOSE TWO

13 CATEGORIES?

14 A    I WOULD ESTIMATE 60 PERCENT ASSIGNED FEMALE AT BIRTH AND

15 ABOUT 40 PERCENT ASSIGNED MALE AT BIRTH.

16 Q    YOU DON'T DISAGREE THAT A PATTERN OF UNEVEN RATIOS

17 ASSIGNED SEX HAS BEEN REPORTED IN GENDER CLINICS WITH ASSIGNED

18 FEMALE AT BIRTH PATIENTS 2 AND A HALF TO 7.1 TIMES MORE

19 FREQUENTLY THAN PATIENTS WHO ARE ASSIGNED MALE AT BIRTH;

20 RIGHT?

21 A    THAT'S THE TREND WE ARE SEEING, YES.

22 Q    THAT COMES STRAIGHT FROM THE WPATH STANDARDS OF CARE;

23 CORRECT?

24 A    SAY THAT AGAIN, PLEASE.

25 Q    WHAT I READ COMES STRAIGHT THE WPATH STANDARDS OF CARE;

1   CORRECT?

2   A     UM-HMM.  COULD YOU SAY THAT AGAIN, PLEASE.

3   Q     THAT A PATTERN OF UNEVEN RATIOS BY ASSIGNED SEX HAS BEEN

4   RECORDED IN GENDER CLINICS WITH ASSIGNED FEMALE AT BIRTH

5   PATIENT CARE 2.5 TO 7.1 TIMES MORE FREQUENTLY?

6   A     THAT SOUNDS LIKE IT IS FROM THE STANDARDS OF CARE.

7   Q     AS A PRACTICING PSYCHOLOGIST SPECIALIZING IN YOUTH

8   TREATMENT, ARE YOU FAMILIAR WITH THE CDC'S YOUTH RISK BEHAVIOR

9   SURVEY?

10  A     YES.

11  Q     AND ARE YOU AWARE THAT THE CDC'S MOST RECENT REPORT IN

12  2021 DETERMINED THAT TEENAGED GIRLS SUFFERED

13  DISPROPORTIONATELY FROM POOR MENTAL HEALTH?

14  A     YES.

15  Q     IN 2021 THAT REPORT INDICATED THAT 50 PERCENT OF FEMALES,

16  TEENAGERS, REPORTED PERSISTENT FEELINGS OF SADNESS AND

17  HOPELESSLY COMPARED TO 29 PERCENT OF MALE TEENAGERS?

18  A     YES.

19  Q     THAT THAT DISPARITY INCREASED OVER THE LAST TEN YEARS?

20  A     YES.

21  Q     DR. MASSEY, I WANT TO ASK YOU SOME QUESTIONS ABOUT THE

22  NATURE OF GENDER IDENTITY.

23        CAN YOU DEFINE FOR ME WHAT AGE GENDER MEANS.

24  A     AGE GENDER REFERS TO SOMEBODY WHO DOES NOT RELATE TO

25  EITHER A MASCULINE OR A FEMININE GENDER IDENTITY.

1  Q    IT'S ITS OWN INDEPENDENT GENDER IDENTITY?

2  A    THAT'S HOW SOME PEOPLE WOULD EXPERIENCE IT, YES.

3  Q    WHAT DOES THE TERM GENDER FLUID MEAN?

4  A    SOME PEOPLE EXPERIENCE, AS THE WORD FLUID SUGGESTS, SOME

5  VARIATION IN HOW MUCH MASCULINITY THEY ARE FEELING OR HOW MUCH

6  FEMININITY THEY ARE FEELING IN TERMS OF THEIR GENDER IDENTITY.

7  Q    IS THAT DISTINCT GENDER IDENTITY?

8  A    IT CAN BE, YES.

9  Q    WHAT DOES THE TERM THIRD GENDER MEAN?

10 A    THIRD GENDER IS A TERM THAT SOME PEOPLE IDENTIFY WITH

11 THAT INDICATES THEY DON'T IDENTIFY WITH THE TRADITIONAL BINARY

12 MALE OR FEMALE OR MASCULINE OR FEMININE GENDER IDENTITY.

13 Q    IS THAT ITSELF AN INDEPENDENT GENDER IDENTITY?

14 A    IT'S NOT LISTED ANYWHERE.  LIKE I KNOW THAT I HAVE SEEN

15 IT IN THE DSM, BUT I THINK THAT IT'S -- SOME PEOPLE EXPERIENCE

16 THAT.

17 Q    IS IT LISTED IN WPATH STANDARDS OF CARE?

18 A    I BELIEVE IT IS PROBABLY.

19 Q    WHAT DOES THE TERM BEING A QUEER MEAN?

20 A    THERE ARE SOME PEOPLE WHO DON'T RELATE TO THE TRADITIONAL

21 TWO GENDERS OF MAN OR WOMAN, BOY OR GIRL, AND THEY MAY WANT TO

22 EXPERIMENT WITH OR REJECT THOSE CATEGORIES.  THEY MAY DO THAT

23 FOR A VARIETY OF REASONS WHERE THEY FEEL THEY ARE OUTSIDE THE

24 TRADITIONAL EXPECTATIONS FOR PEOPLE WHO ARE IDENTIFIED AS A

25 MAN OR A WOMAN.

1  Q    AND MY LAST QUESTION ALONG THOSE LINE, WHAT DOES THE TERM

2  ANY GENDER MEAN?

3  A    I THINK THAT HAS TO DO WITH WHEN FOLKS FEEL SOMEWHAT OF A

4  GENDER IDENTITY BUT NOT FULLY RELATE TO IT.  YOU KNOW, IF I

5  WAS WORKING WITH A YOUNG PERSON, I WOULD WANT TO ASK THEM WHAT

6  DOES THAT MEAN FOR YOU.

7  Q    DO YOU -- DO ALL OF THESE TERMS RELATE IN SOME WAY OR

8  ANOTHER TO AN INTRINSIC CONCEPT OF GENDER IDENTITY THAT A

9  PERSON MIGHT HAVE?

10  A    THOSE ARE UNUSUAL, LESS COMMON-PRESENTING EXPERIENCES

11  THAT SOME PEOPLE HAVE AROUND THEIR GENDER IDENTITY.

12  Q    BUT THEY ARE CONCEPTS OF GENDER IDENTITY THAT SOME PEOPLE

13  HAVE?

14  A    YES.

15  Q    DO YOU AGREE THAT A PERSON MAY CONSIDER A RANGE OF

16  IDENTITIES IN THE ELEMENTS OF GENDER PRESENTATION WHILE THEY

17  ARE EXPLORING THEIR GENDER IDENTITY?

18  A    YES.  THAT'S PART OF WHAT WE DO IN THE STANDARDS OF CARE

19  RECOMMENDATIONS AND IN MY ASSESSMENT WITH THEM.

20  Q    AND DO YOU DEGREE THAT A PERSON MAY SPEND SOME TIME IN A

21  GENDER IDENTITY OR PRESENTATION BEFORE THEY DISCOVER IT DOES

22  NOT FEEL COMFORTABLE AND LATER ADAPT OR SHIFT TO ANOTHER

23  EARLIER IDENTITY OR PRESENTATION?

24  A    YES, I HAVE WORKED WITH THOSE FOLKS.

25  Q    IN YOUR OWN PERSONAL CLINICAL EXPERIENCE, ARE CHILDREN

1   MORE OR LESS LIKELY TO EXPLORE NEW IDENTITIES THAN ADULTS?

2   A    TYPICALLY CHILDREN ARE AND I WOULD SAY IT VARIES BASED ON

3   THE AGE.  ARE YOU TALKING ABOUT IDENTITIES IN GENERAL OR

4   GENERALLY?

5   Q    BOTH.

6   A    YES.

7   Q    IDENTITIES IN GENERAL OBVIOUSLY WOULD INCLUDE GENDER

8   IDENTITY?

9   A    UM-HMM.

10  Q    THAT'S NOT THE QUESTION.  IS IDENTITIES IN GENERAL?

11  A    IDENTITIES IN GENERAL, YES.

12  Q    AND DO YOU THINK IT'S A DIFFERENT ANSWER FOR GENDER

13  IDENTITY?

14  A    I DON'T KNOW THAT ADOLESCENT ARE JUST EXPERIMENTING WITH

15  THEIR GENDER IDENTITY.  THAT'S NOT AS COMMON.

16  Q    DO YOU AGREE WITH ME THAT SOME PEOPLE MAY CHANGE GENDER

17  IDENTITIES MORE THAN ONCE?

18  A    YES.

19  Q    DR. MASSEY, CURRENT WPATH STANDARDS AS ORIGINALLY DRAFTED

20  CONTAINED SUGGESTED MINIMUM AGE LIMITATIONS FOR SOME

21  TREATMENT; IS THAT CORRECT?

22  A    THAT IS CORRECT.

23  Q    INCLUDING MINIMUM AGE FOR CROSS-SEX HORMONE TREATMENT?

24  A    WELL, THEY RECOMMENDED MINIMUM AGES IN THE FIRST DRAFT.

25  MINIMUM AGES.

1   Q    THOSE MINIMUM AGES WERE DELETED FROM THE FINAL STANDARDS;
2   CORRECT?
3   A    THAT IS CORRECT.  WE DIDN'T FEEL THEY REFLECTED THE NEED
4   TO FOCUS ON THE INDIVIDUALIZED CARE.
5   Q    DO YOU PERSONALLY SUPPORT ANY AGE RESTRICTION ON THE USE
6   OF -- LET'S START WITH PUBERTY BLOCKERS FOR GENDER DYSPHORIA?
7   A    NO.  I SUPPORT USING A COMPREHENSIVE PROCESS AS OUTLINED
8   IN MY REPORT LIKE DR. JENSEN'S REPORT, THAT IS THOROUGH AND
9   INVOLVING PARENTS, OTHER HEALTH CARE PROFESSIONALS, GOING
10  THROUGH THE STANDARDS OF CARE KIND OF PROCESS TO ENSURE
11  WHETHER OR NOT SOMEBODY WOULD BENEFIT FROM THE RECOMMENDATION.
12  Q    WHAT IS THE YOUNGEST CHILD, IN YOUR EXPERIENCE WHO WAS
13  TREATED AND THEN RECEIVED PUBERTY BLOCKERS?
14  A    WHO RECEIVED PUBERTY BLOCKERS?
15  Q    YES.
16  A    I THINK THAT I HAVE SEEN SOMEONE WHO HAD PUBERTY BLOCKERS
17  AROUND AGE TEN.
18  Q    AND I SHOULD LIMIT MY QUESTION TO GENDER DYSPHORIA AS
19  OPPOSED TO PRECOCIOUS PUBERTY.
20  A    I THINK AROUND AGE TEN, MAYBE NINE.
21  Q    DO YOU SUPPORT ANY AGE RESTRICTION ON THE USE OF
22  CROSS-SEX HORMONES FOR GENDER DYSPHORIA?
23  A    WELL, AS IT SAYS IN THE STANDARDS OF CARE, WE WANT TO SEE
24  SEVERAL YEARS OF CLEAR GENDER IDENTITY AND I WANT TO SEE A LOT
25  OF THE INFORMATION AND DATA POINTS THAT INDICATE THAT THAT

1  WOULD BE THE NEXT STEP TO TRY WITH SOMEBODY TAKING ANOTHER

2  STEP IN THEIR TRANSITION.  AND ONE OF THE BENEFITS, I FIND

3  ALSO, IS THE WAY IT'S ALSO PRACTICED HERE IN GEORGIA IS -- AND

4  I BELIEVE IN OTHER PLACES -- IS THAT VERY LOW DOSE OF

5  CROSS-SEX HORMONES ARE PRESCRIBED FROM WHAT THE PEDIATRIC

6  ENDOCRINOLOGISTS TELL ME AND THAT ALLOWS US FOR A VERY SLOW

7  PROCESS AND THE YOUNG PERSON CAN EVEN REPORT THEIR EXPERIENCE

8  OF INTERNAL CHANGES, BEFORE ANYTHING IS VISIBLE.  AND SO, THAT

9  IS PART OF THE NEED FOR THE ONGOING COMMUNICATION AND

10 CONSULTATION TO ENSURE THAT EVEN WITH SUBTLE CHANGES THAT ARE

11 NOT VISIBLE TO OTHERS, THE WHOLE PURPOSE IS INDEED COMFORTABLE

12 WITH THEM AND GETTING BENEFIT FROM STARTING EVEN ON THE LOW

13 DOSE OF HORMONES, WHICH IS PARALLEL WITH THE PUBERTY THAT

14 SOMEBODY WOULD HAVE HAD.

15 Q    MY QUESTION, DR. MASSEY, WAS DO YOU SUPPORT ANY AGE

16 RESTRICTION ON THE USE OF CROSS-SEX HORMONES FOR GENDER

17 DYSPHORIA?

18 A    MY CONCERN IN ANSWERING THAT THE WAY IT'S PHRASE IS THAT

19 IT COULD BE MISINTERPRETED TO SUGGEST THAT I THINK IT'S OKAY

20 TO HAVE HORMONE THERAPY AT AGE TEN AND I'M NOT RECOMMENDING

21 THAT.  SO I'M HESITANT TO RESPOND TO YOUR QUESTION AS IT'S

22 PHRASED.  I'M NOT TRYING TO BE DIFFICULT.  I'M JUST TRYING TO

23 BE THOUGHTFUL.

24 Q    LET ME SEE IF I CAN HELP A LITTLE.  YOU DIDN'T SUPPORT

25 THE PROPOSED AGE LIMITATION OF 14; CORRECT?

1  A    WE AGREED THAT THERE NEEDED TO BE INDIVIDUALIZED

2  APPROACHES TO CARE.

3  Q    AND THE STANDARDS DO NOT IMPOSE  MINIMUM AGE LIMITATIONS

4  NOW; CORRECT?

5  A    THAT'S CORRECT.

6  Q    ARE YOU AWARE OF ANYONE AS YOUNG AS TEN EVER RECEIVING

7  CROSS-SEX HORMONES IN YOUR CLINICAL EXPERIENCE?

8  A    NO.

9  Q    WHAT'S THE YOUNGEST PERSON WHO HAS EVER RECEIVED

10  CROSS-SEX HORMONES IN YOUR EXPERIENCE?

11  A    IT WOULD PROBABLY BE AROUND 14 OR 15.

12  Q    AND DO YOU HAVE ANY -- IN YOUR EXPERIENCE, YOU RECOMMEND

13  A WAITING PERIOD BETWEEN THE TIME OF STARTING PUBERTY BLOCKERS

14  AND CROSS-SEX HORMONE TREATMENT.

15  A    IT DEPENDS ON THE CLINICAL PRESENTATION AND THE AGE OF

16  THE PERSON.

17  Q    WHAT'S THE SHORTEST PERIOD YOU'VE SEEN BETWEEN INITIATING

18  PUBERTY BLOCKERS FOLLOWED BY CROSS-SEX HORMONE TREATMENT?

19      WHAT'S THE SMALLEST GAP YOU HAVE SEEN BETWEEN THOSE TWO

20  TREATMENTS?

21  A    THE SMALLEST GAP PROBABLY AROUND A YEAR.  IT'S USUALLY A

22  COUPLE OF YEARS.

23  Q    ARE YOU FAMILIAR WITH THE LITTMAN STUDY REGARDING THE

24  EFFECT OF SOCIAL MEDIA ON CERTAIN SUBGROUPS OF TEENAGERS

25  PRESENTING ASSIST TRANSGENDER?

1  A    YES.  THE 2021 STUDY.

2  Q    YES.  AND, IN FACT, IT'S ACTUALLY INCLUDED IN THE WPATH

3  GUIDELINES; ISN'T IT?

4  A    I THINK IT IS.

5  Q    RIGHT.

6       AND WPATH ACTUALLY ADVISED THAT FOR CERTAIN SUBGROUPS

7  THAT MAY BE A CONCERN THAT'S TAKEN INTO ACCOUNT; CORRECT?

8  A    THERE ARE A VERY SMALL NUMBER OF PATIENTS WHO WOULD NEED

9  TO BE AWARE THAT THEY MAY HAVE PRESSURES TO BE -- TRY TO LIVE

10  A CISGENDER.  THEY MAY BE EXPOSED TO OTHER YOUNG PEOPLE WHO

11  ARE TRANSGENDER THAT'S GOING TO TAKE INTO ACCOUNT THE ENTIRETY

12  OF A PERSON'S EXPERIENCE.

13            MR. STRAWBRIDGE:  NO FURTHER QUESTIONS.

14            THE COURT:  MS. LITTRELL.

15                    **REDIRECT EXAMINATION**

16  BY MS. LITTRELL:

17  Q    DR. MASSEY, ARE THE OPINIONS EXPRESSED IN YOUR REPORT --

18  DO THEY REFLECT YOUR INDEPENDENT JUDGMENT AND EXPERTISE?

19  A    THEY DO.  I HAD LOTS OF AGREEMENT WITH DR. JENSEN'S

20  OPINIONS AND SO HE DIDN'T INFLUENCE MY OPINION.  I WAS ABLE TO

21  UTILIZE A LOT OF THAT MATERIAL BECAUSE OUR OPINIONS ARE VERY

22  COMPATIBLE, WHICH IS NOT SURPRISING.  WE ARE BOTH PART OF THE

23  STANDARDS OF CARE OR VISION COMMITTEE.

24  Q    ARE THE CONCEPTS IN YOUR REPORT THOUGH UNIVERSALLY

25  RECOGNIZED BY EXPERTS, LIKE YOURSELF AND DR. JENSEN?

1  A    YES.

2  Q    THE STUDIES IN YOUR REPORT THAT ARE CITED AND ROUTINELY

3  CITED BY EXPERTS WHO ARE PROVIDING OPINIONS IN THIS ARENA?

4  A    YES.

5  Q    AND IN THE EXHIBIT WERE THOSE STUDIES IN ALPHABETICAL

6  ORDER?

7  A    YES.

8  Q    OKAY.  SO THEY WOULD PRESENT THE SAME WAY ANYBODY CITED

9  THOSE.  IT WOULD BE IN THE SAME ORDER BASED ON THE ALPHABET;

10 CORRECT?

11 A    YES.  AND I DIDN'T THINK TO CITE HIS BECAUSE HE DIDN'T

12 INFLUENCE MY OPINION OR FORM MY OPINION.  IT WAS NICELY LAID

13 OUT.

14 Q    SO WHILE THE SUBSTANCE MAY BE SIMILAR BETWEEN THE TWO

15 AFFIDAVITS AND THE ORGANIZATION MAY BE SIMILAR, THE OPINIONS

16 EXPRESSED IN YOUR REPORT ARE THEY YOUR OWN?

17 A    THEY ARE.

18 Q    AND THE TESTIMONY THAT YOU PROVIDED HERE TODAY IS BASED

19 ON YOUR EXPERTISE AND YOUR EXPERIENCE?

20 A    YES, IT IS.

21 Q    WAS IT TRUTHFUL?

22 A    YES, IT IS.

23 Q    SO SOME QUESTIONS ABOUT SOME UNUSUAL GENDER IDENTITY

24 IDENTITIES.  DOES THAT REFLECT THAT YOUNG PEOPLE USE DIFFERENT

25 TERMINOLOGY IN THEIR GENDER EXPLORATION?

1    A    YES, IT DOES.

2    Q    AND DOES THAT HAVE ANYTHING TO DO WITH THE BEARING ON HOW

3    YOU APPLY THE CRITERIA IN THE DSM-5 TO DIAGNOSIS GENDER

4    DYSPHORIA?

5    A    IT DEFINITELY DOES.  I WANT TO TAKE IT INTO ACCOUNT TO

6    ENSURE THAT SOMEBODY HAS GENDER DYSPHORIA THAT WARRANTS SOME

7    BENEFITS FROM TREATMENTS FOR GENDER DYSPHORIA AS COMPARED TO

8    THEY'RE EXPERIMENTING OR HAVING SOME OTHER EXPERIENCE.

9            MS. LITTRELL:  THANK YOU.  NO FURTHER QUESTIONS.

10           THE COURT:  ALL RIGHT.  THANK YOU.

11           ALL RIGHT, COUNSEL.  IT'S A LITTLE EARLY.  WHAT

12   WOULD YOU -- I HAVE NO STRONG FEELINGS HERE.  I DON'T KNOW HOW

13   LONG IT'S GOING TO TAKE TO PRESENT YOUR NEXT WITNESS.

14           WOULD YOU LIKE TO GET STARTED AND --

15           MR. STRAWBRIDGE:  YEAH, WE CAN PROCEED.

16           IS THE WITNESS IS EXCUSED?

17           THE COURT:  THANK YOU, DOCTOR.  YOU ARE EXCUSED.  I

18   APPRECIATE YOUR TESTIMONY.

19           MR. STRAWBRIDGE:  THE DEFENDANTS CALL MICHAEL

20   LAIDLAW.

21           COURTROOM DEPUTY:  PLEASE RAISE YOUR RIGHT HAND.

22                     **MICHAEL LAIDLAW,**

23   **A WITNESS** HEREIN, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED

