# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

EMMA KOE, et al.,

        Plaintiffs,

    v.

CAYLEE NOGGLE, et al.,

        Defendants.

CIVIL ACTION NO. 1:23-cv-02904-SEG

<u>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION**</u>
<u>**FOR RECONSIDERATION**</u>

The Eleventh Circuit panel opinion in *Eknes-Tucker v. Governor of the State of Alabama*, No. 22-11707, 2023 WL 5344981 (11th Cir. Aug. 21, 2023), leaves open two independent bases for preserving the preliminary injunction barring enforcement of S.B. 140. First, regardless of whether it facially discriminates on the basis of sex, the law violates the Equal Protection Clause because it is a pretext for discrimination against transgender youth. Second, S.B. 140 bears no rational relationship to a legitimate government interest and thus cannot survive even rational basis review. This Court did not reach these issues in its preliminary injunction analysis. But because Plaintiffs are likely to succeed in showing that S.B. 140 is unconstitutional on these additional bases, additional factfinding is warranted, and preliminary injunctive relief remains appropriate. And in no event should this Court vacate the preliminary injunction before the Eleventh Circuit determines whether to rehear *Eknes-Tucker* en banc.

## ARGUMENT

### I.   S.B. 140 Is A Pretext For Discrimination In Violation Of The Equal Protection Clause

The Eleventh Circuit's decision in *Eknes-Tucker* recognized that the Alabama law at issue in that case could violate the Equal Protection Clause if the law was a

pretext for invidious discrimination against transgender individuals—an issue on which the district court had not ruled. *See* 2023 WL 5344981, at *17. The record in this case establishes that S.B. 140 was motivated by a desire to discriminate against transgender minors, in violation of the Equal Protection Clause.

Even a "facially neutral action by a state actor violates the Equal Protection Clause if it is done for a … discriminatory purpose." *Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1006 (11th Cir. 2018); *see also Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1331 (11th Cir. 2003) (Barkett, J., concurring) (noting that the Equal Protection Clause prohibits "intentional sexual discrimination"); *Doe v. Ladapo*, 2023 WL 3833848, at *10 (N.D. Fla. June 6, 2023) ("State action motivated by purposeful discrimination, even if otherwise lawful, violates the Equal Protection Clause." (citations omitted)). To establish that a facially neutral action is a pretext for discrimination, a plaintiff need only show that "the challenged decision was at least motivated in part by a discriminatory purpose." *Jean v. Nelson*, 711 F.2d 1455, 1485 (11th Cir. 1983), *aff'd*, 472 U.S. 846 (1985) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977)).[1] "Plaintiffs need

---

[1] The *Eknes-Tucker* panel opinion quotes language from *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), suggesting that a finding of pretext triggers a heightened-scrutiny inquiry beyond the initial inquiry into the law's discriminatory purpose. *See* 2023 WL 5344981, at *17 (quoting 142 S. Ct. at

not prove a discriminatory purpose was the primary, or dominant purpose, but must show that the action taken was, at least in part, because of, and not merely in spite of its adverse effects upon an identifiable group." *Id*. (citation and quotations omitted); *see Stout*, 882 F.3d at 1006 ("A discriminatory purpose exists if … discrimination was a substantial or motivating factor behind enactment of the law." (quotation omitted)).

The pretext analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. A court must look at the totality of the circumstances surrounding the legislation, including (1) the impact of the challenged law, (2) the historical background, (3) the specific sequence of events leading up to its passage, (4) procedural and substantive departures, (5) the contemporary statements and actions of key legislators, (6) the foreseeability of the disparate impact, (7) knowledge of that impact, and (8) the

---

2245-46). Neither decision elaborates on what any further inquiry would entail, and courts have consistently held that a showing of intentional discrimination itself establishes an equal protection violation. To the extent any further inquiry is required after a finding of pretext, this Court has already found that S.B. 140 fails heightened scrutiny. *See* Doc. 106, Order at 46-67. The State cites the concurring opinion in *Eknes-Tucker* to argue that S.B. 140 does not survive even intermediate scrutiny, *see* Doc. 108, Mot. for Recons. at 6-7, but one judge's non-binding view on that question does not provide a basis for this Court to revisit its prior analysis.

availability of less discriminatory alternatives. *Id*. at 266-68; *see Jean*, 711 F.2d at 1486 (summarizing *Arlington Heights* factors).

Here, an evaluation of the *Arlington Heights* factors demonstrates the legislature's discriminatory intent in enacting S.B. 140.

