## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| EMMA KOE, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:23-cv-02904-SEG |
| RUSSEL CARLSON, et al., | |
| *Defendants*. | |

### <u>REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION</u>

Plaintiffs offer two arguments to maintain the preliminary injunction: (1) a request for this Court to ignore binding, on-point Eleventh Circuit precedent holding that a rational basis challenge to a state law prohibiting medicalized sex transitions for minors is unlikely to succeed on the merits, *see Eknes-Tucker v. Governor of the State of Alabama*, No. 22-11707 (Aug. 21, 2023); and (2) an entirely new pretext/purpose theory that was not previously briefed, argued, or presented at the two-day evidentiary hearing.

Both arguments fail. Plaintiffs may disagree with *Eknes-Tucker*, but it unequivocally held that a rational basis challenge to Alabama's child protection law was unlikely to succeed. At bottom, Plaintiffs argue they have the better view of contested medical and scientific evidence. But that does not come close to showing a likelihood of success under the rational basis standard—especially given *Eknes-*

*Tucker*'s disposition of a materially indistinguishable claim in the face of arguments nearly identical to the ones Plaintiffs raise here.

Plaintiffs alternatively ask this Court to leave the preliminary injunction in place based on a theory of pretext or invidious discrimination. Regardless of its merits, this argument is procedurally inappropriate as Plaintiffs never moved for injunctive relief on this basis or raised it at the evidentiary hearing. For good reason, as it is wholly without merit. When a state is accused of invidious discrimination against a non-suspect class, the state must simply show the challenged policy was "rationally related to a legitimate governmental purpose." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985). Plaintiffs' "invidious discrimination" argument thus fails for the same reason as their rational-basis argument, and is equally foreclosed by *Eknes-Tucker.*

## I.    *Eknes-Tucker* forecloses any argument that Plaintiffs are likely to succeed on a rational-basis claim.

Plaintiffs do not dispute that *Eknes-Tucker* mandates that SB 140 be reviewed under the rational-basis standard rather than intermediate scrutiny. Plaintiffs also acknowledge the Eleventh Circuit's "suggestion" that Alabama's similar law "would likely survive rational basis review," but argue that this "does not foreclose a holding that S.B. 140 likely does not." Opp.20-21. To be clear, the Eleventh Circuit's decision is not a "suggestion" or stray dictum but a *holding* on the question of

likelihood of success on the merits that binds all courts within this Circuit.[1]

*Eknes-Tucker* confirms that Plaintiffs cannot show a likelihood of success on a rational-basis argument. The Eleventh Circuit held that "states have a compelling interest in protecting children from drugs, particularly those for which there is uncertainty regarding benefits, recent surges in use, and irreversible effects." *Eknes-Tucker*, slip op. at 35-36. Under rational basis review, Alabama had "at least rational speculation that some families will not fully appreciate those risks and that some minors experiencing gender dysphoria ultimately will desist and identify with their biological sex." *Id.* at 36. The same could be said verbatim here.[2]

*Eknes-Tucker* reiterates that "rational speculation" is sufficient, but Georgia has offered much more than that. Defendants submitted hundreds of pages of expert reports and presented three live witnesses and numerous additional studies at the evidentiary hearing. Defendants' evidence comprehensively documents the well-established risks but highly speculative benefits of cross-sex hormonal interventions.

---

[1] It is thus irrelevant that a district court in Florida, before *Eknes-Tucker*, found no rational basis to ban cross-sex hormonal interventions for minors.

[2] Plaintiffs correctly note that the Alabama and Georgia laws are not "exactly the same." Opp.21. But there are no material differences between the laws that could result in Georgia's being enjoined while Alabama's is not. Indeed, Georgia's SB 140 is *less restrictive* than Alabama's law. *See Eknes*-Tucker, slip op. at 4-12 (describing Alabama law). Alabama makes it a felony to administer the prohibited interventions, while Georgia makes it a civil offense or, at most, a misdemeanor. Alabama's law applies to persons under the age of 19 while Georgia's applies to persons under the age of 18. And Georgia, unlike Alabama, has included a continuing-care exception.

Plaintiffs' opposition does not dispute much of this. They do not dispute there has been a recent surge of cases among adolescents, mostly girls. Mot. for Recon. 6. Nor do they dispute that the cross-sex hormonal interventions prohibited by SB 140 can pose lifelong risks of infertility, blood clots, and other conditions, as well as irreversible physical changes to one's body. *Id.* at 5; *see also Eknes-Tucker*, slip op. at 36 ("the record evidence is undisputed that the medications at issue present *some* risks," including "'loss of fertility and sexual function'"). Like Alabama, Georgia acted in the face of an unexplained surge of adolescents presenting with gender dysphoria to protect minors from the severe and potentially irreversible risks of interventions with little reliable evidence of their benefits. *See* SB 140 §1 (findings). This is a paradigmatic rational basis for enacting a law.