24   AND TESTIFIED AS FOLLOWS:

25           COURTROOM DEPUTY:  YOU MAY BE SEATED.

1    I JUST WANT TO REMIND YOU IT'S VERY IMPORTANT FOR

2  EVERYONE IN THE COURTROOM TO HEAR YOUR TESTIMONY SO PLEASE

3  SPEAK DIRECTLY INTO THE MICROPHONE.  YOU MAY HELP YOURSELF TO

4  ADDITIONAL WATER, IF WOULD' LIKE.

5    AT THIS TIME COULD STATE AND SPELL YOUR FIRST AND

6  LAST NAME FOR THE RECORD.

7    THE WITNESS:  YES.  MY NAME IS MICHAEL LAIDLAW.

8  M-I-C-H-A-E-L L-A-I-D-L-A-W.

9    COURTROOM DEPUTY:  THANK YOU, SIR.

10    **DIRECT EXAMINATION**

11  BY MR. STRAWBRIDGE:

12  Q    GOOD MORNING, MR. LAIDLAW.  COULD YOU BRIEFLY DESCRIBE

13  FOR THE COURT YOUR EDUCATIONAL BACKGROUND.

14  A    SURE.  I RECEIVED A BACHELOR'S DEGREE IN BIOLOGY WITH A

15  CONCENTRATION IN MOLECULAR BIOLOGY.  IN 1997 I WENT TO MEDICAL

16  SCHOOL.  AFTER THAT UNIVERSITY OF SOUTHERN CALIFORNIA.

17  COMPLETED M.D. DEGREE THERE.  WENT TO THE SAME INSTITUTION TO

18  DO MY THREE YEARS OF INTERNAL MEDICINE RESIDENCY AND THEN

19  FOLLOWED THAT WITH TWO YEARS OF ENDOCRINOLOGY FELLOWSHIP BEING

20  BOARD CERTIFIED IN BOTH OF THOSE SPECIALTIES.

21  Q    I'M GOING TO REMIND YOU TO GO A LITTLE SLOW FOR THE COURT

22  REPORTER.

23  A    SURE.

24  Q    I KNOW I HAVE TO.

25    WHAT ABOUT YOUR PROFESSIONAL EXPERIENCE?  CAN YOU BRIEFLY

1  OUTLINE THAT?

2  A    SURE.  SINCE THAT TIME, I HAVE BEEN WORKING IN PRIVATE

3  PRACTICE IN ROCKLAND, CALIFORNIA.  I HAVE MY OWN PRACTICE

4  THERE AND SEE PRIMARILY ADULTS, PATIENTS FOR ENDOCRINOLOGY

5  CONDITIONS.

6  Q    AND WHAT TYPES OF PATIENTS DO YOU SEE IN YOUR CLINICAL

7  PRACTICE?

8  A    SURE.  MANY TYPES OF PATIENTS.  SO PATIENTS FOR DIABETES

9  FOR EXAMPLE, TYPE 1, TYPE 2, THYROID DISEASE, GLAND DISORDERS,

10  PROBLEMS WITH THEIR GONADS, TESTICULAR DISORDERS, OVARIAN

11  DISORDERS, METABOLIC BONE DISEASE.

12  Q    AND JUST HOW LONG HAVE YOU BEEN IN CLINICAL PRACTICE?

13  A    SO 2006 THROUGH CURRENT SO ABOUT 17 YEARS.

14  Q    OKAY.  AS A CLINICIAN, DOES PUBLISHED RESEARCH INFORM

15  YOUR PRACTICE?

16  A    VERY MUCH SO.  PARTICULARLY NOW SAY FOR EXAMPLE DIABETES

17  NEW MEDICATIONS THAT COME ACROSS THE MARKET, SO I MAKE A POINT

18  TO LOOK AT RESEARCH ARTICLES, HOW ARE THE STUDIES CONDUCTED,

19  WHAT SORT OF RISK THE NEW MEDICATIONS HAVE.  DO I WANT TO

20  START SOMEONE ON A NEW MEDICATION OR TREATMENT OR WOULD IT BE

21  BETTER TO WAIT OR USE IT FOR PEOPLE WITH ONLY SEVERE

22  CONDITIONS AND SO FORTH.  THAT ALL COMES FROM EXAMINING THE

23  LITERATURE THAT'S AVAILABLE.

24  Q    AND HAVE YOU HAD THE OPPORTUNITY TO FAMILIARIZE YOURSELF

25  WITH THE LITERATURE ON HORMONE TREATMENT FOR GENDER DYSPHORIA?

1  A    YES, I HAVE.  I HAVE SPENT SEVERAL YEARS, FIVE OR SIX

2  YEARS, LOOKING VERY CAREFULLY AT THIS LITERATURE.

3  Q    AND JUST TO BE CLEAR, YOU ARE NOT A PEDIATRICIAN;

4  CORRECT?

5  A    I'M NOT A PEDIATRICIAN.

6  Q    DO YOU THINK THAT AFFECTS YOUR ABILITY TO REVIEW,

7  UNDERSTAND OR OPINE ON THAT LITERATURE?

8  A    I DO NOT.  I WAS TRAINED -- WE DO CERTAIN PEDIATRIC

9  ROTATIONS IN ENDOCRINOLOGY FELLOWSHIP.  WE SPENT SOME TIME IN

10 THE PEDIATRIC CLINIC.  I THINK MORE IMPORTANTLY PEDIATRIC

11 PATIENTS IN MOST CASES, HOPEFULLY IN ALL CASES, WILL BECOME

12 ADULT PATIENTS, SO I HAVE TO UNDERSTAND WHAT SORT OF THINGS

13 HAVE HAPPENED THROUGH CHILDHOOD FOR TREATMENT TO SEE DIABETES,

14 HOW -- WHAT WAS THE TREATMENT COURSE, WHAT WAS THE BEST METHOD

15 FOR THEM TO COME INTO ADULTHOOD TO CONTINUE TO PROSPER AND

16 THRIVE.

17 Q    BASED ON YOUR EXPERIENCE AND REVIEW OF LITERATURE, DO YOU

18 HAVE AN ASSESSMENT OF THE RISKS OF CROSS-SEX HORMONE TREATMENT

19 FOR CHILDREN?

20 A    I DO.  I THINK IT WAS MY PRIMARY CONCERN WHEN I FIRST

21 STARTED LOOKING INTO THIS THAT THE DOSES OF HORMONES THAT ARE

22 GIVEN IN A CROSS-SEX MANNER ARE EXCEEDINGLY HIGH COMPARED TO

23 THE BODY'S NORMAL REFERENCE RANGE.

24      SO, FOR EXAMPLE, I'VE CALCULATED THAT TESTOSTERONE GIVEN

25 TO A FEMALE IS SOME SIX TO A HUNDRED TIMES HIGHER THAN NORMAL

1  LEVELS.  ESTROGEN LEVELS ARE SIMILARLY HIGH.

2  Q    I'M GOING TO ASK YOU TO REFER TO YOUR REPORT.  I THINK

3  YOU HAVE A COPY OF IT UP THERE IN ONE OF THOSE BINDERS.  I'M

4  GOING TO PUT UP THE CHART OF PAGE 47 OF YOUR REPORT.

5  A    YES.

6  Q    DOES THIS CHART REFER TO THE LEVELS OF TESTOSTERONE IN

7  FEMALES THAT YOU WERE JUST REFERRING TO?

8  A    YES, IT'S WHAT I HAVE SHOWN ON THE LEFT ARE FOUR

9  DIFFERENT -- THREE DIFFERENT CONDITIONS.  THE NORMAL CONDITION

10  AND BELOW YOU CAN SEE THE VARIOUS LEVELS OF TESTOSTERONE FROM

11  ZERO TO A THOUSAND.

12      AND SO, IN BLUE, I HAVE THE NORMAL REFERENCE RANGE FOR

13  ADULT FEMALES WHICH IS SOME DEPENDING ON THE LAB, 10 TO SAY

14  50.  AND THEN I HAVE OTHER MEDICAL -- MEDICAL CONDITIONS WHICH

15  HAVE HIGHER LEVELS OF TESTOSTERONE THAT WE DIAGNOSIS.  WE CALL

16  THIS CONDITION HYPERANDROGENISM.  HIGH LEVELS OF ANDROGENS OR

17  TESTOSTERONE.  SO A COMMON CONDITION IN GRAY IS POLYCYSTIC

18  OVARIAN SYNDROME AND YOU CAN SEE THAT THE LEVELS CAN BE

19  HIGHER.  THEY CAN BE AS HIGH AS A HUNDRED FIFTY.  SO THIS IS A

20  CONDITION OF HIRSUTISM SYNDROME, UNWANTED HAIR GROWTH ON THE

21  FACE.  IT CAN CAUSE METABOLIC CHANGES.  IT CAN CAUSE

22  INFERTILITY.  SO THIS IS A CONDITION THAT I SEE AND THAT I

23  TREAT AND THAT I'M CONCERNED ABOUT REGULATING THE HORMONES FOR

24  THOSE PATIENTS.

25      BELOW THAT, I'VE SHOWN LEVELS THAT CAN OCCUR WHICH ARE

1  MUCH HIGHER FROM ENDOCRINE TUMORS.  THESE CAN BE FROM

2  DANGEROUS TUMORS SUCH AS CARCINOMA, HORMONE OVARIAN TUMORS

3  PRODUCE VERY HIGH-LEVELS, SOME 200 TO SAY A THOUSAND.  SO I

4  NEED TO BE VERY COGNIZANT OF LEVELS OF HORMONES FOR THESE

5  PATIENTS.

6       WHAT STRUCK ME WHEN I FIRST STARTED INVESTIGATING THIS

7  WAS THAT LEVELS THEY'RE RECOMMENDING FOR FEMALES ARE, AS I

8  SAID, EXCEEDINGLY HIGH COMPARED TO THE NORMAL RANGE.  SO YOU

9  CAN SEE HERE WHAT THEY'RE RECOMMENDING IN THE GUIDELINES IS TO

10 BRING TESTOSTERONE LEVELS TO VERY HIGH RANGES ABOUT THREE

11 HUNDRED TO A THOUSAND AS DEPICTED HERE.

12 Q    AND IN YOUR -- LET ME ASK YOU THIS:  WHAT DOES THE

13 LITERATURE INDICATE ABOUT THE LONG-TERM HEALTH EFFECTS OF

14 PROVIDING THAT KIND OF HORMONE TREATMENT TO TRANSGENDER OR

15 GENDER DYSPHORIA YOUTH?

16 A    RIGHT.  WELL, THERE'S NOT A LOT OF GOOD STUDIES ON

17 LONG-TERM HEALTH EFFECTS.  THERE IS REALLY NONE FOR

18 ADOLESCENTS WHO ARE GIVEN HIGH DOSES OF CROSS-SEX HORMONES

19 SUCH AS THIS.  THERE IS A 30-YEAR STUDY FROM SWEDEN.  I'M NOT

20 SURE HOW TO PRONOUNCE THE NAME SO I'LL JUST SAY DENNY, IN

21 2011, WHICH SHOWED VERY HIGH RATES OF COMPLETED SUICIDE 19

22 TIMES HIGHER THAN THE GENERAL POPULATION.

23      SO THEY COMPARED A FEW HUNDRED PATIENTS WHO HAD TAKEN

24 HORMONES AND ALSO WHO HAD SURGERY TO THE GENERAL POPULATION.

25 THEY LOOKED AT 30 YEARS WORTH OF DATA AND FOUND THAT THEY WERE

1  19 TIMES MORE LIKELY TO COMPLETE SUICIDE.  THEY WERE NEARLY --

2  HAD NEARLY THREE TIMES HIGHER RATE OF DEATH OF ANY CAUSE, AND

3  NEARLY THREE TIMES THE RATE OF PSYCHIATRIC AND PATIENT

4  PSYCHIATRIC HOSPITALIZATION.

5  Q    SETTING ASIDE THE PSYCHIATRIC CONDITIONS AND SUICIDE,

6  WHAT DO THE STUDIES INDICATE ABOUT THE LONG-TERM EFFECTS OF

7  CROSS-SEX HORMONE TREATMENT IN TERM OF PHYSICAL?

8  A    THERE WAS A REVIEW BY DR. ERWIN OF WPATH IN 2018 THAT

9  SHOWED HIGH RATES OF DEATH IN RECEIVING CROSS-SEX HORMONES.

10  AS FAR AS TESTOSTERONE, LABELING INDICATES INCREASED RISK OF

11  THROMBOSIS OR BLOOD CLOTS.  THERE ARE PERMANENT CHANGES TO THE

12  FACE OR OTHER PARTS OF THE BODY FROM HAIR GROWTH.  THERE ARE

13  EFFECTS ON CHOLESTEROL SUCH AS LOWERING GOOD CHOLESTEROL, HDL.

14  THERE ARE NUMEROUS EFFECTS ON THE REPRODUCTIVE SYSTEM SUCH AS

15  ATROPHY OF THE VAGINA, ATROPHY OF THE UTERUS, POLYCYSTIC

16  OVARIES.  THIS CAN LEAD -- AND ALSO AN ENLARGEMENT, AN

17  ABNORMAL ENLARGEMENT TO THE CLITORIS, WHICH CAN BE

18  UNCOMFORTABLE, WHICH ISN'T REVERSIBLE.

19      THERE ARE EFFECTS ON FERTILITY, WHICH FOR ME FOR

20  ADOLESCENT ARE MOST CONCERNING.  ONE THING THAT ISN'T

21  DISCUSSED VERY OFTEN IS THAT THE PELVIC BONES OF FEMALES

22  CHANGE QUITE DRAMATICALLY DURING PUBERTY, SUCH THAT THEY WIDEN

23  AND THE INLETS AND OUTLETS ARE ENLARGED SO THAT A BABY CAN

24  PASS THROUGH AFTER -- DURING DELIVERY.  IF THAT'S INTERFERED

25  WITH BY SAY PUBERTY BLOCKERS ON TOP OF CROSS-SEX HORMONES,

1  THEN, THE PELVIS WILL NOT WIDEN AS IT SHOULD.  THERE COULD BE

2  COMPLICATIONS LATER IN LIFE WITH OBSTRUCTION OF BIRTH,

3  BASICALLY.

4      SEXUAL DYSFUNCTION IS ANOTHER POSSIBILITY BECAUSE OF THE

5  CHANGES THAT HAVE HAPPENED IN FEMALES WITH EASIER TEARING OF

6  THE VAGINA, POSSIBLE ANORGASMIA OR PAINFUL ORGASMS HAVE BEEN

7  REPORTED FROM SOME DETRANSITIONERS.

8  Q   ARE THERE ANY FROM YOUR PERSPECTIVE ANY CONCERNS IN TERMS

9  OF PHYSICAL AFFECTS FROM PROVISION OF THE ESTROGEN TO NATAL

10  MALES?

11  A   YES.  AGAIN, THERE WAS THE STUDY WITH INCREASED RISK OF

12  MYOCARDIA INFARCTION DUE TO CARDIOVASCULAR DISEASE.  INCREASED

13  RISK OF BLOOD CLOTS FOUND ABOUT FIVE TIMES HIGHER IN THE SAME

14  REVIEW.

15      THERE IS PERMANENT CHANGES OBVIOUSLY TO BREAST TISSUE.

16  MALES DO HAVE SOME SMALL AMOUNTS OF BREAST TISSUE WHICH WILL

17  DEVELOP FURTHER.  IF SOMEONE WISHES TO DETRANSITION LATER IN

18  LIFE -- I KNOW A PERSON PERSONALLY WHO WISHES -- WHO HAS

19  DETRANSITIONED BUT IS CONCERNED ABOUT THE COST OF SURGERY AND

20  ALSO PAIN THAT RESULTS FROM THIS TYPE OF REDUCTION.

21      OTHER EFFECTS CAN BE IMPOTENCE, ERECTILE DYSFUNCTION,

22  DECREASED SPERM PRODUCTION, INFERTILITY.

23  Q   SETTING ASIDE THE COMPLEXITY OF TREATMENT FOR GENDER

24  DYSPHORIA, ARE THERE ANY STUDIES INDICATING THAT THERE ARE

25  NEGATIVE PSYCHOLOGICAL EFFECTS THAT ARISE FROM HORMONE

1  TREATMENT?

2  A    FOR EXAMPLE, FOR GIVING TESTOSTERONE, YEAH.  THE CLOSEST

3  MODEL, AS I SAID IN MY CHART HERE, THE LEVELS OF TESTOSTERONE

4  ARE VERY, VERY HIGH THAT ARE PROVIDED FOR IN TRANSITION.  THE

5  CLOSEST -- AND THIS HAPPENS IN THE TUMORS THAT I SHOW HERE.

6  IT HAPPENS VERY INFREQUENTLY IN NATURE, SO WE DON'T HAVE A LOT

7  OF INFORMATION ABOUT LONG-TERM EFFECTS BUT WHAT WE DO HAVE ARE

8  STUDIES OF PEOPLE WHO HAVE ABUSED ANABOLITIC STEROIDS, MEANING

9  TESTOSTERONE OR SIMILAR GIVEN IN VERY HIGH DOSES, IN THIS CASE

10 USUALLY TO INTENSE ATHLETIC PERFORMANCE.

11     WHEN THEY HAVE LOOKED AT PSYCHOLOGICAL CHANGES THAT HAVE

12 HAPPENED IN THESE PEOPLE, THEY FOUND HYPERACTIVITY,

13 AGGRESSIVENESS, IRRITABILITY, GRANDIOSITY, RECKLESS BEHAVIOR

14 AND EVEN POSITIVE EFFECTS LIKE EUPHORIA.

15     IN THE SAME PAPER, THEY SHOW 23 PERCENT OF THOSE PEOPLE

16 HAD MET DSM CRITERIA AT THE TIME OF A MAJOR MOOD SYNDROME

17 DISORDER.  AND EVEN 3 TO 12 PERCENT OF THESE PEOPLE HAD ACTUAL

18 PSYCHOSIS.

19     SO HORMONES ARE VERY POWERFUL MEDICATIONS.  EVEN THYROID

20 HORMONES, FOR EXAMPLE, CAN HAVE VERY HIGH DOSES.  CAN LEAD TO

21 PSYCHOSIS.  CAN LEAD TO ANXIETY.  VERY LOW DOSES OF HORMONES

22 OR VERY HIGH LEVELS CAN LEAD TO PHYSICAL AND MENTAL MORBIDITY.

23 Q    YOU EARLIER RECOMMEND THE DENNY STUDY FROM SWEDEN;

24 CORRECT?

25 A    YES.

1   Q    YOU MENTIONED THE STUDY.

2   A    RIGHT.

3   Q    I'M GOING TO PUT UP THAT STUDY.  THIS IS ONE OF THOSE

4   STUDIES YOU MENTIONED AND RELIED ON IN YOUR REPORT?

5   A    THAT'S CORRECT.

6   Q    AND JUST I WANT TO SHOW THE COVER TO MAKE SURE THIS IS

7   THE APPROPRIATE STUDY.

8   A    YES.

9   Q    CAN I ASK YOU TO EXPLAIN WHAT IS DEPICTED ON THE CHART.

10  A    SURE.  SO THERE ARE SEVERAL LINES HERE SHOWING OVER THE

11  COURSE OF 30 YEARS THE SURVIVAL OF THE DIFFERENT GROUPS OF

12  PEOPLE STUDIED IN THIS SWEDISH STUDY.

13      SO THE TOP TWO BOLDER LINES THAT AREN'T THAT CONTINUOUS

14  SHOW MALE CONTROLS AND FEMALES CONTROLS AND YOU CAN SEE OVER

15  TIME, AS YOU MIGHT EXPECT, PEOPLE DIE AND THEN THE GRAPH

16  SLOWLY GOES DOWNWARDS.

17      WHAT YOU CAN SEE WITH THE DOTTED LINES FOR MALE TO FEMALE

18  AND FEMALE TO MALE, PERSONS WHO HAD HORMONES AND SURGERY AND

19  YOU CAN SEE STARTING AT ABOUT TEN YEARS, ARE RAPID DECREASE IN

20  SURVIVAL OF BOTH OF THOSE GROUPS.

21  Q    NOW I JUST WANT TO BE VERY CLEAR.

22      DO YOU THINK THIS OPINION DEMONSTRATES THAT HORMONE

23  TREATMENT OR GENDER-AFFIRMING TREATMENT CAUSES SUICIDE?

24  A    I HAVE NOT SAID THAT IT DIRECTLY CAUSES SUICIDE.  I

25  HAVEN'T SAID IT INCREASED SUICIDE OR DECREASED SUICIDE.  I

1   SIMPLY SAID THEY SHOWED IN THIS STUDY A 19 TIMES HIGHER RATE

2   OF COMPLETED SUICIDE COMPARED TO GENERAL POPULATION.  SO THERE

3   IS AN ASSOCIATION.

4   Q    AND THERE IS A DIFFERENCE BETWEEN CAUSE AND ASSOCIATION?

5   A    THERE IS A DIFFERENCE BETWEEN CAUSE AND ASSOCIATION.

6   THERE ARE MANY CRITERIA TO ESTABLISH CAUSE.  AND SO YOU WOULD

7   NEED TO DO A PROPERLY CONTROLLED STUDY AND THEN VERIFY THOSE

8   STUDIES TO SHOW FOR SURE THAT ONE CAUSES THE OTHER.

9   Q    YOU ALSO MAYBE HEARD A DISCUSSION YESTERDAY IN THE

10  COURTROOM ABOUT THE CHEN STUDY?

11  A    YES.

12  Q    DOES THE CHEN STUDY REVEAL ANY INFORMATION ABOUT THE

13  ASSOCIATION BETWEEN SUICIDE OR SUICIDALITY IN A POPULATION

14  TAKING GENDER-AFFIRMING HORMONES?

15  A    YES.  SO THEY STUDIED PATIENTS OVER A COUPLE OF YEARS AND

16  WERE LOOKING TO SEE ANY CHANGES IN MENTAL HEALTH.  THERE WERE

17  319 SOME PATIENTS, SOMEWHERE IN THAT ORDER, AND TWO OF THEM

18  HAD COMPLETED SUICIDE.  AND THE MOST COMMON EFFECT THEY FOUND

19  ADVERSE EFFECT WAS SUICIDALITY IN THAT STUDY.

20  Q    DOES THAT MEAN THAT THEIR GENDER-AFFIRMING TREATMENT

21  CAUSED SUICIDE?