1. To start, there is no dispute that S.B. 140 by design impacts only transgender youth, nor is there any dispute about the foreseeability of that result. *See Arlington Heights*, 429 U.S. at 267-68 (considering impact of challenged law, foreseeability of disparate impact, and knowledge of disparate impact). It is no secret that in prohibiting hormone therapy solely for the purpose of treating gender dysphoria, the Ban affects only transgender youth. *See* Doc. 1, Complaint ("Compl.") ¶ 129. The law's express exemptions permitting minors with other medical conditions to receive hormone therapy, *see* S.B. 140 § 3(b), further underscore the General Assembly's deliberate effort to single out transgender minors for differential treatment.

This distinction is particularly suspect because hormone therapy to treat gender dysphoria operates the same way, with the same goals, as hormone therapy to treat various conditions in non-transgender youth. In prescribing hormone therapy to treat gender dysphoria, providers use testosterone or estrogen to bring the patient's levels "up into the normal range for a young man or a young woman that age with

the idea of mimicking the normal timing and tempo of puberty." Aug. 10-11, 2023 Hr'g Tr. ("Tr.") 24:2-8. Likewise for hormone therapy prescribed to treat other conditions in non-transgender minors, the goal is to bring hormones levels into the expected range for minors of a similar age. For example, to treat conditions like Turner Syndrome and Ovarian Insufficiency in non-transgender females, clinicians prescribe estrogen because the patients' bodies cannot produce normal levels. *Id*. at 24:20-25:10.

Beyond singling out transgender minors, the law's objective impact on that group is profound. S.B. 140 prevents transgender minors from obtaining treatment in adolescence so they can go through puberty consistent with their gender identity. The law's impact was known to legislators, who before its passage heard testimony from transgender individuals and families of transgender children about their painful, personal experiences with gender dysphoria and the importance of gender-affirming medical care to their mental and physical well-being. *See* Compl. ¶ 76. These accounts echo the clinical evidence, which shows that forcing minors to wait until adulthood to pursue gender-affirming medical care leads to a significant increase in mental health issues, including suicidality. Tr. 22:1-4, 35:22-36:2, 94:12-19. By blocking timely care, the Ban forces transgender youth, their parents, and their healthcare providers either to depart from the medical consensus and delay

puberty through the prolonged use of puberty-blocking medications, *see* Doc. 106, Order at 15 (citing Doc. 2-8, Shumer Decl. ¶¶ 71, 97; Doc. 70-1, McNamara Decl. ¶ 43); Tr. 35:16-36:12, or to wait until adulthood to begin a medical transition only after going through puberty inconsistent with their gender identity, *see* Tr. 34:21-35:15. Both options are socially isolating and harmful to a transgender minor's physical and mental health. Tr. 20:19-22:8, 34:21-36:12, 94:1-95:3; Compl. ¶¶ 109, 117.

2. The surrounding legislative context further demonstrates the discriminatory intent underlying the Ban. S.B. 140 is just one bill among many that the Georgia legislature has recently introduced targeting transgender youth. *See Arlington Heights*, 429 U.S. at 267-68 (historical background, specific sequence of events leading to bill's passage, and contemporary statements and actions of key legislators are relevant to discriminatory purpose inquiry). So far in 2023, Georgia legislators have introduced three bills to prohibit gender-affirming health care for transgender minors. *See* H.B. 653, 157th Gen. Assemb., Reg. Sess. (Ga. 2023); S.B. 140, 157th Gen. Assemb., Reg. Sess. (Ga. 2023); S.B. 141, 157th Gen. Assemb., Reg. Sess. (Ga. 2023). Legislators introduced a fourth bill to bar transgender youth from using multiple-occupancy restrooms that align with their gender identity. *See* H.B. 836, 157th Gen. Assemb., Reg. Sess. (Ga. 2023). A fifth bill would restrict Georgia

minors' ability to change their name and gender in school records while simultaneously prohibiting teachers, librarians, social services agents, and camp staff from talking to a minor about sexual orientation and gender identity. *See* S.B. 88, 157th Gen. Assemb., Reg. Sess. (Ga. 2023).

The 2023 bills continue a pattern of discriminatory legislation in Georgia, following four bills targeting transgender youth in 2021 and six in 2022. Together, these bills are designed to—and will—deny transgender minors medically necessary health care, isolate them from their peers, deprive them of the ability to present their identities, and alienate them from their teachers, mentors, coaches, and caregivers. The discriminatory thread running through each of these bills is facially apparent.