"On rational-basis review, a classification … comes to us bearing a strong presumption of validity, … and those attacking the rationality of the legislative classification have the burden 'to negate every conceivable basis which might support it.'" *FCC v. Beach Commc'ns*, 508 U.S. 307, 314 (1993). "[A] classification must be upheld against equal protection challenge if there is *any reasonably conceivable state of facts* that could prove a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993). Indeed, even if a state's rationale is found "erroneous," it is "immunize[d]" from constitutional challenge as long as it is "arguable." *Beach Commc'ns*, 508 U.S. at 320.

Plaintiffs' arguments do not come close to showing a likelihood of success under that standard. First, a so-called "medical consensus" (Opp.16) cannot dictate constitutional law. The Alabama plaintiffs made an identical argument, *see* Appellees Br. at 40, No. 22-11707 (11th Cir. filed Aug. 10, 2022) ("Appellees' *Eknes-Tucker* Br.") (arguing that an "overwhelming medical consensus" found cross-sex medical interventions to be "'well-established, evidence-based treatments for gender dysphoria in minors'"), but that was no obstacle to the Eleventh Circuit vacating the preliminary injunction there.

In all events, Defendants' evidence showed there is not remotely a "consensus" in favor of giving cross-sex hormones to minors to treat gender dysphoria. *See* Def. Exs. 1-6; *see also L.W. by & through Williams v. Skrmetti,* 73 F.4th 408, 418 (6th Cir. 2023) (the "medical community" is not "of one mind about the use of hormone therapy for gender dysphoria"). Indeed, Dr. McNamara conceded that the studies from Sweden finding no measurable benefits from cross-sex hormones for minors (Def. Exs. 4-5) were "original clinical research that should be considered in considering all of the evidence on gender-affirming care…" Tr. 102.

Plaintiffs again argue that the multiple European studies finding no documented benefits of cross-sex hormonal interventions are irrelevant because no European country has adopted a "ban" on such treatments. Opp.16. But the plaintiffs in *Eknes-Tucker* raised an identical argument, without success. *See* Appellees'

*Eknes-Tucker* Br. at 41-42 (arguing that "'no country or state in the world categorically bans their use as Alabama has'"). Those arguments should fare no better here than they did in *Eknes-Tucker.* The Eleventh Circuit cited and relied upon the recent European research without suggesting that these highly pertinent studies somehow became irrelevant simply because those countries did not adopt a policy response identical to Alabama's. *See Eknes-Tucker*, slip op. at 36 (explaining that "'several European countries have restricted treating minors with transitioning medications due to growing concern about the medications' risks'").[3]

Plaintiffs then pivot to two arguments that SB 140 is irrational because it is *underinclusive* in that it has a continuing-care exception and does not prohibit puberty blockers as a treatment for gender dysphoria. Opp.18-20. Those arguments fail as a matter of law because courts have long held that allegations of underinclusion are no basis for finding a law *irrational*. "Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by [the legislature] imperfect, it is nevertheless the rule that … 'perfection is by no means required.'" *Vance v. Bradley*, 440 U.S. 93, 108 (1979);

---

[3] Plaintiffs cite the 2022 Turban study for the proposition that adolescents who receive cross-sex hormones were less likely to experience psychological distress or suicidal ideation, and they say "[t]he State has no contrary evidence." Opp.17. Georgia in fact offered abundant "contrary evidence" *specifically addressing the flaws of the Turban study*, which involved self-reported surveys—an exceptionally low-quality form of research. *See* Cantor Report ¶¶24, 43, 56-59, 253. "It is not possible for a survey to yield evidence that a treatment is effective." *Id.* ¶56.

*see also Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 471 n. 33 ("[M]ere underinclusiveness is not fatal to the validity of a law under the equal protection [clause]"). In short, "'the legislature must be allowed leeway to approach a perceived problem incrementally,' even if its incremental approach is significantly over-inclusive or under-inclusive." *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001).

In all events, Plaintiffs' underinclusion arguments fail on their own terms. Plaintiffs make the curious argument that Georgia's continuing-care exception— which one would expect Plaintiffs to support, given their position that cross-sex hormones are medically necessary—somehow makes the law irrational.[4] But it was hardly irrational for Georgia to include this exception, which—like countless other laws—accommodates potential reliance interests. *See Haves v. City of Miami*, 52 F.3d 918, 922 (11th Cir. 1995).