22  A    I'M NOT SAYING IT CAUSED SUICIDE BECAUSE THIS STUDY CAN'T

23  PROVE THAT WITH CERTAINTY BUT THERE'S AN ASSOCIATION THAT

24  NEEDS TO BE CONSIDERED.  THERE'S BIOLOGICAL PLAUSIBILITY THAT

25  MENTAL HEALTH CONDITIONS AS I HAVE DESCRIBED COULD WORSEN WITH

1  HIGH DOSES OF HORMONES.

2  Q    AND WERE YOU IN THE COURTROOM WHEN DR. MCNAMARA

3  REFERENCED THE GUPTA STUDY, A RELATIVELY NEW STUDY OUT OF

4  EMORY?

5  A    YES.

6  Q    AND HAVE YOU HAD A CHANCE TO REVIEW THAT STUDY?

7  A    I HAVE TAKEN A LOOK AT THAT STUDY.

8  Q    CAN YOU JUST DESCRIBE BRIEFLY WHAT THAT STUDY SHOWS.

9  A    SURE.  WELL, THEY DID A CHART REVIEW OF PATIENTS LOOKING

10  AT, I THINK THE YEARS WERE SOMETHING LIKE 2000 TO 2019 LOOKING

11  AT WHEN PATIENTS INITIATED HORMONE THERAPY, CROSS-SEX HORMONE

12  THERAPY UNTIL SOME END TIME POINT AND THEN THEY FOLLOWED UP

13  WHERE THEY COULD WITH PHONE CALLS TO SEE IF PATIENTS WERE

14  STILL TAKING CROSS-SEX HORMONE THERAPY.

15      THERE WERE 50 -- THIS WAS A 121, I BELIEVE, PERSONS WHO

16  WERE UNDER 18 AND THOSE WERE FOLLOWED FOR JUST TWO YEARS.

17  THERE A PRETTY HIGH DROP-OUT RATE THAT I COULD SEE THERE, TOO.

18  THEY COULDN'T ACCOUNT FOR 15 PERCENT OF THE PATIENTS.

19      THEY DIDN'T LOOK AT ALL AT SUICIDALITY, SUICIDE

20  PSYCHIATRIC, CO-MORBIDITIES, PSYCHIATRIC MEDICATIONS.  THEY

21  DIDN'T LOOK AT IF GENDER DYSPHORIA, IMPROVED OR WORSENED.  IT

22  DOESN'T HAVE A LOT TO SAY, AS FAR AS I CAN SEE.

23  Q    ARE YOU PERSUADED BY THE RECOMMENDATIONS SET FORTH IN

24  WPATH STANDARDS OF CARE FOR THE TREATMENT OF GENDER DYSPHORIA?

25  A    SPEAKING SPECIFICALLY ABOUT FOR ADOLESCENTS IN THIS CASE?

1  THEY HAVE NOT -- NO, I DON'T AGREE WITH THEIR STANDARDS OF

2  CARE.

3  Q    CAN YOU EXPLAIN WHY.

4  A    THEY HAVE NOT BEEN ABLE TO DO OR THEY CLAIM THEY CAN'T DO

5  A COMPREHENSIVE REVIEW, SYSTEMATIC REVIEW ON OUTCOMES.  AND

6  SO, THEY CAN'T SAY WITH CERTAINTY THAT THE SAFETY PROFILE IN

7  FSQC AS A TREATMENT IS OF A HIGH MAGNITUDE.

8       THIS IS IN CONTRAST TO A NUMBER OF OTHER NATIONS

9  INCLUDING ENGLAND, FINLAND, SWEDEN AND NORWAY, WHO HAVE DONE

10  THEIR OWN SYSTEMATIC REVIEWS OF THE EVIDENCE.  THEY DID LOOK

11  AT ADOLESCENTS.  THEY WERE ABLE TO DO IT AND THEY CONCLUDED

12  THAT THERE IS NO GOOD EVIDENCE.  THERE ARE NO GOOD

13  HIGH-QUALITY STUDIES.  THERE ARE NO LONG-TERM STUDIES THAT

14  SHOW SAFETY AND EFFICACY OF THE WPATH STANDARDS OF CARE,

15  MEANING SOCIAL TRANSITION, PUBERTY BLOCKERS, CROSS-SEX

16  HORMONES AND GENITAL SURGERIES.

17       MR. STRAWBRIDGE:  THANK YOU, DR. LAIDLAW.  I DON'T

18  HAVE ANY FURTHER QUESTIONS.

19                    **CROSS-EXAMINATION**

20  BY MR. BRADSHAW:

21  Q    GOOD MORNING, MR. LAIDLAW.

22  A    GOOD MORNING.

23  Q    DO I HAVE IT RIGHT YOU ARE A ADULT ENDOCRINOLOGIST;

24  RIGHT?

25  A    YOU ARE CORRECT.

1  Q    I THINK YOU SAID THAT YOU PRIMARILY TREAT ADULTS FOR

2  ENDOCRINE CONDITIONS; CORRECT?

3  A    YES.

4  Q    AND ISN'T THE CASE THAT LESS THAN 5 PERCENT OF YOUR

5  PATIENTS ARE ADOLESCENTS OR CHILDREN?

6  A    YES.

7  Q    NOW YOU INDICATED THAT YOU'RE FAMILIAR WITH RESEARCH

8  ABOUT GENDER DYSPHORIA BUT YOU HAVEN'T CONDUCTED ANY ORIGINAL

9  RESEARCH YOURSELF WITH RESPECT TO GENDER DYSPHORIA; CORRECT?

10 A    YOU ARE CORRECT.

11 Q    AND YOU HAVEN'T PUBLISHED ANY PEER-REVIEWED ARTICLES IN

12 ANY SCIENTIFIC PUBLICATION WITH RESPECT TO GENDER DYSPHORIA;

13 CORRECT?

14 A    I HAVE AN ARTICLE IN A PEER-REVIEWED AMERICAN JOURNAL OF

15 BIOETHICS.

16 Q    OKAY.  THAT'S BIOETHICS THOUGH.  THAT'S NOT IN THE

17 MEDICAL JOURNAL; CORRECT?

18 A    AS FAR AS I KNOW IT'S A MEDICAL JOURNAL.

19 Q    NOW YOU TESTIFIED JUST GENERALLY AND WE'RE GOING TO COME

20 BACK AND COVER SOME OF THESE THINGS, BUT YOU TESTIFIED

21 GENERALLY TO THE RISKS IN YOUR OPINION WITH RESPECT TO THE

22 TREATMENT OF ADOLESCENTS WITH HORMONAL THERAPIES; CORRECT?

23 A    YES.

24 Q    AND YOU HAVE THOSE OPINIONS DESPITE THE FACT THAT YOU

25 HAVE NEVER IN YOUR PRACTICE DIAGNOSED AN ADOLESCENT WITH

1   GENDER DYSPHORIA; CORRECT?

2   A    WELL, I HAVE AN ADULT PATIENT WHO HAD GENDER DYSPHORIA

3   AND IS A DETRANSITIONER.

4   Q    AND I UNDERSTAND THAT THAT'S AN ADULT.  THAT WASN'T MY

5   QUESTION.  MY QUESTION IS HAVE YOU EVER DIAGNOSED AN

6   ADOLESCENT EVER IN YOUR PRACTICE WITH GENDER DYSPHORIA?

7   A    I DON'T DIAGNOSE THAT CONDITION.

8   Q    AND ISN'T IT THE CASE, ALSO, DR. LAIDLAW YOU HAVE NEVER

9   TREATED AN ADOLESCENT FOR GENDER DYSPHORIA?

10  A    CORRECT.

11  Q    AND WITH RESPECT TO THE ONE ADULT PATIENT THAT YOU SAID

12  YOU HAVE TREATED WAS A DETRANSITIONER, WHEN WAS THAT

13  TREATMENT?

14  A    IT'S ON -- WHAT TREATMENT ARE YOU REFERRING TO, THE

15  INITIAL TREATMENT?

16  Q    WELL, YOU SAID THAT YOU WERE TREATING AN ADULT FOR GENDER

17  DYSPHORIA.  DID I GET THAT CORRECT?

18  A    YES, IT'S ONGOING.

19  Q    WHEN DID THAT START?

20  A    I'M TREATING THE PATIENT FOR AFTEREFFECTS OF

21  GENDER-AFFIRMATIVE THERAPY TO BE CLEAR.  I'M NOT TREATING THEM

22  FOR GENDER DYSPHORIA.

23  Q    WHEN DID THAT START?

24  A    LIKE A YEAR, YEAR AND A HALF AGO.

25  Q    OKAY.  HOW OLD IS THAT PATIENT?

1    A    HE IS AROUND 20.

2    Q    EXCUSE ME.

3    A    SOMEWHERE AROUND 20.

4    Q    OKAY.  THANK YOU.

5         NOW DR. LAIDLAW, YOU ARE NOT A LICENSED, MEDICAL HEALTH

6    CARE PROVIDER; CORRECT?

7    A    THAT'S CORRECT.

8    Q    YOU ARE NOT A PSYCHIATRIST?

9    A    I AM NOT.

10   Q    YOU ARE NOT A PSYCHOLOGIST?

11   A    I AM NOT.

12   Q    YOU ARE A BIOETHICIST; RIGHT?

13   A    NOT TRAINED BIOETHICIST.

14   Q    IN FACT, YOU WERE TRAINED IN INTERNAL MEDICINE?

15   A    AND ENDOCRINOLOGY.

16   Q    NOT PEDIATRICS?

17   A    NOT PEDIATRICS.

18   Q    SO IS THE PATIENT THAT YOU SAID THAT YOU ARE TREATING,

19   DID THAT PATIENT HAVE GENDER DYSPHORIA?

20   A    AT SOME POINT IN TIME.

21   Q    OTHER THAN THAT PATIENT, HAVE YOU EVER TREATED ANY

22   PATIENT, ADULT OR ADOLESCENT, FOR GENDER DYSPHORIA?

23   A    I HAD ONE ADULT PATIENT IN TRAINING WHO I PRESCRIBED

24   ESTROGEN.  I HAD A FOLLOW-UP VISIT A NATAL MALE PATIENT THAT I

25   PRESCRIBED ESTROGEN.

1  Q    AND THAT WAS IN THE EARLY 2000S; RIGHT?  THAT ONE

2  PATIENT?

3  A    YEAH 2005, '6, SOMETHING LIKE THAT.

4  Q    AND THAT RELATED TO YOU REFILLED THAT PATIENT'S

5  PRESCRIPTION FOR ESTROGEN; CORRECT?

6  A    WELL, THEY CAME IN FOR A VISIT, SO I SAW THEM, EVALUATED

7  AND EXAMINED THEM AND THEN I FILLED THE MEDICATION.

8  Q    ALL RIGHT.  SO EARLY 2000S?

9  A    YES.

10 Q    AND THAT WAS BEFORE DSM-5?

11 A    AND THAT WAS BEFORE THE ENDOCRINE SOCIETY'S FIRST SET OF

12 GUIDELINES EVEN.

13 Q    AND YOU ACTUALLY WENT AHEAD AND FILLED THE PRESCRIPTION

14 FOR ESTROGEN; CORRECT?

15 A    I DID.

16 Q    AS PART OF YOUR AFFIDAVIT IN THIS CASE, YOU HAVE

17 SUBMITTED A CV?

18 A    YES.

19 Q    IS THAT UP-TO-DATE?

20 A    I TRIED TO MAKE IT UP-TO-DATE.

21 Q    IS EVERYTHING IN THAT CV ACCURATE?

22 A    WHATEVER IS IN THERE SHOULD BE ACCURATE BUT THERE'S BEEN

23 A NUMBER OF DIFFERENT STATES ASKING FOR MY ASSISTANCE, SO I

24 TRIED TO LIST EVERY ONE I COULD.

25 Q    LET'S ACTUALLY TALK ABOUT THAT.

1    YOU LISTED IN YOUR CV SEVERAL CASES IN WHICH YOU HAVE

2  BEEN RETAINED AS AN EXPERT; CORRECT?

3  A    YES.

4  Q    AND IN ALL OF THOSE CASES, YOU HAVE BEEN RETAINED TO

5  OFFER OPINIONS IN OPPOSITION TO AN INJUNCTION OR PRELIMINARY

6  INJUNCTION THAT'S BEING SOUGHT; CORRECT?

7  A    I BELIEVE SO.

8  Q    OKAY.  WELL, IF YOU TURN TO YOUR CV, LET'S ACTUALLY TALK

9  A LITTLE BIT ABOUT THIS.  AT PAGE 3 DOWN AT THE BOTTOM IT SAYS

10 EXPERT WITNESS WORK IN AMICUS BRIEFS.

11 A    YES.

12 Q    DO YOU SEE THAT?

13 A    I DO.

14 Q    OKAY.  THE SECOND ENTRY DOWN IS 2023 AND IT MAKES

15 REFERENCE TO THE THORNBURY CASE.

16 A    WHICH YEAR?

17 Q    AT THE BOTTOM OF THE PAGE THERE'S THREE ENTRIES WHERE YOU

18 IDENTIFY YOU HAVE BEEN RETAINED AS AN EXPERT WITNESS.  THIS IS

19 PAGE 3 OF YOUR CV?

20 A    OKAY.  THERE IS -- I SEE 2020, 2019 AND 2018.

21        MR. BRADSHAW:  MAY I APPROACH, YOUR HONOR?

22        THE COURT:  PLEASE.

23 A    OKAY.

24 Q    THE SECOND ENTRY DOWN.

25 A    YES.  I SEE IT.

1   Q    IT SAYS UNITED STATES DISTRICT COURT FOR THE WESTERN

2   DISTRICT OF KENTUCKY.  DO YOU SEE THAT?

3   A    YES.

4   Q    NOW YOU SUBMITTED A REPORT -- WELL, STRIKE THAT.  IS THIS

5   THE CASE THAT INVOLVES A STATUTE DIRECTED AS BANNING CARE TO

6   ADOLESCENT MINORS FOR TRANSGENDERS --

7   A    BANNING GENDER-AFFIRMING THERAPY.

8   Q    RIGHT.  THAT'S PENDING IN KENTUCKY; CORRECT?

9   A    YES.

10  Q    AND YOU SUBMITTED A REPORT IN THAT CASE; CORRECT?

11  A    YEP.

12  Q    DID YOU TESTIFY IN THAT CASE?

13  A    NO, I DON'T BELIEVE SO.

14  Q    AND THE REPORT THAT YOU SUBMITTED WAS IN SUPPORT -- OR

15  EXCUSE ME -- IN OPPOSITION TO A MOTION FOR INJUNCTION;

16  CORRECT?

17  A    YES.

18  Q    DO YOU KNOW HOW THE COURT RULED IN THAT CASE?

19  A    YES.  IT RULED AGAINST OUR POSITION.

20  Q    OKAY.  IF YOU GO DOWN TO THE NEXT ONE, IT REFERENCES A

21  CASE IN TENNESSEE.  DO YOU SEE THAT?

22  A    YES.

23  Q    AND YOU SUBMITTED A EXPERT REPORT IN THE TENNESSEE CASE?

24  A    YES.

25  Q    THE TENNESSEE CASE INVOLVES GENDER-AFFIRMING CARE;

1    CORRECT?

2    A     YES.

3    Q     DID YOU TESTIFY IN THAT CASE OR JUST SUBMIT A REPORT?

4    A     I BELIEVE -- YEAH, I JUST SUBMITTED A REPORT.

5    Q     AND IT WAS IN OPPOSITION TO A MOTION FOR PRELIMINARY

6    INJUNCTION?

7    A     YES.

8    Q     HOW DID THE COURT RULE?

9    A     THE DISTRICT COURT OR THE APPEALS COURT?

10   Q     DISTRICT.

11   A     THE DISTRICT COURT RULED AGAINST OUR POSITION.

12   Q     OKAY.  YOU ALSO SUBMITTED A REPORT IN A CASE TUCKER

13   VERSUS IVY IN THE MIDDLE DISTRICT OF ALABAMA; CORRECT?

14   A     YES.

15   Q     DID YOU TESTIFY IN THAT CASE?

16   A     NOT AS OF YET.

17   Q     OKAY.  YOU JUST SUBMITTED A REPORT?

18   A     YES.

19   Q     AND THAT WAS IN OPPOSITION TO A MOTION FOR A PRELIMINARY

20   INJUNCTION?

21   A     THE INITIAL ONE.  AND I THINK IT'S -- I HAVE SUBMITTED A

22   SUBSEQUENT REPORT.

23   Q     OKAY.  WHO HAS THAT SUBSEQUENT REPORT BEEN SUBMITTED TO?

24   TO THE COURT?

25   A     TO THE COURT.

1   Q     HOW DID THE COURT RULE OF THE MOTION FOR PRELIMINARY

2   INJUNCTION?

3   A     AGAINST OUR POSITION.

4   Q     I'M SORRY?

5   A     AGAINST OUR POSITION.

6   Q     NOW, DR. LAIDLAW, GOING BACK TO YOUR CV, YOU LIST IN YOUR

7   CV, IF I'M CORRECT, ALL OF THE PUBLICATIONS THAT YOU'VE

8   WRITTEN; IS THAT RIGHT?

9   A     AS MANY AS I COULD THINK OF.

10  Q     OKAY.  HAVE YOU EVER PUBLISHED A PEER-REVIEWED ARTICLE

11  WITH RESPECT TO THE AFFECTS ON STERILITY AS IT RELATES TO

12  GENDER-AFFIRMING CARE?

13  A     MY AMERICAN JOURNAL OF BIOETHICS DISCUSSES INFERTILITY.

14  Q     DOES -- HAVE YOU EVER PUBLISHED A PEER-REVIEWED ARTICLE

15  WITH RESPECT TO FERTILITY?

16  A     THAT'S WHAT IT WAS ABOUT.

17  Q     OKAY.  IN YOUR POSITION IS THE ARTICLE THAT YOU ARE

18  REFERRING TO, IS IT SUBJECT TO THE PEER-REVIEW PROCESS?

19  A     IT'S A PEER-REVIEWED JOURNAL.  I DON'T KNOW WHAT PROCESS

20  THEY WENT THROUGH.

21  Q     OKAY.  OTHER THAN THAT, HAVE YOU EVER PUBLISHED AN

22  ARTICLE WITH RESPECT TO THE AFFECTS, IF ANY, ON STERILITY OR

23  FERTILITY WITH THE TO GENDER-AFFIRMING CARE?

24  A     I HAVE PUBLICATIONS WHICH I HAVE LISTED WHERE I DISCUSSED

25  THAT.  ARE YOU TALKING IN MEDICAL JOURNALS?

1  Q    I'M TALKING ABOUT A PEER REVIEWED -- YOU ARE FAMILIAR

2  WITH THE PEER-REVIEW PROCESS; RIGHT?

3  A    RIGHT.

4  Q    I'M TALKING ABOUT A PEER REVIEW.  I'M NOT --

5  A    OKAY.

6  Q    LET ME ASK THE QUESTION.  I'M NOT TALKING ABOUT LETTERS

7  TO THE EDITOR.  I'M NOT TALKING ABOUT ESSAYS.  I'M TALKING

8  ABOUT AN ACTUAL ARTICLE THAT'S SUBJECT TO A CONFIRMED

9  PEER-REVIEW PROCESS.

10  A    NO.

11  Q    HAVE YOU EVER WRITTEN AN ARTICLE SUBJECT TO THE

12  PEER-REVIEW PROCESS ABOUT INFORMED CONSENT WITH RESPECT TO

13  GENDER-AFFIRMING TREATMENTS?

14  A    NO.

15  Q    NOW, YOU DID MENTION THAT YOU HAVE SOME -- YOU HAVE

16  WRITTEN SOME LETTERS TO THE EDITOR AND OTHER PIECES OF WORK

17  WITH RESPECT TO GENDER-AFFIRMING CARE.  AM I CORRECT ABOUT

18  THAT?

19  A    YES.

20  Q    NONE OF THOSE HAVE BEEN SUBJECT TO PEER REVIEW?

21  A    I DON'T KNOW.

22  Q    YOU DON'T KNOW.

23  A    I DON'T KNOW.

24  Q    DR. LAIDLAW, YOU SUBMITTED AN AMICUS BRIEF TO THE UNITED

25  STATES SUPREME COURT, DID YOU NOT, IN THE CASE OF DOE VERSUS

1  BOYERTOWN AREA SCHOOL DISTRICT?

2  A    THIS WOULD BE 2018?

3  Q    I WILL TELL YOU FROM THE ONE LISTED AMICUS BRIEF IN YOUR

4  CV, IT'S NOT THE AMICUS BRIEF THAT YOU FILED IN THE DOE VERSUS

5  BOYERTOWN CASE.  THAT'S MY QUESTION.  SO LET ME START AGAIN.

6       DR. LAIDLAW, DID YOU SUBMIT AN AMICUS BRIEF IN THE CASE

7  TO THE UNITED STATES SUPREME COURT IN THE CASE OF DOE VERSUS

8  BOYERTOWN?

9  A    I DON'T RECALL SUBMITTING AN AMICUS TO THE SUPREME

10 COURT.

11 Q    DO YOU SEE WHAT I HAVE JUST PUT UP ON THE SCREEN?

12 A    YES.

13 Q    DOES THIS REFRESH YOUR MEMORY ABOUT WHETHER YOU SUBMITTED

14 AN AMICUS BRIEF TO UNITED STATES SUPREME COURT IN THE CASE OF

15 DOE VERSUS BOYWERTOWN?  IS THAT YOU LISTED AS AUTHOR, MICHAEL

16 LAIDLAW?

17 A    YES.

18 Q    OKAY.  DOES IT REFRESH YOUR RECOLLECTION NOW THAT YOU

19 DID, IN FACT, SUBMIT AN AMICUS BRIEF TO UNITED STATES SUPREME

20 COURT?

21 A    I SEE MY NAME THERE.  I PROBABLY HAVE TO LOOK AT SOME OF

22 THE WORDING TO REMEMBER FOR SURE.

23 Q    SO IS IT YOUR TESTIMONY DESPITE SEEING YOUR NAME, YOU