It is also telling that the same legislators are behind these various bills. For example, ten of the senators who sponsored S.B. 140 also sponsored S.B. 141 and S.B. 88. And while presenting to the Georgia Senate, Tom Rawlings—the former Director of the Division of Children and Family Services who helped draft S.B. 140 and S.B. 88—explained that "the real issue" motivating S.B. 88 is preventing "a male child … who likes to play with dolls" and "is more feminine" from "getting the wrong idea that he can be a feminine boy," "that if you feel feminine, but you're a male, that you may want to consider becoming transgender or nonbinary." *Hearing on S.B. 140 Before the S. Comm. on Educ. & Youth*, 2023 Leg., 157th Gen. Assemb.

at 50:00 (Ga. 2023), https://vimeo.com/853106114. These remarks not only closely resemble statements by the State's expert Dr. Hruz that this Court characterized as "disparaging" and "inflammatory," Doc. 106, Order at 19 n.11; *see* Tr. 150:11-154:4—they are textbook discrimination.

Although S.B. 140 is cut from the same cloth as the larger package of legislation targeting transgender young people, S.B. 140 represents a marked substantive departure from the legislature's recent impulse to safeguard parental rights. *See Arlington Heights*, 429 U.S. at 267 (substantive departures can support finding of discriminatory purpose). Just last year, for example, the State enacted legislation to protect parents' right to determine whether their child wears a mask or face covering while present on school property. *See, e.g.*, S.B. 514, 156th Gen. Assemb., Reg. Sess. (Ga. 2022). That same year, the State enacted the Parents' Bill of Rights, which secures the "fundamental right of parents to direct the upbringing and education of their minor children." H.B. 1178, 156th Gen. Assemb., Reg. Sess. (Ga. 2022). But where the parental decisions to be made concern treatment for gender dysphoria—a condition affecting only transgender individuals—the legislature has decided that parents can no longer be trusted to safeguard their children's health and well-being.

3. The circumstances surrounding the adoption of S.B. 140 in particular

further demonstrate its discriminatory purpose. The General Assembly cherry-picked evidence contrary to medical consensus, relied on studies for propositions they do not support, and discounted the testimony of transgender children and their families—all to enact a bill rife with internal inconsistencies that undermine the State's claim that hormone therapy is unsafe for transgender minors. During the floor debate, for instance, the General Assembly heard testimony only from a single doctor—who has no expertise treating transgender minors—in support of the bill. Compl. ¶ 74. That testimony contradicted input from more than 500 Georgia pediatricians, psychiatrists, and endocrinologists who treat transgender youth, who opposed the legislation and emphasized that hormone therapy is a necessary, safe and effective treatment for their patients. *Id*. ¶ 73.

The General Assembly also credited studies and subsequent legislative action from a handful of European countries recommending caution in prescribing hormone therapy to minors. *Hearing on S.B. 140 Before the H. Comm. on Pub. Health, 2023 Leg.*, 157th Gen. Assemb. at 1:13:16, 1:14:58, 1:25:12 (Ga. 2023) (statement of Sen. Ben Watson), https://www.youtube.com/watch?v=REs3xP8H-Wg&t=6226s. But none of those countries implemented a total ban, because none of the studies recommended one. *See* Doc. 106, Order at 55-57. The decision to proceed with a ban that is contrary to medical evidence—and despite opposition from hundreds of

medical professionals and testimony from transgender individuals and parents of transgender children about the lifesaving effects of hormone therapy—demonstrates that the General Assembly was motivated "at least in part" by discriminatory purpose. *Jean*, 711 F.2d at 1485; *see also Arlington Heights*, 429 U.S. at 266; *cf. Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022) (affirming finding of pretext where district court relied in part on "the fact that the Council generally did not attempt to respond to public concerns about racial gerrymandering"); *Cooper v. Harris*, 581 U.S. 285, 291-92 (2017) (plaintiffs may use circumstantial evidence to demonstrate other considerations were subordinated to discriminatory purpose).

Statements from legislators who supported S.B. 140 bring their discriminatory purpose into clear view. Throughout the legislative process, these legislators and their supporting witnesses consistently denied that gender dysphoria is a legitimate medical diagnosis. One representative described gender dysphoria as something "based on their feelings." *Leg. Sess. on S.B. 140 Before the H.R.*, 2023 Leg., 157th Gen. Assemb. at 2:05:21 (Ga. 2023) (statement of Rep. Will Wade), https://www.youtube.com/watch?v=JJA0nENgk2A. Tom Rawlings asserted— without evidence or support—that "the majority of individuals who display gender dysphoria resolve it in some way" without medical intervention. *Hearing on S.B.*

*140 Before the S. Comm. on Health & Hum. Servs.*, 2023 Leg., 157th Gen. Assemb. at 36:13 (Ga. 2023) (statement of Tom Rawlings), https://www.youtube.com/watch?v=WsGBigfkYro. Perhaps most egregiously, one senator sought to distinguish gender dysphoria from "real" medical conditions, stating callously, "[O]bviously we treat diabetes or the person would die. You don't die from gender dysmorphia [*sic*] unless there's suicides." *Id.* at 44:40 (statement of Sen. Carden Summers); *see* Doc. 2-8, Shumer Decl. ¶¶ 42, 91, 99 (describing increased likelihood of suicide in patients with untreated gender dysphoria); *Jacksonville Branch of NAACP*, 2022 WL 16754389, at *4 (in racial gerrymandering case, statements from councilmember that "seemed to confirm that race was a priority" in drawing district map supported finding of pretext).