Plaintiffs' other argument on underinclusion attacks a straw man. Because SB 140 does not regulate puberty blockers as a treatment for gender dysphoria, Plaintiffs say that Georgia "intends to endorse" "prolonged use of puberty-blocking medications to treat individuals with gender dysphoria." Opp.19. But nowhere in

---

[4] While the ACLU of Georgia is arguing here that the *presence* of a continuing-care exception undermines the constitutionality of SB 140, the ACLU of Kentucky simultaneously argued that the *absence* of a continuing-care exception should doom Kentucky's law. *See Doe 1 v. Thornbury*, No. 3:23-cv-00230-DJH, ECF 77 at 1-2, (W.D. Ky. July 11, 2023). The challengers to these laws apparently cannot decide whether a continuing-care exception is a feature or a bug.

Georgia's briefing, or at the hearing, did it "endorse" anything of the sort. To quote defense counsel's closing argument:

> And Georgia, unlike the laws in Tennessee and Kentucky, did not ban puberty blockers or restrict puberty blockers. ***That is in no way an endorsement of that, but the state targeted the drug, if you look at Appendix C of WPATH, they targeted the drug [cross-sex hormones] that is most likely to result in the permanent, irreversible impact.*** So we think the law is plenty tailored.

Tr. 397 (emphasis added).

It is a gross mischaracterization of the record for Plaintiffs to state that Georgia "endorsed" prolonged use of puberty blockers, Opp.19, when counsel unequivocally disclaimed this. The only other source Plaintiffs cite for this purported "endorsement" is Defendants' sur-reply, Doc. 78 at 9-10, but the cited pages do not even mention puberty blockers, much less suggest that Georgia encourages "minors to delay puberty until they reach the age of majority," Opp.19. At most, just as counsel argued in closing, Georgia has drawn lines in SB 140 that target the drugs most likely to result in infertility for minors who may not be able to comprehend the lifelong impacts of such a momentous decision. The fact that Georgia has addressed this issue incrementally, taking it one issue at a time, makes it *more* defensible under rational basis review, not less.

At bottom, Plaintiffs ask this Court to assess "the clinical evidence" and conclude that Plaintiffs have the better view. Opp.17. But that argument is manifestly ill-suited to rational-basis review. It is not this Court's role to parse

medical studies and determine who is "right." Instead, the law "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022). And that "respect for a legislature's judgment" applies "even when the laws at issue concern matters of great social significance." *Id.* Plaintiffs have no likelihood of showing SB 140 is irrational, as *Eknes-Tucker* confirms.

## II. Plaintiffs' pretext/purpose argument was not briefed in their preliminary injunction motion or presented at the evidentiary hearing and provides no basis to maintain the injunction.

**A.** With the arguments they raised in their preliminary injunction motion and presented at the evidentiary hearing now foreclosed by Eleventh Circuit precedent, Plaintiffs "ask for a mulligan to try again under a different theory." *Pacific Bell v. LinkLine Commc'ns*, 555 U.S. 438, 446 (2009). Plaintiffs argue the preliminary injunction should be maintained because "S.B. 140 is a pretext for discrimination" and was done for a "discriminatory purpose." Opp.1-2. Indeed, the opposition brief devotes 13 pages to developing this argument. *Id.* at 1-14. That comes as a surprise to Defendants because it is the first time any of this has been raised in this case.

Plaintiffs' motion for preliminary injunction and reply—spanning a combined 40 pages—make no argument based on "pretext" or "discriminatory purpose." During the two-day evidentiary hearing, the sole mention of "pretext" was in a

question by the Court regarding whether *Dobbs* supported *Defendants* on the level of scrutiny. Tr. 369. There was no mention of animus or discriminatory purpose. And Plaintiffs' counsel did not argue in closing that the Court should enjoin SB 140 because it was a mere pretext for invidious discrimination.[5] Perhaps most telling: in the section of their opposition devoted to pretext/purpose, Plaintiffs cite eight cases from the Supreme Court or Eleventh Circuit (*Stout*, *Snider*, *Jean*, *Arlington Heights*, *Jacksonville NAACP*, *Cooper*, *Romer*, and *Windsor*). Opp.1-14. But *not a single one of those cases* is cited—much less discussed—in Plaintiffs' complaint, preliminary injunction motion, preliminary injunction reply, or at the hearing.