24 DON'T RECALL WHETHER YOU SUBMITTED AN AMICUS BRIEF TO THE

25 UNITED STATES SUPREME COURT?

1  A    I WOULD HAVE TO LOOK AT WHAT'S WRITTEN THERE TO REMEMBER.

2  Q    OKAY.  REGARDLESS, YOU DIDN'T LIST IT ON YOUR CV, DID

3  YOU?

4  A    IF I HAD DONE IT AT THAT TIME, IT WAS A MISTAKE.

5  Q    HAVE YOU EVER LISTED THIS SUPREME COURT -- THE BRIEF TO

6  THE SUPREME COURT, THE AMICUS BRIEF THAT YOU FILED IN THE CASE

7  OF DOE VERSUS BOYERTOWN?

8  A    I DON'T SEE IT LISTED.

9  Q    LET ME FINISH.

10         THE COURT:  THE COURT REPORTER IS GOING TO BE UPSET

11  SO LET'S TRY TO --

12  A    RIGHT.

13  Q    ALLOW ME TO FINISH MY QUESTION.

14     HERE'S MY QUESTION:  HAVE YOU EVER LISTED THE AMICUS

15  BRIEF THAT YOU SUBMITTED TO THE UNITED STATES SUPREME COURT IN

16  THE CASE OF DOE VERSUS BOYERTOWN ON YOUR CV?

17  A    WHAT YOU HAVE THERE I DON'T RECALL EVER PUTTING IT ON A

18  CV.

19  Q    WHY NOT?

20  A    PROBABLY IT SLIPPED MY MEMORY.  I'M NOT TRYING TO HIDE

21  ANYTHING.

22  Q    WELL, LET'S TALKING ABOUT THE BRIEF THAT YOU SUBMITTED TO

23  THE UNITED STATES SUPREME COURT.  ON PAGE 14 OF THE BRIEF --

24  AND I'LL PUT IT UP IN YOU WANT --

25  A    YES, PLEASE.

1  Q    -- YOU WROTE GENDER DYSPHORIA USERS HAVE A FALSE BELIEF

2  IN THEIR GENDER IDENTITY; CORRECT?

3         MR. STRAWBRIDGE:  OBJECTION.  THE WITNESS DID

4  ASK FOR HIM TO PULL IT UP.

5         MR. BRADSHAW:  I'M HAPPY TO PUT IT UP.

6         THE COURT:  YES.

7  BY MR. BRADSHAW:

8  Q    I'LL JUST REPRESENT YOU TO, DR. LAIDLAW, THE MARKINGS ARE

9  MINE.  THEY ARE NOT IN THE ACTUAL BRIEF THAT YOU SUBMITTED,

10 OKAY.

11     IN FACT, YOU WROTE, IN THE BRIEF TO THE SUPREME COURT,

12 DID YOU NOT, THAT GENDER DYSPHORIA USERS HAVE A FALSE BELIEF

13 IN THEIR GENDER IDENTITY?

14 A    LET ME REREAD IT, IF I COULD.

15 Q    I WILL READ THE SPECIFIC LANGUAGE TO YOU.  IT'S

16 HIGHLIGHTED.  SUCH TREATMENTS ENCOURAGE A GENDER DYSPHORIC

17 YOUTH LIKE SOME IN THIS CASE, TO ADHERE TO HIS OR HER FALSE

18 BELIEF THAT HE OR SHE IS OF THE OPPOSITE SEX.

19     HERE IS MY QUESTION:  DID YOU WRITE THAT, DR. LAIDLAW?

20 A    I'M LISTED ON THAT BRIEF, SO I WOULD TAKE ACCOUNTABILITY

21 FOR IT.

22 Q    AND DID YOU WRITE THAT UNDERSTANDING THAT YOU HAVE NEVER

23 TREATED AN ADOLESCENT FOR GENDER DYSPHORIA?

24 A    YES.

25 Q    AND DID YOU WRITE THAT DESPITE THE FACT THAT YOU NEVER

1  DIAGNOSED EVER AN ADOLESCENT FOR GENDER DYSPHORIA?

2  A     YES.

3  Q     NOW, IN THE SUPREME COURT BRIEF THAT YOU SUBMITTED ON

4  PAGE 15 YOU WROTE AND I'M GOING TO SHOW IT TO YOU, THAT GENDER

5  DYSPHORIC YOUTH ARE MAINTAINING A CHARADE; IS THAT CORRECT?

6  A     COULD I SEE IT PLEASE.

7  Q     I'LL JUST BEGIN -- THE MARKINGS ARE MINE.  YOU SAY, YOU

8  WRITE, THESE TREATMENTS WOULD HELP THE CHILD TO MAINTAIN HIS

9  OR HER DELUSION BUT WITH LESS DISTRESS AND AMONG OTHER ASPECTS

10  REQUIRING OTHERS IN THE CHILD'S LIFE TO GO ALONG WITH THIS

11  CHARADE.  DO YOU SEE THAT?

12  A     I DO.

13  Q     DID I READ THAT CORRECTLY?

14  A     YOU DID.

15  Q     AND THAT'S WHAT YOU WROTE IN A BRIEF TO THE UNITED STATES

16  SUPREME COURT?

17  A     IT APPEARS.

18  Q     AND YOU WROTE THAT DESPITE THE FACT THAT YOU HAVE NEVER

19  DIAGNOSED AN ADOLESCENT FOR GENDER DYSPHORIA?

20  A     YES.

21  Q     AND YOU WROTE THAT DESPITE THE FACT THAT YOU HAVE NEVER

22  TREATED AN ADOLESCENT FOR GENDER DYSPHORIA?

23  A     YES.

24  Q     ALL RIGHT.  ON PAGE 16 OF THE BRIEF THAT YOU SUBMITTED TO

25  THE UNITED STATES SUPREME COURT, YOU REFERRED TO GENDER

1  TRANSITION AS A QUOTE IMPERSONATION OF THE OPPOSITE SEX.  DOES

2  THAT RING A BELL?

3  A    YES.

4  Q    AND, YOU DID, IN FACT, WRITE THAT TO THE UNITED STATES

5  SUPREME COURT?

6  A    COULD YOU SHOW IT TO ME.

7  Q    ABSOLUTELY.  I WOULD BE HAPPY TO.  AGAIN, THE MARKINGS

8  ARE MINE.  A YOUTH'S FALSE BELIEF WOULD THUS BE PERPETUATED

9  THROUGH NAME AND PRONOUN CHANGES, THE SUCCESSFUL IMPERSONATION

10 OF THE OPPOSITE SEX.  DID YOU WRITE THAT?

11 A    YES.

12 Q    OKAY.  AND YOU WROTE THAT DESPITE THE FACT YOU COULD HAVE

13 NEVER DIAGNOSED AN ADOLESCENT FOR GENDER DYSPHORIA?

14 A    YES.

15 Q    AND YOU WROTE THAT DESPITE THE FACT THAT YOU HAVE NEVER

16 TREATED AN ADOLESCENT FOR GENDER DYSPHORIA?

17 A    YES.

18 Q    ON PAGE 16 ALSO, YOU REFER TO GENDER DYSPHORIA AFFIRMANCE

19 AS PLAY ACTING.  DO YOU SEE THAT?

20 A    YES.

21 Q    SAME QUESTION.  YOU WROTE THAT DESPITE THE FACT THAT YOU

22 RECEIVE NEVER TREATED A CHILD OR AN ADOLESCENT FOR GENDER

23 DYSPHORIA?

24 A    YES.

25 Q    AND YOU WROTE THAT DESPITE THE FACT THAT YOU HAVE NEVER

1  DIAGNOSED A CHILD OR ADOLESCENT WITH GENDER DYSPHORIA?

2  A     YES.

3  Q     DR. LAIDLAW, YOU'RE AWARE THAT YOUR OPINIONS ON WPATH

4  STANDARDS OF CARE ARE CONTRARY TO THE RECOMMENDATIONS OF EVERY

5  MAJOR MEDICAL AND MENTAL HEALTH ASSOCIATION IN THE UNITED

6  STATES?

7  A     IN THE UNITED STATES, YES.

8  Q     AND YOU ARE AWARE THAT THOSE MEDICAL AND MENTAL HEALTH

9  ASSOCIATIONS HAVE SUBMITTED AN AMICUS BRIEF?  I KNOW YOU ARE

10 FAMILIAR WITH AMICUS BRIEFS, IN THIS CASE?

11 A     I DON'T KNOW ABOUT THIS CASE.  I KNOW THEY HAVE IN MANY

12 OTHER CASES.

13 Q     OKAY.  HAVE YOU READ THE AMICUS BRIEF THAT THOSE

14 ORGANIZATIONS IS IN SUPPORT OF HORMONAL INTERVENTIONS FOR

15 TREATING GENDER DYSPHORIA SUBMITTED IN THIS CASE?

16 A     NOT FOR THIS CASE.

17 Q     HAVE YOU READ ANY OF THE AMICUS BRIEFS THEY FILED IN

18 OTHER CASE?

19 A     YES.  IN ALABAMA, I BELIEVE SO.

20 Q     SO -- AND YOU ARE AWARE THAT YOUR POSITIONS ARE DIRECTLY

21 AT ODDS WITH THOSE ORGANIZATIONS?

22 A     YES.

23 Q     NOW IN YOUR REPORT, DR. LAIDLAW, YOU TALK ABOUT

24 STERILIZATION AS POTENTIAL CONSEQUENCES OF GENDER-AFFIRMING

25 CARE; IS THAT RIGHT?

1   A    THAT'S CORRECT.

2   Q    WHEN YOU REFER IN PARAGRAPH 95 YOU'RE REFERRING PRIMARILY

3   TO GENDER-AFFIRMING SURGERY?

4   A    THAT RIGHT.  YES.

5   Q    OKAY.  SO, YOUR OPINION, WITH RESPECT TO STERILITY IS

6   FOCUSED ON SURGERIES, THE REMOVING OR THE CHANGING OF GONADS

7   WITH RESPECT TO STERILITY?

8   A    WELL, IT'S PART OF THE CONTINUUM THAT STARTS WITH PUBERTY

9   BLOCKERS TO CONTINUES TO CROSS-SEX HORMONES TO SURGERIES.  SO

10  MOST OF THOSE PATIENTS WHO START ON PUBERTY BLOCKERS IN THE

11  STUDY WENT ON TO CROSS-SEX HORMONES, WENT ON TO SURGERIES.  SO

12  IT'S PART OF CONTINUUM THAT ENDS IN STERILITY.

13  Q    OKAY.  SO YOUR OPINION WITH RESPECT TO STERILITY IS

14  FOCUSED ON SURGERY?

15  A    THAT'S ALL THAT WE HAVE.  WE'RE NOT SURE YET ABOUT

16  PATIENTS WITH PUBERTY BLOCKERS AND CROSS-SEX HORMONES IF THEY

17  WILL BE PERMANENTLY STERILIZED.

18  Q    OKAY.  ARE YOU AWARE THAT THE AMERICAN COLLEGE OF

19  OBSTETRICIANS AND GYNECOLOGISTS HAVE CONCLUDED THAT HORMONE

20  THERAPY IS NOT AN EFFECTIVE CONTRACEPTION?  AWARE YOU OF THAT?

21  A    YES.

22  Q    NOW YOU WOULD AGREE WITH ME, WOULD YOU NOT, DR. LAIDLAW,

23  THAT AS LONG AS A PERSON RETAINS THEIR GONADS, THEY HAVE THE

24  POTENTIAL FOR FERTILITY?

25  A    NOT NECESSARILY.

1  Q     IN WHAT WAY WOULD YOU DISAGREE?

2  A     LET'S SAY SOMEONE HAD THE MUMPS, VERY PAINFUL, EXTRACTION

3  OF TISSUE OR A SOME OTHER CONDITION THAT DESTROYED OVARIAN

4  TISSUE THEY WOULD BE INFERTILE.

5  Q     NOW YOU ARE AWARE THAT THERE ARE OPTIONS FOR TRANSGENDER

6  PATIENTS TO PRESERVE THEIR FERTILITY?

7  A     FOR SOME, YES.  FOR OTHERS THE OPTIONS ARE VERY LIMITED

8  TO EXPERIMENTAL TREATMENTS.

9          MR. STRAWBRIDGE:  YOUR HONOR, I'M RELUCTANT TO DO

10  IT.  I JUST NOTE THAT THE PARTIES DID HAVE AN AGREEMENT ON

11  TIME.  I THINK THE PLAINTIFFS' TIME HAS EXPIRED.  I DON'T

12  OBJECT TO HIM FINISHING A LINE OF QUESTIONS BUT AT SOME POINT

13  IT FEELS LIKE THE TIME SHOULD BE OBSERVED.

14          MR. BRADSHAW:  I RECOGNIZE THAT AND I'M NOT

15  TRYING -- I HAVE BEEN TRYING TO KEEP TRACK OF MY TIME.  I WILL

16  FINISH UP IN A MINUTE.

17          THE COURT:  OKAY.  FINE.

18  BY MR. BRADSHAW:

19  Q     DR. LAIDLAW, I HAVE JUST A COUPLE QUICK QUESTIONS AND

20  THEN I'LL BE FINISHED.

21      ON PAGE 93 OF YOUR REPORT YOU ACTUALLY PROVIDE SOME

22  OPINIONS REGARDING THE FIVE MINOR PLAINTIFFS IN THIS CASE.  AM

23  I RIGHT ABOUT THAT?

24  A     YES.

25  Q     YOU NEVER TALKED TO ANY OF THE FIVE MINOR PLAINTIFFS IN

1   THIS CASE; RIGHT?

2   A    NO.  I READ THEIR DECLARATIONS PROVIDED.

3   Q    YOU NEVER TALKED TO THEIR MEDICAL PROVIDERS?

4   A    NO.

5   Q    NEVER TALKED TO THEIR PARENTS?

6   A    NO.

7   Q    IN PARAGRAPH 259, YOU STATE AS AN OPINION THAT BOTH AK

8   AND TM APPEAR TO HAVE AN UNREALISTIC EXPECTATION  ABOUT

9   GENDER-AFFIRMING TREATMENT.  DO YOU SEE THAT?

10  A    YES.

11  Q    AND YOU HAVE NEVER DISCUSSED WITH AK OR TM WHAT THEIR

12  EXPECTATIONS ARE WITH RESPECT TO GENDER-AFFIRMING TREATMENT,

13  HAVE YOU?

14  A    I'M USING WHAT'S WRITTEN IN THE DECLARATION.

15  Q    THAT WASN'T MY QUESTION.

16       MY QUESTION IS HAVE YOU EVER DISCUSSED WHAT THEIR

17  EXPECTATIONS ARE WITH THEM?

18  A    I HAVEN'T DISCUSSED ANYTHING WITH THEM.

19  Q    OKAY.  AND SAME WITH RESPECT TO LZ WHO YOU CLAIM IS UNDER

20  THE FALSE IMPRESSION THAT THERE IS ANOTHER OPTION AVAILABLE,

21  OTHER THAN GOING THROUGHOUT NATURAL PUBERTY.

22       DO YOU SEE THAT?  IT IS IN PARAGRAPH 259.  I'M SORRY.

23  A    FALSE IMPRESSION.  MIDDLE, END OR WHICH PART OF THE

24  PARAGRAPH?  I'M SORRY.

25  Q    IT'S THE SECOND TO LAST SENTENCE IN THAT PARAGRAPH.  I'LL

1  READ IT.

2      LZ WHO HAS SOCIALLY TRANSITIONED AS A CHILD IS UNDER THE

3  FALSE IMPRESSION THAT THERE IS ANOTHER OPTION AVAILABLE, OTHER

4  THAN GOING THROUGH NATURAL MALE PUBERTY.  DO YOU SEE THAT?

5  A    YES.

6  Q    SO YOU NEVER TALKED WITH LZ ABOUT WHAT IMPRESSION SHE HAS

7  OR DOESN'T HAVE?

8  A    I HAVEN'T TALKED.  IT'S BASED ON WHAT'S IN DECLARATION.

9          MR. BRADSHAW:  NO FURTHER QUESTIONS, YOUR HONOR.

10         THE COURT:  THANK YOU.

11         MR. STRAWBRIDGE:  NO, YOUR HONOR.

12         THE COURT:  NO REDIRECT.  THANK YOU.

13         THE WITNESS:  THANK YOU.

14         THE COURT:  I APPRECIATE YOUR TESTIMONY.

15         ALL RIGHT.  COUNSEL, IS THERE ANYTHING THAT WE

16  SHOULD DISCUSS BEFORE WE TAKE A LUNCH BREAK?

17         MR. STRAWBRIDGE:  THE PARTIES, I THINK, NEED TO

18  MARK -- GO OVER AND MARK THE EXHIBITS.  WE'RE HAPPY TO DO THAT

19  WHEN WE ADJOURN HERE.  I JUST WANT TO MAKE SURE THEY GET

20  ADMITTED BEFORE THE HEARING IS CLOSED.

21         THE COURT:  YEAH, SURE.  WHY DON'T WE DO THIS:

22  WE'LL BREAK NOW AND IF YOU ALL CAN -- BEFORE WE RESUME, IF YOU

23  CAN DO WHAT NEEDS TO BE DONE IN TERMS OF CONFERRING WITH

24  MS. PITTMAN ABOUT EXHIBITS AND WE'LL BE READY TO DEAL WITH THE

25  EXHIBITS WHEN WE RESUME AFTER LUNCH.

1           MR. BRADSHAW:  WE ARE GOING TO 30 MINUTES OF

2    ARGUMENT PER SIDE AFTER LUNCH?

3           THE COURT:  LET'S START WITH THAT.  I'M GOING TO

4    HAVE QUITE A FEW QUESTIONS FOR EACH SIDE, SO YOU WILL HAVE AT

5    LESS 30 MINUTES.

6           ALL RIGHT.  ANYTHING ELSE?

7           MR. STRAWBRIDGE:  WE WILL BREAK FOR AN HOUR.

8               (LUNCHEON RECESS WAS TAKEN.)

9           THE COURT:  WE HAVE EXHIBITS TO DISCUSS; IS THAT

10   CORRECT?

11          MR. BRADSHAW:  YES, YOUR HONOR.  I THINK WE HAVE

12   BEEN WORKING WITH MS. PITTMAN TO GET A FINAL SET OF EXHIBITS

13   THAT ARE ADMITTED AND THAT ARE STIPULATED TO.  I THINK WE

14   ALMOST ARE THERE.  THERE'S A COUPLE THAT WE NEED TO PRINT OUT

15   AND SO WE'RE WORKING THROUGH THE LOGISTICS OF THAT.  BUT,

16   OTHERWISE, WE HAVE GONE THROUGH THE EXHIBITS, THEY HAVE BEEN

17   MARKED,  BOTH FOR THE PLAINTIFFS AS WELL AS FOR THE DEFENDANTS

18   AND I THINK THE ONLY ISSUE IS WITH RESPECT TO A COUPLE THAT

19   ARE -- WE'RE HOPING TO GET PRINTED OUT AND WE'LL WORK WITH

20   MS. PITTMAN.

21          THE COURT:  OKAY.  THAT SOUNDS FINE.  AND ARE THE

22   OUTSTANDING ONES, ARE THESE THE DECLARATIONS THAT ARE ON THE

23   DOCKET OF THE CASE?

24          MR. BRADSHAW:  THEY ARE.  SPECIFICALLY, THEY'RE THE

25   DECLARATIONS OF THE PLAINTIFFS AND DECLARATIONS THAT THE

1  DEFENDANTS SUBMITTED IN THEIR SUR-REPLY AS PART OF THE

2  BRIEFING.  SO THEY ARE ON THE DOCKET.

3           THE COURT:  YEAH.

4           MR. BRADSHAW:  SO THEY HAVE BEEN FILED IN THE CASE.

5  WE JUST WANT TO MAKE SURE THEY HAVE BEEN MARKED AS EXHIBITS

6  AND ARE --

7           THE COURT:  THAT'S FINE.  IF YOU WANT TO DO IT THAT

8  WAY, THAT'S FINE WITH ME.  ALTERNATIVELY, IF YOU WANT TO GIVE

9  ME A LIST OF WHERE THEY ARE ON THE DOCKET, YOU CAN ORALLY MOVE

10 TO ADMITTED THEM AND I WILL ADMIT THEM.

11          MR. BRADSHAW:  WE WILL CAN DO THAT.  THAT WOULD SAVE

12 US SOME LOGISTICAL  --

13          THE COURT:  SURE.  AND YOU DON'T HAVE TO PRINT.

14          MR. STRAWBRIDGE:  DO YOU WANT US TO WAIT AND THEN

15 ADMIT EVERYTHING AT THE END OF ARGUMENT?

16          THE COURT:  WHY DON'T YOU-ALL JUST TAKE A FEW

17 MINUTES AND SEE IF YOU CAN AGREE ON WHAT NEEDS TO COME IN,

18 MAKE YOUR LIST, AND THEN I WILL ADMIT EVERYTHING AND THEN WE

19 CAN MOVE ON TO CLOSING EVIDENCE.

20          MR. STRAWBRIDGE:  OKAY.

21          THE COURT:  DOES THAT SOUND ALL RIGHT?

22          MR. BRADSHAW:  YES.  WE'RE ALL SET.  I CAN READ THEM

23 OUT TO YOU.

24          THE COURT:  OKAY.

25          MS. GARAGIOLA:  SO PLAINTIFFS' EXHIBITS WE WOULD BE

1   STARTING WITH PX 19 DOCKET ENTRIES IS 2-1.  2-2 WILL BE PX 20.

2   2-3 WILL BE PX 21.  2-4-PX WILL BE 22.  2-5-PX WILL BE 23. 2=6

3   WILL BE PX 24.  2-7 WILL BE PX 25.  78-1 WILL BE PX 26.  78-2

4   WILL BE PX 27.  78-3 WILL BE PX 28.  78-4 WILL BE PX 29.  AND

5   99-1 WILL BE PX 30.