4. The General Assembly's decision to proceed with a total ban when clear alternatives are available further supports a finding of purposeful discrimination. *Arlington Heights*, 429 U.S. at 267-68 (availability of less discriminatory alternatives is relevant to pretext analysis). One obvious option would have been to implement a legislative policy in line with WPATH's standards of care. Or the State could have selected any one of the policies implemented by Finland, Sweden, France, and Norway—the very policies the State identified attempting to support its total ban—which embrace a cautious approach to hormone therapy for transgender

minors that balances potential safety concerns with the critical necessity of this treatment. *See supra* at 9; Doc. 106, Order at 55-57. The State ignored these options, instead proceeding with a policy that altogether forecloses access to hormone therapy for treating minors with gender dysphoria. *Cf. Romer v. Evans*, 517 U.S. 620, 632 (1996) ("sheer breadth" of a policy can be "so discontinuous with the reasons offered for it" as to be "inexplicable by anything but animus").

5. The State argues that Plaintiffs did not sufficiently allege an equal protection violation based on discriminatory intent in their complaint. *See* Doc. 108, Mot. for Recons. at 8. That is wrong. Plaintiffs alleged that the Ban "singles out and stigmatizes [transgender minors]" and their families by depriving only transgender individuals of hormone therapy. Compl. ¶ 134. Plaintiffs further alleged that the law has no legitimate purpose, supporting a conclusion that its purpose was to discriminate. Specifically, as recited in the complaint, the General Assembly passed the bill despite clear and uncontroverted testimony regarding the necessity of this care, *id*. ¶¶ 76-77; ignored guidance from more than 500 Georgia medical practitioners who treat transgender minors, *id*. ¶ 73; and relied for its position on testimony by a single physician who has no experience treating transgender minors pursuant to the accepted standard of care, *id*. ¶¶ 74-75. The complaint also highlights inconsistencies in S.B. 140 that reflect its "discriminatory purpose," including the

exception permitting minors who began hormone therapy before the bill's effective date to continue a purportedly unsafe treatment. *Id*. ¶ 129. Plaintiffs adequately—and expressly—alleged S.B. 140's discriminatory purpose.[2]

S.B. 140 bars transgender youth and their parents alone from accessing medically necessary and appropriate hormone treatment. *See Id*. ¶ 134; Tr. 34:19-20. The "practical effect" of that design is "to impose a disadvantage, a separate status, and so a stigma" upon Plaintiffs and transgender youth across the State of Georgia, depriving them not only of necessary medical care but also of equal dignity. *See United States v. Windsor*, 570 U.S. 744, 770 (2013); *see also Ladapo*, 2023 WL 3833848, at *10 (concluding that Florida law banning gender-affirming care for transgender minors was motivated in substantial part by "purposeful discrimination"); *Lange v. Houston Cnty.*, 499 F. Supp. 3d 1258, 1275 (M.D. Ga. 2020) (plaintiff stated claim that employer policy excluding gender-affirming surgery from healthcare benefits "is a facially neutral classification that has a disproportionate impact on transgender persons and is motivated by discriminatory purpose"). The Ban's discriminatory purpose renders it a violation of the Equal

---

[2] If the Court nonetheless concludes that Plaintiffs' complaint does not sufficiently allege that S.B. 140 violates the Equal Protection Clause because it is a pretext for prohibited discrimination, Plaintiffs respectfully request leave to file a motion to amend the complaint to state such a claim.

Protection Clause. That is sufficient basis to leave in place the preliminary injunction barring enforcement of S.B. 140.

## II.   S.B. 140 Bears No Rational Relationship To Ensuring Safe Medical Care For Transgender Minors Or Any Other Legitimate Government Interest

Even if the record regarding S.B. 140 did not demonstrate that the law is a pretext for invidious discrimination, preliminary injunctive relief would still be warranted because S.B. 140 does not survive even rational basis review.

1. To survive rational basis review, a status-based classification must be "directed to an identifiable legitimate purpose or discrete objective." *Romer*, 517 U.S. at 621. The State must show that a "classification bears a rational relationship to an independent and legitimate legislative end" and was "not drawn for the purpose of disadvantaging the group burdened by the law." *Id*. at 632-33.