If Plaintiffs wish to start from square one on a new legal theory by amending their complaint or filing a new preliminary injunction motion, they may attempt to do so, and Defendants will respond as appropriate. But that is no basis to maintain a preliminary injunction sought and justified on grounds that are now foreclosed by Eleventh Circuit precedent.

**B.**     Regardless, Plaintiffs' new theory of invidious discrimination is wholly without merit. They ask this Court to apply *Village of Arlington Heights v.*

---

[5] Defendants' counsel noted in closing: "And I appreciate – I think nobody has accused anyone of ill will on any side." Tr. 400. Plaintiffs did not dispute that characterization of the proceedings or the issues. And Dr. Shumer answered "No" to whether he had any evidence that the authors of the Swedish systematic review finding no benefits from cross-sex hormones were "motivated by anti-trans bias." Tr. 58, 60; *see also id.* at 64 (Dr. Shumer conceding that U.K. report questioning benefits of cross-sex hormones was not "driven by mal intent").

*Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Opp.3. But *Arlington Heights* applies when the question is whether "[a] facially neutral action" had "a racially discriminatory purpose." *Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1006 (11th Cir. 2018). In other words, it applies to factual disputes over whether a neutral statute really had an invidious purpose.

*Arlington Heights* does not apply to the question whether SB 140 is somehow "invidious." To start, there is no dispute about what SB 140 does—it prohibits certain cross-sex medical interventions as a treatment for gender dysphoria in minors. SB 140 §§2(a), 3(a). More importantly, even if this law were specifically *targeted* at people who identify as transgender, that alone would not be enough to show that it is invidious. In *Eckness-Tucker*, the Eleventh Circuit held that even a law targeting "a course of treatment that … only transgender individuals would want to undergo would not trigger heightened scrutiny unless the regulation is a pretext for invidious discrimination against such individuals." Slip op. at 46. Thus, unlike race, the mere fact of a classification is not enough to show an invidious purpose.

The Supreme Court is crystal clear about the test that applies to determine whether a law targeting a non-suspect class was based on invidious discrimination: ***rational basis review***. In *City of Cleburne*, the Court explained that its decision not to "recognize the retarded as a quasi-suspect class does not leave them entirely unprotected from invidious discrimination." 473 U.S. at 446. To decide whether a

law was based on invidious discrimination, the Court asked whether it was "rationally related to a legitimate governmental purpose." *Id.*; *see also Romer v. Evans*, 517 U.S. 620, 634 (1996) (failure to satisfy rational basis "raise[s] the inevitable inference that the disadvantage imposed is born of animosity"). For all the reasons set forth in *Eknes-Tucker* and above, Plaintiffs cannot establish a likelihood of success under the rational-basis standard.

But even if *Arlington Heights* applied, Plaintiffs cannot satisfy that standard. They first argue that SB 140's disparate impact shows invidious discrimination, insisting that it affects "only transgender youth." Opp.4. That is wrong. Not all youth who identify as transgender choose to undergo cross-sex hormonal interventions, and some individuals who begin cross-sex hormones will stop them or desist from identifying as transgender. *See* Tr. 314-17 (Dr. Massey agreeing that "a person may consider a range of identities" and that "people may change gender identities more than once); Tr. 53 (Dr. Shumer testifying that "hormone intervention" "is something that we constantly re-evaluate" and may be "discontinue[d]" at any time); Tr. 103-04 (Dr. McNamara agreeing that "[p]eople may spend some time in a gender identity" before "they discover it does not feel comfortable and later adapt it or shift to an earlier identity").

But even if Plaintiffs had shown that kind of impact, it would not support their claim. "[A] disparate impact" on individuals who identify as transgender "alone does

not violate the Constitution." *Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 810 (11th Cir. 2022) (en banc). And "it would be rare to find a case" where disparate impact is enough to show invidious discrimination. *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021). This kind of showing would require "'a clear pattern, unexplainable on grounds other than" invidious discrimination. *Id*. Here, SB 140 reasonably advances the General Assembly's goal of proceeding with caution to protect minors experiencing gender dysphoria from interventions with irreversible impacts on their health, fertility, and bodies. That purpose is "a compelling interest," *Eknes-Tucker*, slip op. at 35, not a basis for a finding of invidious discrimination.[6]

Unable to rely on disparate impact, Plaintiffs argue that the "surrounding legislative context" shows discriminatory intent. Opp.6. Specifically, they argue that several other recent bills have "target[ed] transgender youth." *Id.* But Plaintiffs never link those other bills to any discriminatory intent. Strangely, they point to a bill that would "bar transgender youth from using multiple-occupancy restrooms that align with their gender identity." *Id.* But the Eleventh Circuit recently *upheld* a similar law, finding that it "mischaracterizes" this kind of policy "[t]o say that" it "singles