6           THANK YOU.

7           THE COURT:  ALL RIGHT.  ANY OBJECTION TO THE

8   ADMISSION OF ANY OF THOSE?

9           MR. STRAWBRIDGE:  NO.  I JUST WANT TO UNDERSTAND, SO

10  YOU READ IN THE AFFIDAVITS FROM THE DEFENDANTS AS WELL?  78 I

11  THINK THAT'S OUR FILINGS?

12          MS. GARAGIOLA:  I'M SO SORRY.  YOU ARE RIGHT.  I

13  DID.  I'M SO SORRY.  ALL RIGHT.  78-1, 78-2, 78-3 AND 78-4,

14  SHOULD BE DX'S.

15          MR. STRAWBRIDGE:  IF YOU WANT TO WITHDRAW THE 78'S,

16  I CAN THEN --

17          THE COURT:  OKAY.  WE'LL WITHDRAW THE 78'S, AND

18  MR. STRAWBRIDGE, IS THERE ANY OBJECTION TO ADMISSION OF THE

19  OTHER EXHIBITS THAT COUNSEL HAS JUST LISTED?

20          MR. STRAWBRIDGE:  NO OBJECTION FOR ADMISSION FOR

21  PURPOSES OF THIS HEARING.

22          THE COURT:  OKAY.  SO THOSE ARE ADMITTED.  AND THEN

23  YOU HAVE SOME THAT YOU'D LIKE TO ADMIT.

24          MR. STRAWBRIDGE:  YES.  IN ADDITION TO THE EXHIBITS

25  THAT ALREADY BEEN ADMITTED, WE WOULD MOVE THE ADMISSION OF

1  DOCKET 78-1, WILL BE DX13.  78-2 WHICH WILL BE DX 14.  78-3

2  WHICH WILL BE DX15.  78-4, WHICH WILL BE DX 16, AND 78-5,

3  WHICH WILL BE DX 17.

4             THE COURT:  ANY OBJECTION?

5             MS. GARAGIOLA:  NO OBJECTION.

6             THE COURT:  ALL RIGHT.  ALL OF THESE EXHIBITS ARE

7  ADMITTED.

8             COURTROOM DEPUTY:  YOU ARE ADMITTING PX 1 THROUGH 8,

9  DX 1 THROUGH 12.

10            THE COURT:  ANY OBJECTION?  MY UNDERSTANDING IS THAT

11 YOU ALL AGREED TO ALL OF THAT.

12            MR. BRADSHAW:  NO OBJECTION.

13            MR. STRAWBRIDGE:  WE ARE.

14            THE COURT:  YES, THEY ARE ADMITTED.

15            ARE YOU READY FOR ARGUMENT.

16            MR. BRADSHAW:  THANK YOU, YOUR HONOR.

17            MAY IT PLEASE THE COURT.  BEN BRADSHAW FOR THE

18 PLAINTIFFS.

19            AT THE OUTSET, YOUR HONOR, LET ME JUST THANK YOU FOR

20 YOUR TIME OVER THE LAST TWO DAYS AND FOR THE TIME OF THE

21 COURT'S PERSONNEL.  WE APPRECIATE IT.  WE KNOW IT HAS BEEN A

22 LOT.

23            YOUR HONOR, THE TESTIMONY THAT WE HEARD OVER THE

24 PAST TWO DAYS CONFIRMS THAT GENDER DYSPHORIA IS A REAL AND

25 SERIOUS MEDICAL CONDITION.

1          WHAT'S ALSO BEYOND DISPUTE IS THAT GENDER DYSPHORIA,

2   WHILE A SERIOUS MEDICAL CONDITION, IS HIGHLY TREATABLE.

3   THERE'S A WELL-ESTABLISHED STANDARD OF CARE FOR THE TREATMENT

4   OF TRANSGENDER YOUTH WHO SUFFER FROM GENDER DYSPHORIA AND THAT

5   STANDARD OF CARE INCLUDES HORMONE THERAPY.

6          AND, CRITICALLY, YOUR HONOR, THE EVIDENCE CONFIRMS,

7   THE EVIDENCE THAT YOU'VE HEARD OVER THE LAST TWO DAYS,

8   CONFIRMS THAT TREATMENTS LEAD TO POSITIVE OUTCOMES.  THEY MAKE

9   PEOPLE BETTER  AND ALLEVIATE THE DEBILITATING DISTRESS THAT

10  MINORS SUFFERING FROM GENDER DYSPHORIA EXPERIENCE IN THEIR

11  LIVES.  AND ISN'T THAT THE POINT OF MEDICAL TREATMENT?  TO

12  MAKE PEOPLE BETTER AND ALLEVIATE PAIN.

13         THE RECORD EVIDENCE THAT YOU'VE HEARD IS CLEAR THAT

14  THERE IS CONSENSUS IN THE MEDICAL COMMUNITY THAT TRANSITIONING

15  MEDICATIONS, INCLUDING THE HORMONE THERAPY BANNED BY S.B. 140,

16  ARE SAFE, EFFECTIVE, AND MEDICALLY APPROPRIATE TO TREAT GENDER

17  DYSPHORIA.  EVERY MAJOR MEDICAL ORGANIZATION IN THE UNITED

18  STATES AGREES WITH THIS.  AND YOU HAVE THE AMICUS BRIEFS FROM

19  THOSE ORGANIZATIONS IN THIS CASE SUPPORTING AFFIRMING CARE FOR

20  MINORS AND ADOLESCENTS WITH GENDER DYSPHORIA.

21         STILL, S.B. 140 BANS THEIR USE.  AND IN DOING SO,

22  INARBITRARILY DENYING TRANSGENDER MINORS THE SAFE, EFFECTIVE,

23  AND LIFE-AFFIRMING MEDICAL CARE THAT THEY NEED, IT VIOLATES

24  THEIR CONSTITUTIONAL RIGHTS.

25         BUT THIS JUST ISN'T ABOUT THEORETICAL LEGAL

1   PRINCIPLES, YOUR HONOR.  BECAUSE OF THIS LAW, THE MINOR

2   PLAINTIFFS IN THIS CASE AMY, TORI, LISA, LINDA, ARE UNABLE TO

3   RECEIVE THE MEDICAL TREATMENT THAT THEY NEED WITH DEVASTATING

4   PHYSICAL, PSYCHOLOGICAL AND EMOTIONAL CONSEQUENCES.

5          THE LAW ALSO DENIES THEIR PARENTS THE FUNDAMENTAL

6   RIGHT TO MAKE DECISIONS CONCERNING THE MEDICAL CARE OF THEIR

7   CHILDREN.  AND LIKE ANY PARENT, THE PARENT PLAINTIFFS IN THIS

8   CASE WANT THE BEST FOR THEIR CHILDREN.  AND WHEN THEY SEE

9   THEIR CHILDREN SUFFERING, WANT TO GET THE BEST TREATMENT THEY

10  CAN.  THAT'S WHAT THIS CASE IS ABOUT.

11         I WANT TO ADDRESS THE COURT'S QUESTIONS.  YOUR FIRST

12  QUESTION -- AND I'M GLAD YOU ASKED THE QUESTION -- ABOUT THE

13  CRITICAL FACTS AND HOW WE APPLY THEM TO THE CONSTITUTIONAL

14  STANDARDS.  I'M GOING TO TALK ABOUT SOME OF THOSE FACTS.

15         YOUR HONOR, AT A MINIMUM, FROM THE

16  CONSTITUTIONAL-STANDARDS PROSPECTIVE HEIGHTENED SCRUTINY

17  APPLIES, AT A MINIMUM IN THIS CASE.  IT APPLIES BECAUSE S.B.

18  140 DISCRIMINATES ON SEX, IT DISCRIMINATES ON THE BASIS OF

19  TRANSGENDER STATUS AND IT DISCRIMINATES AGAINST A

20  QUASI-SUSPECT CLASS.

21         NOW, IN ORDER, YOUR HONOR, TO SURVIVE HEIGHTENED

22  SCRUTINY, THE STATE MUST ESTABLISH AN EXCEEDINGLY-PERSUASIVE

23  JUSTIFICATION FOR THE CLASSIFICATION.  THAT'S U.S. V.

24  VIRGINIA, 518 US 515.  THAT'S THE STANDARD THAT THE STATE, IN

25  JUSTIFYING THAT IT HAS AN IMPORTANT INTEREST, MUST DEMONSTRATE

1    THROUGH EXCEEDINGLY-PERSUASIVE EVIDENCE THAT THE

2    CLASSIFICATION IS AN IMPORTANT INTEREST.  THAT'S WHERE THE

3    FACTS COME INTO PLAY.

4          SO IN TERMS WHEN YOU ARE THINKING THROUGH THE

5    CONSTITUTIONAL ANALYSIS AND THE APPLICATION OF THE FACTS, THE

6    FACTS COME INTO PLAY NOT WITH RESPECT TO WHETHER HEIGHTENED

7    SCRUTINY APPLIES -- AND BY THE WAY, STRICT SCRUTINY APPLIES

8    FOR THE SUBSTANTIVE DUE PROCESS CLAIM.  THAT'S WHY I SAY AT A

9    MINIMUM HEIGHTENED SCRUTINY APPLIES.  BUT THE FACTS COME INTO

10   PLAY IN TERMS OF ASSESSING WHETHER THE STATE CAN DEMONSTRATE A

11   COMPELLING OR AN IMPORTANT GOVERNMENT INTEREST.

12          THE COURT:  AND I AGREE WITH YOU.

13          AND SO WHAT DO I DO ON THAT POINT?

14          WHAT DO I DO WITH THE TESTIMONY THAT WE'VE HEARD?

15   AND I THINK WE HAVE HEARD SOME CONSENSUS, AT LEAST SOME

16   CONSENSUS FROM THE EXPERTS ON BOTH SIDES, ABOUT SOME OF THE

17   RISKS THAT ARE INVOLVED.

18          SO HOW DO I FACTOR THAT IN, APPLYING -- IF I APPLY

19   HEIGHTENED SCRUTINY, HOW WOULD I DO THAT?

20          MR. BRADSHAW:  TWO POINTS, YOUR HONOR.

21          FIRST OF ALL, WE WOULD CONTEST THAT THE EVIDENCE IS

22   OVERWHELMINGLY IN SUPPORT THAT THESE ARE SAFE, EFFECTIVE,

23   MEDICALLY-APPROPRIATE TREATMENTS WHEN APPLIED WITH THE

24   APPLICABLE STANDARDS OF CARE.

25          NOW, THERE ARE SOME VOICES -- AND YOU'VE HEARD FROM

1   THE DEFENDANTS FROM THE STATE'S EXPERTS.  THOSE VOICES MIGHT

2   BE LOUD BUT THEY'RE OUTLIERS.  AND WHAT'S IMPORTANT FOR THE

3   COURT TO UNDERSTAND IS THAT NONE OF THE STATE'S WITNESSES HAS

4   EVER DIAGNOSED A PATIENT, AN ADOLESCENT WITH GENDER DYSPHORIA.

5   NONE OF THE EXPERTS FROM THE STATE HAVE EVER TREATED AN

6   ADOLESCENT WITH GENDER DYSPHORIA.  TWO OF THE THREE HAVE

7   PROMOTED THAT GENDER DYSPHORIA IS A CHARADE AND A FALSE

8   BELIEF.  THOSE ARE WELL AND CONTRARY AND OUTSIDE OF THE

9   MAINSTREAM.

10          NOW, WHAT IS YOUR HONOR TO DO WITH THAT?

11          HERE'S THE QUESTION THAT YOUR HONOR HAS TO ASK IN

12  TERMS OF THE CONSTITUTIONAL STANDARD AND EXCESSIVELY,

13  EXCEEDINGLY-PERSUASIVE JUSTIFICATION:  IS A STUDY FROM FINLAND

14  OR A STUDY FROM SWEDEN, THAT DOESN'T BY THE WAY.  THEY'RE

15  REPORTS THAT DOESN'T BAN CARE AND IS LARGELY INCONSISTENT WITH

16  THE WPATH STANDARDS.  DOES THAT EVIDENCE RISE TO THE LEVEL OF

17  EXCEEDINGLY PERSUASIVE?

18          ABSOLUTELY NOT.

19          IN OTHER WORDS, YOUR HONOR, THE STATE OF STRICT

20  SCRUTINY REQUIRES -- IS A MEANINGFUL STANDARD.  YOUR HONOR

21  DOESN'T -- IF THERE IS -- AND WE WOULD CONTEST THERE ISN'T

22  CREDIBLE EVIDENCE ON THE OTHER SIDE.  BUT IF YOUR HONOR FINDS

23  THAT THERE IS SOME CREDIBLE EVIDENCE, THAT IS NOT

24  DETERMINATIVE BECAUSE IT DOESN'T SATISFY THE CONSTITUTIONAL

25  STANDARD FOR HEIGHTENED SCRUTINY.

1          ALSO, YOUR HONOR, REMEMBER, IT'S NOT JUST A

2    COMPELLING OR AN IMPORTANT  INTEREST.  IT IS, IS IT NARROWLY

3    TAILORED.  IN OTHER WORDS, IS THE BAN NARROWLY TAILORED TO THE

4    GOVERNMENT INTEREST.

5          THERE CAN BE NO QUESTION HERE, YOUR HONOR, THAT THIS

6    BAN IS NOT NARROWLY TAILORED.  EVEN IF YOU -- EVEN IF YOU FIND

7    THAT THERE'S AN IMPORTANT INTEREST THIS IS AN ABSOLUTE BAN.

8    THERE ARE NUMEROUS LESS-RESTRICTIVE ALTERNATIVES THAT THE

9    STATE COULD EMPLOY HERE.

10          IF THE STATE IS CONCERNED ABOUT MEDICAL PROVIDERS

11    PUSHING THESE TREATMENTS ON UNWITTING ADOLESCENTS FOR WHICH

12    THERE IS NO SUPPORT -- THERE IS NO EVIDENCE FOR THAT IN THE

13    RECORD -- THE STATE CAN MANDATE THAT THE INFORMED CONSENT

14    PROCESSES OF THE AMERICAN ENDOCRINE ASSOCIATION AND THE OTHER

15    STANDARD BODIES, THE STATE COULD MANDATE THOSE PROCEDURES.

16          IF THE STATE HAS SOME CONCERN ABOUT MEDICAL

17    MALFEASANCE, THE APPROPRIATE BOARDS CAN MONITOR AND ENFORCE

18    THOSE.

19          WHAT THE STATE HAS DONE, IT'S TAKEN THE RADICAL STEP

20    OF BANNING THE TREATMENT ENTIRELY.  UNDER THE CONSTITUTIONAL

21    STANDARDS, THAT'S NOT NARROWLY TAILORED.

22          SO, YOUR HONOR -- AND I WANT TO GO THROUGH THE FACTS

23    BECAUSE YOU'VE HEARD FROM TESTIMONY -- YOU'VE HEARD TESTIMONY.

24    YOU'VE HEARD FROM DR. SHUMER.

25          DR. SHUMER IS ONE OF THE LEADING PEDIATRIC

1   ENDOCRINOLOGISTS IN THE COUNTRY WHO HAS PERSONALLY TREATED

2   OVER 400 ADOLESCENTS WITH GENDER DYSPHORIA.  HE DOES IT ON A

3   DAILY BASIS.  HE HAS TESTIFIED THAT THE COMPREHENSIVE STANDARD

4   OF CARE FOR TREATING GENDER DYSPHORIA IS BASED ON ROBUST

5   RESEARCH, EXTENSIVE CLINICAL EXPERIENCE, AND THAT STANDARD OF

6   CARE HAS THE SUPPORT OF EVERY MAJOR MEDICAL PROFESSIONAL --

7   PROFESSIONAL MEDICAL OR MENTAL HEALTH ASSOCIATION IN THE

8   COUNTRY.

9            THAT'S NOT A REPORT FROM FINLAND THAT, BY THE WAY AS

10  I HAVE ALREADY SAID, DOESN'T BAN TREATMENT.  WE'VE HEARD SO

11  MUCH ABOUT SWEDEN AND FINLAND AND ENGLAND.  IN NONE OF THOSE

12  COUNTRIES ARE THESE TREATMENTS BANNED, WHICH GOES DIRECTLY TO

13  THE NARROWLY-TAILORED CLAIM.

14           YOU HEARD FROM DR. MASSEY.  THESE ARE -- AND I HOPE

15  I'M BEING RESPONSIVE TO YOUR QUESTION BECAUSE THESE ARE THE

16  FACTS THAT YOUR HONOR HAS HEARD THAT ARE THE CRITICAL FACTS

17  FOR THE CONSTITUTIONAL ANALYSIS.

18           DR. MASSEY -- SO WE HAVE SUMMARIZED SOME OF THE

19  EVIDENCE FOR YOUR HONOR WHICH I -- WE WILL I HAVE A PAPER

20  COPY.

21           CAN I APPROACH?

22           THE COURT:  YES.

23           MR. BRADSHAW:  DR. MASSEY TESTIFIED, YOUR HONOR --

24  WELL, FIRST OF ALL, A CLINICAL PSYCHOLOGIST HERE IN GEORGIA

25  WHO PERSONALLY HAS TREATED FOR THE LAST TEN YEARS ADOLESCENTS

1  WITH GENDER DYSPHORIA HERE IN GEORGIA, HAS TESTIFIED THAT THE

2  WPATH STANDARDS OF CARE REPRESENTS A GLOBAL MEDICAL CONSENSUS,

3  HAVING BEEN DEVELOPED BY PROFESSIONALS FROM AROUND THE WORLD.

4          THIS NOTION THAT EVERY COUNTRY IS MOVING OFF IN THIS

5  DIRECTION AND THE US IS SOMEHOW OFF ON A TANGENT IN THIS

6  DIRECTION -- YOU HEARD DR. CANTOR OPINE ABOUT THAT -- IS

7  SIMPLY FALSE.  AND YOU'VE HEARD THE TESTIMONY WHICH EXPLICITLY

8  REJECTS IT.

9          DR. MCNAMARA.  YOU'VE HEARD FROM DR. MCNAMARA, A

10  BOARD-CERTIFIED PEDIATRICIAN ADOLESCENT MEDICINE PHYSICIAN,

11  WHO PERSONALLY TREATS ADOLESCENTS WITH GENDER DYSPHORIA.

12          DR. MCNAMARA TESTIFY THAT INTERNATIONAL AND NATIONAL

13  MEDICAL CONSENSUS SUPPORTS THE TREATMENTS IN ACCORDANCE WITH

14  EVIDENCE.

15          THE IMPORTANT FACTS, YOUR HONOR, WHEN YOUR HONOR IS

16  CAREFULLY ASSESSING THE EVIDENCE THAT YOU'VE HEARD AND

17  DETERMINING UNDER HEIGHTENED SCRUTINY AT A MINIMUM, WHETHER

18  THE STATE HAS EXCEEDINGLY PERSUASIVELY DEMONSTRATED ITS

19  INTEREST, THIS IS THE EVIDENCE THAT YOU SHOULD CONSIDER:

20          RISKS.  THERE WAS A LOT OF DISCUSSION ABOUT RISKS

21  OVER THE LAST TWO DAYS.  THE RISKS ASSOCIATED WITH THESE

22  TREATMENTS.  YOUR HONOR, THE THRUST OF MANY OF THE STATE'S

23  ARGUMENTS AND QUESTIONING OF OUR EXPERTS IS THAT THERE ARE

24  RISKS ASSOCIATED WITH SENATE BILL 140 AND MEETS THE HORMONAL

25  INTERVENTIONS AND TREATMENTS OF THE BILL.  WE DON'T DISPUTE

1 THAT BASIC PREMISES.

2          THERE'S NO SUCH THING AS A RISK-FREE TREATMENT.

3 EVERY MEDICAL INTERVENTION HAS SIDE EFFECTS OF SOME KIND AND

4 CARRY SOME DEGREE OF RISK.  BUT AS DR. SHUMER HAS TESTIFIED,

5 SOMEONE WHO TREATS PATIENTS WITH GENDER DYSPHORIA, WHO ADVISES

6 THEM ABOUT THEIR RISKS, THE RISKS ASSOCIATED WITH HORMONAL

7 INTERVENTIONS ARE WELL-KNOWN AND THEY'RE MANAGEABLE.

8          DR. SHUMER TESTIFIED THAT THOSE RISKS CAN BE MANAGED

9 WITH ACCURATE DOSING AND WITH MONITORING.  AND, YOUR HONOR --

10 AND THIS IS WHAT THE STATE ENTIRELY IGNORES IN ITS DISCUSSION

11 OF THE RISKS, AS WITH ANY MEDICAL INTERVENTION, THE RISKS OF

12 PURSUING THE TREATMENT MUST BE MEASURED AGAINST THE RISKS OF

13 WITHHOLDING IT.

14          AND WHAT ARE THE RISKS OF WITHHOLDING THESE

15 TREATMENTS?  ALL OF THE PLAINTIFFS' EXPERTS HAVE TESTIFIED

16 ABOUT THE TREMENDOUS, WELL-DOCUMENTED BENEFITS OF HORMONE

17 TREATMENT FOR ADOLESCENTS WITH GENDER DYSPHORIA AND HAVE

18 TESTIFIED THAT WITHHOLDING THOSE TREATMENTS STRONGLY

19 CORRELATED WITH SERIOUS ADVERSE OUTCOMES.

20      THESE TREATMENTS ALLOW ADOLESCENTS TO THRIVE AND TO

21 FLOURISH AND WITHHOLDING THEM, CAST THEM BACK INTO SERIOUS

22 DISTRESS.  THAT'S WHAT THE TESTIMONY IS.  THAT'S WHAT THE

23 EVIDENCE IS.

24      FRANKLY, THE STATE'S ATTEMPT TO CHARACTERIZE THESE

25 TREATMENTS AS EXPERIMENTAL IS DESPERATE AND IT FAILS BASED ON

1  THE WEIGHT OF THE EVIDENCE.  THESE TREATMENTS HAVE BEEN USED

2  FOR A LONG TIME FOR A VARIETY OF INDICATIONS.  THERE'S NOTHING

3  EXPERIMENTAL ABOUT THEM.

4      DR. SHUMER TESTIFIED DIRECTLY ABOUT THE QUOTE, UNQUOTE

5  THE EXPERIMENTAL NATURE OF THESE TREATMENTS.  THESE ARE OTHER

6  FACTS THAT ARE IMPORTANT -- THAT YOUR HONOR NEEDS TO CONSIDER

7  WHEN IT'S LOOKING AT WHETHER -- AND APPLYING THE EVIDENCE THAT

8  YOU HAVE HEARD TO THE CONSTITUTIONAL STANDARDS.

9      WE TALKED A LITTLE BIT ABOUT INFORMED CONSENT.  WELL,

10 WHAT WAS THE TESTIMONY ABOUT INFORMED CONSENT?  AND THE IDEA

11 THAT, AGAIN, THAT SOMEHOW, UNSCRUPULOUS AND UNETHICAL

12 PROVIDERS ARE PUSHING THESE TREATMENTS WITHOUT CONSENT ON TO

13 MINORS AND DUPING THEIR PARENTS, THERE'S NO EVIDENCE TO

14 SUPPORT THAT.

15     AND, IN FACT, DR. SHUMER, DR. MCNAMARA AND DR. MASSEY ALL

16 TESTIFIED, YOU KNOW WHAT, THEY'RE THE ONES WHO PROVIDE THE

17 TREATMENT.  THEY HAVE ALL TESTIFIED ABOUT THE COMPREHENSIVE,

18 EXTENSIVE INFORMED CONSENT PROCESS THAT THE STANDARDS OF CARE

19 MANDATE, AND THAT THEY FOLLOW IN THEIR PRACTICE.

20     UNDER THE STANDARDS OF CARE, NO PATIENT IS RUSHED INTO

21 MEDICAL TREATMENT.  THE WPATH STANDARDS OF CARE 8 REQUIRE THAT

22 THERE'S A THERE IS A MULTIDISCIPLINARY APPROACH AND THAT THE

23 DECISION WHETHER OR NOT TO PURSUE THESE TREATMENTS TAKES PLACE

24 WITH PARENTS, WITH PSYCHIATRISTS, WITH PEDIATRICIANS, WITH

25 ENDOCRINOLOGISTS, ALL OF THE RELEVANT DISCIPLINES.

1        AND, YOUR HONOR, EVEN IF THERE IS -- WE CONTEST THAT

2   THERE IS ANY EVIDENCE.  EVEN IF THERE IS, THE ANSWER IS NOT TO

3   BAN THESE TREATMENTS IN THEIR ENTIRETY.  AGAIN, THERE ARE

4   LESS-RESTRICTIVE MEANS THAT COURTS COULD USE -- NOT THE

5   COURTS, EXCUSE ME -- THAT THE STATE COULD USE.

6        OTHER FACTORS THAT YOU -- AND FACTS.  I'M GOING TO GET TO

7   SOME OF YOUR OTHER QUESTIONS.

8        I WANT TO TALK ABOUT FDA APPROVAL, BECAUSE IT'S AN

9   IMPORTANT ISSUE.  THERE'S BEEN THE INSINUATION THAT JUST

10  BECAUSE THE USE OF TESTOSTERONE AND ESTROGEN TO TREAT GENDER

11  DYSPHORIA IS OFF LABEL, THAT IT SOMEHOW RENDERS THEM LESS

12  EFFECTIVE AND LESS SAFE.

13       BUT YOU HEARD FROM DR. SHUMER WHO TESTIFIED ABOUT THIS.

14  THE USE OF TESTOSTERONE AND ESTROGEN OFF LABEL TO TREAT GENDER

15  DYSPHORIA IS WIDELY ACCEPTED WITHIN THE FIELD OF

16  ENDOCRINOLOGY.

17       DR. HRUZ SAT IN THAT CHAIR AND SAID THE SAME THING.  HE

18  SAID IT IS COMMON IN THE AREA OF PEDIATRICS TO PRESCRIBE

19  MEDICATIONS OFF LABEL.  AND, YOUR HONOR, COURTS HAVE

20  RECOGNIZED THIS.

21       NOW, AGAIN, I'M HAPPY TO ANSWER ANY QUESTIONS ABOUT THE

22  EQUAL-PROTECTION ANALYSIS.  WE STRONGLY, STRONGLY BELIEVE,

23  YOUR HONOR, THAT HEIGHTENED SCRUTINY IS APPLICABLE HERE

24  BECAUSE SB 140 DISCRIMINATES ON THE BASIS OF SEX.

25       AND I KNOW WHAT THE ARGUMENT IS BUT, YOUR HONOR, THE

1 REASON THAT S.B. 140 DISCRIMINATES ON THE BASIS OF SEX IS

2 BECAUSE A MEDICAL PROCEDURE THAT IS PERMITTED FOR ONE MINOR.

3 A MINOR OF ONE SEX, IS PROHIBITED FOR A MINOR OF ANOTHER SEX.

4          THE COURT:  CAN YOU ADDRESS THE LANGUAGE, I THINK I

5 RECALL THAT DEFENDANTS CITED FROM DOBBS --

6          MR. BRADSHAW:  SURE.