Rational basis review is not a free pass. "[E]ven in the ordinary equal protection case calling for the most deferential of standards, [courts] insist on knowing the relation between the classification adopted and the object to be attained." *Id*. at 632; *see, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447-50 (1985) (striking down on rational basis review ordinance requiring group-care facilities for the developmentally disabled, but not other multiple-occupant facilities, to obtain land-use permits); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985) (same for tax exemption for Vietnam War veterans limited

to those who resided in the state on a certain date); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 529 (1973) (same for statute denying food stamps to unrelated people living in the same household). Where the Supreme Court has struck down laws on rational basis review, "a common thread" has been that the laws are so disconnected from any claimed legitimate governmental objective that they seemingly "lack any purpose other than a 'bare desire to harm a politically unpopular group.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (quoting *Moreno*, 413 U.S. at 534); *see also Romer*, 517 U.S. at 634; *Cleburne*, 473 U.S. at 446-47.

That is exactly the case here. This Court has recognized that transgender youth face potential stigma and discrimination—a notion the State does not contest. Doc. 89, Order at 7-9; *see also* Compl. ¶ 131. In prohibiting transgender youth from receiving hormone therapy, the General Assembly purported to be acting on its "obligation to protect children … from undergoing unnecessary and irreversible medical treatment." S.B. 140 § 1(7). While that may be a legitimate government objective in the abstract, S.B. 140 cannot reasonably be understood to promote it.

S.B. 140's legislative history and the record evidence demonstrate that the Ban—which applies *only* to transgender youth—bears no rational relationship to protecting children or preventing them from undergoing unnecessary medical treatment. The State tries to cast S.B. 140 as "a proper legislative choice among

15

competing public concerns." Doc. 78, Defs.' Sur-Reply at 13 (quotation omitted). But as the record evidence indicates, the medical consensus is that hormone therapy is a safe, effective, and often *necessary* treatment option for minors with gender dysphoria. *See, e.g.*, Tr. 19:5-11 (Dr. Shumer testified that "mainstream clinicians in the field of pediatric endocrinology are not debating the [safety and efficacy of] basic standards of care.").

The State's only supposed evidence to the contrary fails to actually support its position. As this Court concluded, the State's position is based "heavily" on studies from a handful of European countries urging caution in prescribing hormone therapy to minors, and on the policy actions those countries took regulating minors' access to these treatments. Doc. 106, Order at 55-56 (citing Doc. 92, Cantor Decl. ¶¶ 21-34); *see id*. at 21 (noting that State's expert Dr. Laidlaw relied on European studies for his opinion that WPATH's standards of care are not supported by sufficient evidence (citing Doc. 93, Laidlaw Decl. ¶¶ 180-99)). But none of these studies recommend a categorical ban on hormone therapy to treat gender dysphoria, and none of the countries the State identifies have implemented such a ban. *See id*. at 62-63; Tr. 73:20-74:10. Just the opposite—"these countries continue to adhere to treatment protocols not much different from the WPATH standards of care endorsed by the American medical establishment." Doc. 106, Order at 62; *see* Tr. 75:1-76:4.

The General Assembly further attempted to justify the Ban by baselessly asserting that a "wait-and-see" approach to treating gender dysphoria in minors "do[es] no harm." S.B. 140 § 1(6). But the clinical evidence shows that forcing transgender minors to wait until adulthood to pursue gender-affirming medical care leads to a significant increase in mental health issues. Tr. 22:1-4, 35:22-36:2. For instance, a study comparing more than 21,000 adults who sought gender-affirming hormone treatment found that those who were able to access this care in early adolescence were 222 percent less likely to experience severe psychological distress and 135 percent less likely to experience suicidal ideation as adults compared to those who lacked access to hormone therapy. Doc. 2-8, Shumer Decl. ¶ 99 (citing J.L. Turban et al., *Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults*, PLoS One (2022)). The State has no contrary evidence, leaving it with a record that overwhelmingly demonstrates that the Ban harms, rather than protects, the health and well-being of Georgia's transgender minors. Proceeding to categorically ban gender-affirming hormone therapy on this record, in the purported interest of protecting minors, is not rational. *See Ladapo*, 2023 WL 3833848, at *11-13 (concluding medical evidence did not provide "a rational basis for denying patients the option to choose this treatment").

2. That a categorical ban on hormone therapy for transgender minors does not

rationally further any interest in protecting the health and well-being of those individuals is underscored by the fact that S.B. 140 permits transgender youth who began hormone therapy before the law's effective date to continue that therapy without restriction. S.B. 140 § 3(b). If these medications are sufficiently safe and effective for minors already receiving them to continue treatment, there is no rational basis to prohibit those treatments for other patients with the same medical condition simply because they had not started treatment as of July 1, 2023.