---

[6] Plaintiffs argue that the interventions prohibited by SB 140 "operate[] the same way, with the same goals, as hormone therapy to treat various conditions in non-transgender youth." Opp.4; *see also* Opp.18 (same). Defendants' motion for reconsideration already explains (at 3-4) why that contention is wrong.

out transgender students." *Adams*, 57 F.4th at 808 (upholding school policy restricting bathroom usage based on biological sex). And most of the other cited bills proposed policies similar to SB 140 to protect minors from certain medical interventions to treat gender dysphoria. But, again, the state has a "compelling interest in protecting children" from medical treatments that could have "irreversible effects." *Eknes-Tucker*, slip op. at 35-36.

Plaintiffs next turn to the "circumstances surrounding" the passage of SB 140. Opp.8-9. Most of their discussion simply insists the Legislature should have weighed the evidence differently. They insist that the General Assembly followed evidence that was "contradicted" by numerous medical professionals who "opposed the legislation." *Id.* at 9. But Plaintiffs' disagreement with the General Assembly's weighing of the evidence does not show animus, as "concerns expressed by political opponents during the legislative process are not reliable evidence of legislative intent." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 940 (11th Cir. 2023).

Nor do the three legislator statements Plaintiffs cite (Opp.10-11) support a finding that the 236-member *General Assembly* acted with invidious intent. The Eleventh Circuit has cautioned against finding discriminatory intent from statements by individual legislators. *See Greater Birmingham*, 992 F.3d at 1324-26. In fact, the Court has explained that it is "questionable" whether even "the sponsor speaks for

all legislators." *Id*. at 1324. And "[i]t stretches logic to deem a sponsor's 'intent' …
as *the* legally dispositive intent of the entire body." *Id*.

Finally, Plaintiffs argue that SB 140 is based on invidious discrimination
because the General Assembly enacted "a total ban when clear alternatives are
available." Opp.11. But that is just a rehash of Plaintiffs' narrow-tailoring argument,
which fails for all the reasons discussed above. Nothing in the Constitution deputizes
Plaintiffs to re-weigh the evidence, override the legislature's judgment, and demand
a policy they believe to be more favorable.

### III. The Court should promptly dissolve the preliminary injunction to comply with *Eknes-Tucker*, which is already binding circuit precedent.

Finally, Plaintiffs argue that this Court need not act expeditiously and, indeed,
should await the Eleventh Circuit's disposition of any forthcoming rehearing petition
in *Eknes-Tucker* before acting on the motion for reconsideration. Opp.22-25. But the
Eleventh Circuit itself provides that "*published opinions are binding precedent*," and
"[t]he issuance or non-issuance of the mandate *does not affect this result*." 11th Cir.
I.O.P 2 to FRAP 36 (emphasis added); *see also Martin v. Singletary*, 965 F.2d 944
n.1 (11th Cir. 1992) ("Although the mandate in *Johnson* has not yet issued, it is
nonetheless the law of this circuit."). In the extraordinarily unlikely event the
Eleventh Circuit reverses the panel decision in *Eknes-Tucker*, Plaintiffs can renew
their motion for preliminary injunction. But *Eknes-Tucker* remains binding circuit
precedent in the meantime.

## CONCLUSION

This Court should grant the motion for reconsideration, vacate its prior order

(Dkt. No. 106), and deny Plaintiffs' motion for preliminary injunction.

Respectfully submitted this 1st day of September, 2023.

Christopher M. Carr
  *Attorney General*
  Georgia Bar No. 112505
Stephen J. Petrany
  *Solicitor General*
  Georgia Bar No. 718981
Ross W. Bergethon
  *Principal Deputy Solicitor General*
  Georgia Bar No. 054321
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
404-458-3408
spetrany@law.ga.gov

*/s/ Jeffrey M. Harris*
Jeffrey M. Harris*
Cameron T. Norris*
Tiffany H. Bates*
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
cam@consovoymccarthy.com
tiffany@consovoymccarthy.com

Patrick Strawbridge*
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

*\*pro hac vice*

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I certify that, on September 1, 2023, I electronically filed the foregoing with the Court and served it on opposing counsel through the Court's CM/ECF system. All counsel of record are registered ECF users.

*/s/ Jeffrey M. Harris*

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief conforms to the requirements of L.R. 5.1C. The brief is prepared in 14 point Times New Roman font.

*/s/ Jeffrey M. Harris*