7          THE COURT:  -- IN THEIR BRIEFING AND THE PARTICULAR

8 LANGUAGE?

9          MR. BRADSHAW:  I'D BE HAPPY TO.

10          THE COURT:  SO THIS LANGUAGE IN PARTICULAR, AND I'M

11 READING FROM DOBBS AND THIS PARTICULAR QUOTE CITES THE SUPREME

12 COURT CASE FROM 1974.  SO THE LANGUAGE IS THE REGULATION OF A

13 MEDICAL PROCEDURE THAT ONLY ONE SEX CAN UNDERGO DOES NOT

14 TRIGGER HEIGHTENED CONSTITUTIONAL SCRUTINY, UNLESS THE

15 REGULATIONS IS A MERE PRETEXT DESIGNED TO EFFECT

16 DISCRIMINATION AGAINST MEMBERS OF ONE SEX OR THE OTHER.

17          SO WHAT WOULD YOU HAVE ME DO WITH THAT LANGUAGE?

18          MR. BRADSHAW:  IT'S NOT APPLICABLE.  YOU SHOULD

19 DISREGARD IT.  DOBBS DOESN'T HELP THE DEFENDANTS HERE.  WHAT

20 DOBBS SAID IS THAT THE STATE REGULATING ABORTION DOES NOT

21 CONSTITUTE SEX-BASED DISCRIMINATION UNDER THE EQUAL-PROTECTION

22 CLAUSE.

23          BY THE WAY THERE WAS LIKE A PARAGRAPH AND A HALF

24 BECAUSE THE CASE IS NOT AN EQUAL-PROTECTION SEX-DISCRIMINATION

25 CASE.  THE REASON THAT IT'S NOT SEX-BASED DISCRIMINATION IS

1  BECAUSE ONLY ONE SEX CAN UNDERGO THE PROCEDURE.

2           UNDER S.B. 140, BOTH SEXES CAN UNDERGO THE

3  PROCEDURE.  THE PROCEDURE IS APPLICABLE TO MALES.  IT'S

4  APPLICABLE TO FEMALES.  AND WHETHER OR NOT THE TREATMENT IS

5  PERMISSIBLE, DEPENDS ON WHETHER THE NATAL SEX OF THE PATIENT

6  IS MALE OR WHETHER THE NATAL SEX IS FEMALE.  DOBBS JUST DOES

7  NOT HELP THEN.

8           DOBBS WAS NOT A SEX-BASED DISCRIMINATION CASE.  AND

9  AS YOUR HONOR WELL KNOWS, IT WAS A SUBSTANTIVE DUE-PROCESS

10 CLAIM THAT BY ITS VERY TERMS, WAS LIMITED TO THE CONTEXT OF

11 THE ABORTION.  IT DOES NOT HELP THE STATE AND IT DOES NOT

12 APPLY HERE.

13          THE SECOND -- AND I WANT TO GET TO THIS -- AND FEEL

14 FREE TO INTERRUPT ME AT ANY POINT.

15          THE COURT:  LET ME SAY THIS:  I UNDERSTAND THAT YOU

16 HAVE BOTH AGREED TO TIME LIMITS HERE AND THOSE HAVE BEEN

17 EXTREMELY HELPFUL TO ALL OF US, TO ME IN PARTICULAR THROUGHOUT

18 THE COURSE OF THIS PROCEEDING.  THIS PART IS CRITICAL FOR MY

19 PROCESS, SO I'M GOING TO MAKE SURE THAT YOU EACH GET AN EQUAL

20 AMOUNT OF TIME, BUT I'M GOING TO FEEL FREE TO GO OVER 30

21 MINUTES IF I FEEL LIKE I NEED TO WITH EITHER SIDE.  I'LL LET

22 YOU KNOW.

23          MR. BRADSHAW:  OF COURSE IT'S FINE.  I DON'T KNOW

24 HOW MUCH TIME I HAVE.

25          THE COURT:  GO AHEAD.

1        MR. BRADSHAW:  I DO WANT TO TALK ABOUT TRANSGENDER

2   STATUS BECAUSE IT'S AN INDEPENDENT BASIS FOR APPLYING

3   HEIGHTENED SCRUTINY TO EQUAL PROTECTION CLAIM.

4        BRUMBY, YOUR HONOR FROM THE ELEVENTH CIRCUIT IS

5   CONTROLLING ON THIS QUESTION.  THE QUESTION IN BRUMBY WAS

6   WHETHER OR NOT DISCRIMINATION AGAINST AN INDIVIDUAL BASED ON

7   HIS OR HER GENDER NONCONFORMITY WAS A VIOLATION OF THE EQUAL

8   PROTECTION CLAUSE AND WAS SEX-BASED DISCRIMINATION.

9        UNEQUIVOCALLY, THE BRUMBY COURT SAID, YES, IT IS.

10  BRUMBY -- THE ONLY ARGUMENT THAT THE STATE HAS WITH RESPECT TO

11  TRANSGENDER STATUS IS THAT SOMEHOW -- FIRST OF ALL, IT'S

12  LINGUISTIC GYMNASTICS THAT THE STATE WANTS TO ENGAGE IN.  AND

13  IT'S TO SAY THAT SB 140 DOESN'T CREATE A CLASSIFICATION BASED

14  ON -- OR DOESN'T DISCRIMINATE BASED ON GENDER NONCONFORMITY.

15  THAT'S JUST INCONSISTENT WITH THE LANGUAGE OF THE STATUTE

16  ITSELF.

17        GENDER -- THIS S.B. 140 TARGETS GENDER DYSPHORIA,

18  PROHIBITS TREATMENTS FOR THE TREATMENT OF GENDER DYSPHORIA.

19  INHERENT IN THE DEFINITION OF GENDER DYSPHORIA IS AN

20  INDIVIDUAL'S IDENTITY AS TRANSGENDER.  IN OTHER WORDS, THERE'S

21  AN INCONGRUENCE BETWEEN AN INDIVIDUAL'S GENDER IDENTITY AND

22  THEIR NATAL SEX.  THAT'S THE DEFINITION OF GENDER

23  NONCONFORMITY.

24        WE WOULD SUBMIT TO YOUR HONOR THIS ONE IS AN EASY

25  ONE.  THIS STATUTE DISCRIMINATES ON THE BASIS OF TRANSGENDER

1  STATUS, WHICH COURTS INCLUDING BRUMBY, HAVE FOUND

2  UNEQUIVOCALLY IS A SEX-BASED DISCRIMINATE -- SEX-BASED

3  CLASSIFICATION.

4          ON QUASI-SUSPECT CLASS, THE THIRD INDEPENDENT BASIS

5  FOR APPLYING HEIGHTENED SCRUTINY, THE STATE'S PRIMARY ARGUMENT

6  SEEMS TO BE IT'S A REALLY HIGH BAR FOR THE CREATION OF A

7  QUASI-SUSPECT CLASS, AND THAT NEITHER THE SUPREME COURT NOR

8  THE ELEVENTH CIRCUIT HAS EXPLICITLY RECOGNIZED THAT

9  TRANSGENDER INDIVIDUALS CONSTITUTE QUASI-SUSPECT CLASS.

10 THAT'S TRUE.  IT IS A HIGH BAR.  THE SUPREME COURT HASN'T

11 SPECIFICALLY RULED ON IT BUT IT'S NOT AN INSURMOUNTABLE BAR.

12 IT'S NOT IMPOSSIBLE.  IT'S A HIGH BAR.

13         TRANSGENDER INDIVIDUALS HAVE SUFFERED A LONG HISTORY

14 OF PREJUDICE AND DISCRIMINATION.  THAT IS WHY SEVERAL COURTS,

15 INCLUDING THE FOURTH CIRCUIT IN THE GRIMM CASE -- AND WE WOULD

16 REFER YOUR HONOR TO THE GRIMM CASE IN THE FOURTH CIRCUIT WHERE

17 THE FOURTH CIRCUIT SPECIFICALLY HELD THAT TRANSGENDER

18 INDIVIDUALS CONSTITUTE A QUASI-SUSPECT CLASS.  THAT CASE IS

19 VERY INSTRUCTIVE BECAUSE IT LISTS ALL OF THE DISTRICT COURTS

20 THAT HAVE FOUND THE SAME THING.

21         BRANDT VERSUS RUTLEDGE.

22         THE EIGHTH CIRCUIT BY THE WAY, THE CORE HOLDING OF

23 BRANDT VERSUS RUTLEDGE WAS A STATUTE VERY SIMILAR TO THIS ONE,

24 SEX-BASED DISCRIMINATION AND, THEREFORE, SUBJECT TO HEIGHTENED

25 SCRUTINY.  BUT IN A FOOTNOTE IN BRANT V RUTLEDGE, THE EIGHTH

1  CIRCUIT CONCLUDES OR CONFIRMS THAT THE DISTRICT COURT

2  APPROPRIATELY IN BRANT VERSUS RUTLEDGE CONCLUDED THAT

3  TRANSGENDER INDIVIDUALS CONSTITUTE A QUASI-SUSPECT CLASS.

4         IN THE ELEVENTH CIRCUIT -- I KNOW IT'S IN THE

5  DISSENT BY JUDGE JORDAN IN THE ADAMS CASE -- WHAT DID JUDGE

6  JORDAN SAY?  HE SAID QUOTE, LIKE THE FOURTH CIRCUIT IN GRIMM,

7  I HAVE NO TROUBLE CONCLUDING THAT TRANSGENDER INDIVIDUALS

8  CONSTITUTE A QUASI-SUSPECT CLASS.  ALL RIGHT.

9         UNLESS YOUR HONOR HAS ANY QUESTIONS, I'M NOT SURE

10  WHAT I'M -- I'LL GO FOR ANOTHER TEN MINUTES, IF THAT'S OKAY.

11         THE COURT:  I DID WANT YOU -- THAT'S FINE WITH ME

12  BUT I WANTED TO ASK SOME QUESTIONS ABOUT STANDING.

13         MR. BRADSHAW:  AND I WANT TO ADDRESS SOME OF YOUR

14  OTHER QUESTIONS.

15         THE COURT:  OKAY.  LET ME JUST -- ALL RIGHT.  ON THE

16  QUESTION OF IMMINENT HARM, SO I UNDERSTAND THAT IT'S THE

17  PLAINTIFFS' POSITION AS ARTICULATED IN THEIR REPLY BRIEF, THAT

18  AND -- IN THE DECLARATIONS THAT SOME OF THE PLAINTIFFS WILL

19  BEGIN OR INTEND TO BEGIN HORMONE THERAPY IN THE NEAR FUTURE.

20  AND THIS IS RELEVANT TO YOUR ARGUMENT BECAUSE YOU'RE SAYING

21  THE HARMS ARE NOT REMOTE AND SPECULATIVE.  AND, IN FACT, YOUR

22  CLIENTS SAY THAT THEY ARE EXPERIENCING THESE HARMS RIGHT NOW.

23         AND SO HELP ME UNDERSTAND WHAT ARE THE HARMS THAT

24  THESE PLAINTIFFS IN PARTICULAR ARE EXPERIENCING RIGHT NOW AND

25  WHAT IS THE RECORD EVIDENCE OF THOSE PARTICULAR HARMS?

1          MR. BRADSHAW:  THE HARMS THAT THEY ARE EXPERIENCING

2     RIGHT NOW ARE THE DISTRESS ASSOCIATED FROM BEING IN LIMBO.

3     TWO OF THE MINOR PLAINTIFFS WHO HAVE BEEN RECEIVING PUBERTY

4     BLOCKERS -- LET ME TAKE A STEP BACK FOR A SECOND.  ALL OF THE

5     MINOR PLAINTIFFS HERE HAVE BEEN DIAGNOSED WITH GENDER

6     DYSPHORIA.  ALL OF THEM HAVE BEEN RECEIVING SOME FORM OF

7     GENDER-AFFIRMING CARE FOR SEVERAL YEARS.  NOW, TWO HAVE BEEN

8     RECEIVING PUBERTY BLOCKERS.  THEY ARE -- THEY HAVE DECIDED

9     WITH THEIR MEDICAL PROVIDERS AND WITH THEIR PARENTS TO START

10    HORMONE THERAPY.  THE HARM THAT THEY ARE EXPERIENCING RIGHT

11    NOW, THEY ARE LIVING IN A STATE OF LIMBO.

12          BUT, YOUR HONOR, THE HARM -- I WANT TO GET BACK TO

13    THE LAW A LITTLE BIT BECAUSE THE HARM UNDER THE LAW FOR

14    IMMANENCE FOR PRELIMINARY INJUNCTION DOESN'T REQUIRE THAT THE

15    HARM ALREADY OCCUR.  IN OTHER WORDS, THERE DOESN'T HAVE TO BE

16    A CONSUMMATION OF THE INJURY.  THAT'S THE WHOLE POINT OF A

17    PRELIMINARY INJUNCTION, TO TRY TO STOP THE INJURY BEFORE IT

18    ACTUALLY HAPPENS.

19          SO ONE POINT, NO. 1, YOU DON'T HAVE TO HAVE INJURY

20    CONSUMMATED.  IT JUST HAS TO BE IMMINENT AS TO NOT

21    SPECULATIVE.  OKAY.  WE'VE MET THAT STANDARD HERE.  OKAY.

22          THE ELEVENTH CIRCUIT HAS SAID THAT -- AND IN THE

23    FLORIDA STATE CASE WHICH WE CITE IN OUR BRIEF, THAT IN THE

24    ELEVENTH CIRCUIT THE CONCEPT OF IMMANENCE IS ELASTIC.  THE

25    STATE WANTS TO ARGUE THAT BECAUSE THE NAMED PLAINTIFFS HERE

1    THE MINOR PLAINTIFFS CAN'T SPECIFICALLY STATE A DATE WHEN THEY

2    WOULD START THAT, THAT SOMEHOW RENDERS THEM -- THAT THEY

3    HAVEN'T SATISFIED THE IRREPARABLE HARM REQUIREMENT.  THAT'S

4    JUST NOT THE LAW.  THE ELEVENTH CIRCUIT HAS SAID IT'S AN

5    ELASTIC CONCEPT.  IT CAN'T BE REDUCED DOWN TO A SPECIFIC DATE,

6    A SPECIFIC WEEK OR EVEN SPECIFIC MONTH.

7            SEVERAL OF THE MINOR PLAINTIFFS ARE ON THE VERGE OF

8    PUBERTY.  THEY'RE RECEIVING GENDER-AFFIRMING CARE,

9    PSYCHOSOCIAL CARE, AND THE MINUTE THAT THEY HIT PUBERTY, WHICH

10   NOBODY -- THAT COULD HAPPEN TOMORROW, NOBODY KNOWS, BUT THE

11   MINUTE THAT HAPPENS, WHAT WOULD BE THE NEXT STEP?  THE NEXT

12   STEP WOULD BE FOR THEM TO START PUBERTY BLOCKERS, FOLLOWED BY

13   HORMONAL INTERVENTIONS.  THAT'S THE COURSE OF TREATMENT.  THAT

14   TREATMENT IS UNAVAILABLE TO THEM BECAUSE OF THIS AND THEY WILL

15   SUFFER IMMINENT INJURY AS A RESULT.

16           PARENTS ARE SUFFERING INJURY NOW BECAUSE THEY'RE

17   CONSIDERING WHETHER THEY HAVE TO GO OUT OF STATE TO GET

18   TREATMENT FOR THEIR KIDS.  WHETHER THEY HAVE TO MOVE, MAYBE UP

19   TO MICHIGAN WHERE DR. SHUMER PRACTICES, BECAUSE THEY CAN'T GET

20   THE TREATMENTS THAT THEIR KIDS NEED TO THRIVE AND FLOURISH

21   HERE IN GEORGIA.  THOSE ARE IMMINENT HARMS.

22           NOW, ONE OF YOUR HONOR'S QUESTIONS WAS ABOUT

23   SUBSTANTIVE DUE PROCESS AND ANY BINDING PRECEDENT FROM THE

24   ELEVENTH CIRCUIT APPLYING THE TROXEL CASE.  WE WOULD SUBMIT,

25   YOUR HONOR, AND, OF COURSE, AS YOUR HONOR KNOWS, THE RIGHT

1  THAT IS BEING INFRINGED HERE IS THE FUNDAMENTAL RIGHT OF

2  PARENTS TO CARE FOR THEIR CHILDREN.  THAT IS A RIGHT OF WHICH

3  THERE IS A CENTURY PRECEDENT.

4          THE STATE WANTS TO MAKE THIS ALL ABOUT A NEW

5  SUBSTANTIVE DUE PROCESS RIGHT.  WE'RE NOT TALKING ABOUT A NEW

6  SUBSTANTIVE DUE PROCESS RIGHT.  THE STATE WANTS TO RECAST THE

7  RIGHT OF A PARENT TO DIRECT THE MEDICAL CARE OF THEIR

8  CHILDREN.  THAT IT SOMEHOW IS A RIGHT TO DEMAND A SPECIFIC

9  MEDICAL PROCEDURE, AND IN THIS CASE HORMONAL INTERVENTION, AND

10 BECAUSE HORMONAL INTERVENTIONS AREN'T DEEPLY ROOTED IN THE

11 COUNTRY'S HISTORY, THAT, THEREFORE, WE'RE OUT OF LUCK.

12          THEY'RE BUILDING UP A STRAW MAN JUST TO KNOCK IT

13 DOWN.  THE RIGHT IS NOT A RIGHT, A SPECIFIC RIGHT OF HORMONAL

14 THERAPY AND THE BENDIBURG DECISION -- I'M GETTING TO YOUR

15 HONOR'S QUESTION -- IT WAS A LONG INTRO.

16          THE COURT:  OKAY.

17          MR. BRADSHAW:  THE BENDIBURG DECISION IS

18 CONTROLLING.  THE BENDIBURG DECISION DOESN'T CITE TROXEL BUT

19 THE TROXEL ANALYSIS IS THE ANALYSIS THAT IT FOLLOWS.  AND WHAT

20 DOES IT SAY?  WHAT DID BENDIBURG SAY ABOUT THIS ARGUMENT ABOUT

21 NARROWLY DRAWING THE PARENTAL RIGHT TO A RIGHT TO DEMAND A

22 SPECIFIC MEDICAL TREATMENT?  IT REJECTS IT.

23          WHAT DOES IT SAY?  QUOTE.  THIS IS FROM BENDIBURG,

24 THE ELEVENTH CIRCUIT, THE STATE CANNOT WILLFULLY DISREGARD THE

25 RIGHT OF THE PARENTS TO GENERALLY MAKES DECISION CONCERNING

1  THE MEDICAL TREATMENT TO BE GIVEN THEIR CHILDREN.  THE

2  BENDIBURG COURT DIDN'T SAY DRAW TO A SPECIFIC RIGHT FOR A

3  SPECIFIC TREATMENT.  WE'RE TALKING ABOUT A RIGHT GENERALLY,

4  AND THAT MATTERS.

5          THE COURT:  DOESN'T IT ALSO MATTER, THOUGH, THAT --

6  WASN'T THE ULTIMATE DETERMINATION IN THAT CASE THAT THERE WAS

7  NOT A SUBSTANTIVE DUE PROCESS RIGHT FOR THAT PARENT IN THAT

8  CASE; ISN'T THAT CORRECT?

9          MR. BRADSHAW:  THAT'S RIGHT.  BUT THE ANALYSIS THAT

10  YOUR HONOR SHOULD BE APPLYING IS THE ANALYSIS WHICH FOLLOWS

11  WHICH IS THERE'S NOT A SPECIFIC -- THE COURT DIDN'T IN ITS

12  ACKNOWLEDGMENT OF THE SUBSTANTIVE DUE PROCESS RIGHT, IT DID

13  NOT DRAW IT SO NARROWLY AS FOR A SPECIFIC TREATMENT.  WE

14  BELIEVE THAT BENDIBURG IS APPLICABLE HERE AND IT IS

15  CONTROLLING.

16          THE STATE ALSO MAKES THE ARGUMENT THAT SOMEHOW THE

17  PARENTAL RIGHTS -- THIS IS THEIR ARGUMENT WHAT WE ARE REALLY

18  TALKING ABOUT NEW AND SUBSTANTIVE DUE PROCESS -- THAT SOMEHOW,

19  THE RIGHT TO DIRECT MEDICAL CARE OF CHILDREN IS DEPENDENT ON A

20  SUBSTANTIVE DUE-PROCESS RIGHT OF THE PARENT OR THE CHILD, THAT

21  THERE IS SOMEHOW AN UNDERLYING SUBSTANTIVE DUE-PROCESS RIGHT,

22  SO THE PARENTAL RIGHT CAN'T GO BEYOND THE UNDERLYING

23  SUBSTANTIVE DUE PROCESS.  WE THINK THAT'S WRONG AS A MATTER OF

24  LAW AND AS A MATTER OF FACT.

25          AND FOR THESE REASONS BECAUSE THE SUPREME COURT'S

1   PRECEDENT ESTABLISHES THAT PARENTAL RIGHTS STAND ON THEIR OWN,

2   THEY'RE NOT DEPENDENT ON AN UNDERLYING -- AND THE EXAMPLE THAT

3   WE GIVE IN OUR BRIEFING IS THAT, FOR EXAMPLE, THE SUPREME

4   COURT HAS HELD THAT PARENTS HAVE A RIGHT TO DECIDE WHETHER

5   THEIR CHILD ATTENDS A PUBLIC OR PRIVATE SCHOOL, EVEN THOUGH

6   CHILDREN DO NOT HAVE A CONSTITUTIONAL RIGHT TO PUBLIC

7   EDUCATION.

8           AND ANOTHER REASON THIS ARGUMENT IS MISGUIDED, YOUR

9   HONOR, IS BECAUSE PARENTS CAN ACCESS -- ADULTS CAN ACCESS

10  HORMONE THERAPIES.  THEY'RE NOT BANNED.  THEY ARE NOT BARRED.

11  WHAT'S BARRED AND WHAT BEING USURPED HERE IS THE RIGHT OF

12  PARENTS TO MAKE A DECISION TO PURSUE THOSE TREATMENTS FOR

13  THEIR CHILDREN.

14          ADULTS CAN -- PARENTS CAN, YOU KNOW, ADULTS CAN WALK

15  IN, GET DIAGNOSED, AND GET THESE TREATMENTS.  YOUR HONOR, I'M

16  GOING TO TRY TO WRAP UP.

17          I WANT TO ADDRESS YOUR QUESTIONS THOUGH.  FACIAL

18  CHALLENGE.  WE ARE SEEKING A FACIAL CHALLENGE.  AND THAT GOES

19  TO THE SCOPE OF THE INJUNCTION.  WE ARE SEEKING A FACIAL

20  STATEWIDE INJUNCTION AND IT'S APPROPRIATE IN THIS CASE FOR THE

21  FOLLOWING REASONS:

22          FIRST, THIS IS A FACIAL CHALLENGE TO THE

23  CONSTITUTIONALITY OF THE STATUTE.  FACIAL INJUNCTIONS ARE

24  APPROPRIATE WHEN THE CHALLENGE IS THE FUNDAMENTAL

25  CONSTITUTIONALITY OF THE STATUTE.  IF THIS STATUTE IS

1    UNCONSTITUTIONAL AS TO THESE PLAINTIFFS, IT'S UNCONSTITUTIONAL

2    AS TO EVERYONE.  THAT'S WHAT A FACIAL CHALLENGE DOES.  IF THIS

3    WERE BASED ON SOME OTHER NON-CONSTITUTIONAL CHALLENGE, IT

4    MIGHT BE A DIFFERENT QUESTION.  BUT WE BELIEVE THAT IT IS

5    APPROPRIATE BECAUSE THE CONSTITUTIONALITY OF THE STATUTE

6    STATES THAT IT'S A FACIAL INJUNCTION.  SO THAT'S THE FIRST

7    REASON.

8            THE SECOND REASON IS THAT A STATEWIDE INJUNCTION IS

9    NECESSARY TO AFFORD THE PLAINTIFFS COMPLETE RELIEF.

10           TWO POINTS I WANT TO MAKE HERE, YOUR HONOR.

11           THE FIRST IS THAT FOR THE INDIVIDUAL PLAINTIFFS

12   THEIR CARE DEPENDS ON THE MULTIPLE PROVIDERS:  DOCTORS,

13   INSTITUTIONS, HOSPITALS, MEDICAL LABS, PHARMACIES.  IT WOULD

14   BE INEFFECTUAL TO TRY TO LIMIT AN INJUNCTION NARROWLY JUST TO

15   THESE POINTS.  I DON'T EVEN KNOW HOW YOU WOULD DO IT.  WHEREAS

16   I MEAN, WHEN THEY GO TO PICK UP THEIR PRESCRIPTION AT A

17   PHARMACY, BECAUSE -- WHICH PHARMACY?  HOW ARE THE PHARMACIES

18   SUPPOSED TO GET THE MEDICATION, IF THERE'S NOT A BROAD

19   INJUNCTION?  AS A MATTER OF -- IT'S IMPRACTICAL.  SO IN ORDER

20   TO PROVIDE COMPLETE RELIEF TO THE INDIVIDUAL PLAINTIFFS, A

21   STATEWIDE INJUNCTION IS NECESSARY.

22           SECONDLY, AND THIS IS A CRITICAL POINT, TRANSPARENT.

23   THERE'S AN ORGANIZATION THAT IS A PLAINTIFF IN THIS CASE.

24   TRANSPARENT IS AN EDUCATIONAL AND SUPPORT ADVOCACY

25   ORGANIZATION FOR PARENTS OF TRANSGENDER YOUTH.  TRANSPARENT

1  HAS MEMBERS ACROSS THE STATE.  TRANSPARENT, AS A PLAINTIFF,

2  CAN'T GET COMPLETE RELIEF UNLESS THERE'S A STATEWIDE

3  INJUNCTION.  NONE OF THE CASES THAT HAVE DRAWN -- AND THERE

4  ARE SOME IN THIS AREA THAT HAVE ONLY APPLIED A MORE NARROW

5  INJUNCTION -- NONE OF THEM HAD AN ORGANIZATIONAL PLAINTIFF

6  THAT WAS A PLAINTIFF IN THE CASE.  THAT IS A MEANINGFUL,

7  MEANINGFUL DISTINCTION.

8          AND REALLY QUICKLY, YOUR HONOR, THE IDEA THAT

9  SOMEHOW CLASS ACTION IS NECESSARY BECAUSE THE STATE ARGUES

10  THAT ONLY -- YOU HAVE TO HAVE A CLASS ACTION IN ORDER TO

11  ACHIEVE STATEWIDE RELIEF.  THAT'S JUST NOT THE CASE.  IT'S NOT

12  THE CASE, WHEN WE ARE DEALING WITH AN UNCONSTITUTIONAL

13  STATUTE.

14          AND WE WOULD REFER YOUR HONOR TO -- I WANT TO GIVE

15  YOUR HONOR A COUPLE CASES FROM THE ELEVENTH CIRCUIT.  WE

16  DIDN'T HAVE AN OPPORTUNITY TO BRIEF THIS, YOUR HONOR.

17          THE FIRST CASE IS -- AND THESE ARE CASES IN WHICH

18  THE ELEVENTH CIRCUIT IN NON-CLASS CASES ISSUED STATEWIDE

19  INJUNCTIONS.  STATE DETECTIVE AGENCY V. MILLER, WHICH IS 115

20  F.3D 904, ELEVENTH CIRCUIT 1997.  AND PEOPLE FIRST OF ALABAMA

21  V. SECRETARY OF STATE FOR ALABAMA, WHICH IS 815, F APPENDIX,

22  505, ELEVENTH CIRCUIT 2020.