The Ban also contains exceptions for (1) medical conditions other than gender dysphoria or for the purpose of sex reassignment if medically necessary; (2) individuals born with a medically verifiable disorder of sex development; and (3) individuals with partial androgen insensitivity syndrome. S.B. 140 § 3(b). Record evidence shows that use of hormone therapy to treat these medical conditions does not pose meaningfully different risks than use of hormone therapy to treat gender dysphoria. Tr. 52:9-53:4 (Dr. Shumer testified that minors taking estrogen to treat gender dysphoria will have a higher risk of venous thromboembolism, as "anyone taking estrogen for any reason" would); *see also id*. at 28:23-32:23, 69:4-70:14; *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021) ("If the State's health concerns were genuine, the State would prohibit these procedures for all patients under 18 regardless of gender identity."), *aff'd*, 47 F.4th 661 (8th Cir. 2022).

18

Finally, S.B. 140 permits puberty-blocking medications, which delay the onset of puberty and serve as the first step of medical transition for transgender youth beginning or nearing puberty. Doc. 2-8, Shumer Decl. ¶¶ 47, 62, 65. The State argues that this provision minimizes the harm imposed by S.B. 140 by targeting only "the drug that is most likely to result in permanent" side effects while allowing minors to delay puberty until they reach the age of majority. Tr. 397:6-18; *see* Doc. 78, Defs.' Sur Reply at 9-10. This justification is unsupported by, and in fact contradicted by, the evidentiary record in this case. Puberty-blocking medications are intended only as a bridge to the next phase of treatment, which typically includes the hormone therapy that S.B. 140 prohibits. *See* Doc. 2-8, Shumer Decl. ¶¶ 79, 97; Tr. 22:14-18 (explaining that puberty blockers serve as "a bridge to another decision point" which is typically testosterone or estrogen). That is because, as both parties' experts testified, there are serious physical and psychological risks associated with prolonged use of puberty blocking medications. *See, e.g.*, Tr. 162:2-6 (Dr. Hruz testified that, as an endocrinologist, he would not advise that patients take puberty blockers from the onset of puberty to the age of 18); *id*. at 21:14-22:4 ("Delaying puberty indefinitely has negative mental health and physical health risks." (Dr. Shumer)). To the extent the State intends to endorse through S.B. 140 prolonged use of puberty-blocking medication to treat individuals with gender dysphoria, it is

19

pushing the State's transgender youth toward a *less* safe course of treatment that is *not* consistent with global standards of medical care, while banning hormone therapy that is well-established in the medical community as safe, appropriate, and necessary. *See* Doc. 2-8, Shumer Decl. ¶¶ 35-36; Tr. 32:20-23 (in "withholding [hormones] until 18, we're missing that critical window of addressing gender dysphoria during puberty, which can have life-long consequences"). The bill's irrationality is underscored by Dr. Shumer's unchallenged testimony that he is unaware of any other jurisdiction in the world that bans hormone therapy but permits puberty blockers. Tr. 64:15-17, 73:20-74:10.

These discrepancies and departures from widespread medical consensus demonstrate that S.B. 140 bears no "rational relationship" to the "legitimate legislative end" of regulating medical treatment to ensure patient safety. *Romer*, 517 U.S. at 621. Rather, as discussed above, the legislative history and record in this case show the law was "drawn for the purpose of disadvantaging the group burdened by the law." *Id*. at 632-33. That is not a legitimate state interest. *See Ladapo*, 2023 WL 3833848, at *10 ("Dissuading a person from conforming to the person's gender identity rather than to the person's natal sex is not a legitimate state interest.").

3. The Eleventh Circuit's suggestion in *Eknes-Tucker* that Alabama's ban on hormone therapy for transgender minors would likely survive rational basis review,

*see* 2023 WL 5344981, at *13-15, 17, does not foreclose a holding that S.B. 140 likely does not. Rational basis review is a highly fact-intensive inquiry; indeed, the Eleventh Circuit declined to hold that Alabama's law would not pass muster and remanded for the district court to address that question in the first instance. *See id*. Courts that have definitively ruled on the rational basis review question, however, have concluded that categorial bans on hormone therapy to treat gender dysphoria in minors are not rationally related to a legitimate government purpose. *See Ladapo*, 2023 WL 3833848, at *5-6 ("There is no rational basis for a state to categorically ban" hormone therapy.); *Brandt*, 551 F. Supp. 3d 882, 891-92 (holding that Arkansas gender-affirming care ban, "based on the record," "would not even withstand rational basis scrutiny if it were the appropriate standard of review").