23          AND THE CASE THAT THE STATE CITES FOR THE ARGUMENT

24  THAT -- SUPPORT FOR THE ARGUMENT THAT THERE HAS TO BE A CLASS

25  ACTIONS, IT'S JUST NOT APPLICABLE.  IT WAS INVOLVING THE

1    FEDERAL STATUTE INVOLVING COVID.  IT SOUGHT A NATIONAL

2    INJUNCTION BASED ON A FEDERAL LAW.  IT'S JUST NOT APPLICABLE.

3             FINALLY, YOUR HONOR, YOUR QUESTION ABOUT

4    REDRESSABILITY AND STANDING.  SO THE STATE SOMEHOW ARGUES THAT

5    WE HAVEN'T NAMED ALL OF THE APPROPRIATE DEFENDANTS, SO THERE

6    CAN'T BE EXPLICIT OR COMPLETE REDRESS.  THAT'S JUST NOT THE

7    CASE.

8             IT'S NOT CONSISTENT WITH THE LAW FOR THE FOLLOWING

9    REASONS:  THE DEPARTMENT OF COMMUNITY HEALTH IS TASKED WITH

10   ENFORCING THE -- WELL, THERE ARE TWO PROVISIONS IN THE

11   STATUTE.  ONE IS DIRECTED AT HOSPITALS AND INSTITUTIONS.  AND

12   ONE THAT IS DIRECTED AS MEDICAL PROVIDERS.

13            IT IS THE FIRST SECTION THAT THE DEPARTMENT OF

14   COMMUNITY HEALTH IS THE ENTITY WITH ENFORCEMENT AUTHORITY.

15            IN THE SECOND, IT IS THE MEDICAL BOARD.  SO THERE IS

16   A LITTLE BIT -- THERE ARE TWO DIFFERENT STATUTES ADDRESSED TO

17   TWO DIFFERENT POTENTIAL ENTITIES AND ENFORCEMENT IS DIFFERENT

18   FROM THE TWO.

19            IT'S THE FIRST CATEGORY FOR WHICH THE STATE ARGUES

20   THAT THERE IS A -- BROADLY A GENERIC STATUTE THAT SAYS A

21   VIOLATION OF TITLE 31 CAN BE A MISDEMEANOR.  THE STATUTE

22   SPECIFICALLY GIVES THE DEPARTMENT OF COMMUNITY HEALTH THE

23   AUTHORITY TO ESTABLISH SANCTIONS BY RULE AND REGULATION FOR

24   VIOLATIONS OF THE CODE.  IT'S THE DEPARTMENT OF COMMUNITY

25   HEALTH.  SO IT'S -- THE IDEA WHETHER OR NOT THERE IS A

1   VIOLATION IS GOING TO BE DETERMINED NOT BY SOME PROSECUTOR

2   SOMEWHERE.  IT'S GOING TO BE DETERMINED BY THE DEPARTMENT OF

3   COMMUNITY HEALTH.  SO AN INJUNCTION ON THE DEPARTMENT OF

4   COMMUNITY HEALTH PROVIDES COMPLETE REDRESSABILITY.

5           NEXT, AND WE CITED IN OUR BRIEF UNDER RULE 65 D, AN

6   INJUNCTION IS FULLY BINDING ON THE DEFENDANTS AND WE CITE THE

7   AMERICAN BOOKSELLERS'S CASE.  IT'S IN OUR BRIEF IN OUR REPLY

8   BRIEF ON PAGE 15, THEIR OFFICERS, AGENTS, SERVANTS, EMPLOYEES,

9   ATTORNEYS, AND UPON THOSE IN ACTIVE CONCERT OR PARTICIPATION

10  WITH THEM WHO RECEIVE ACTUAL NOTICE OF THE ORDER BY PERSONNEL

11  OR OTHERWISE, AND THAT ENCOMPASSES OTHER STATE OFFICIALS WITH

12  ENFORCEMENT AUTHORITY.

13          LONG WAY OF SAYING THE STATE ATTORNEY GENERAL, THE

14  ATTORNEY GENERAL OF THE STATE OF GEORGIA HAS SIGNED THE

15  BRIEFS.  HAS MADE AN APPEARANCE BY SIGNING THE BRIEFS IN THIS

16  CASE.  THEY ARE ON NOTICE AND UNDER THE AUTHORITY OF THE

17  AMERICAN BOOKSELLERS, THEY'RE APPROPRIATELY -- THEY WILL BE

18  APPROPRIATELY ENJOINED BECAUSE THEY ARE ACTING IN ACTIVE

19  CONCERT OR PARTICIPATION WITH THE DEPARTMENT OF COMMUNITY

20  HEALTH.  SO THAT'S WHY THERE'S FULL REDRESSABILITY.  LOOK,

21  YOUR HONOR, THE STATE DIDN'T EVEN ADDRESS THIS ISSUE IN ITS

22  SUR-REPLY.  WE DON'T THINK IT'S AN ISSUE AT ALL.

23          YOUR HONOR, BEFORE I SIT DOWN -- I WILL SIT DOWN, I

24  PROMISE, TRANSGENDER INDIVIDUALS HAVE SUFFERED A LONG HISTORY

25  OF PREJUDICE AND DISCRIMINATION.  THIS LAW DENIES THEM

1  LIFE-AFFIRMING CARE THAT THEY NEED TO THRIVE.  IT IMPOSES

2  IMMEASURABLE HARM ON FAMILIES WORKING TO GET NECESSARY CARE

3  FOR THEIR KIDS.

4          WE'VE SATISFIED EACH OF THE REQUIREMENTS FOR

5  PRELIMINARY INJUNCTION AND WE WOULD REQUEST THAT THE COURT

6  GRANT THAT INJUNCTION UNTIL THE TIME THERE WOULD BE A TRIAL ON

7  THE MERITS.

8          THE COURT:  THANK YOU, MR. BRADSHAW.

9          MR. HARRIS:  MAY IT PLEASE THE COURT.  JEFFREY

10 HARRIS FOR THE DEFENDANTS.

11         THE COURT:  GOOD AFTERNOON.

12         MR. HARRIS:  THERE ARE SOME THINGS IN GEORGIA

13 CHILDREN JUST CAN'T DO, EVEN IF THEIR PARENTS APPROVE.

14         IN GEORGIA, A MINOR UNDER THE AGE OF 18 WHO'S NOT

15 EMANCIPATED CANNOT LAWFULLY GET MARRIED, EVEN WITH PARENTAL

16 APPROVAL.  WHY?  BECAUSE GEORGIA, LIKE COUNTLESS OTHER STATES,

17 HAS DECIDED THAT CHILDREN BELOW 18 SIMILARLY DON'T HAVE THE

18 CAPACITY OR JUDGMENT TO MAKE SUCH A CONSEQUENTIAL LIFE

19 DECISION.

20         YET, THE PLAINTIFFS HERE INSIST THERE IS A

21 CONSTITUTIONAL RIGHT FOR THOSE SAME CHILDREN TO MAKE MOMENTOUS

22 DECISIONS ABOUT LIFE-CHANGING MEDICAL INTERVENTIONS THAT COULD

23 LEAD TO IRREVERSIBLE IMPACTS ON THEIR LIVES, BODIES, HEALTH,

24 AND FERTILITY.

25         JUST IN THE LAST FEW WEEKS, THE SIXTH CIRCUIT HAS

1   ALLOWED TENNESSEE AND KENTUCKY'S BROADLY SIMILAR LAWS TO GO

2   INTO FORCE, DESCRIBING THIS AS AN AREA OF UNFOLDING MEDICAL

3   AND POLICY DEBATE AND THAT THE COURT WASN'T GOING TO SHORT

4   CIRCUIT STATE LAWS DESIGNED TO ADDRESS THESE ISSUES.

5          THOSE LAWS THAT ARE NOW ENFORCED ARE EVEN BROADER IN

6   GEORGIA AS THEY'VE ALSO BANNED PUBERTY BLOCKERS AND THEY HAVE

7   NARROWED NONEXISTING CONTINUING CARE EXCEPTIONS.

8          GEORGIA WAS WELL WITHIN ITS POWER TO PROHIBIT THESE

9   INTERVENTIONS UNTIL CHILDREN REACH AGE 18.  SO I'D LIKE TO

10  START THE LEGAL CLAIMS, IF THAT'S OKAY WITH THE COURT.

11         THERE IS NO SUBSTANTIVE DUE PROCESS RIGHT TO PROVIDE

12  CHILDREN OFF-LABEL MEDICATIONS FOR PURPOSES OF GENDER

13  TRANSITION.  THE SUPREME COURT IS CRYSTAL CLEAR THAT THE RIGHT

14  MUST BE DEFINED WITH SPECIFICITY.  SO IT'S NOT ENOUGH TO JUST

15  POINT TO A RIGHT TO DIRECT THE UPBRINGING OF CHILDREN.  IT

16  MUST BE DEEPLY ROOTED IN HISTORY AND TRADITION.

17         NEITHER THE SUPREME COURT NOR THE ELEVENTH CIRCUIT

18  HAS EVER FOUND A SUBSTANTIVE DUE PROCESS RIGHT TO DEMAND A

19  PARTICULAR MEDICAL INTERVENTION.  THERE'S NO RIGHT TO ASSISTED

20  SUICIDE.  THERE IS NO RIGHT TO MEDICAL MARIJUANA.  THERE IS NO

21  RIGHT TO ACCESS EXPERIMENTAL DRUGS, EVEN FOR THE TERMINALLY

22  ILL.  THERE IS NO RIGHT TO ACCESS IN VITRO FERTILIZATION.

23         I'D REFER THE COURT TO THE MORRISSEY ELEVENTH

24  CIRCUIT CASE WHICH FOUND NO RIGHT TO IVF.  AND I'D REFER THE

25  COURT TO THE ABIGAIL ALLIANCE EN BANC D.C. CIRCUIT WHICH SAID

1    THAT TERMINALLY-ILL INDIVIDUALS, CANCER PATIENTS, HAD NO

2    CONSTITUTIONAL RIGHT TO DEMAND DRUGS IN TRIALS.  WHATEVER THE

3    COURT THINKS OF THIS CLAIM ON THE MERITS, IT IS A NEW CLAIM.

4    AND MAY BE THEY WILL MAY BE THEY WON'T ULTIMATELY PREVAIL.  WE

5    DON'T THINK THEY WILL, BUT THIS IS NEW AND THE SIXTH CIRCUIT

6    JUST SAID THAT IT SHOULDN'T BE A PRELIMINARY INJUNCTION

7    POSTURE WHERE COURTS ARE RECOGNIZING NEW OR DIFFERENT TYPES OF

8    RIGHTS.

9         TURNING TO EQUAL PROTECTION, THERE IS NO TRADITIONAL

10   SEX DISCRIMINATION BECAUSE, OF COURSE, THE LAW PROHIBITS

11   CERTAIN TREATMENTS FOR GENDER DYSPHORIA, REGARDLESS OF WHETHER

12   IT'S A NATAL BOY OR NATAL GIRL.

13        SO WHAT THE PLAINTIFFS TELL US IS LOOK AT

14   TESTOSTERONE, AND IF THAT IS GIVEN TO A BOY, IT'S OKAY.  AND

15   IF IT'S GIVEN TO A GIRL, IT'S NOT.  THAT BREAKS DOWN.  EVEN IF

16   YOU -- EVEN IF YOU LOOK AT BOSTOCK AS THE LAW OF THE EQUAL

17   PROTECTION CLAUSE, WHICH WE SHARPLY DISPUTE, BOSTOCK SAYS TO

18   DISCRIMINATE IS TO TREAT AN INDIVIDUAL WORSE THAN OTHERS WHO

19   ARE SIMILARLY SITUATED.

20        THERE IS NOTHING SIMILARLY SITUATED ABOUT GIVING A

21   BOY TESTOSTERONE TO CORRECT A DEFICIENCY AND BRING HIM BACK UP

22   TO NATURALLY-OCCURRING LEVELS VERSUS GIVING IT TO A BIOLOGICAL

23   GIRL TO AS DR. LAIDLAW JUST TESTIFIED, INCREASE HER

24   TESTOSTERONE BY SIX TO A HUNDRED TIMES THE BIOLOGICAL LEVEL IN

25   ORDER TO ACHIEVE CERTAIN PHYSICAL CHANGES.  WHATEVER ONE

1    THINKS ABOUT THOSE PROCEDURES, THOSE INDIVIDUALS ARE NOT

2    SIMILARLY SITUATED.

3         I'D ALSO POINT THE COURT TO ADAMS, THE ELEVENTH

4    CIRCUIT EN BANC FOOTNOTE 6.  IT SAYS THE PROMISE OF EQUAL

5    PROTECTION IS KEEPING GOVERNMENT DECISION MAKERS FROM TREATING

6    DIFFERENTLY PERSONS WHO ARE IN ALL RELEVANT RESPECTS ALIKE.

7         THINK OF THE MILANI CASE.  THERE WOMEN WANTED ACCESS

8    TO SPORTS IN A SCHOOL THAT WERE ONLY RESERVED FOR MEN.  IT WAS

9    THE SAME THING.  BUT THEY WERE TREATED DIFFERENTLY, SO THE

10   COURT APPLIED HEIGHTENED SCRUTINY.  WE DON'T HAVE ANYTHING

11   LIKE THAT HERE.

12        AND I THINK ONCE AGAIN, WE COMPLETELY AGREE WITH THE

13   COURT'S INVOCATION OF DOBBS, THAT JUST BECAUSE A MEDICAL --

14   NOBODY WOULD SAY THAT AN ABORTION RESTRICTION IS SEX

15   DISCRIMINATION JUST BECAUSE THE LAW SPECIFICALLY MENTIONED

16   WOMEN.  IT REGULATES A MEDICAL PROCEDURE.

17        SO, ONCE AGAIN, WE'D REFER THE COURT TO THE SIXTH

18   CIRCUIT DECISION ON THIS AND WHEN THE PLAINTIFFS TURN TO

19   TRANSGENDER STATUS AS A NEW CLASS, FIRST OF ALL, THE SUPREME

20   COURT HAS REJECTED HEIGHTENED SCRUTINY FOR METAL DISABILITY

21   FOR AGE, FOR POVERTY, THINGS THAT ARE MUCH, MUCH MORE

22   WELL-DEFINED AND INTRACTABLE THAN THIS CLASS.

23        YOU HEARD MULTIPLE OF THE PLAINTIFFS' EXPERTS AGREE

24   THAT GENDER CAN BE FLUID.  THERE ARE MANY DIFFERENT GENDER

25   IDENTITIES.  WPATH ITSELF -- I'D REFER YOU TO PAGE S41.  IT

1   SAYS MANY TGV ADULTS MAY CONSIDER A RANGE OF IDENTITIES AND

2   ELEMENTS OF GENDER PRESENTATION.  PEOPLE MAY SPEND SOME TIME

3   IN A GENDER IDENTITY BEFORE THEY DISCOVER IT DOES NOT FEEL

4   COMFORTABLE.  AND SO THIS JUST -- THIS IS JUST NOT THE TYPE OF

5   CLASS THAT THE COURTS IDENTIFIED AS SOMETHING THAT WARRANTS

6   THE HEIGHTENED TREATMENT RESERVED FOR SEX DISCRIMINATION.

7           AND JUST BRIEFLY TO ADDRESS THE BRUMBY CASE BECAUSE

8   I KNOW PLAINTIFF POINTED TO THAT.  THAT WAS A CASE THAT

9   EXPLICITLY -- AN EMPLOYEE OF A GOVERNMENT ENTITY WAS FIRED,

10  AND DISCIPLINED FOR NOT CONFIRMING TO GENDER ROLES AND THE

11  COURT SAYS THAT THAT IS SEX DISCRIMINATION.  BUT IT HEAVILY

12  RELIED ON THE NOTION OF SEX STEREOTYPES AND THE LAW AT ISSUE

13  HERE, ONCE AGAIN, IT REGULATES MEDICAL PROCEDURES.  IT DOES

14  NOT HAVE ANY BASIS IN STEREOTYPE.  IT HAS NO BASIS IN ANYTHING

15  OTHER THAN BIOLOGICAL DIFFERENCES AND SO WE THINK DOBBS AND

16  THE RELATED CASES IS WHAT DRIVES THAT.

17          NOW --

18          THE COURT:  LET ME JUST INTERROGATE THAT LAST POINT

19  THAT YOU MADE A LITTLE BIT.  TELL ME MORE ABOUT WHY -- WE

20  HEARD COUNSEL FOR THE PLAINTIFFS TALK ABOUT GENDER STEREOTYPES

21  HERE, AND WE HEARD TESTIMONY ABOUT THE CONDITION OF GENDER

22  DYSPHORIA AND THE FACT -- AND WE HAVE DECLARATIONS ON THE

23  RECORD FROM YOUNG PEOPLE WHO WERE BORN NATAL GIRLS WHO SAY

24  THAT THEY ARE HAVING EXPERIENCE OF FEELING THAT THEY ARE A

25  DIFFERENT GENDER IDENTITY AND THEY ARE WANTING TO MANIFEST

1  THAT IDENTITY IN VARIOUS WAYS THAT ARE NON CONFIRMING TO THEIR

2  NATAL SEX.

3        SO HOW IS IT THAT THIS IS NOT AN ISSUE OF YOUNG

4  PEOPLE NOT CONFIRMING TO GENDER STEREOTYPES?

5        MR. HARRIS:  IT'S BECAUSE THE MEDICAL PROCEDURES

6  HAVE NOTHING TO DO WITH THAT.  AND, AGAIN, REMEMBER GOING BACK

7  TO ADAMS, GOING BACK TO BOSTOCK, AND, AGAIN, WE DON'T CONCEDE

8  THAT BOSTOCK IS THE EQUAL-PROTECTION TEST, BUT I THINK THE

9  PLAINTIFFS HAVE RELIED ON IT.  EVEN UNDER THERE, YOU HAVE TO

10  LOOK AT WHAT IS THE SPECIFIC AREA WHERE YOU THINK PEOPLE ARE

11  BEING TREATED DIFFERENTLY.

12        AND, AGAIN, DR. LAIDLAW PUT UP ON THE SCREEN THE

13  DIFFERENCES IN THE TESTOSTERONE THAT WOULD BE GIVEN TO A NATAL

14  GIRL VERSUS A NATAL BOY AND IT HAS -- IT IS A DIFFERENT

15  TREATMENT WITH DIFFERENT INDICATIONS, DIFFERENT RISK PROFILES,

16  DIFFERENT DOSAGES.  I JUST DON'T THINK THE COURT CAN SAY THAT

17  THESE ARE SIMILARLY-SITUATED INDIVIDUALS.

18        THE COURT:  ALL RIGHT.  GO AHEAD.

19        MR. HARRIS:  I'M GOING TO TURN TO -- I KNOW YOU

20  ASKED ABOUT THE KEY FACTS.  I'M HAPPY TO OFFER YOU MINE.  SO

21  WHERE THE FACTS, OF COURSE, WOULD COME IN IS IN THE TAILORING

22  ANALYSIS.  WE ARGUE THERE HASN'T BEEN HEIGHTENED SCRUTINY, SO

23  WE THINK IT'S RATIONAL BASIS.  WE ALSO THINK IT'S EITHER

24  RATIONAL BASIS AND REASONABLE CONNECTION OR IMPORTANT INTEREST

25  AND CLOSE, CLOSE CONNECTION.  SO WE THINK IT'S RATIONAL BASIS

1   BUT THE FACTS I WILL ARGUE, I THINK WOULD MEET EITHER.

2           WE THINK THERE ARE THREE THINGS.  WHY DID GEORGIA DO

3   THIS?  AND THESE ARE ALL IN THE FINDINGS OF THE LAW, WHICH I

4   THINK ARE IMPORTANT BECAUSE THEY ARE FULLY SUPPORTED BY WHAT

5   YOU HEARD TODAY AND WHAT WE'VE SUBMITTED IN THE REPORTS.

6           FIRST, SKYROCKETING CASES IN NEW DEMOGRAPHICS

7   COMBINED WITH HIGHLY-UNCERTAIN BENEFITS AND RISKS OF LIFELONG

8   IRREVERSIBLE HARM.  SO EVERY ONE OF THESE IS ENUMERATED IN

9   BOTH THE FINDINGS AND THE RECORD WE PRESENTED TO THE COURT.

10  AND WHATEVER THE LEVEL OF SCRUTINY, PROTECTING THE CHILDREN

11  FROM PROFOUND RISKS TO THEIR HEALTH AND FERTILITY WITH

12  TREATMENT UNCERTAIN BENEFITS IS ABSOLUTELY THE HIGHEST STATE

13  INTEREST THERE IS.

14          NOW, FIRST, I THINK -- I THINK THERE IS ACTUALLY

15  COMMON GROUND.  EVERYONE, INCLUDING DR. MASSEY, AGREES THAT

16  POPULATIONS ARE INCREASING AND THERE ARE NEW POPULATIONS.

17  MR. MASSEY USED THE WORDS LARGE INCREASE IN THE PATIENTS HE'S

18  BEEN SEEING IN RECENT YEARS.

19          THEN YOU HEARD DR. CANTOR TALK ABOUT THE DIFFERENT

20  MAKE UP.  IT USED TO BE PRESENTED -- GENDER DYSPHORIA USED TO

21  BE MOSTLY PRESENTED IN MIDDLE-AGED MEN AND VERY YOUNG CHILDREN

22  AND DR. CANTOR SAID COMPLETELY DIFFERENT POPULATIONS.  THE

23  YOUNG CHILDREN MIGHT BE EXPLORING OR TESTING GENDERS AND MANY

24  WOULD DESIST.  THE MIDDLE-AGED MEN, VERY DIFFERENT POPULATION,

25  DIFFERENT TREATMENT, DIFFERENT PROFILES.

1          NOW IT'S SPIKING IN THE LAST 10 OR 15 YEARS AMONG

2    ADOLESCENT GIRLS.  YOU HEARD DR. SHUMER SAID TWO-THIRDS OF HIS

3    PATIENTS ARE GIRLS.  WPATH SAYS CASES AMONG ADOLESCENTS ARE

4    TWO AND A HALF TO SEVEN TIMES MORE LIKELY TO BE GIRLS.

5          NOW, THE PLAINTIFFS MISCONSTRUED PRETTY BADLY WHAT

6    DR. CANTOR SAID.  HE MENTIONED SOCIAL MEDIA.  HE DIDN'T OPINE

7    THAT SOCIAL MEDIA IS CAUSING THIS.  HE NOTED THAT THERE ARE A

8    LOT OF THINGS SPIKING AT THE SAME TIME.  SOCIAL MEDIA, MENTAL

9    HEALTH ISSUES, AUTISM, DEPRESSION, ANXIETY, GENDER DYSPHORIA.

10         SO WHAT HE SAID IS WE DON'T KNOW WHAT CAUSES THESE,

11   BUT SOMETHING IS HAPPENING AND IT'S NEW AND IT GIVES THE STATE

12   COMPLETE GROUNDS TO SAY MAYBE WE NEED TO TAKE A TIMEOUT AND

13   SEE MORE RESEARCH BEFORE WE ALLOW OUR KIDS TO BE DOING THIS.

14         NOW, ONCE AGAIN, I THINK WE ALSO HAVE COMMON GROUND.

15   YOU HEARD DR. MCNAMARA.  YOU HEARD OUR EXPERTS.  I WALKED

16   THROUGH TABLE C, APPENDIX C OF WPATH WITH DR. MCNAMARA.  IT'S

17   TERRIFYING.  IT'S IN BOLD AS CLINICALLY SIGNIFICANT WHEN IT

18   LISTS THE RISKS.  INFERTILITY FOR MEN AND WOMEN IS IN BOLD AT

19   THE TOP.  BLOOD CLOTS IS IN BOLD AT THE TOP.  AND THE NAME --

20   I FORGET WHICH IS THE THICKENING OF THE BLOOD WHICH IS A VERY

21   SERIOUS CONDITION -- IS AT THE TOP FOR, I BELIEVE, NATAL MEN

22   RECEIVING ESTROGEN, AND THAT'S NOT EVEN GETTING TO THE

23   PERMANENCE OF THE EFFECTS.

24         YOU HEARD DR. LAIDLAW SAID NATAL WOMAN TAKING

25   TESTOSTERONE HAVE DIFFERENT HIP STRUCTURES, DIFFERENT HAIR

1   DISTRIBUTIONS, VERY, VERY DIFFERENT DEVELOPMENT OF

2   REPRODUCTIVE FUNCTIONS AND SEX CHARACTERISTICS.

3          SO ONCE AGAIN, WPATH CONCEDES THAT AND I THINK

4   THE PLAINTIFF -- AGAIN, DR. MCNAMARA, WE WALKED THROUGH THOSE

5   AND I THINK SHE BASICALLY CONCEDED CORRECTLY THAT NOBODY

6   REALLY DISPUTES THE SIDE EFFECTS WHICH ARE THE HARM, BUT

7   BEYOND THAT PHYSICAL CHANGES, WHICH I DON'T THINK WOULD BE

8   LISTED AS SIDE EFFECTS BUT THEY ARE PERMANENT, YOUR BODY

9   STRUCTURE WILL NOT CHANGE IF YOU DESIST FROM HORMONE LATER IN

10  LIFE AFTER TAKING THEM AS AN ADOLESCENT.

11         AND SO THE QUESTION IS DO WE THINK A 14 OR 15 YEAR

12  OLD CAN MEANINGFULLY CONSENT TO LOSING HIS OR HER FERTILITY AT

13  A TIME THEIR BRAINS AND JUDGMENT ARE STILL DEVELOPING?  AND

14  AGAIN, WPATH STANDARD OF CARE 8 SAYS THERE ARE ONLY

15  PRELIMINARY RESULTS FROM RETROSPECTIVE STUDIES ABOUT THE

16  DECISIONS MADE WHEN YOUNG REGARDING THE CONSEQUENCES OF THE

17  MEDICAL-AFFIRMING TREATMENT ON REPRODUCTIVE CAPACITY.

18         SO TURNING TO THE BENEFIT SIDE, IF YOU ARE GOING TO

19  ADMINISTER SOMETHING WITH THE RISK PROFILE THAT I JUST

20  DESCRIBED AND THAT I WALKED THROUGH WITH OUR EXPERTS AND DR.

21  MCNAMARA, THERE BETTER BE PROFOUND BENEFITS.  AND THE EVIDENCE

22  JUST DOESN'T SUPPORT THAT.

23         YOU HEARD DR. HRUZ, YOU HEARD DR. CANTOR, YOU HEARD

24  DR. LAIDLAW WALK THROUGH THE PYRAMID OF EVIDENCE AND SAY THE

25  STUDIES THAT WE SEE CITED -- OR LET ME START WITH OURS.  DX 1

1   THROUGH DX 5, THEY SPEAK FOR THEMSELVES.  THEY'RE CLEAR AND

2   UNEQUIVOCAL.  DX 1 FROM ENGLAND, A REVIEW OF ALL -- AN

3   INDEPENDENT REVIEW TO INFORM THE UK GOVERNMENT.  LIMITED

4   EVIDENCE FOR THE EFFECTIVENESS AND SAFETY OF GENDER-AFFIRMING

5   HORMONES WITH ALL STUDIES BEING UNCONTROLLED OBSERVATIONAL

6   STUDIES AND ALL OUTCOMES VERY LOW CERTAINTY.  AND EVEN IN THE

7   PYRAMID WHICH IS IN THE RECORD, IT SAYS -- I CONCEDE AND I

8   THINK THEIR EXPERTS HAVE ARGUED AND YOU HEARD DR. MCNAMARA

9   TALK ABOUT LOW-QUALITY EVIDENCE.  WE CONCEDE THAT IT CAN BE

10  CONSIDERED BUT, IT HAS -- FOR SOMETHING THAT'S THIS MOMENTOUS

11  AND EVEN THE PYRAMID ITSELF SAYS IT NEEDS TO REALLY -- YOU CAN

12  CONSIDER IT BUT YOU HAVE TO BE VERY, VERY CAREFUL ABOUT USING

13  IT FOR CONSEQUENTIAL DECISIONS.

14          SO DX 5 -- I DON'T HAVE TO DO ALL OF THEM.  THE

15  COURT HEARD THE TESTIMONY BUT DX 5 WAS A SYSTEMATIC REVIEW

16  2023, THIS YEAR, AND THE ABSENCE OF LONG-TERM STUDIES IS

17  WORRYING BECAUSE MANY INDIVIDUALS START TREATMENT AS MINORS

18  AND HORMONE THERAPY IS LIFELONG.

19          THE PURPORTED BENEFITS WERE HAMPERED BY SMALL

20  NUMBERS AND HIGH-ATTRITION RATES.  AND THAT'S ANOTHER THING

21  YOU HEARD THAT FROM DR. CANTOR, WHO KNOWS MORE THAN ANYONE

22  ABOUT HOW TO EVALUATE THESE.  MANY OF THESE STUDIES THE

23  PLAINTIFFS CITE TO ARE PLAGUED BY ATTRITION RATES.  BECAUSE IF

24  YOU'RE STUDYING A GENDER-AFFIRMING INTERVENTION BUT PEOPLE

25  LEAVE OVER TIME, THE PEOPLE WHO LEAVE THE STUDY ARE THE ONES

1   WHO ARE MOST LIKELY TO HAVE NOT FOUND IT HELPFUL OR MAYBE EVEN

2   FOUND IT HARMFUL.  AND SO, AGAIN, IT'S IN OUR HUNDREDS OF

3   PAGES OF EXPERTS REPORTS, BUT WHEN YOU LOOK AT -- WHEN YOU

4   LOOK AT A LOT OF THE PLAINTIFFS' STUDIES, YOU KNOW, THAT'S ONE

5   THING THAT SWEDEN NOTED, AND I THINK OUR EXPERTS NOTED AS

6   WELL.