While the Alabama and Georgia laws have broad similarities, neither the laws themselves nor the purported rationale and evidence supporting them are exactly the same,[3] underscoring the need for independent inquiries into the rationality of each State's legislation. The record surrounding S.B. 140 demonstrates that the Ban contradicts medical consensus and deprives transgender minors (but no one else) of necessary medical care—a status-based classification with no rational justification.

---

[3] For example, Alabama's ban does not exempt transgender patients who began treatment before the law's effective date. *See* Ala. S.B. 184.

It is not the case that a law survives rational basis review merely because the State can articulate some theoretical justification for it. That a law does not necessarily need to be supported by "evidence or empirical data" to survive rational basis review, *Eknes-Tucker*, 2023 WL 5344981 at *13 (citation omitted), does not negate the requirement that it bear a "rational relationship" to a legitimate governmental end, *Romer*, 517 U.S. at 621. For example, in *Plyler v. Doe*, 457 U.S. 202 (1982), the Supreme Court struck down a Texas statute denying public education to the children of undocumented immigrants even though there were "colorable state interests" supporting the statute because the statute did not actually serve those interests in practice. *Id.* at 227-30; *see also Vance v. Bradley*, 440 U.S. 93, 97 (1979). As described at length above, the State has made no showing that banning hormone therapy to treat gender dysphoria actually protects the health and welfare of Georgia's transgender youth. The absence of any rational relationship between the State's stated interest and the effect of the Ban fatally undermines the State's argument S.B. 140 survives rational basis review.

## III.   The Court Should Not Rush To Rule On Georgia's Reconsideration Motion Before The Eleventh Circuit Decides Whether To Hear *Eknes-Tucker* En Banc

Notwithstanding the panel decision in *Eknes-Tucker*, the issues discussed above provide additional, independent bases to preserve the preliminary injunction

in this case. While Plaintiffs appreciate the Court's desire to promptly address the issues raised in the State's reconsideration motion, *see* Doc. 113, Order, Plaintiffs respectfully submit that the State's plea for near-immediate relief is overstated. The State will not face undue prejudice from the Court taking adequate time to fully evaluate whether preliminary injunctive relief remains appropriate.

Notably, in the normal procedural course, the mandate in *Eknes-Tucker* will not issue until the later of (1) seven days after the time to file a petition for rehearing expires, or (2) seven days after the Eleventh Circuit denies a timely petition for rehearing.[4] Fed. R. App. P. 41(b). Until then, Alabama will remain subject to the very injunction addressed by the Eleventh Circuit's opinion. *See* Fed. R. App. P. 41, cmt. to 1998 amendment ("The court of appeals' judgment or order is not final until issuance of the mandate; at that time the parties' obligations become fixed."). Though timeliness of relief is of course important to all judicial proceedings, the mandate process accounts for the equally important principle of finality. *See id*. A short delay before any relief granted by the court of appeals is effectuated is a

---

[4] The United States intervened in *Eknes-Tucker* and is now a party to the case. *See* Doc. 94, *Eknes-Tucker v. Marshall*, No. 2:22-cv-00184-LCB-CWB (M.D. Ala. May 8, 2022); *United States v. Jim*, 891 F.3d 1242, 1252-53 (11th Cir. 2018) ("It is hornbook law that an intervenor ... has equal standing with the original parties." (quotation omitted)). Any petition for rehearing en banc therefore must be filed within 45 days from the entry of the judgment. 11th Cir. R. 35-2.

standard part of the appellate process. There is no need for this Court to expedite resolution of the State's motion for reconsideration to afford Georgia relief before even Alabama receives it. And of course if the Court concludes there are additional grounds for upholding the injunction, the State would not be entitled to any relief.

If, despite Plaintiffs' additional arguments in support of a preliminary injunction, the Court is otherwise inclined to vacate the injunction based on *Eknes-Tucker*, the Court should wait to do so until the Eleventh Circuit decides whether to reconsider *Eknes-Tucker* en banc. The Alabama plaintiffs intend to file a petition for rehearing en banc,[5] and if the Eleventh Circuit grants it, the panel decision will be vacated. *See* 11th Cir. R. 35-10, 41-1(d). In that case, the vacated panel opinion would have "no legal effect whatever," eliminating the sole basis for the State's motion for reconsideration. *See United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) ("None of the statements made in [a vacated opinion] has any remaining force and cannot be considered to express the view of this Court.").