7           SO JUST TO GIVE YOU AN EXAMPLE, I'LL TALK ABOUT

8   CHEN, BECAUSE I THINK YOU HEARD LOT ABOUT CHEN FROM EVERYONE.

9   CHEN IS A CLASSIC EXAMPLE OF A STUDY.

10          DOES IT TELL US SOMETHING?  OF COURSE IT DOES.

11          DOES IT PROVE ANYTHING?  OF COURSE IT DOESN'T.

12          WHAT CHEN DOES IS IT'S ASSOCIATION AND OBSERVATION.

13  THEY OBSERVE PEOPLE BEFORE TREATMENT AND THEN TWO YEARS LATER

14  THEY OBSERVE THEM AFTER TREATMENT.  AND SERVE -- IT'S NOT --

15  THEY STUDY THE POPULATION BEFORE AND AFTER.  CHEN SAYS THAT

16  HORMONES ARE ASSOCIATED WITH BETTER RESULTS ON SOME

17  PSYCHOLOGICAL MEASURES.

18          BUT WAS IT THE HORMONES THAT CAUSED THE IMPROVEMENT

19  OR WAS IT SOMETHING ELSE?  IT COULD BE ANYTHING.  IT COULD BE

20  MAYBE IT WAS THE PSYCHOTHERAPY THAT THEY WERE UNDERGOING.

21  MAYBE THE GENDER DYSPHORIA OR THE CONDITIONS WOULD HAVE

22  RESOLVED, REGARDLESS OF INTERVENTION.  MAYBE THE PEOPLE IN THE

23  STUDY WERE WEALTHIER AND BETTER EDUCATED AND HAD BETTER ACCESS

24  TO HEALTHCARE THAN OTHERS.  AND SO I'M NOT GOING TO SAY THAT

25  CHEN SHOULD BE DISREGARDED, BUT IT'S GOING TO BE NOWHERE NEAR

1  AS POWERFUL AS SOMETHING LIKE A SYSTEMATIC REVIEW OR A

2  RANDOMIZED-CONTROLLED TRIAL.

3          NOW ON THAT QUESTION, I DON'T THINK -- THERE WAS A

4  LOT OF BACK AND FORTH ON THAT.  AT THE END OF THE DAY

5  RANDOMIZED CONTROLLED TRIALS ARE DONE ALL THE TIME, INCLUDING

6  IN LIFE-THREATENING THINGS LIKE CANCER AND HEART DISEASE AND

7  MANY CONDITIONS THAT ARE CERTAINLY VERY SERIOUS AND LIFE

8  THREATENING.  AND THE NOTION THAT IT WOULD BE UNETHICAL TO DO

9  THAT HERE, I THINK IS NOT RIGHT.

10         AND YOU HEARD SOME TESTIMONY ON THAT, BECAUSE IT

11 WOULDN'T BE A MATTER OF GIVING SOMEONE NO TREATMENT OR GIVING

12 SOMEONE ELSE A FULL SLATE OF TREATMENT.  BUT, OF COURSE, MAYBE

13 THE CONTROL GROUP WOULD HAVE A SOCIAL TRANSITION PLUS

14 PSYCHOTHERAPY AND THE TEST GROUP WOULD ALSO TRY THE HORMONES

15 OR DRUGS.

16         AND, IN FACT,  I'LL TALK ABOUT EUROPE IN A MINUTE

17 BUT THAT'S WHERE IN THE BEGINNING OF DR. CANTOR'S REPORT TELL

18 US EXACTLY WHERE THEY'RE GOING.  THAT'S WHAT A LOT OF THEM ARE

19 CONTEMPLATING, MOVING TOWARD ALLOWING ACCESS TO THESE

20 TREATMENTS ONLY IN SCENARIOS WHERE THEY WOULD BE CAREFULLY

21 OBSERVED AND STUDIED, SO THAT WE CAN ACTUALLY FIGURE OUT ONCE

22 AND FOR ALL WHAT, YOU KNOW, WHERE ANY THE BENEFITS ARE.

23         SO IF I CAN SAY A MINUTE -- IF I CAN TALK FOR A

24 MINUTE ABOUT SOME OF THE EXPERTS, SOME OF THE CRITICISMS WE

25 HAVE SEEN.  SO YOU SAW SOME LINES OF QUESTIONING IN ARGUMENT

1   THAT, YOU KNOW, OUR EXPERTS IN PARTICULAR THEY TALKED ABOUT OR

2   I THINK THEY SAID ALL THREE WEREN'T QUALIFIED BECAUSE THEY

3   DON'T PERSONALLY ADMINISTER HORMONES TO CHILDREN FOR GENDER

4   DYSPHORIA.  THAT CAN'T POSSIBLY BE THE RULE.  BECAUSE IT WOULD

5   EXCLUDE ANYONE WHO DOESN'T AGREE WITH THE INTERVENTION, IT

6   WOULD MEAN THAT YOU ONLY GET ONE SIDE.

7         SO IMAGINE FROM A PRIOR LIFE I ONCE HAD IN A CASE

8   ABOUT HIP IMPLANTS AND THE ONLY PEOPLE WHO COULD TESTIFY ABOUT

9   THE HIP IMPLANTS WERE PEOPLE WHO USED THE HIP IMPLANT.  WELL,

10  OF COURSE, THE DOCTORS USING IT, USE IT BECAUSE THEY THINK

11  IT'S A GOOD PRODUCT AND IT'S GOOD FOR THEIR PATIENTS.  AND SO,

12  I THINK IT WOULD BE AN EXTRAORDINARY RULE TO SAY THAT

13  PHYSICIANS AND PSYCHOLOGISTS WHO KNOW THE FIELD, KNOW THE

14  LITERATURE, USE THE -- AND EVEN USE THESE DRUGS, ALBEIT FOR

15  DIFFERENT INDICATIONS, BUT DISAGREE WITH THESE TREATMENTS, IT

16  CAN'T POSSIBLY BE THE RULE THAT THEY'RE NOT QUALIFIED TO

17  TESTIFY BECAUSE THEY DON'T DO THE INTERVENTION.

18        NOW TO RESPOND, MR. BRADSHAW SAID ALL TREATMENTS

19  HAVE RISKS.  OF COURSE THAT IS TRUE BUT INCOMPLETE.  IT'S NOT

20  ENOUGH TO JUST SAY THAT.  BECAUSE THE QUESTION IS THE SEVERITY

21  OF THE RISKS, WHICH THEN MUST BE WEIGHED AGAINST THE BENEFITS.

22        IF THE RISKS ARE HEADACHES, FATIGUE, AND NAUSEA,

23  MAYBE WE CAN, THEN, TOLERATE MORE UNCERTAINTY ABOUT THE

24  BENEFITS.  BUT WHEN WE'RE TALKING ABOUT PERMANENT BODY CHANGES

25  AND POTENTIAL LOSS OF FERTILITY AND BLOOD CLOTS AND VERY

1  SERIOUS HIGH-LEVEL THINGS, THERE HAS TO BE MORE SIGNIFICANT

2  EVIDENCE OF BENEFITS, WHICH JUST AREN'T SUPPORTED BY THE

3  LITERATURE.

4         THEN, ON THE QUESTION OF THE UNIFORMITY OF THE

5  MEDICAL PROFESSION, WE HEARD A LOT ABOUT THAT TODAY AND

6  YESTERDAY.  DO THE BIG US MEDICAL ASSOCIATIONS SUPPORT THESE

7  TREATMENTS?  THEY DO.  THE MEDICAL PROFESSION IS NOT

8  INFALLIBLE.

9         DR. HRUZ TESTIFIED THAT EVERY DAY STANDARDS OF CARE

10  CHANGE BECAUSE THEY NEED TO CHANGE AS EVIDENCE AND SCIENCE AND

11  MEDICINE EVOLVES.  SO FIRST OF ALL, JUST BECAUSE SOMETHING --

12  AND WE CERTAINLY DON'T CONCEDE THAT THE WPATH STANDARDS ARE

13  THE STANDARD OF CARE BUT EVEN IF IT IS, THAT IS NOT ETCHED IN

14  STONE.  THEY CHANGE EVERY DAY.  THE MEDICAL PROFESSION ONCE

15  ENDORSED STERILIZATIONS AND LOBOTOMIES FOR THE MENTALLY ILL

16  WHICH, OF COURSE, ARE CONSIDERED HORRIBLE TODAY.

17         AND SO THE SIXTH CIRCUIT JUST CONSIDERED THIS EXACT

18  ARGUMENT AND SAID FIRST OF ALL, THIS IS NOT A CONSENSUS.  THEY

19  SAID IT'S AN AREA OF ACTIVE SCIENTIFIC AND POLICY DEBATE, BUT

20  EITHER WAY, IT CAN'T BE THAT THE MEDICAL PROFESSION CAN MAKE

21  ITS OWN RULES BECAUSE THERE HAVE ALWAYS BEEN LIMITS ON THAT.

22         THE COURT:  CAN YOU ADDRESS THE ISSUE OF NARROW

23  TAILORING THAT MR. BRADSHAW HAS RAISED HERE?

24         MR. HARRIS:  SURE.  SO A COUPLE THINGS.  THE

25  ELEVENTH CIRCUIT'S ADAMS EN BANC CASE SAYS THERE DOESN'T HAVE

1 TO BE A PERFECT FIT BETWEEN MEANS AND END WHEN IT COMES TO SEX

2 DISCRIM -- AND THAT'S APPLYING SCRUTINY, WHICH WE DON'T EVEN

3 CONCEDE THAT'S THE TEST HERE BUT ADAMS SAYS IT DOESN'T HAVE TO

4 BE A PERFECT FIT.  AND THIS LAW IS TAILORED.  IT'S LIMITED TO

5 CHILDREN UNDER 18.

6          SO ADULTS ONCE YOU'VE REACHED THE AGE OF MAJORITY

7 THE STATE SAYS YOU ARE COMPETENT TO MAKE THIS DECISION AND YOU

8 MAY, THEN, UNDERSTAND THE RISKS AND TAKE THEM ON VOLUNTARILY.

9 IT HAS A CONTINUING CARE EXCEPTION WITH NO LIMIT.  IT, OF

10 COURSE, CARVES OUT MEDICAL CONDITIONS UNRELATED TO GENDER

11 DYSPHORIA.

12          AND GEORGIA, UNLIKE THE LAWS IN TENNESSEE AND

13 KENTUCKY, DID NOT BAN PUBERTY BLOCKERS OR RESTRICT PUBERTY

14 BLOCKERS.  THAT IS IN NO WAY AN ENDORSEMENT OF THAT, BUT THE

15 STATE TARGETED THE DRUG, IF YOU LOOK AT APPENDIX C OF WPATH,

16 THEY TARGETED THE DRUG THAT IS MOST LIKELY TO RESULT IN THE

17 PERMANENT, IRREVERSIBLE IMPACT.  SO WE THINK THE LAW IS PLENTY

18 TAILORED.

19          THEN, JUST A NOTE ABOUT EUROPE, I THINK THAT'S

20 RELATED TO YOUR QUESTION BECAUSE WE'VE HEARD A LOT THAT EUROPE

21 DOESN'T HAVE TOTAL BANS.  IT DOESN'T BUT A FEW TAKEAWAYS FROM

22 THAT.

23          DR. CANTOR WALKS THROUGH AT THE START OF HIS REPORT

24 EXACTLY WHERE THE RESTRICTIONS ARE IN A LOT OF THESE.  SEVERAL

25 OF THE EUROPEAN COUNTRIES HAVE LIMITED DISTRIBUTION OF

1   HORMONES OR PUBERTY BLOCKERS TO CONTROLLED CLINICAL TRIALS,

2   WHICH IS IMPORTANT BECAUSE IT SHOWS THAT THE DRUGS ARE, IN

3   FACT, EXPERIMENTAL AND THAT THEY DON'T THINK THEY WOULD BE

4   APPROPRIATE FOR A BROADER POPULATION UNTIL MORE BENEFITS ARE

5   SHOWN.

6           BUT THE EUROPEAN EVIDENCE ALSO SHOWS THE STATE CAN

7   CERTAINLY RELY ON THAT.  I MEAN, AGAIN, WE HAVE -- WE HAVE

8   EVIDENCE OF PROVEN RISKS, PROVEN PERMANENT CHANGES, AND THESE

9   EUROPEAN STUDIES SAY AND SYSTEMATIC REVIEWS HAVE NOT SHOWN

10  BENEFITS.

11          AND SO, DOES THAT MEAN THAT GEORGIA OR TENNESSEE OR

12  ALABAMA OR CALIFORNIA WOULD HAVE TO DO EXACTLY THE SAME THING

13  AS EUROPE?  OF COURSE NOT.  BUT THE STATE CAN CERTAINLY

14  CONSIDER THE EXPERIENCE AND RESEARCH OVER THERE.

15          THEN, THE -- AND THEN ON THE SCOPE OF RELIEF, I WAS

16  SURPRISED TO HEAR MR. BRADSHAW SAY THIS IS A FACIAL CHALLENGE,

17  BECAUSE I THOUGHT THEY WERE NOT CHALLENGING THE BAN ON

18  SURGERY.  AND IF THIS WERE A FACIAL CHALLENGE AND THE COURT

19  ENJOINED THE LAW ON ITS FACE, THAT WOULD ALSO INVALIDATE THE

20  BAN ON SURGERY, EVEN THOUGH I THINK THEY'VE DISCLAIMED ANY

21  INTENT TO DO THAT.  SO I THINK FOR THAT ALONE, THE TEST UNDER

22  SALERNO IS NO SET OF CIRCUMSTANCES, AND I THINK THERE ARE LOTS

23  OF CIRCUMSTANCES, EVEN IF YOU ACCEPT, WHICH WE DON'T, THAT

24  THERE ARE SOME UNCONSTITUTIONAL CIRCUMSTANCES, THEY DON'T

25  CHALLENGE THE BAN ON SURGERY AND THAT WOULD ESSENTIALLY MEAN

1  ENJOINING IT FOR PEOPLE AT ALL AGES SO THAT WOULD MEAN --

2  THE COURT:  CAN'T YOU -- CAN'T A PLAINTIFF IN THEORY

3  CHALLENGE A PARTICULAR PORTION OF A STATUTE?

4  MR. HARRIS:  YES.  THAT'S AS AN APPLIED CHALLENGE,

5  NOT A FACIAL CHALLENGE.  AND SO, -- AND ALSO IN THE SCOPE OF

6  RELIEF, AGAIN, WE WOULD POINT THE COURT TO THE GEORGIA CASE, I

7  MEAN THIS -- AGAIN, WE DON'T THINK ANY RELIEF IS APPROPRIATE

8  BUT, IF THE COURT FINDS -- AND I WOULD REFER THE COURT ON

9  IRREPARABLE HARM, THE PLAINTIFFS HAVE OFFERED DECLARATIONS

10 TESTING TO THEIR CIRCUMSTANCES.  I'M SURE THE COURT HAS

11 REVIEWED THE ONES WE SUBMITTED FROM SOME OF THE

12 DETRANSITIONERS.  THESE WERE FOLKS WHO SAID -- FROM PARENTS

13 WHO SAID THEY HAD VERY DISTURBED KIDS WITH A LOT OF ISSUES

14 GOING ON, MANY CO-MORBIDITIES AND BELIEVED THEY HAD THESE

15 TREATMENTS PUSHED ON THEM.

16 AND, AGAIN, I THINK IT'S IMPORTANT TO SEE THAT PIECE

17 OF THE STORY IN TERMS OF THE OVERALL BALANCE OF HARDSHIPS,

18 INCLUDING WE ATTACHED -- AND, OF COURSE IT'S JUST A COMPLAINT

19 SO IT'S NOT CITED FOR THE TRUTH OF THE MATTER, BUT THE FACT

20 THAT THERE IS EVEN LITIGATION STARTING AGAINST CLINICS FROM

21 PEOPLE WHO CLAIM I WAS PUSHED INTO A SET OF TREATMENTS THAT --

22 THE COMPLAINT SPEAKS FOR ITSELF.  SO I THINK THAT IS IMPORTANT

23 IN THE BALANCE OF THE EQUITIES.

24 AND, AGAIN, WE THINK ELEVENTH CIRCUIT PRECEDENT AND,

25 CERTAINLY, SUPREME COURT PRECEDENT HAS VERY STRONGLY BEEN

1  MOVING IN THE DIRECTION OF EVEN IF THERE IS SOME SORT OF

2  RELIEF, IT SHOULD BE LIMITED TO THE PARTIES.

3        SO MY TAKEAWAY WOULD BE THE COURT HEARD A LOT TODAY

4  AND YESTERDAY ABOUT SCIENCE AND RESEARCH AND EVIDENCE.  THE

5  COURT DOESN'T HAVE TO DECIDE WHO'S RIGHT OR WHO EVEN HAS THE

6  BETTER VIEW.  THERE IS NO SERIOUS QUESTION THAT THERE ARE OPEN

7  ACTIVE, GOOD-FAITH SCIENTIFIC DEBATES ABOUT WHETHER THESE

8  INTERVENTIONS ARE APPROPRIATE.

9        AND I APPRECIATE -- I THINK NOBODY HAS ACCUSED

10  ANYONE OF ILL WILL ON ANY SIDE.  I THINK WE ARE ALL OPERATING

11  IN GOOD FAITH TO GET TO THE RIGHT ANSWER AND -- BUT THERE'S NO

12  REAL DISPUTE THAT THIS IS A CONTESTED, VERY-OPEN ISSUE AMONG

13  THE SCIENTIFIC COMMUNITY AND NOTHING IN THE CONSTITUTION BARS

14  GEORGIA FROM ACTING IN THE FACE OF UNCERTAINTY TO PROTECT

15  CHILDREN FROM POTENTIALLY PERMANENT AFFECT ON THEIR BELIEVES.

16        THE COURT:  CIRCLE BACK TO DUE PROCESS.

17        MR. HARRIS:  OKAY.

18        THE COURT:  AND THE BENDIBURG DECISION.

19        MR. HARRIS:  UM-HMM.

20        THE COURT:  I ASKED YOUR COLLEAGUE ON THE OTHER SIDE

21  ABOUT THIS CASE AND I WANT TO GET YOUR TAKE ON IT.

22        BENDIBURG HAS SOME LANGUAGE THAT WEIGHS IN FAVOR OF

23  THE PLAINTIFFS' CASE.  HOW AM I TO -- HOW AM I TO -- THIS IS

24  BINDING PRECEDENT; RIGHT?

25        MR. HARRIS:  UM-HMM.

1            THE COURT:  HOW AM I TO MAKE SENSE OF BENDIBURG IN

2    THE CONTEXT OF THIS CASE?  AND I THINK MAYBE I'M GOING TO GIVE

3    YOU A HYPOTHETICAL.

4            MR. HARRIS:  SURE.

5            THE COURT:  YEAH.  SO LET ME POSE THE FOLLOWING

6    HYPOTHETICAL.  SAY THE STATE OF GEORGIA DECIDED TO BAN

7    VACCINATIONS, CERTAIN VACCINATIONS FOR CHILDREN OR LET ME TAKE

8    A NON-POLITICIZED ISSUE.

9            LET'S SAY -- WE HEARD FROM DR. MCNAMARA ABOUT

10   STEROIDS FOR CROUP IN CHILDREN AND SHE SAID -- I LEARNED A LOT

11   YESTERDAY.  SHE SAID THAT THERE IS ONLY LOW-QUALITY EVIDENCE

12   THAT EXIST IN SUPPORT OF THAT TREATMENT.

13           SAY THE STATE OF GEORGIA DECIDED TO BAN THAT

14   TREATMENT FOR ALL CHILDREN IN GEORGIA, MEANING THAT NO PARENT

15   IN GEORGIA WOULD HAVE THE RIGHT TO ASK FOR THAT TREATMENT,

16   EVEN THOUGH IT HAD BEEN ADMINISTERED TO A WHOLE LOT OF

17   CHILDREN AND IT HAD SOLVED THE PROBLEM IN A WHOLE LOT OF

18   CASES, BUT IF THE STATE OF GEORGIA THOUGHT, WELL, WE NEED TO

19   WAIT AND SEE.  WE NEED TO -- WE'RE NOT SURE ABOUT THE RISKS

20   HERE, COULD THE STATE -- WOULD YOU TAKE THE SAME POSITION THAT

21   THIS STATE WOULD, IN FACT, HAVE THE AUTHORITY TO SAY THAT KIND

22   OF MEDICATION IS OFF THE TABLE AND WE, THE LEGISLATURE, ARE

23   GOING TO TAKE THAT DECISION AWAY FROM THE PARENT AND -- SO,

24   YEAH.

25           MR. HARRIS:  A COUPLE OF REACTIONS.  LET ME DO IT --

1    LET ME DO IT BACKWARDS.  I THINK THAT WOULD BE UNAMBIGUOUSLY A

2    RATIONAL BASIS CASE.  I DON'T THINK THAT'S A STRICT SCRUTINY

3    CASE.  IF YOU LOOK AT LUXEMBOURG, YOU COULD AGREE OR NOT ABOUT

4    WHETHER IT MAKES SENSE, BUT I THINK THE SUPREME COURT DRAWS A

5    VERY CLEAR RIGHT TO REFRAIN FROM SOMETHING VERSUS AFFIRMATIVE

6    RIGHT TO SOMETHING.  AND THE COURT HAS SAID I THINK IN CRUZAN,

7    PEOPLE HAVE A SUBSTANTIVE DUE PROCESS RIGHT TO REFRAIN FROM

8    MEDICAL -- TO REFRAIN FROM ENTERING TREATMENT PUSHED ON YOU.

9              IN BENDIBURG IT WAS THAT SORT OF CLAIM BUT, OF

10   COURSE, AS YOU SAID, THE ELEVENTH CIRCUIT REJECTED IT

11   ULTIMATELY, EVEN THOUGH THE CHILD WAS PHYSICALLY TAKEN FROM

12   THE HOUSE AND THEN IN THE CUSTODY OF THE STATE AND FORCIBLY

13   TREATED, BUT, TO -- SO I THINK IN YOUR HYPOTHETICAL, I THINK

14   IT WOULD BE UNEQUIVOCALLY A RATIONAL BASIS CASE, JUST LIKE

15   THIS ONE SHOULD BE AND THE STATE WOULD HAVE TO SHOW THAT ITS

16   DECISION WAS FOR A LEGITIMATE INTEREST AND RATIONALLY RELATED.

17             AND SO MAYBE IF THERE WERE -- MAYBE IT WERE AN

18   INDICATED USE WITH MUCH -- THE SIDE EFFECTS FOR FATIGUE,

19   HEADACHE AND LETHARGY, THEN THE STATE COULDN'T MEET ITS

20   BURDEN.  AND, YOU KNOW, COULD SHOW A BETTER BENEFIT SO.  THE

21   STATE COULD STILL HAVE A BURDEN UNDER RATIONAL BASIS JUST AS I

22   ACKNOWLEDGE WE DO TODAY.  BUT I THINK IN YOUR HYPOTHETICAL, IT

23   WOULD NOT BE A STRICT SCRUTINY CASE.  I THINK LUXEMBOURG

24   BRINGS THAT HOME.

25             I THINK PIERCE IS HELPFUL.  PIERCE IS ONE OF THE

1  FIRST CASES EVER ABOUT PARENTAL RIGHTS AND I THINK PIERCE

2  SAYS -- PIERCE SAY PARENTS HAVE A RIGHT TO DECIDE WHETHER TO

3  SEND THEIR CHILDREN TO PRIVATE SCHOOL OR PUBLIC SCHOOL.  I

4  THINK THEIR THEORY WOULD BE IF PARENTS IN PIERCE CLAIMED A

5  RIGHT TO SEND THEIR CHILDREN TO A PUBLIC SCHOOL WITH A

6  CURRICULUM ON GENDER THEORY, THE PARENTS HAVE A RIGHT TO

7  DIRECT THE UPBRINGING OF THEIR CHILDREN.  THEY DON'T HAVE A

8  RIGHT TO AFFIRMATIVELY REQUEST INTERVENTIONS AND I DON'T THINK

9  THERE'S ANY CASE WE'VE SEEN, ESPECIALLY AGAIN IN A

10 LIKELIHOOD-OF-SUCCESS POSTURE, WE ARE NOT JUST IN A

11 50/50-POSTURE THAT SHOWS ANY SORT OF RIGHT LIKE THAT.

12          AND I THINK JUST -- I THINK SOME OF THIS CAME UP AT

13 THE STATUS CONFERENCE.  I KNOW I WASN'T THERE BUT JUST TO

14 CONCLUDE -- AND OF COURSE, THE STATUS OF THE ALABAMA CASE IS

15 IN THE ELEVENTH CIRCUIT.  IT WAS ARGUED IN NOVEMBER AND STILL

16 WAITING TO BE DECIDED.  SO HOWEVER THAT'S RESOLVED, I HAVE A

17 FEELING IF THAT COMES OUT I CERTAINLY WILL BRING IT TO YOUR

18 ATTENTION, BUT THAT OBVIOUSLY ONE WAY OR ANOTHER COULD AFFECT

19 WHAT THE COURT DOES HERE.

20          THE COURT:  YES, I DID SEE THAT THE CASE IS IN THAT

21 POSTURE.

22          MR. HARRIS:  UNLESS THE COURT HAS FURTHER QUESTIONS,

23 I HAVE NOTHING FURTHER.  I WOULD URGE THE COURT TO DENY THE

24 MOTION.

25          THE COURT:  THANK YOU VERY MUCH.

1            THANK YOU FOR YOUR ARGUMENT.

2            ANYTHING, MR. BRADSHAW?  ANY REBUTTAL?

3            MR. BRADSHAW:  JUST REALLY QUICKLY, YOUR HONOR.

4            ONE POINT THAT I WANT TO MAKE AND I MEANT TO MAKE IN

5   MY CLOSING AND THAT'S THE -- AND IT GOES TO MR. HARRIS'S POINT

6   ABOUT NARROWLY TAILORING THAT STATUTE ALLOWS PUBERTY BLOCKERS

7   THAT BANNED HORMONE THERAPY.  PUBERTY BLOCKERS WE DON'T THINK

8   WE THINK THAT'S A DISTINCTION WITHOUT A DIFFERENCE.  PUBERTY

9   BLOCKERS WERE NEVER MEANT TO BE A LONG-TERM SOLUTION FOR

10  GENDER DYSPHORIA.  PUBERTY BLOCKERS ARE THE FIRST STEP IN A

11  SERIES OF INTERVENTIONS THAT ARE CONSIDERED AS A WHOLE FOR

12  TREATING GENDER DYSPHORIA AND THERE ARE SERIOUS PSYCHOLOGICAL

13  AND PHYSICAL CONSEQUENCES FOR PROLONGED USE, SO THE IDEAS THAT

14  SOMEHOW MERITS OF PUBERTY BLOCKERS, THE IDEA -- AND AS

15  DR. SHUMER TESTIFIED, NO JURISDICTION ANYWHERE, ANYWHERE, IN

16  THE WORLD HAS ALLOWED PUBERTY BLOCKERS BUT BANNED HORMONE

17  THERAPY.  GEORGIA IS THE FIRST ANYWHERE.  TALK ABOUT

18  EXPERIMENTAL.

19            AND, FINALLY, WE JUST AGREE WITH YOUR HONOR IN TERMS

20  OF FACIAL CHALLENGE.  THE FACT THAT WE'RE NOT CHALLENGING THE

21  SURGICAL BAN HAS NO BEARING ON WHETHER OR NOT AN INJUNCTION

22  FOR THE PARTS OF THE STATUTE THAT ARE BEING APPLIED ARE --

23  THE PARTS THAT ARE BEING CHALLENGED, IS THAT THE INJUNCTION

24  SHOULD BE APPLIED STATEWIDE.  THANK YOU, YOUR HONOR.

25            THE COURT:  THANK YOU.  ALL RIGHT.  I KNOW THAT

1  THERE ARE SIGNIFICANT INTERESTS ON BOTH SIDES HERE AND THAT

2  YOU ALL ARE EAGER TO GET A RULING.  I NEED TO PROCESS THE

3  EVIDENCE THAT WE'VE HEARD IN THE LAST TWO DAYS AND TAKE SOME

4  ADDITIONAL TIME TO MAKE SURE THAT I GET THIS RIGHT.  SO I'M

5  NOT GOING TO RULE FROM THE BENCH TODAY BUT I WILL GET YOU A

6  WRITTEN ORDER AS SOON AS I POSSIBLY CAN.

7              AND I WOULD LIKE TO THANK ALL OF THE COUNSEL HERE.

8  I KNOW -- I CAN IMAGINE THAT A GREAT DEAL OF BEHIND-THE-SCENES

9  WORK AND NEGOTIATIONS WENT ON TO ENSURE THAT THESE PROCEEDINGS

10 RAN AS EFFICIENTLY AS THEY DID, AND I APPRECIATE THAT.

11             IS THERE ANYTHING ELSE THAT WE SHOULD DISCUSS BEFORE

12 WE ADJOURN?

13             MR. BRADSHAW:  NO, YOUR HONOR.

14             MR. STRAWBRIDGE:  NO, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  THANKS TO ALL.

16             (THE PROCEEDINGS CONCLUDED AT 3:12 P.M.)

17                     REPORTERS CERTIFICATE

18 I DO HEREBY CERTIFY THAT THE FOREGOING PAGES ARE A TRUE AND

19 CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY ME IN THE

20 CASE AFORESAID.

21             THIS, THE 28TH DAY OF AUGUST 2023.

22

23

24             /S/MELISSA C. BROCK RPR, RMR
               OFFICIAL COURT REPORTER

25