Since, in the normal course, the mandate will not issue before the Eleventh Circuit decides whether to take *Eknes-Tucker* en banc, the State of Alabama will

---

[5] *See* Jemma Stephenson, *Alabama transgender medicine ban: Attorneys want full rehearing on federal court ruling*, Ala. Reflector (Aug. 29, 2023, 11:39 AM), https://alabamareflector.com/2023/08/29/alabama-transgender-medicine-ban-attorneys-want-full-rehearing-on-federal-court-ruling/.

remain subject to an injunction at least that long. Waiting to resolve Georgia's motion for reconsideration until after the Eleventh Circuit decides whether to grant any petition for rehearing en banc will not unreasonably prejudice the State, and it will allow the Court to avoid the potential procedural whiplash of lifting and then reinstating its preliminary injunction in short order. *Cf. Clinton v. Jones*, 520 U.S. 681, 683 (1997) (court "has broad discretion to stay proceedings as an incident to its power to control its own docket"); *Sessions v. Barclays Bank Delaware*, 276 F. Supp. 3d 1349, 1350 (N.D. Ga. 2017) (stay may be warranted where an appellate decision is likely to have a substantial or controlling effect on the case).

## CONCLUSION

For the foregoing reasons, this Court should preserve the preliminary injunction on the independent grounds that S.B. 140 is a pretext for unlawful discrimination against transgender minors and in any event also fails rational basis review. If the Court declines to uphold the injunction on either of these grounds, the Court should stay resolution of the State's motion for reconsideration until the Eleventh Circuit decides whether to grant any petition for rehearing en banc in *Eknes-Tucker*—a decision that in the ordinary course will be made before the Alabama injunction is lifted and will provide clarity regarding whether the panel decision will remain controlling Eleventh Circuit law.

Respectfully submitted this 30th day of August, 2023.

SOUTHERN POVERTY LAW
CENTER
/s/ Elizabeth Littrell
Elizabeth Littrell (GA Bar No. 454949)
Maya Rajaratnam (GA Bar No. 452753)
150 Ponce de Leon Ave.
Ste. 340, Decatur GA 30030
Fax: (404) 221-5857
Email: Beth.Littrell@splcenter.org
Phone: (404) 221-5876
Maya.Rajaratnam@splcenter.org
Phone: (334) 398-0328

Scott D. McCoy (FL Bar No. 1004965)
2 Biscayne Boulevard, Suite 3750
Miami, FL 33131
Email: Scott.McCoy@splcenter.org
Phone: (334) 224-4309


AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF GEORGIA
Cory Isaacson (GA Bar No. 983797)
Nneka Ewulonu (GA Bar No. 373718)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF GEORGIA
P.O. Box 570738
Atlanta, GA 30357
Phone: (770) 415-5490
CIsaacson@acluga.org
NEwulonu@acluga.org

O'MELVENY & MYERS
/s/ Benjamin G. Bradshaw
Benjamin G. Bradshaw*
Deanna M. Rice*
Meredith Garagiola*
Carly Gibbs*
Rachel A. Chung (pro hac vice
forthcoming)
Danielle Siegel*
Patric Reinbold*
O'MELVENY & MYERS LLP
1625 Eye Street N.W.
Washington, DC 20006
Phone: 202-383-5300
bbradshaw@omm.com
drice@omm.com
mgaragiola@omm.com
cgibbs@omm.com
rchung@omm.com
dsiegel@omm.com
preinbold@omm.com

Stephen McIntyre*
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2899
Phone: 213-430-6000
smcintyre@omm.com

Paul Sieben*
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025-7019
Phone: 650-473-2600
psieben@omm.com

26

HUMAN RIGHTS CAMPAIGN
FOUNDATION
Cynthia Cheng-Wun Weaver* (NY Bar
No. 5091848)
Ami Rakesh Patel* (CA Bar No.
325647)
1640 Rhode Island Avenue N.W.
Washington, DC 20036
Phone: (202) 993-4180
Cynthia.Weaver@hrc.org
Ami.Patel@hrc.org

*Attorneys for Plaintiffs*
*(\* Admitted Pro Hac Vice)*

Jennifer Beard*
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
Phone: 415-984-8700
jbeard@omm.com

/s/ Edward D. Buckley
Edward D. Buckley (Ga. Bar No. 092750)
Thomas J. Mew IV (Ga. Bar No. 503447)
BUCKLEY BALA WILSON MEW LLP
600 Peachtree Street N.E., Suite 3900
Atlanta, GA  30308
Phone: (404) 781-1100
edbuckley@bbwmlaw.com
tmew@bbwmlaw.com

*Counsel for Intervenor Plaintiff Nancy
Doe individually and on behalf of her
minor daughter Linda Doe*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on August 30, 2023, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system.

/s/ Benjamin G. Bradshaw
Benjamin G. Bradshaw

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with LR 5.1(C) because it was prepared in a double-spaced typeface using Microsoft Word in 14-point Times New Roman font.

<u>/s/ Benjamin G. Bradshaw</u>
Benjamin G. Bradshaw

Dated: August 30, 2023